## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL B. LEVIN, SANTOS J. ROSARIO
and FELICIA ROSARIO,

Plaintiffs,

v.

SARAH LAWRENCE COLLEGE, LEE
CHEN, GUMLEY-HAFT LLC, and SCOTT
MULLER,

Defendants.

Civil Action No.: 1:23-cv-10236

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT, SARAH LAWRENCE COLLEGE'S, <u>MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

JUSTICE LAW COLLABORATIVE, LLC
Kelly A. Guagenty, Esq. (MA BBO 658872)
Paula S. Bliss, Esq.  (MA BBO 652361)
210 Washington Street
North Easton, MA 02356
Tel: (508) 230-2700
paula@justicelc.com
kelly@justicelc.com

*Attorneys for the Plaintiffs*
*(admitted Pro Hac Vice)*

CHAFFIN LUHANA LLP
Nicholas R. Farnolo, Esq.
Roopal P. Luhana, Esq.
600 Third Ave., 12th Floor
New York, New York 10016
Tel: (888) 480-1123
luhana@chaffinluhana.com

*Attorneys for the Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..................................................................................................iii

PRELIMINARY STATEMENT............................................................................................1

STATEMENT OF FACTS.....................................................................................................2

    *Sarah Lawrence College*.............................................................................................2

    *The Manhattan Condominium*.................................................................................4

    *Pinehurst, North Carolina*.......................................................................................4

    *Piscataway, New Jersey*...........................................................................................4

    *Evidence Documenting that Sarah Lawrence Knew or Should Have Known of Ray's*
    *Presence on their Campus*.......................................................................................5

APPLICABLE STANDARD ON A MOTION TO DISMISS................................................6

ARGUMENT...........................................................................................................................7

    I.     THE PLAINTIFFS' CLAIMS ARE NOT TIME BARRED..................................7

          A.    *The ASA Applies to this Case Because Sarah Lawrence Enabled*
                 *Lawrence Ray's Misdeeds and/or was Negligent in their Response to*
                 *Lawrence Ray's Misdeeds*............................................................................7

          B.    *The ASA Applies to this Case Because Lawrence Ray's Misdeeds*
                 *Constitute Sexual Offenses as Defined by New York Penal Law*.................9

          C.    *Plaintiffs' Claims Under the TVPRA are Timely and the ASA Revives any*
                 *Potentially Time-Barred TVPRA Claims*.....................................................11

    II.    THE PLAINTIFFS' COMMON LAW NEGLIGENCE CLAIMS WERE
          PROPERLY PLED................................................................................................13

          A.    *Sarah Lawrence Owed a Duty to these Plaintiffs Because They Alone Could*
                 *Regulate and Restrict Ray's Presence on Campus*......................................13

          B.    *Living in Dorms is More than a Landlord-Tenant Arrangement*................14

    III.   THE PLAINTIFFS' NEGLIGENT INFLICTION OF EMOTIONAL
          DISTRESS CLAIMS WERE PROPERLY PLED.................................................15

A.      *Sarah Lawrence Held a Special Relationship with these* Plaintiffs............15

    1.      *As a Landlord, Sarah Lawrence Had a Duty to Protect Students from Foreseeable Danger*................................................15

        *Ray's Criminal Conduct was Foreseeable*.........................16

        *Sarah Lawrence's Negligent Conduct was a Proximate Cause of the Plaintiffs' Injuries*...........................................18

B.      *The Plaintiff's NIED Claims are Separate and Distinct from their Negligence Claims*......................................................................18

IV.     THE PLAINTIFFS' TVPRA CLAIMS WERE PROPERLY PLED.....................20

A.      *Sarah Lawrence Knowingly Benefited*.........................................20

B.      *Sarah Lawrence Participated in a Venture*..................................21

C.      *Sarah Lawrence Knew or Should Have Known of the TVPRA Violation*.................................................................22

V.      LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY....................23

CONCLUSION AND REQUEST FOR A HEARING………………………………………...23

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89 (E.D.N.Y. 2011)...............15, 16

*Allaire Corp. v. Okumus*, 433 F.3d 248 (2d Cir. 2006)....................................................7

*Arista Records LLC v. Doe*, 604 F.3d 110 (2d Cir. 2010)...............................................6

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)..................................................................6, 7

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)........................................................6

*Brown v. New York Design Ctr., Inc.*, 215 A.D.3d 1 (1st Dept 2023)............................................19

*Brown v. University of Rochester*, 216 A.D.3d 1328 (3d Dep't. 2023).....................................9, 17

*Burroughs v. Mitchell,* 325 F. Supp. 3d 249 (N.D.N.Y. 2018)................................................15, 16

*Carroll v. Trump*, 650 F.Supp. 213 (S.D.N.Y. 2023)........................................................9

*City Store Gates Mfg. Corp. v. Empire Rolling Steel Gates Corp.*, 113 A.D.3d 718 (2014)..........11

*Cruz v.* Maypa, 773 F.3d 138 (4th Cir. 2014)..............................................................11

*Curtis v. Gates Cmty. Chapel of Rochester, Inc.*, 2023 WL 1070650
    (W.D.N.Y. Jan. 27, 2023)........................................................................18, 19

*Doe v. Doe*, No. 952013/2023, 2024 WL 928103 (Sup.Ct. N.Y. Cty Mar. 1, 2024)......................8

*Eiseman v. State*, 70 N.Y.2d 175 (1987)...................................................................14

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014)........................................12

*Foman v. Davis,* 371 U.S. 178 (1962).....................................................................2, 23

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011)............................................................12

*Hores v. Sargent*, 230 AD2d 712 (2nd Dept. 1996)........................................................8, 14

*Lama v.* Malik, 192 F.Supp.3d 313 (E.D.N.Y. 2016).....................................................11

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019).........................20

*Marrero v. Roman Cath. Archdiocese of N.Y.*, No. 70329/2021E, 2023 N.Y. Misc.
    LEXIS 25241 (Sup.Ct. Brox Cty. September 25, 2023) *(opinion attached)*.................19, 20

*Morrison v. Shalach*, 67 Misc. 3d 451 (Sup.Ct. Westchester Cty 2020)..........................................8

*Moskowitz v. Masliansky*, 155 N.Y.S.3d 414 (2d Dep't 2021)........................................................13

*Paguirigan v. Prompt Nursing Emp't Agency LLC,* 286 F. Supp. 3d 430 (E.D.N.Y. 2017)..........21

*Pasquaretto v. Long Is. Univ.*, 106 A.D.3d 794 (2d Dep't 2013)....................................................14

*Ramirez v. Genovese*, No. 26231/08, 2012 NY Slip Op 33607(U) 2012 N.Y. Misc.
   LEXIS 6568, *8 (Sup. Ct. Westchester Cty. 2012)(*opinion attached*)........................16, 17

*Reed v. Chisolm*, No. 711440/2023, 2023 N.Y. Misc. LEXIS 21889
   (Sup.Ct. Queens Cty. Aug. 15, 2023) (*opinion attached*)......................................................7

*Rothbard v. Colgate Univ.*, 235 A.D.2d 675 (3d Dep't 1997).........................................................14

*Salahuddin v. Cuomo,* 861 F.2d 40 (2d Cir. 1988)..........................................................................7

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008)..........................................12

*United States of America v. Ray,*. 20 Cr. 110 (LJL) (S.D.N.Y 2022).......................................*passim*

*Watson v. United States*, 865 F.3d 123 (2d Cir. 2017)....................................................................12

*Weitz v. State*, 182 Misc. 2d 320 (Ct. Cl. N.Y. 1999)......................................................................16

**Statutes:**

18 U.S.C. §1591...............................................................................................................................20, 21

18 U.S.C. §1594...............................................................................................................................20, 21

18 U.S.C. § 1595...........................................................................................................................*passim*

42 U.S.C. § 1983.................................................................................................................................15

C.P.L.R. § 214-j...........................................................................................................................*passim*

N.Y. Penal Law §121.12...................................................................................................................10

N.Y. Penal Law §130.52..................................................................................................................9

N.Y. Penal Law §130.90...................................................................................................................10

N.Y. Penal Law §130.91...................................................................................................................10

**Rules:**

Fed. R. Civ. P. 8(a)(2)............................................................................................................6

Fed. R. Civ. P. 12(b)(6).........................................................................................................6

## **PRELIMINARY STATEMENT**

This case arises out of grooming, manipulation, sexual abuse, physical abuse, and emotional abuse suffered by the plaintiffs, Daniel Levin, Santos Rosario, and Felicia Rosario, as a result of the negligent and wrongful conduct on the part of the Defendants, Sarah Lawrence College, Lee Chen, Gumley-Haft, LLC and Scott Muller. This Opposition will focus solely on the claims asserted against Defendant, Sarah Lawrence College (hereinafter "Sarah Lawrence").

In its Motion to Dismiss, Sarah Lawrence's first argument (i.e., the ASA does not apply to the plaintiffs' claims against Sarah Lawrence) is not supported by the facts. Sarah Lawrence contends that it did not enable Lawrence Ray to commit acts of manipulation, grooming, and sexual abuse during the year he was present on campus, and therefore the ASA does not apply. By making said argument, Sarah Lawrence attempts to parse out arbitrary limitations on categories of duty, but Sarah Lawrence provides no basis for this carving. Moreover, there is no language within the text of the ASA that gives credence to Sarah Lawrence's position. Sarah Lawrence further argues that the plaintiffs will be unable to plausibly allege a predicate sex offense to trigger the ASA, and therefore the ASA should not apply. As the facts demonstrate, a multitude of horrific acts constituting Article 130 sex offenses were perpetrated due to Sarah Lawrence's negligent conduct, giving rise to the application of the ASA. Sarah Lawrence goes on to argue that the plaintiffs' Trafficking Victim Protection Reauthorization Act ("TVPRA") 18 U.S.C. §1595 claims are not revived by the ASA. As discussed in detail below, a plain reading of the ASA statute says otherwise.

Sarah Lawrence's second argument (i.e., the plaintiffs fail to state a claim for common law negligence), is unpersuasive for several reasons. First, Sarah Lawrence owed a duty to these plaintiffs because it knew or should have known of Ray's presence on campus. Moreover, Sarah Lawrence took affirmative steps to supervise and control activities and interactions among

students, and instead of taking reasonable steps to prevent injury "during the [school-sponsored] activity" of living in Slonim Woods 9, Sarah Lawrence allowed a violent stranger and non-student to reside on campus while it collected tuition and rent for the dorm rooms.

With respect to Sarah Lawrence's third argument (i.e., the plaintiffs' NIED claim is meritless), this argument fails for three reasons. First, as a landlord, Sarah Lawrence had a duty to protect students from foreseeable danger. Second, Sarah Lawrence created a special duty by encouraging its students to participate in activity. Third, the Plaintiffs' NIED claims are separate and distinct from their negligence claims, and therefore should not be dismissed as being "duplicative", as suggested by Sarah Lawrence.

Finally, with respect to Sarah Lawrence's fourth argument (i.e., the plaintiffs have failed to plead a viable TVPRA claim), the facts will demonstrate that Sarah Lawrence benefited from its participation in a venture, while it knew or should have known Ray's acts violated the TVPRA.

Wherefore, the plaintiffs respectfully request that this Honorable Court deny Sarah Lawrence's Motion to Dismiss. In the alternative, if the court sees fit to dismiss any or all of the plaintiffs' claims, the plaintiffs request that they be dismissed with leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (holding that Fed. R. Civ. P. 15(a) requires that leave to amend be freely given).

## **STATEMENT OF FACTS**
### *Sarah Lawrence College*

During the fall of 2010, several students from Sarah Lawrence College, including Plaintiffs Daniel Levin and Santos Rosario, were housed together in an on-campus townhouse style dormitory known as Slonim Woods 9. Dkt. 1 at ¶ 19 ("Complaint"). Slonim Woods 9 is located on Kimball Avenue. Dkt. 1 at ¶ 20. Kimball Avenue is a busy, main road of the campus, regularly traveled by students and staff. Dkt. 1 at ¶ 28. Signage on campus indicates that Kimball

Avenue is under "24 Hour Video Recording". Dkt. 1 at ¶ 29. There are several campus buildings on/around Kimball Avenue, including the Kober building, the Campus Operatives building, and numerous parking lots for staff and students. Dkt. 1 at ¶ 30.

Soon after moving into Slonim Woods 9, Daniel Levin and Santos Rosario learned that Talia Ray's father, Lawrence Ray, had recently been released from prison. Dkt. 1 at ¶ 24. (Talia Ray was one of the roommates residing in the dormitory.) After being released from prison, Lawrence Ray moved into Slonim Woods 9. Dkt. 1 at ¶ 25. When Ray first moved into the dormitory, the dormmates viewed him as a father figure. He kept the dormitory clean, cooked healthy meals, and offered advice on romantic relationships, friendships, and family. Ray sat with the dormmates for hours at a time, sometimes overnight into the morning hours. Unbeknownst to Daniel Levin, Santos Rosario, and many of the other dormmates, this was Ray's way of immersing himself into their lives for the ultimate purpose of exploiting them for human trafficking.

Several events transpired throughout the school year that were obvious indicators that Ray's conspiracy to ultimately traffic these young students all started at Slonim Woods 9. Ray's behavior in the dorm resulted in a sexually exploitative environment for the students. For example, on more than one occasion, Ray sat with Santos for hours at a time and encouraged Santos to talk about his father's infidelity and affairs. *United States of America v. Ray*, S.D.N.Y. 20 Cr. 110 (LJL) at p.1834, lines 165-166 (March 29, 2022). Ray also directed Daniel and Santos on their dating and sex lives. *United States of America v. Ray*, 20 Cr. 110 (LJL) at p.244, lines 1-10 (S.D.N.Y. March 11, 2022).

3

### *The Manhattan Condominium*

At the end of the 2010-2011 school year, after a year of manipulation, coercion, and grooming, Ray moved out of Slonim Woods 9 and into a condominium in Manhattan. Dkt. 1 at ¶ 53. Shortly thereafter, Daniel Levin and Santos Rosario moved into the condominium with Ray. In or around 2012, Felicia Rosario moved into the condominium unit. (Felicia Rosario is the sister of Santos Rosario). Dkt. 1 at ¶ 76. At the condominium, Ray used, sexual abuse, physical abuse, verbal abuse, sleep deprivation, and food deprivation as a weapon to control the plaintiffs for the purpose of ultimately exploiting them for human trafficking.

### *Pinehurst, North Carolina*

In or around the summer of 2013, Ray brought Felicia Rosario, and several other students to a home in Pinehurst, North Carolina that was owned by Ray's stepfather. Dkt. 1 at ¶ 83. Santos Rosario remained in the Manhattan condominium. In North Carolina, Felicia was subjected to heinous acts of physical abuse, labor trafficking, food deprivation, and sleep deprivation. Dkt. 1 at ¶ 84. Felicia Rosario's mental health deteriorated to where she was nearly unrecognizable. Ray brought Felicia Rosario and the others back to the Manhattan condominium towards the end of 2013. Santos Rosario was still in the condominium. After suffering three years of sexual abuse, physical abuse and emotional abuse at the hands of Ray, Santos Rosario escaped.

### *Piscataway, New Jersey*

In or around 2015, Ray brought Felicia Rosario and I.P. to a home in Piscataway, New Jersey that was owned by Defendant, Scott Muller. Dkt. 1 at ¶ 88. At that home, Felicia Rosario was subject to years of abuse and human trafficking. Dkt. 1 at ¶ 93. Finally, in February 2020, *nearly ten years after Ray first entered Sarah Lawrence property,* the New York Police, along with the Federal Bureau of Investigations, invaded the Piscataway, NJ property. Dkt. 1 at ¶ 97.

During the raid, Ray was arrested for human trafficking, exploitation, sexual abuse, money laundering, amongst other charges. Dkt. 1 at ¶ 98. On January 20, 2023, Ray was sentenced to sixty years in prison for racketeering, conspiracy, violent crime in aid of racketeering, extortion, sex trafficking, forced labor, tax evasion, and money laundering offenses. Dkt. 1 at ¶ 99.

<em>Evidence Documenting that Sarah Lawrence Knew or Should<br>Have Known of Ray's Presence on Campus</em>

Perhaps the most shocking is the fact that all of this could have been stopped back in 2010, when Ray first appeared at Sarah Lawrence College. Lawrence Ray resided at Slonim Woods 9 for nearly an entire school year without being removed by school officials or staff. Slonim Woods 9 is where Ray first committed acts of manipulation, coercion and grooming upon these plaintiffs to further his ultimate intention, which was to coerce Daniel Levin, Santos Rosario (and later Felicia Rosario) into human trafficking.

Lawrence Ray made minimal effort to conceal his existence at Sarah Lawrence. Dkt. 1 at ¶ 32. He freely entered and exited the grounds, without being noticed or approached by Sarah Lawrence staff or security. Dkt. 1 at ¶ 33. Ray often drove to and from the grocery store, where he would pass Sarah Lawrence cameras, security personnel, and staff. Dkt. 1 at ¶ 34.

During the time Ray was living in the dormitory, the dormmates had a cat living there. Dkt. 1 at ¶ 36. Several times, the cat escaped. Dkt. 1 at ¶ 37. On those occasions when the cat escaped, Ray openly searched for it by walking around campus, where he was easily visible to staff and security. Dkt. 1 at ¶ 38. Moreover, one day while Ray was living in the dormitory, a fire alarm activated while Ray was cooking. Dkt. 1 at ¶ 39. When Sarah Lawrence staff and fire department arrived, Ray was the only individual in the dorm. Dkt. 1 at ¶ 40. No one from Sarah Lawrence asked Ray why he was alone in the dorm cooking. Dkt. 1 at ¶ 41. Ray was not monitored after the fire incident to ensure he was not residing in the dormitory. Dkt. 1 at ¶ 42.

Moreover, in June 2013, Daniel Levin put Sarah Lawrence on notice of Ray when he emailed Angela Moger, a professor at Sarah Lawrence who he trusted. Dkt. 1 at ¶ 123. In that email, Daniel disclosed that he and his peers were being abused and manipulated by Ray. Upon information and belief, Professor Moger never responded to that email, nor did she take any affirmative steps to investigate, despite her duty to do so. Dkt. 1 at ¶ 125. As a result of Professor Moger's breach of duty, Felicia Rosario suffered another six years of trauma at the hands of Ray. Dkt. 1 at ¶ 126.

## APPLICABLE STANDARD ON A MOTION TO DISMISS

A motion under Fed. R. Civ. P. 12(b)(6) tests the formal sufficiency of a claim for relief. If the complaint provides fair notice of the plaintiff's claims and the facts alleged sufficiently show a plausible claim for relief, the motion must be denied. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 662 (*citing Twombly*, 550 U.S. at 556). Ultimately, a complaint need only set forth "a short and plain statement . . . showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).

The Second Circuit has rejected the contention that "*Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010). Further, the Second Circuit has held that "[t]he *Twombly* plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged "upon information and belief" where the facts are peculiarly within the possession and

control of the defendant ... or where the belief is based on factual information that makes the inference of culpability plausible.'" *Id.* at 120 (*citing Boykin v. KeyCorp.*, 521 F.3d 202, 205 (2d Cir. 2008); *Iqbal*, 566 U.S. at 662.)

Finally, the Court must accept as true all well-pleaded factual allegations, and "draw … all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks omitted). Dismissal is reserved only "for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988).

<u>**ARGUMENT**</u>

**I.      THE PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED**

**A.      The ASA Applies to this Case Because Sarah Lawrence College Enabled Lawrence Ray's Misdeeds and/or was Negligent in their Response to Lawrence Ray's Misdeeds.**

Sarah Lawrence contends that the ASA does not apply because Sarah Lawrence did not enable Lawrence Ray to commit acts of manipulation, grooming, and sexual abuse while living at Slonim Woods 9. Sarah Lawrence's position here is baseless, as the facts demonstrate that Sarah Lawrence staff had actual and constructive notice of Ray's presence on campus as well as the harm he was causing students.

"The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the Legislature." *Reed v. Chisolm*, No. 711440/2023, 2023 N.Y. Misc. LEXIS 21889, at *3 (Sup.Ct. Queens Cty. Aug. 15, 2023) (*citing Anonymous v Castagnola*, 210 AD3d 940 (App. Div. 2d Dep't 2022), *inner citations omitted*) *aff'd Reed v. Chisolm*, 2024 WL 928103 (App. Div. 2d Dep't 2024). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Id.* at *3-*4 (*quoting Majewski v Broadalbin-Perth Cent. Sch. Dist.,* 91

NY2d 577, 696 NE2d 978 (1998)). The Adult Survivors Act, codified in C.P.L.R. §214-j, applies to:

> "… every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense …"

Sarah Lawrence attempts to parse out arbitrary limitations on categories of duty which can be argued in the "intentional or negligent acts or omissions" for which the ASA applies, but they provide no basis for this carving. There is no language within the statute that would suggest this proposition. Rather, "under CPLR 214-g's plain language, the term "every" applies to all "civil claims or cause of action" that would have been properly brought in New York in the first instance." *Doe v. Doe*, No. 952013/2023, 2024 WL 928103, *1 (Sup.Ct. N.Y. Cty Mar. 1, 2024) (*citing Samuel W. v. United Synagogue of Conservative Judaism*, 219 AD3d 421, 422 (1st Dept 2023)).

Sarah Lawrence further provides no footing within legislative intent to justify their recommended limitations on the theory of duty for the ASA to apply. Sarah Lawrence instead crudely attempts to hinge their argument on a single dictionary definition of the word "enable." In fact, there is an entire branch of law dedicated to delineating who can be said to "enable" or be held responsible for wrongful conduct which is established in the common law identifying duty. New York Courts have held that landlords properly have a duty to protect tenants from intruders and that colleges have a duty to protect students from threats in activities which they have taken affirmative steps to supervise and control. *See e.g. Morrison v. Shalach*, 67 Misc. 3d 451, 455 (Sup.Ct. Westchester Cty 2020); *Hores v. Sargent*, 230 AD2d 712, 712 (2nd Dept. 1996).

The text and legislative history clearly show that the purpose of the ASA is to decrease the ticking clock on how long survivors of sexual abuse have to come forward if they want to seek

civil remedies using the existing causes of action and related legal theories. The New York Legislature passed the ASA in order combat a long-recognized problem wherein individuals and institutions who perpetrate and enable sexual abuse can do so without justice or accountability because of a "culture of silence." *Carroll v. Trump*, 650 F.Supp. 213 (S.D.N.Y. 2023). A college's silence while a dangerous man resided with students in a dormitory for a full year for the purpose of committing sexual abuse and ultimately perpetrate a venture of sex and labor trafficking is precisely the "culture of silence" the ASA was passed to change.

The applicability of the ASA here is exemplified by similar cases proceeding under New York's Child Victims Act (CVA), a law that is not only highly analogous to the ASA, but that legislators used as their model when enacting it. *See* 2022 Reg. Sess. N.Y. Assembly Bill A.66A (May 23, 2022) at 35, 46; 2022 Reg. Sess. N.Y. Senate Bill S.66A (April 26, 2022) at 2708. *See Brown v. U. of Rochester*, 216 A.D.3d 1328, 1331-32 (3d Dep't. 2023).

**B.     The ASA Applies to this Case Because Lawrence Ray's Misdeeds Constitute Sexual Offenses as Defined by New York Penal Law**

The revival of civil causes of action under the ASA is triggered by "conduct which constitutes a sexual offense as defined in article one hundred thirty of the penal law." N.Y. C.P.L.R. §214-j. Here, a multitude of horrific acts constituting Article 130 sex offenses were perpetrated as a result of Sarah Lawrence's negligent acts and omissions.

As a result of Sarah Lawrence's intentional and negligent acts and omissions and participation in a trafficking venture, Daniel Levin and Santos Rosario were the victims of forcible touching as defined in PL, §130.52. For example, on one occasion, Ray intentionally, and for no legitimate purpose, forcibly wrapped a loop of aluminum foil and saran wrap around Daniel Levin's testicles and twisted hard for the purpose of degrading and abusing him. *United States of America v. Ray*, 20 Cr. 110 (LJL) at p.264, lines 4-7 (S.D.N.Y. March 11, 2022). On

many occasions, Ray choked Santos and Daniel until they lost consciousness, and would sometimes hold a knife to their genitals while threatening to cut them off. *United States of America v. Ray*, 20 Cr. 110 (LJL) at pp. 263, 316, 317 (S.D.N.Y. March 11, 2022). This contact with Rosario and Levin's genitals was for no legitimate purpose other than to degrade and abuse. Felicia Rosario was also subjected to forcibly touching by Ray. On at least one occasion, Ray aggressively grabbed Felicia, picked her up, and threw her forcibly on the floor.

As a result of Sarah Lawrence's intentional and negligent acts and omissions and participation in a trafficking venture, Daniel Levin, Santos Rosario, and Felicia Rosario were the victims of multiple sexually motivated felonies as defined by N.Y. Penal Law §130.91. First, due to Sarah Lawrence's abject failure to protect the plaintiffs from dangers in the school's programming, dangers posed by an intruder, as well as its participation in a trafficking venture, Ray committed promotion of prostitution in the second degree as defined in section 230.20. Ray advanced prostitution by compelling Felicia Rosario to engage in prostitution by intimidation and force. Felicia Rosario was forced to engage in sex acts with men for the benefit of Ray's trafficking enterprise as well as his own sexual gratification. Dkt. 1 at ¶ 86. Second, as a result of Sarah Lawrence's intentional and negligent acts and omissions, Santos Rosario and Daniel Levin were victims of a sexually motivated felony when they were subjected to strangulation in the second degree as defined in N.Y. Penal Law §121.12. *United States of America v. Ray*, 20 Cr. 110 (LJL) at pp. 263, 316, 317 (S.D.N.Y. March 11, 2022). These instances of strangulation were committed to create and promote a prostitution and sex trafficking venture and for Ray's personal sexual gratification.

Moreover, all three plaintiffs were victims of facilitating a sex offense with a controlled substance as defined in N.Y. Penal Law §130.90. The facts will demonstrate that Ray coerced the

plaintiffs into taking Adderall to ensure they were sleep deprived and could easily be controlled. Ray did this for the purpose of controlling them to promote prostitution, create a sex trafficking venture, and for his own sexual gratification.

### C.   Plaintiffs' Claims Under the TVPRA are Timely and the ASA Revives any Potentially Time-Barred TVPRA Claims

Sarah Lawrence argues that the plaintiffs' TVPRA claims arising prior to November 21, 2013 are untimely because the ten-year limitations period expired prior to plaintiffs filing the Complaint on November 21, 2023. Sarah Lawrence bases this argument on a false conclusory assertion that the plaintiffs' claims accrued at the latest in May 2011. Dkt 17-1 at 13. (Defendant's Memorandum in Support) Plaintiffs' claims under the TVPRA do not accrue until the victims have escaped from his or her traffickers and are free to seek legal redress. *See Cruz v.* Maypa, 773 F.3d 138, 146 (4th Cir. 2014) (taking facts "in light most favorable to [plaintiff], this virtual imprisonment prevented her from seeking legal redress until at least the date of her escape"); *Lama v.* Malik, 192 F.Supp.3d 313, 321 (E.D.N.Y. 2016)("claim accrued when she left Malik's home in 2008"). Construing the complaint in the light most favorable to plaintiffs, they did not escape from Mr. Ray's abuse and the cult brainwashing until well after November 2013.

In addition, the plaintiffs' TVPRA claims should be equitably tolled. The ten-year limitations period under the TVPRA begins to run when "the cause of action arose." 18 U.S.C. §1595. For typical tort claims, a cause of action accrues when the wrongful conduct occurs (or when the last element of the cause of actions occurs). *City Store Gates Mfg. Corp. v. Empire Rolling Steel Gates Corp.*, 113 A.D.3d 718, 718 (2nd Dep't. 2014) ("With respect to tort claims, accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in the complaint ...." (internal quotation marks and citations omitted)). The limitations period may be tolled or extended under principles of equitable tolling if the party

seeking tolling establishes "two elements: (1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Watson v. United States*, 865 F.3d 123, 132 (2d Cir. 2017) (internal quotation marks omitted). To satisfy the diligence requirement in the first element, a plaintiff must "demonstrate that [she] did not discover [her human trafficking] cause of action -- and *could not* have discovered it with due diligence -- until less than ten years before bringing suit." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 at 800 (2d Cir. 2014) (affirming dismissal where "plaintiffs were aware of all the necessary elements of a cause of action for human trafficking long before" the event they allege triggered knowledge of their claim). The "extraordinary circumstance" in the second element refers "to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011).

A claim may be dismissed based on the statute of limitations only if it is clear on the face of the complaint that the claim is untimely as a matter of law. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008), 547 F.3d at 425. Given the possibility of equitable tolling, a TVPRA claim is subject to dismissal based on a statute of limitations defense only if the complaint makes clear that the alleged wrongful conduct arose more than ten years before the claim was filed, and that the plaintiff has not been pursuing her rights diligently, and that no extraordinary circumstance stood in her way. *See Ellul*, 774 F.3d at 800.

At the pleading stage, however, dismissal of the § 1595 claim is not warranted because it is not clear from the face of the Complaint that equitable tolling does not apply. Ray was enabled by Sarah Lawrence to devise a scheme, plan, and pattern to manipulate the plaintiffs into a perpetual state of fear and enslavement. Dkt. 1 at ¶¶ 44, 46, 48, 59, 108, 129, 133, 147, 165, 194. That is not the case here. In fact, when Sarah Lawrence became aware of the plaintiffs' suffering

and the danger they were in, Sarah Lawrence negligently ignored these signs and cries for help. Dkt at ¶¶ 26, 59, 121, 122, 130, 136. Through their negligence, Sarah Lawrence enabled Ray to isolate and mistreat the plaintiffs. Ray tortured, manipulated, and brainwashed the plaintiffs so horrifically that they were unable to escape let alone seek help or pursue redress. The plaintiffs were victims of coercion, manipulation, threats, physical and sexual assault, and monitoring for years. While under the control of Ray, the plaintiffs had no access to legal advice, no significant freedom of movement, and they were primarily contained wherever Ray was staying, isolated from others, socially and otherwise. They were not able to freely communicate with family and not able to leave if they wanted to. The circumstances surrounding their years living with Ray were sufficiently "extraordinary" to warrant equitable tolling.

Plaintiffs further request leave to amend the complaint to supplement information related to accrual of the plaintiffs' TVPRA claims.

## II.   THE PLAINTIFFS' COMMON LAW NEGLIGENCE CLAIMS WERE PROPERLY PLED

Plaintiffs have adequately pled common law negligence under New York law, which requires (1) the existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by the breach.

### A.   Sarah Lawrence Owed a Duty to these Plaintiff Because They Alone Could Regulate and Restrict Ray's Presence on Campus

Ray was violating Sarah Lawrence's own regulations by living on campus in a dorm room, and Sarah Lawrence alone had the ability and the authority to regulate Ray's presence there. "[A] duty of care may arise where a special relationship exists between the defendant and the plaintiff that requires the defendant to protect the plaintiff from the conduct of others." *Moskowitz v. Masliansky*, 155 N.Y.S.3d 414, 417 (2d Dep't 2021). Sarah Lawrence claims that New York courts have created a blanket immunity for claims against it, and that colleges have no

liability for the conduct of others on campus because courts have agreed that colleges are not to stand *in loco parentis*.[1] *See, e.g.*, *Eiseman v. State*, 70 N.Y.2d 175, 189-90 (1987). Although Sarah Lawrence may have had no blanket duty to widely shield all students from the dangerous activities of others, or even to shield the Slonim Woods 9 students from their own dangerous activity toward each other (*Rothbard v. Colgate Univ.*, 235 A.D.2d 675, 676 (3d Dep't 1997)), the college did have a duty to regulate outside individuals reported to them as committing offenses and crimes on their property and against their students and any other foreseeable victims.

**B.      Living in Dorms is More than a Landlord-Tenant Arrangement**

Sarah Lawrence encouraged students to live on campus and exercised control over the dorms. As pointed out by Sarah Lawrence, a "school-controlled activity" exception was recognized in *Hores v. Sargent*, 230 A.D.2d 712 (2d Dep't 1996). Once Sarah Lawrence monitored the dorms, staffed them and took on responsibility for student safety, it assumed a duty for the "school-controlled activity" of dorm life on its campus. In a dissimilar case *Pasquaretto v. Long Is. Univ.*, 106 A.D.3d 794, 796 (2d Dep't 2013), the university had not taken on a duty to encourage or support its student body joining a fraternity through initiation. In that case, the university was not alleged to have profited from the fraternity, and the university had taken no affirmative steps to provide safety and security to those students involved in the initiation activities. In our case, however, Sarah Lawrence had taken steps to provide security, was benefiting financially from their stay, and had control over who and what was allowed into Slonim Woods 9.

"Dorm life" at Sarah Lawrence is a lucrative venture, and virtually all students at colleges such as Sarah Lawrence are encouraged to participate. The specific duty to plaintiffs harmed by

Lawrence Ray arose not just in "dorm life" but when Sarah Lawrence was put on notice of Ray's activities and crimes on campus. Plaintiffs were injured by Ray because he had access to students at Sarah Lawrence.

## III.   THE PLAINTIFFS' NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS WERE PROPERLY PLED

In their Motion to Dismiss, Sarah Lawrence argues that the plaintiffs' NIED claims fail for two reasons, namely (1) Sarah Lawrence did not owe a "special duty" to the plaintiffs; and (2) the plaintiffs' NIED claims are duplicative of their negligence claims. For the following reasons, all three of Sarah Lawrence's arguments fail.

### A.   Sarah Lawrence Held a Special Relationship with these Plaintiffs

#### 1.   As a landlord, Sarah Lawrence had a duty to protect students from foreseeable danger.

In their Motion to Dismiss, Sarah Lawrence argues that the plaintiffs' NIED claims must be dismissed because no "special duty" existed between the plaintiffs and Sarah Lawrence. In support of their argument, Sarah Lawrence relies on two cases, namely *Burroughs v. Mitchell,* 325 F. Supp. 3d 249 (N.D.N.Y. 2018) and *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011). However, the facts and circumstances outlined in both *Burroughs* and *Alexander* are clearly distinguishable from our case at bar, and therefore should not be considered as binding upon this court.

In *Burroughs*, the plaintiff filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 asserting claims arising out of his confinement while in the custody of the New York Department of Corrections and Community Supervision. The court dismissed the NIED claims in that case because the plaintiff had "failed to allege any special duty owed to him by defendants aside from the general duty owed to all inmates not to use excessive force". *Burroughs* at 285.

In *Alexander*, the plaintiff was a teacher who sued a school district alleging that she was sexually harassed by a principal at her school. In *Alexander*, the court dismissed the plaintiff's NIED claim on the grounds that the defendant did not owe a "special duty" to the plaintiff because an employer had an obligation to treat all employees in the same matter.

Neither *Burroughs* nor *Alexander* bear any resemblance to our case at bar. Our case involves a college's duty to protect its students from harm, particularly when said college is on direct and constructive notice of said harm. Wherefore, we direct the court to *Weitz v. State*, 182 Misc. 2d 320 (Ct. Cl. N.Y. 1999). In *Weitz*, the plaintiff filed suit to recover for personal injuries he sustained as a result of being attacked while a student at the State University of New York at Albany.

The *Weitz* court determined that a college (as a landlord) can be held liable for personal injuries suffered by a student (tenant), *if* the plaintiff can prove two elements: (1) the underlying criminal conduct was foreseeable; and (2) the college's negligent conduct was a proximate cause of the plaintiff's injury. *Id.* at 328. Applying that test to our case at bar, this Honorable Court should rule that Sarah Lawrence held a special duty to the plaintiffs in the instant case.

### *Ray's Criminal Conduct was Foreseeable:*

First, the criminal conduct committed by Ray was foreseeable. On numerous occasions, Ray was reported to Sarah Lawrence professors and staff and Sarah Lawrence did nothing about it. Sexual and physical abuse occurred on Sarah Lawrence property. A landowner has a duty to protect persons from a foreseeable risk of harm from criminal activities of third persons on the premises." *Ramirez v. Genovese*, No. 26231/08, 2012 NY Slip Op 33607(U) 2012 N.Y. Misc. LEXIS 6568, *8 (Sup. Ct. Westchester Cty. 2012) (*citing Camacho v. Edelman*, 176 A.D.2d 453, 454) *aff'd Ramirez v. Genovese* 117 AD3d 930 (App. Div. 2d Dep't 2014). In this case, Sarah

Lawrence had actual knowledge that a dangerous man who was not enrolled in the school was living in their dormitory and that students were experiencing significant harm.

Moreover, around the time Ray was moving the young students out of New York (in June 2013), Daniel wrote an email to Angela Moger, one of his professors at Sarah Lawrence. Dkt. 1 at ¶ 123. In that email, Daniel explained in detail the abuse that he and others were suffering at the hands of Ray. Professor Moger never responded to that email, nor did she take any affirmative steps to investigate, despite her duty to do so. As a result of Professor Moger's breach of duty, Santos and Felicia suffered another six years of trauma at the hands of Ray.

Further, the College had a duty to take minimal precautions to protect their tenants from intruders. *See Brown v. U. of Rochester*, 216 A.D.3d 1328 at 1331-32 (N.Y. App. Div. 3rd 2023). Courts have long held that a landowner has a duty to protect persons against foreseeable risk of harm from criminal activities of third persons on the premises." *Ramirez* at *8 (*citing Camacho* at 454). Through Sarah Lawrence's failure to provide adequate security, a dangerous and violent man was able to move into one of their dormitories and remain there for an entire school year. Not only was this risk foreseeable by the general frequency of intruders, sexual abuse, and parents trying to become overly involved, but Sarah Lawrence had actual knowledge that Ray was living in the dormitory and causing harm to students. Sarah Lawrence's campus security was aware that Ray was present in the dormitory when he was the only individual present when a fire alarm went off and the fire department responded. Moreover, a Sarah Lawrence professor received notice that Ray was harming students when Daniel sent an email asking for help that was ignored.

In summary, Sarah Lawrence breached the duty of care owed to Daniel and Santos by failing to protect them from foreseeable harm of physical and sexual assault by Ray. Sarah

Lawrence failed to remove Ray after being put on notice of his impermissible residency on Sarah Lawrence's campus and the danger he posed to their students.

_Sarah Lawrence's Negligent Conduct was a Proximate Cause of the Plaintiffs' Injuries:_

Second, Sarah Lawrence's negligent conduct was a proximate cause of all three of the plaintiffs' injuries. As a result of Sarah Lawrence's failure to protect its student, Ray was able to coerce Daniel and Santos to move off-campus, trapped in his extreme violence and manipulation. As a result of Sarah Lawrence's failure to protect its students, Ray was permitted to live in a dormitory on its campus for _nearly an entire school year_. It was during this school year when Ray set the foundation (through coercion, brainwashing) for the years of physical abuse, sexual abuse, emotional abuse, and human trafficking later suffered by these plaintiffs. Moreover, but-for Sarah Lawrence's negligence, Felicia Rosario never would have been introduced to Ray.

**B.    The Plaintiffs' NIED Claims are Separate and Distinct from their Negligence Claims**

Sarah Lawrence argues that the Plaintiffs' NIED claim should be dismissed because the NIED claim is "duplicative" of the negligence claim. In support of this argument, Sarah Lawrence relies on only one case, _Curtis v. Gates Cmty. Chapel of Rochester, Inc._, 2023 WL 1070650 (W.D.N.Y. Jan. 27, 2023). It is true that, in _Curtis_, the Court agreed that the Plaintiffs' negligence claims and NIED claims involved identical conduct, sought the same relief, and were duplicative. _Curtis_ at 14. It is also true that, in _Curtis,_ the Court dismissed the Plaintiff's NIED claim. However, a careful reading of the _Curtis_ decision reveals that the Court's decision to dismiss the Plaintiff's NIED was as a result of a technicality, not substance. More specifically, in _Curtis,_ the Plaintiff's counsel failed and/or neglected to oppose the Defendant's argument seeking dismissal of the NIED claim. The _Curtis_ court went on to say that dismissal of the NIED claim is warranted

because, by not offering an opposing argument, Plaintiff's counsel had abandoned the NIED claim. *Curtis* at 13.

Wherefore, Sarah Lawrence's reliance on the *Curtis* decision as grounds for dismissal of the Plaintiffs' NIED claims in our case is not warranted. In our case, the Plaintiffs vehemently oppose dismissal of their NIED claim. As grounds in support of their opposition, the Plaintiffs rely on *Marrero v. Roman Cath. Archdiocese of N.Y.*, No. 70329/2021E, 2023 N.Y. Misc. LEXIS 25241 (Sup.Ct. Brox Cty. September 25, 2023).

In *Marrero,* the Defendants sought to dismiss the Plaintiffs' NIED claims as being duplicative to their other negligence-based causes of action. The *Marrero* court disagreed, finding that a "duplicative claim" is not a viable basis for dismissal within CPLR 3211(a). *Id.* at 7. The *Marrero* court looked at several other decisions as grounds in support of their ruling, including *Brown v. New York Design Ctr., Inc.*, 215 A.D.3d 1, 9 (1st Dep't 2023) (the court allowed both a negligence claim and a NIED claim based on the same underlying facts and circumstances to survive after a summary judgment motion). The *Marrero* court went on to state that there is a risk of prejudicing the due process rights of a litigant by eliminating causes of action that contain separate elements that must be proven when all necessary elements have been adequately pleaded. *Marrero* at 7. The *Marrero* Court also found that such prejudice to the Plaintiff is greater than any prejudice to the civil defendant in defending against them - if their theory holds true it will require no additional effort at all on their part to refute since the underlying conduct in question is the same. *Id.* The *Marrero* court further held that under New York law, a negligence cause of action and a negligent infliction of emotional distress cause of action are not the same. *Id.*

19

## IV.     THE PLAINTIFFS' TVPRA CLAIMS WERE PROPERLY PLED

Plaintiffs are each a victim of multiple violations, including 18 U.S. Codes §1591; §1594; all of which are contained in Chapter 77 (referred to as the "TVPRA" or Trafficking Victim Protection Reauthorization Act). Third party liability claims are brought under 18 U.S. Code § 1595(a). Plaintiffs' allegations include that Sarah Lawrence knowingly benefited from participation in a venture, while Sarah Lawrence knew or should have known that Ray was engaged in acts in violation of the TVPRA. Sarah Lawrence (1) knowingly benefited, financially, by charging students tuition and rent, (2) from participating in a venture of running dorms on its campus, (3) while it should have known of Ray's use of force, fraud and coercion to violate TVPRA. Dkt. 1 at ¶¶ 136, 140. Sarah Lawrence chose to keep its benefit, including financial gains, while it knew or should have known of Ray's obtaining, recruiting, enticing, and grooming for the purpose of labor and sex trafficking by force, fraud and coercion.

### A.     Sarah Lawrence Knowingly Benefited

Sarah Lawrence knowingly benefited from tuition and fees paid for the dorm used by Ray to violate the TVPRA. Sarah Lawrence was in control and had more oversight than a hotel brand, which had been found to knowingly benefit from room rentals at its hotels. *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019). Sarah Lawrence offered dormitories to students on campus in exchange for rent payments and tuition. Sarah Lawrence profited financially and also indirectly benefited by offering its incoming students an opportunity to live among students at Sarah Lawrence. Sarah Lawrence further need not engage in Ray's trafficking venture directly to be liable as a third-party beneficiary under 18 U.S. Codes §1595.

**B.      Sarah Lawrence Participated in a Venture**

Sarah Lawrence participated in a venture. Defendant Sarah Lawrence attempts to equate "participate in a venture" to participating in a "conspiracy" (See 18 U.S.C. 1594(b)). Plaintiffs need not show that Sarah Lawrence "entered into a joint enterprise with consciousness of its general nature and extent." Dkt. 17-1 at 23. Proof that Sarah Lawrence was conspiring with Ray would expose the college to not just civil, but criminal liability. See definition of a conspiracy in *Paguirigan v. Prompt Nursing Emp't Agency LLC, 286 F. Supp. 3d 430 (E.D.N.Y. 2017)* (*United States v. Ray*, 20-cr-110 (LJL), Opinion and Order (S.D.N.Y. Jul. 27, 2021). Plaintiffs are not claiming that Sarah Lawrence violated a criminal statute and is not claiming that their actions rose to the level of "conspiracy" in terms of their consciousness of the general nature and extent of Ray's actions on campus. Instead, Plaintiffs argue that Sarah Lawrence was in its own profitable venture of providing housing to a majority of its students.

Sarah Lawrence further attempts to define "venture" by using a criminal standard in 18 U.S.C. § 1591(e)(6). Reading in this heightened standard for Plaintiffs' §1595 claim would give no meaning to the "should have known" language that gives rise to a civil claim.

Furthermore, there is no requirement in 18 U.S.C. § 1595 that there be a formal association between Ray and Sarah Lawrence. The fact that Sarah Lawrence had the authority to remove Ray and permitted him to stay on campus created a tacit agreement to allow Ray access to Plaintiffs.

Sarah Lawrence argues that they did not participate in a venture due to there being no appearance that they had not established a pattern of conduct, however, Sarah Lawrence did engage in a pattern of conduct of ignoring Ray's presence on campus. Sarah Lawrence's conduct specifically with respect to Ray's access to students indicated they were motivated to ignore

student complaints about Ray's presence and concerning behavior. When notified of a convicted felon living in a dorm room manipulating residents of the dorm, Sarah Lawrence was the only party with the authority to remove him from its campus and dorms, yet they chose to do nothing.

**C.    Sarah Lawrence Knew or Should Have Known of the TVPRA Violations**

Sarah Lawrence was aware of Ray was on campus. Ray freely entered and exited the dorms and campus.  Ray also openly wandered around campus visible to staff and security. He set off the fire alarm in the townhouse while cooking dinner and when Sarah Lawrence staff and fire department personnel arrived, no one questioned Ray as to why he was alone in the dorm cooking. Dkt. 1 at ¶ 39. Ray drove to and from the grocery store, passing Sarah Lawrence's cameras, security personnel, and staff on his way. Dkt. 1 at ¶ 34. Sarah Lawrence knowingly benefited from a venture at Slonim Woods 9. Furthermore, Sarah Lawrence was on notice that a dangerous predator had taken control of the Slonim Woods 9 townhouse. Whether Sarah Lawrence knew or should have known that Ray was a desperate and predatory prison convict who would obtain, groom, recruit and entice Plaintiffs by force, fraud and coercion to engage in commercial sex acts and labor trafficking is a question of fact.

Defendants conclude that "trafficking" did not occur in the townhouse, however, Ray's TVPRA violations began when he lived at Sarah Lawrence and obtained, groomed, recruited and enticed his victims for the purpose of commercial sex acts and labor trafficking. Sarah Lawrence was on notice with reports that Ray was harming students. Sarah Lawrence was also in a unique position and relationship and was alerted to Ray's presence, as well as to his tactics of control and manipulation.

Sarah Lawrence chose convenience and revenue over intervening when it was in a unique position to prevent and put an end to Ray's further terror. Sarah Lawrence should have known of

Ray's multiple tactics that amounted to violations of the TVPRA through use of force, fraud and coercion. Ray's tactics on campus were reported. The school should have known that Ray's tactics were used to compel both labor and sex acts for his benefit. Ray's tactics on campus included using access to the students in Slonim Woods 9 to entice, obtain, groom, and recruit Plaintiffs for the purpose of his multiple trafficking ventures.

Plaintiffs are not required to plead that Def. should have known the exact evil that Ray would exact in his multiple trafficking ventures, which included sex trafficking, labor trafficking and domestic servitude. It is foreseeable that Ray would see students as an easy target to exploit and it is foreseeable they he would obtain, recruit, groom and entice his victims through force, fraud or coercion for his benefit.

The pleaded conduct constitutes sex and labor trafficking, and Sarah Lawrence knew they were profiting from students, and it was foreseeable that Ray's reported acts constituted a TVPRA violation.

## V.      LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY

If the Court sees fit to dismiss these claims, the plaintiffs respectfully request that they be dismissed with leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182 (1962)(holding that Fed. R. Civ. P. 15(a) requires that leave to amend a pleading be freely given).

## CONCLUSION AND REQUEST FOR A HEARING

For the foregoing reasons, the plaintiffs respectfully request that this Honorable Court deny Defendant, Sarah Lawrence College's, Motion to Dismiss on all grounds. The plaintiffs further request a hearing.

Dated: March 11, 2024

Respectfully submitted,
The Plaintiffs,
By their attorneys,
*Admitted pro hac vice,*

*/s/ Kelly A. Guagenty, Esq.*
Kelly A. Guagenty, Esq. (MA BBO 658872)
Paula S. Bliss, Esq.  (MA BBO 652361)
JUSTICE LAW COLLABORATIVE, LLC
210 Washington Street
North Easton, MA 02356
Tel: (508) 230-2700
paula@justicelc.com
kelly@justicelc.com


And,


*/s/ Nicholas R. Farnolo, Esq.*
Nicholas R. Farnolo, Esq.
Roopal P. Luhana, Esq.
CHAFFIN LUHANA LLP
600 Third Ave., 12th Floor
New York, New York 10016
Tel: (888) 480-1123
Farnolo@chaffinluhana.com
luhana@chaffinluhana.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY this 11th day of March 2024, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system, which will automatically serve notice of this filing via e-mail to all registered counsel of record.

I hereby certify that a copy of the foregoing was served via electronic and first-class mail upon the following:

*Defendant:*
Mr. Scott Muller
34 Knox Street
Mount Pocono, PA 18344
scottm1427@yahoo.com

Dated:  March 11, 2024                          */s/ Kelly A. Guagenty*
                                                                         Kelly A. Guagenty, Esq

# Attachment

*Courtesy Copies of Unpublished Cases Not in Westlaw*

# *Marrero v. Roman Cath. Archdiocese of N.Y.*

Supreme Court of New York, Bronx County

September 25, 2023, Decided; September 25, 2023, Filed

INDEX NO. 70329/2021E

**Reporter**

2023 N.Y. Misc. LEXIS 25241 *

MARRERO, Plaintiff(s), v. ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK, et al., Defendant(s),

**Judges:** [*1] Hon. MARISSA SOTO, J.S.C.

**Opinion by:** MARISSA SOTO

## Opinion

The following papers NYSCEF Doc No. __. Read on this motion. (Seq. No. 1) Noticed on__ and duly submitted as NYSCEF Doc. No.__.

NYSCEF Doc. No.

Notice of Motion - Order to Show Cause - Exhibits and Affidavits Annexed 12-18

Answering Affidavit and Exhibits

Replying Affidavit and Exhibits

Other: Stipulation

Upon the foregoing papers, it is ordered that this motion is decided in accordance to the annexed decision and order.

This constitutes the order of the Court.

**Dated**: 9/25/2023

Hon.

/s/ MARISSA SOTO

**MARISSA SOTO, J.S.C.**

SUPREME COURT OF THE STATE OF NEW

YORK COUNTY OF BRONX: I.A.S. PART 22

LUIS MARRERO, Plaintiff(s), v. ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK, SACRED HEART PARISH, and PETER C. O'DONNELL Defendant(s).

DECISION AND ORDER

Index No.: 70329/2021E

MOT SEQ. 1

Honorable Marissa Soto, J.S.C.

The following e-filed NYSCEF papers read herein:

Papers NYSCEF Doc. #'s/No.

Notice of Motion and Affidavits/Affirmations Annexed: 12-18

Opposition Affirmation/ Cross Motions: 19-24, 27-34

Reply Affirmation: 35

Defendant The Roman Catholic Archdiocese of New York (hereinafter the "Archdiocese") moves pursuant to *CPLR § 3211(a)(7)* for dismissal of Plaintiff's Luis Marrero (hereinafter the "Plaintiff") [*2] Plaintiff's fifth cause of action for negligent infliction of emotional distress against the Archdiocese and granting the Archdiocese such other and further relief as this Court deems just and proper.

Co-Defendant, Sacred Heart Paris (hereinafter "Sacred Heart"), cross moves for the same relief seeking to strike the sixth cause of action

for negligent infliction of emotional distress pursuant to *CPLR § 3211(a)(7)*. Plaintiff opposes both motions.

This action was commenced by summons and complaint, dated August 6, 2021, at NYSCEF Doc. No. 1 (hereinafter the "Complaint"). The Complaint alleges that in or around 1982 through in or around 1983, when Plaintiff was approximately fourteen (14) years old, he was attending baptism classes at the Defendant Sacred Heart, he was sexually abused by Father Peter C. O'Donnell (hereinafter "Father Peter C. O'Donnell") and Father Roy Gomey (hereinafter "Father Roy Gomey") "on numerous occasions, as frequently as weekly, over the course of approximately one year." Plaintiff's Complaint ¶¶ 36-48.

The Plaintiffs allege that they sustained emotional and physical injuries caused by the Defendants and brought this action under the *CPLR § 214-g*, also known as the Child Victims Act (hereinafter, [*3] the "CVA") against all the Defendants with the following six causes of action: (1) negligence against the Archdiocese; (2) negligence against Sacred Heart Parish; (3) negligent hiring, retention, and supervision against the Archdiocese; (4) negligent hiring, retention, and supervision against Archdiocese; (5) negligent infliction of emotional distress against the Sacred Archdiocese; (6) negligent infliction of emotional distress against Sacred Heart Parish; (7) assault against Father Peter C, O'Donnell; (8) battery against Father Peter C. O'Donnell; and (9) intentional infliction of emotional distress against Fr. Peter C. O'Donnell.

## DISCUSSION

It is well settled law that complaints are to be liberally construed. *CPLR §3026*. "On a motion to dismiss pursuant to *CPLR 3211*, the pleading is to be afforded a liberal construction. "We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." *34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 51 (2022)* citing *Sassi v. Mobile Life Support Servs., Inc., 37 N.Y.3d 236, 239 (2021)*; accord *Chanko v. American Broadcasting Cos. Inc., 27 N.Y.3d 46, 52 (2016)*; *Goshen v. Mutual Life Ins. Co. of N.Y., 98 N.Y.2d 314, 326 (2002)*; *Campaign for Fiscal Equity v. State of New York, 86 N.Y.2d 307, 318, (1995)*; *Leon v Martinez, 84 N.Y.2d 83, 87-88, (1994)*.

Pursuant to *CPLR §3211(a)(7)* a party may move for judgment dismissing one or more causes of action asserted against him on the ground that the pleading fails to [*4] state a cause of action. *Maroutian v. Fuchs, 124 A.D.3d 541, 541 (1st Dept 2015)*. When considering a motion to dismiss for failure to state a cause of action, the pleadings must be liberally construed. *CPLR §3026*; *Siegmund Strauss, Inc., 104 A.D.3d 401, 403 (1st Dept 2013)*. In deciding such a motion, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs 'the benefit of every possible favorable inference,' [and] determine only whether the facts as alleged fit into any cognizable legal theory." *Siegmund Strauss, Inc., 104 A.D.3d at 403*; citing *Leon v Martinez, 84 NY2d 83, 87-88 [1994]*). "In deciding such a pre-answer motion, the court is not authorized to assess the relative merits of the complaint's allegations against the defendant's contrary assertions or to determine whether or not plaintiff has produced evidence to support his claims." *Salles v. Chase Manhattan Bank, 300 A.D.2d 226, 228 (1st Dept 2002)*. However, "allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence are not" presumed to be true or accorded every favorable inference. *David v. Hack, 97 A.D.3d*

437 (1st Dept 2012) citing *Mass v. Cornell Univ., 94 N.Y.2d 87, 91 (1999)*; *Biondi v Beekman Hill House Apt. Corp., 257 A.D.2d 76, 81 (1st Dept 1999)*, affd *94 N.Y.2d 659 (2000)*; *Kliebert v. McKoan, 228 A.D.2d 232 (1st Dept)*, lv denied *89 N.Y.2d 802 (1996)*.

### Claims Subject to Revival

Numerous state and federal courts have found that the claim revival provision of New York's Child Victims Act does not violate the due process clauses of the New York and United States Constitution. *See Farrell v. United States Olympic & Paralympic Comm., No. 1:20 -CV-1178 FJS/ CFH, 567 F.Supp.3d 378, 391 (N.D.N.Y., Oct. 15, 2021)* ("a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in [*5] order to remedy an injustice"); *see Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 N.Y.3d 377, 400 (2017)*. "The CVA, which afforded victims of childhood sexual abuse a limited period of time within which to pursue their claims of sexual abuse through the judicial system, was a reasonable, non-arbitrary response to remedy an injustice and therefore satisfies the New York Due Process Clause." *PC-41 Doe v. Poly Prep Country Day Sch., No. 20-CV-03628 (DG) (SJB), 590 F.Supp.3d 551, 558 (E.D.N.Y., Sept. 22, 2021)*.

Multiple New York courts and two federal district courts in the Second Circuit have held that the CVA does not run afoul of due process because it remedies an injustice. *Id., see* e.g., *Giuffre v. Dershowitz, No. 19 Civ. 3377 (LAP), 2020 WL 2123214, *2, 2020 U.S. Dist. LEXIS 78596, *5-*6 (S.D.N.Y., Apr. 8, 2020)*; *PB-36 Doe v. Niagara Falls City Sch. Dist., No. E172556/2020, 72 Misc.3d 1052, 1058-1059, 2021 NY Slip. Op. 21188, *4-6, (Sup. Ct., Niagara County, July 19, 2021)*; *Torrey v. Portville Cent. Sch., 66 Misc.3d 1225 [A], *4,*

*125 N.Y.S.3d 531, *4 (Sup Ct, Cattaraugus County, Feb. 21, 2020)*. As *CPLR §214-g* has been found repeatedly to be constitutional.

As a housekeeping matter, the Court will only address the Plaintiff's fifth and sixth causes of action as both are for Negligent Infliction of Emotional Distress claim (hereinafter "NIED") against each Defendant, the Archdiocese and Sacred Heart.

### Negligent Infliction of Emotional Distress

The Defendants seek to dismiss Plaintiffs' Negligent Infliction of Emotional Distress claims ("NIED"), as being duplicative to the other negligence-based causes of action. The Archdiocese argues Plaintiff's fifth cause of action for NIED should be dismissed as duplicative of the Plaintiff's negligence claims, specifically the Plaintiff's first cause of action for negligence [*6] and the third cause of action for negligent hiring, retention, and supervision. Sacred Heart argues that the sixth cause of action for NIED is based on common law negligence and negligent hiring, retention and supervision, and the facts relied upon to support the negligence causes of action are identical to those pleaded in support for NIED, therefore it should be dismissed as duplicative.

The Court does not find duplicative claim as a viable basis for dismissal within *CPLR 3211(a)*. *CPLR 3211(a)* Motion to Dismiss Cause of Action states in relevant part A party may move for judgment dismissing one or more causes of action asserted against him on the ground that:

1. a defense is founded upon documentary evidence; or

2. the court has not jurisdiction of the subject matter of the cause of action; or

3. the party asserting the cause of action has not legal capacity to sue; or

4. there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground but may make such order as justice requires; or

5. the cause of action may not be maintained because of arbitration and award, collateral estoppel, discharge in bankruptcy, [*7] infancy or other disability of the moving party, payment, release, res judicata, statute of limitations, or statute of frauds; or

6. with respect to a counterclaim, it may not properly be interposed in the action; or

7. the pleading fails to state a cause of action; or

8. the court has not jurisdiction of the person of the defendant; or

9. the court has not jurisdiction in an action where service was made under section 314 or 315; or

10. the court should not proceed in the absence of a person who should be a party.

11. the party is immune from liability pursuant to section seven hundred twenty-a of the not-for-profit corporation law. Presumptive evidence of the status of the corporation, association, organization or trust under section 501 (c) (3) of the internal revenue code may consist of production of a letter from the United States internal revenue service reciting such determination on a preliminary or final basis or production of an official publication of the internal revenue service listing the corporation, association, organization or trust as an organization described in such section, and presumptive evidence of uncompensated status of the defendant may consist of an affidavit of the chief financial officer of the corporation, association, [*8] organization or trust. On a motion by a defendant based upon this paragraph the court shall determine whether such defendant is entitled to the benefit of section seven hundred twenty-a of the not-for-profit corporation law or subdivision six of section 20.09 of the arts and cultural affairs law and, if it so finds, whether there is a reasonable probability that the specific conduct of such defendant alleged constitutes gross negligence or was intended to cause the resulting harm. If the court finds that the defendant is entitled to the benefits of that section and does not find reasonable probability of gross negligence or intentional harm, it shall dismiss the cause of action as to such defendant.

NY CLS CPLR R 3211. As a result, the Court will look to the case law referenced and the general landscape of the law in this area.

The First Department has allowed both a negligence and negligent infliction of emotional distress claims based on the same underlying facts and circumstances to survive after a summary judgment motion. *Brown v. New York City Design Ctr., Inc., 215 A.D.3d 1, 9 (1st Dept 2023).* (. . . motion for summary judgment dismissing the negligent infliction of emotional distress claim and denied the motion as to the negligence claim, should be modified, on the law, to [*9] reinstate the negligent infliction of emotional distress claim . . .). In *Brown,* the bathroom of a building owned by the defendant had a grapefruit sized hole in the wall between the men's and women's bathroom through which video was being taken of the women using the bathroom. *Id.* The plaintiff's alleged negligence and negligent infliction of emotional distress claims based on the defendant's failure to fix the hole. *Id.* Both were allowed to proceed after defendant's summary judgment motion was denied on appeal. *Id.* This Court understands that *Brown* is distinguishable in that it was a motion pursuant to *CPLR 3212* rather than 3211 and that the Court may not have addressed the explicit duplicative argument. However, the

Court still finds the First Department's treatment of these two causes of action informative in how to address them in this context.1

Further, the authority relied on for the proposition that civil causes of action can be dismissed on a *CPLR §3211* motion based on the fact that there are multiple causes of action that stem from the same set of operative facts and circumstances is unclear. Defendants argue that a NIED claim cannot remain if it is essentially duplicative of tort or contract causes [*10] of action. Defendant cites to *Wolkstein v. Morgenstem,* a First Department case addressing the dismissal of a negligent infliction of emotional distress in connection with professional malpractice. *275 A.D.2d 635, 637 (1st Dept 2000)* ("Generally, a cause of action for infliction of emotional distress is not allowed if essentially duplicative of tort or contract causes of action.") citing *Murphy v. American Home Prods. Corp., 58 NY2d 293, 303 (1983)* citing *Fischer v. Maloney, 43 NY2d 553, 557 (1978)*. In *Wolkstein,* the court expressly states that the first step for the court to determine in this posture is whether the conduct alleged can be is outrageous and immediately finds that it does not. *Id.* The next sentence states that "generally" the negligent infliction of emotional distress should be dismissed if duplicative of a tort or contract claim. *Id.* This Court interprets the use of the word "generally" as the qualifier of the remainder of the sentence, which precludes the application of the premise as a bright line rule.

Further, distinguishing *Wolkenstein* from the current case is the authority relied on by the court therein, the Court of Appeals decision in *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293 (1983)*. The Court of Appeals in the *Murphy* decision dismissed the IIED claim because it stemmed from a termination of employment and stated that "there is now no cause of [*11] action in tort in New York for abusive or wrongful discharge of an at-will employee, plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress. *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d at 303*. This reasoning could be interpreted to mean that an IIED claim will be subject to additional hurdles unless there is an already existing and recognized tort for the conduct underlying the IIED claim. *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d at 303* ("The facts alleged by plaintiff regarding the manner of his termination fall far short of this strict standard."). The Court of Appeals in *Murphy* contrasts its reasoning to that of the court in *Fischer v. Moloney, 43 NY2d 553, 557 (1978)*. In *Fischer,* like in *Wolkenstein* and *Murphy,* the court first stated that the conduct alleged did not meet the outrageous element. *Id.* It then went on to question whether it could exist if the conduct complained of fit well within an established tort action. *Id. at 558*. The questioning in *Fisher* was dicta and not the holding of the Court of Appeals. Further, all three of the cases in that line of authority deal with intentional infliction of emotion distress and not negligent infliction of emotion distress and therefore, [*12] are also distinguishable on those grounds.

The protections against double jeopardy afforded to criminal defendants are set forth in the Constitution of the United States, the New York State Constitution, and codified in the *New York State NY CLS CPL § 40.20*, yet even those protections do not shield a criminal defendant from answering to all charges applicable to the underlying criminal conduct alleged if they require different elements be proven. *See generally* Lexis+ Commentary to *NY CLS CPL § 40.20*; PRACTICE INSIGHTS: *How to Tell When Previous Prosecution Constitutes Double Jeopardy,* By John M.

Castellano, Esq., Member of New York Bar, General Editor, John M. Castellano, Esq., Member of New York Bar. The Court finds that there are greater protections to a criminal defendant than a civil defendant as demonstrated by the lower burden of proof and the lack of unanimity required of juries. As a result, it is incongruous to this Court's logic that a civil defendant would be shielded from the need to have to defend multiple causes of action that stem from the same conduct but not the criminal defendant, whose protections are woven through the foundational principles of our legal system.

This Court finds that there is the risk of prejudicing [*13] the due process rights of a litigant by eliminating causes of action that contain separate elements that must be proven when all necessary elements have been adequately pleaded. The Court also finds that such prejudice to the Plaintiff is greater than any prejudice to the civil defendant in defending against them - if their theory holds true it will require no additional effort at all on their part to refute since the underlying conduct in question is the same. To dismiss the cause of action as duplicative may eliminate a litigant's ability to recover on a cause of action that it might otherwise be entitled to. It is completely conceivable that a reasonable jury could find all the elements that support one cause of action and not the other if the causes of action require non identical elements be proven. In addition, the Court is not certain why it or the defendant should be in the position to dictate which of the two allegedly duplicative causes of action survive.

Under New York law, a cause of action alleging intentional infliction of emotional distress "has four elements; (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, [*14] severe emotional distress; (iii) a causal connection between the conduct and

injury; and (iv) severe emotional distress." *Brown, 215 A.D.3d at 9* (internal citations omitted). A cause of action for negligent infliction of emotional distress does not require extreme or outrageous conduct, or physical injury. *Id.* However, the mental injury must be "a direct, rather than a consequential, result of the breach", meaning the negligent breach of the duty of care, (*Kennedy v. McKesson Co., 58 N.Y.2d at 506*), and the claim must possess "some guarantee of genuineness." *Id.* Therefore, a negligent infliction of emotional distress cause of action requires an accompanying negligence finding. Further, negligent infliction of emotional distress contains a separate element that is not necessary for a negligence claim, i.e. severe emotional distress. Based on the above, the Court does not find that dismissal for being duplicative is warranted as a matter of law.

Sacred Heart argues in its motion to dismiss that the negligent infliction of emotional distress cause of action is duplicative of the negligence and negligent hiring, retention and supervision. Here, the Court would like to make clear that the misclassification of the motion as a cross motion will be disregarded [*15] for purposes of reaching the merits. The elements to each are different and it is therefore conceivable that one or all of them could be found to have been proven by a jury. Accordingly, the Court does not find that the nature of the causes of action require a dismissal of any one as a matter of law.

The Court notes that neither motion to dismiss alleged that the causes of action were insufficiently pleaded and therefore does not reach that issue.

The Court has considered the remaining arguments and they do not warrant a contrary result and finds them unavailing.

**CONCLUSION**

2023 N.Y. Misc. LEXIS 25241, *15

Accordingly, for the foregoing reasons, it is hereby

**ORDERED** that the Defendant Archdiocese motion to dismiss the fifth cause of action of the Plaintiff's complaint of negligent infliction of emotional distress is denied; it is further

**ORDERED** that the Defendant Sacred Heart motion to dismiss the sixth cause of action of the complaint for negligent infliction of emotional distress is denied; it is further

**ORDERED** that the parties shall proceed with discovery; and it is further

**ORDERED** that counsel for Defendants shall serve a copy of this order, along with notice of entry, on all parties within 30 days.

This constitutes [*16] the decision and order of the Court.

Dated: September 25, 2023

/s/ MARISSA SOTO

HON. MARISSA SOTO, J.S.C.

1 The Court recognizes that the duplicative claim may not have been argued on appeal but the record below is sealed so the exact arguments presented below and preserved for appeal are unknown.

---

**End of Document**

# *Ramirez v Genovese*

Supreme Court of New York, Westchester County

May 18, 2012, Decided; May 18, 2012, Filed

26231/08

**Reporter**

2012 N.Y. Misc. LEXIS 6568 *; 2012 NY Slip Op 33607(U) **

[**1]  ERNESTO R. RAMIREZ and MARIA LUZ RAMIREZ, Plaintiffs, -against- DANIEL GENOVESE, MANHATTANVILLE COLLEGE, SECURITAS SECURITY SERVICES USA, INCORPORATED and DAMON JARETT, Defendants. Index No.: 26231/08

**Notice:** THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**Subsequent History:** Affirmed in part and modified in part by, Summary judgment granted, in part, summary judgment denied, in part by, As moot *Ramirez v. Genovese, 117 A.D.3d 930, 986 N.Y.S.2d 220, 2014 N.Y. App. Div. LEXIS 3612 (N.Y. App. Div. 2d Dep't, 2014)*

**Prior History:** *Ramirez v. Genovese, 2010 N.Y. Misc. LEXIS 6955 (N.Y. Sup. Ct., Oct. 15, 2010)*

**Counsel:** [*1] For Securitas Security Services, USA, Inc. And Damon Jarett, Defendant: Rodrigo Armand, Jr., Esq., MARIN GOODMAN, LLP, Harrison, New York.

For Plaintiff: JERRY I. KLEIN, ESQ.

**Judges:** HON. LESTER B. ADLER, SUPREME COURT JUSTICE.

**Opinion by:** LESTER B. ADLER

# Opinion

## DECISION & ORDER

ADLER, J.

Plaintiff Ernesto R. Ramirez and his wife, derivatively, commenced this action, *inter alia*, to recover damages from both Manhattanville College ("Manhattanville") and [**2] Securitas Security Services, USA, Inc. ("Securitas") alleging that the security measures at the campus were inadequate.

## FACTUAL BACKGROUND

On September 24, 2004, defendant Securitas entered into an agreement with defendant Manhattanville to provide on-premises security at its campus location in Purchase, New York (the "Contract"). Section 4 of the Contract contains the "Description of Duties" for the site manager, shift supervisor, desk sergeant, roving patrols security officers, and the main gate security officer.

The description of the "shift supervisor" requires, *inter alia*, that the individual occupying the position "possess good interpersonal skills to be able to resolve issues" with Manhattanville's faculty, staff, students and visitors. The description further states that [*2] the shift supervisor must respond to emergency conditions. Although the Contract refers to a standard operating procedures manual for a description of further duties, in the affidavit of Eugene Moscardi,

Securitas' project manager, he avers that no such manual exists.

In referring to the roving patrol security officers, the Contract states that these officers are "the visual insight deterrent to crime and violence" and are the "first line of defense in cases of disorder." The only duties and responsibilities described in this section are the additional duties of security officers in opening and closing buildings, but it does refer to other responsibilities of security officers as set forth in the "general orders." As with the standard operating procedures manual, Mr. Moscardi avers in his affidavit that no such general orders exist.

[**3] The Contract further provides for the indemnification of Manhattanville by Securitas under certain circumstances. Specifically, Section 5 provides, in pertinent part, that:

> The Contractor indemnifies and holds The College harmless from any and all claims, actions, liabilities, damages, costs and expenses (including settlements, attorneys' fees and court costs), regardless [*3] of the outcome of such claim or action, caused by or resulting from any act or omission of the Contractor, or any person(s) acting on behalf of The Contractor, or its successors or assigns in accordance with the laws of the State of New York."

On December 2, 2007, at approximately 3:30 a.m., plaintiff Ernesto R. Ramirez allegedly sustained physical injuries when he was assaulted by defendant Daniel Genovese ("Genovese") and other unknown assailants near Founder's Hall at the Purchase campus. Defendant Damon Jarrett ("Jarrett"), a security guard and employee of defendant Securitas, was present at the time of the alleged assault.

At his examination before trial, Mr. Ramirez testified that he was transporting four individuals (two males and two females) from a taxi stand located on Mamaroneck Avenue and East Post Road in the City of White Plains, New York to the Purchase campus of Manhattanville. Shortly after the individuals entered his taxi, a dispute arose as to the amount of the fare. He then stopped the taxi and told the individuals to get out if they were not going to pay the quoted fare. One of the passengers, a tall, thin, blond male, agreed to pay the fare and so Mr. Ramirez proceeded [*4] to the guard booth seeking to enter the Manhattanville campus. When one of the passengers produced student identification, Mr. Ramirez was permitted entry.

[**4] After going through the guard booth, Mr. Ramirez then proceeded to the front entrance of Founder's Hall, at which time three of the four passengers exited the taxi and ran into the building. The remaining passenger stated that he would not pay Mr. Ramirez and that he should leave. When the male passenger attempted to open the driver's side door of the taxi, Mr. Ramirez got out of the vehicle, at which time the male grabbed his neck and insulted him. Another male approached the taxi and offered to pay the fare with a credit card, but the male who had been a passenger said "No, no. Let him go. Let him leave." Mr. Ramirez then got into his taxi and started to drive away from the dorm.

At the end of the circular drive in front of the dorm, a security guard pulled up along side his taxi and signaled with his hand that he wanted Mr. Ramirez to stop. The security guard, who was later identified as defendant Jarrett, then got out of his vehicle and asked Mr. Ramirez to come over to where he was standing in front of the dorm. There were still [*5] "many people" in front of the door to the dorm at the time. Jarrett asked Mr. Ramirez what happened, and he told Jarrett that someone did not want to pay him. Jarrett asked him

Case 1:23-cv-10236-LJL   Document 38   Filed 03/11/24   Page 42 of 49

Page 3 of 6

2012 N.Y. Misc. LEXIS 6568, *5; 2012 NY Slip Op 33607(U), **4

"Who is it?" Mr. Ramirez then identified the male who had been in his taxi, and while he was doing so, he was hit from behind. He could not see who was attacking him, but felt "many hands," and he could hear people yelling at him to get out of there and also yelling insults. Defendant Jarrett was approximately three to four feet from him at the time the attack occurred.

Mr. Ramirez eventually fell to the ground, at which time he felt like he was being kicked and punched by "many people," and then he lost consciousness. According to Mr. Ramirez, defendant Jarrett was just standing there and did nothing to stop the [**5] assault except to say "hey, hey." When he regained consciousness, Mr. Ramirez asked defendant Jarrett why he did not help him, to which defendant Jarrett allegedly responded that Mr. Ramirez should leave. Mr. Ramirez further testified that the entire encounter in front of the dorm in the presence of defendant Jarrett lasted approximately four to five minutes. At the conclusion of the assault, Mr. Ramirez [*6] testified that he returned to his taxi, and called the police on his cellular phone.

Defendant Jarrett testified at his examination before trial that on December 2, 2007 he was working the midnight to 8:00 a.m. shift when he received a radio call from his desk sergeant to respond to Founder's Hall on a report of a large group of students and loud noises/loud voices. As he pulled into the circular drive in front of Founder's Hall, he observed a group of students in front of the building and he could hear loud voices arguing. He then got out of his vehicle and approached the group. When questioned about the taxi driver, defendant Jarrett responded that he saw the taxi driver, but he did not see the taxi itself and he did not know where it was. He testified that Mr. Ramirez was out of the taxi at the time he arrived on the scene, and he overhead an argument regarding cab fare. Jarrett testified

that some of the students "may have approached him," and were telling him "He paid. He paid."

A fight then broke out between Mr. Ramirez and one of the students who was later identified as defendant Genovese. Jarrett testified that he was on the opposite side of the circular driveway when the fight [*7] broke out, and he told the students to "get back." He then radioed his desk sergeant for assistance and then focused his attention on controlling the crowd of students. He testified that the fight broke out within minutes of his arrival at the scene, and that the desk sergeant responded to his call within a [**6] matter of seconds. Jarrett testified that he did not attempt to intervene in the fight between Genovese and Mr. Ramirez, but rather focused his attention on crowd control.

Defendants Manhattanville, Securitas and Jarrett now move for summary judgment dismissing the complaint. Defendant Manhattanville further moves for summary judgment on its cross-claim against defendant Securitas for contractual indemnification.

## LEGAL ANALYSIS

In order to prevail on a motion for summary judgment, the moving party "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324, 508 N.Y.S.2d 923, 501 N.E.2d 572* [citations omitted]). Failure to make that initial showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*Winegrad v. New York University Med. Ctr., 64 N.Y.2d 851, 853, 487 N.Y.S.2d 316, 476 N.E.2d 642*; *St. Luke's-Roosevelt Hosp. v. American Tr. Ins. Co., 274 A.D.2d 511, 712 N.Y.S.2d 372*). However, once this showing has been made, the burden

Case 1:23-cv-10236-LJL   Document 38   Filed 03/11/24   Page 43 of 49

Page 4 of 6

2012 N.Y. Misc. LEXIS 6568, *7; 2012 NY Slip Op 33607(U), **6

shifts to the party [*8] opposing the motion to "produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact on which he [or she] rests his [or her] claim or must demonstrate an acceptable excuse" for his or her failure to do so (*Zuckerman v. City of New York, 49 N.Y.2d 557, 560, 427 N.Y.S.2d 595, 404 N.E.2d 718*; see also *Alvarez v. Prospect Hosp., 68 N.Y.2d at 324*; *Tillem v. Cablevision Sys. Corp., 38 A.D.3d 878, 832 N.Y.S.2d 296*).

[**7] It is well settled that the owner or possessor of property has a general duty to take reasonable measures to maintain his or her property in a safe condition (see *Maheshwari v. City of New York, 2 N.Y.3d 288, 294, 778 N.Y.S.2d 442, 810 N.E.2d 894*; *Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451*; *Basso v. Miller, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 352 N.E.2d 868*). A "natural corollary" of this common-law duty is the obligation to maintain minimal security precautions to protect users of premises against injury caused by the reasonably foreseeable criminal acts of third parties (*Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d at 519-520*; *Donohue v. Seaman's Furniture Corp., 270 A.D.2d 451, 705 N.Y.S.2d 291*). However, landowners are not the insurer's of a visitor's safety (*Maheshwari v. City of New York, 2 N.Y.3d at 294*; *Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d at 519*), and a landowner has no duty to protect persons against unforeseeable and unexpected assaults, unless there was a foreseeable risk of harm from criminal activities of third persons on the premises (*Camacho v. Edelman, 176 A.D.2d 453, 454, 574 N.Y.S.2d 356*).

While it is for the trier of fact to determine whether and to what extent a particular duty was breached, it is for the court in the first instance to determine whether any duty exists (*Maheshwari v. City of New York, 2 N.Y.3d 288, 810 N.E.2d 894, 778 N.Y.S.2d 442*). The

scope of the duty to minimize foreseeable danger arising from the criminal acts [*9] of third parties is defined according to the likelihood that such behavior will occur (*O'Connor v. Syracuse Univ., 66 A.D.3d 1187, 1189, 887 N.Y.S.2d 353*). In order to establish foreseeability, "the criminal conduct at issue must be shown to be reasonably predictable based on the [**8] prior occurrence of the same or similar criminal activity at a location sufficiently proximate to the subject location" (*Novikova v. Greenbriar Owners Crop., 258 A.D.2d 149, 153, 694 N.Y.S.2d 445*).

Here, defendant Manhattanville has established that it took minimal security precautions to protect members of the public from foreseeable criminal acts of third parties (see *Burgos v. Aqueduct Realty Corp., 92 N.Y.2d 544, 548, 684 N.Y.S.2d 139, 706 N.E.2d 1163*), and that the attack here was unforeseeable. Additionally, the assault on plaintiff was a spontaneous and unexpected criminal act of a third party for which Manhattanville may not be held liable (see *Scalice v. Kullen, 274 A.D.2d 426, 710 N.Y.S.2d 632, lv. denied 95 N.Y.2d 767, 717 N.Y.S.2d 547, 740 N.E.2d 653*). To the extent plaintiffs seek to hold Manhattanville vicariously liable for Jarrett's conduct, Manhattanville has established that it cannot be held liable since Securitas was an independent contractor (see *McCann v. Varrick Group, LLC, 84 A.D.3d 591, 923 N.Y.S.2d 471, cf. Urena v. Pace Univ., 1 A.D.3d 208, 767 N.Y.S.2d 220*).

Liberally construing the evidence in the light most favorable to plaintiffs (see *Pearson v. Dix McBride, 63 A.D.3d 895, 883 N.Y.S.2d 53, 53*; *Dykeman v. Heht, 52 A.D.3d 767, 769, 861 N.Y.S.2d 732*), they have failed to raise an issue of fact as to whether the assault was foreseeable (see *Cameron Plocas v. Best Western Hotel & Convention Ctr., 300 A.D.2d 556, 751 N.Y.S.2d 878*). Plaintiffs have not

2012 N.Y. Misc. LEXIS 6568, *9; 2012 NY Slip Op 33607(U), **8

submitted any documentary evidence establishing prior [*10] reports and/or records of any similar type of criminal activity at the campus, and the fact that Manhattanville was aware that students were not paying for cab fare is insufficient to establish that the assault on Mr. Ramirez [**9] was foreseeable (see *Pascarelli v. LaGuardia Elmhurst Hotel Corp., 294 A.D.2d 343, 742 N.Y.S.2d 98*; *Durham v. Beaufort, 300 A.D.2d 435, 752 N.Y.S.2d 88*; *Novikova v. Greenbriar Owners Corp., 258 A.D.2d 149, 694 N.Y.S.2d 445*).

Defendant Mahattanville further moves for summary judgment with respect to its cross-claim against defendant Securitas for contractual indemnification. "The right to contractual indemnification depends on the specific language of the contract" (*George v. Marshalls of MA, Inc., 61 A.D.3d 925, 931, 878 N.Y.S.2d 143*). A promise to indemnify "should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding circumstances" (*Id.*). "[A] party seeking contractual indemnification must prove itself free from negligence, because to the extent its negligence contributed to the accident, it cannot be indemnified therefor" (*Rodriguez v. Tribeca 105, LLC, 93 A.D.3d 655, 657, 939 N.Y.S.2d 546*, quoting *Cava Constr. Co., Inc. v. Gealtec Remodeling Corp., 58 A.D.3d 660, 662, 871 N.Y.S.2d 654* [internal quotations omitted]). Here, Manhattanville has made a prima facie showing that it is free from negligence (see *Fernandez v. Abalene Oil Co., Inc., 91 A.D.3d 906, 938 N.Y.S.2d 119*; *Hopes v. New Amsterdam Restoration Group, Inc., 83 A.D.3d 784, 921 N.Y.S.2d 143*). In opposition, Securitas has failed to raise a triable issue of fact.

Defendants Securitas and Jarett have also moved for summary judgment, arguing that the Contract contains no expression of intent to [*11] confer a mutual benefit on members of the general public (see *Duff v. Grenadier Realty Corp., 247 A.D.2d 577, 668 N.Y.S.2d 504*; *Hering v. New York Yankees, 166 A.D.2d 253, 560 N.Y.S.2d 455, lv. denied 87 N.Y.2d 807, 641 N.Y.S.2d 598, 664 N.E.2d 509*; *Bernal v. Pinkerton's, Inc., [**10] 52 A.D.2d 760, 382 N.Y.S.2d 769, affd. 41 N.Y2d 938, 394 N.Y.S.2d 638, 363 N.E.2d 362*).

Generally, the existence of a contractual obligation, standing alone, does not give rise to tort liability in favor of a third party (*Espinal v. Melville Snow Contrs., 98 N.Y.2d 136, 138, 746 N.Y.S.2d 120, 773 N.E.2d 485*; *Martinez v. National Amusements, Inc., 50 A.D.3d 302, 302, 855 N.Y.S.2d 82*). "Before an injured party may recover as a third-party beneficiary for failure to perform a duty imposed by contract, it must clearly appear from the provisions of the contract that the parties thereto intended to confer a direct benefit on the alleged third-party beneficiary to protect him [or her] from physical injury" (*Kotchina v. Luna Park Hous. Corp., 27 A.D.3d 696, 697, 815 N.Y.S.2d 594*, quoting *Bernal v. Pinkerton's, 52 A.D.2d 760, 382 N.Y.S.2d 769* [internal quotations omitted]). Here, the evidence submitted in support of the motion for summary judgment establishes that there was no express provision in the Contract with Manhattanville that extended the security benefits thereunder to third parties such as plaintiffs (see *Murshed v. New York Hotel Trades Counsel, 71 A.D.3d 578, 898 N.Y.S.2d 25*).

Since plaintiff was neither a party to the Contract nor was an intended third-party beneficiary thereof, the Court must look beyond the Contract to determine whether there is any evidence to support plaintiffs' alternative argument that Securitas owed Mr. Ramirez a common-law duty of care (see *Rahim v. Sottile Sec. Co., 32 A.D.3d 77, 817 N.Y.S.2d 33*). In *Espinal*, the Court of Appeals [*12] identified three situations in

Case 1:23-cv-10236-LJL   Document 38   Filed 03/11/24   Page 45 of 49   Page 6 of 6

2012 N.Y. Misc. LEXIS 6568, *12; 2012 NY Slip Op 33607(U), **10

which a party who enters into a contract to render services may be said to have assumed a duty of care to third parties which include: "(1) where the contracting party, in failing to [**11] exercise reasonable care in the performance of [its] duties, launche[s] a force or instrument of harm; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely" (*Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d at 140*).

While plaintiff and Jarrett have different versions as to the events of the evening, as stated above, on this motion for summary judgment the Court is required to liberally construe the evidence in the light most favorable to plaintiffs (see *Pearson v. Dix McBride, 63 A.D.3d 895, 883 N.Y.S.2d 53*). At his deposition, Mr. Ramirez testified that on the night of the alleged assault, Jarrett was driving a security vehicle, was wearing a security uniform, and stopped his taxi from leaving the campus. Further, Jarrett asked plaintiff to step out of his taxi and return to the front of the dorm where the incident took place. Jarrett also inquired of plaintiff as to what had previously occurred.

Clearly, the deposition testimony [*13] presents a question of fact as to whether Jarrett's action in allegedly having Mr. Ramirez return to Founder's Hall placed him in a more vulnerable position than if Jarrett had taken no action and plaintiff had driven away (see *Mirza v. Metropolitan Life Ins. Co., 2 A.D.3d 808, 809, 770 N.Y.S.2d 384*; *Bloom v. City of New York, 123 A.D.2d 594, 507 N.Y.S.2d 13*). One who voluntarily assumes a duty to act with reasonable care toward others may be held liable for breach of that duty if the plaintiff relied on that undertaking and the act or failure to act placed the plaintiff in a more vulnerable

position than if the obligation had not been assumed (*Heard v. City of New York, 82 N.Y.2d 66, 72, 603 N.Y.S.2d 414, 623 N.E.2d 541*, [**12] *rearg. denied 82 N.Y.2d 889, 610 N.Y.S.2d 155, 632 N.E.2d 465*). Here, there is a triable issue of fact whether the alleged conduct of Jarrett "enhanced the risk [that plaintiff] faced, created a new risk [or] induced [plaintiff] to forego some opportunity to avoid risk" (*Id. at 73*).

Accordingly, it is hereby

ORDERED, that defendant Manhattanville's motion for summary judgment dismissing the complaint insofar as asserted against it is GRANTED; and it is further

ORDERED, that defendant Manhattanville's motion for summary judgment on its cross-claim against defendant Securitas is GRANTED; and it is further

ORDERED, that defendants Securitas and Jarrett's motion for summary judgment dismissing the complaint insofar as asserted against [*14] them is DENIED;

ORDERED, that the matter is referred to the Settlement Conference Part for a conference to be held on June 22, 2012 at 9:30 a.m. in Courtroom 1600, 111 Dr. Martin Luther King, Jr. Boulevard, White Plains, New York.

The foregoing constitutes the Decision and Order of the Court.

Dated: White Plains, New York

May 18, 2012

/s/ Lester B. Adler

HON. LESTER B. ADLER

SUPREME COURT JUSTICE

---

# *Reed v. Chisolm*

Supreme Court of New York, Queens County

August 15, 2023, Decided; August 15, 2023, Filed

INDEX NO. 711440/2023

**Reporter**

2023 N.Y. Misc. LEXIS 21889 *

YOLANDA REED, Plaintiff, v. DOUGLAS CHISOLM, C.R.N.A. and ST. JOHN'S EPISCOPAL HOSPITAL, Defendant.

**Judges:** [*1] HONORABLE KARINA E. ALOMAR, Judge.

**Opinion by:** KARINA E. ALOMAR

## Opinion

Short Form Order

The following numbered papers numbered 10 to 49 read on this motion by defendant Douglas Chisolm, C.R.N.A. ("Chisolm") for an order pursuant to *CPLR §3211(a)(5)* on the principles of collateral estoppel, res judicata, and the unavailability of the Adult Survivors Act codified at *CPLR §214-j*

⊞*Go to table1*

Upon the foregoing cited papers, defendant Chisolm's motion for an order pursuant to *CPLR §3211(a)(5)* is decided as follows:

By way of background, plaintiff commenced a virtually identical action based on the same alleged events seeking the same relief against the same defendants on or about February 11, 1991, under index number 22551/1991 (the "prior action"). On or about November 15, 1999, defendant, St. John's, filed a voluntary petition for bankruptcy under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Easter District of New York (Case Nos. 199-23816-353 through 199-23828-353). Pursuant to *Section 362(a) of the Bankruptcy Code*, the filing of the voluntary petition operated as an automatic stay of the Prior Action [*2] as against St. John's. On December 28, 2000, St. John's emerged from bankruptcy after the Easter District Bankruptcy Court confirmed a Reorganization Plan and issued a Confirmation Order. On or about July 27, 2006, Chisolm filed a motion, pursuant to *CPLR § 3126*, requesting an order to strike Plaintiff's complaint with respect to the Prior Action for failure to comply with discovery. Plaintiff failed to oppose Chisolm's motion and the Court issued an order on November 17, 2006, which, inter alia, dismissed the prior action as against defendant Chisolm. On March 13, 2007, a final judgment was entered dismissing the prior action as against Chisolm. Plaintiff failed to appeal the Order or the Judgment.

On March 21, 2023, Plaintiff commenced an action against Douglas Chisolm C.R.N.A. and St. John's Episcopal Hospital seeking the same relief on the same facts as the previous action pursuant to *CPLR § 214-j* (the "Adult Survivors Act").

Pursuant to *CPLR §214-j*:

Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition

precedent to commencement of an action or [*3] special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, or incest as defined in section 255.26 or *255.27 of the penal law* committed against such person who was eighteen years of age or older, which **is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim**, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

Special laws that revive causes of action are extreme examples of legislative power which must be narrowly construed. (*S.H. v Diocese of Brooklyn, 205 AD3d 180, 167 NYS3d 171 [2d Dept 2022]*; *Anonymous v Castagnola, 210 AD3d 940, 178 NYS3d 587 [2d Dept 2022]*). The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the Legislature. (*Anonymous v Castagnola, 210 AD3d 940, 178 NYS3d 587 [2d Dept 2022]*, inner citations omitted). "As the clearest [*4] indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." (*Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 696 NE2d 978 [1998]*). "In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or

contradiction, there is no room for construction and courts have no right to add or take away from that meaning." (*Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 696 NE2d 978 [1998]*, quoting *Tompkins v Hunter, 149 NY117, 43 NE 532 [1896]*).

Here, *CPLR §214-j* is an example of a "special law" which revives causes of action and as such must be narrowly construed. A plain reading of *CPLR §214-j* provides that an action may be revived under three circumstances: (1) where the previous action was dismissed as time-barred; 2) where the previous action was dismissed for failure to file a notice of claim; and 3) where the previous action was dismissed for failure to file a notice of intention to file a claim. Here, plaintiff argues that their causes of actions may be revived pursuant to CPLR §241 -j' s provision.

It should be noted however that the legislative intent behind *CPLR §214-j* was to provide "those who have had justice denied [to] them as a result of New York's [*5] formerly insufficient statutes of limitations... the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law." (2022 Sess. Law News of N.Y. Legis. Memo Ch. 203 [McKinney's]). As such, the Adult Survivor's Act was a response to those injustices in which a plaintiff's causes of action were originally barred by the statute of limitations, for failure to file a notice of claim, and/or for failure to file a notice of intention to file a claim. The Adult Survivor's Act gave plaintiff's the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.

Here, plaintiff has had their opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law when she timely filed the prior action on February 11, 1991. After which, plaintiff failed to oppose defendant Chisolm's motion for an order

2023 N.Y. Misc. LEXIS 21889, *5

dismissing the complaint as against Chismol. Thereafter, the Court issued an order on November 17, 2006, dismissing the prior action as against defendant Chisolm, and a final judgment was entered dismissing the prior action as against Chisolm on March 13, 2007. Plaintiff had failed to appeal either [*6] the February 17, 2006, or the March 13, 2007, Order. As such, plaintiff's prior action was not dismissed for failure to commence the action within the statutory limitations period.

Plaintiff is correct in that the action was dismissed without prejudice and as such plaintiff was allowed to commence a new action upon the same occurrences. However, pursuant to *CPLR §205(a)*:

If an action is timely commenced and is terminated in any other manner than by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits, the plaintiff...may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

Here, plaintiff failed to commence a new action until more than a decade after the prior action was dismissed. As such, plaintiff may not now revive what is essentially her prior action.

Accordingly, it is hereby

**ORDERED**, that [*7] defendant Douglas Chisolm, C.R.NA.'s motion for an order pursuant to *CPLR §3211(a)(5)* dismissing plaintiff's complaint as against Douglas Chisolm, C.R.N.A. is granted, it is further

**ORDERED**, that plaintiff shall serve a copy of this order, with notice of entry, upon defendants within thirty (30) days of the date of entry.

This constitutes the decision and order of the Court.

Dated: August 14, 2023

__

**KARINA E. ALOMAR, J.S.C.**

2023 N.Y. Misc. LEXIS 21889, *7

**Table1 (** *Return to related document text* **)**

| PAPERS | NUMBERED |
|---|---|
| Notice of Motion, Affidavit, Exhibits | 10-24 |
| Affirmation in Opposition, Affidavit, Exhibits | 37-40 |
| Affirmation in Reply, Exhibits | 10-20 |

**Table1 (** *Return to related document text* **)**

---

**End of Document**