## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL B. LEVIN, SANTOS J. ROSARIO and FELICIA ROSARIO,

                Plaintiffs,

      v.

SARAH LAWRENCE COLLEGE, LEE CHEN, GUMLEY-HAFT LLC, and SCOTT MULLER,

                Defendants.

Civil Action No.: 1:23-cv-10236

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT, GUMLEY-HAFT'S, MOTION TO DISMISS PLAINTIFFS' COMPLAINT

JUSTICE LAW COLLABORATIVE, LLC
Kimberly A. Dougherty, Esq. (MA BBO 658014)
Paula S. Bliss, Esq. (MA BBO 652361)
Kelly A. Guagenty, Esq. (MA BBO 658872)
210 Washington Street North Easton, MA 02356
Tel: (508) 230-2700
kim@justicelc.com
paula@justicelc.com
kelly@justicelc.com
*Attorneys for the Plaintiffs*
*(admitted Pro Hac Vice)*

CHAFFIN LUHANA LLP
Nicholas R. Farnolo, Esq.
Roopal P. Luhana, Esq.
600 Third Ave., 12th Floor
New York, New York 10016
Tel: (888) 480-1123
luhana@chaffinluhana.com

*Attorneys for the Plaintiff*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………...………..iii

PRELIMINARY STATEMENT………………………………………………………1

STATEMENT OF FACTS……………………………………………………………1

      *Sarah Lawrence College*…………………………………..……………..1

      *The Manhattan Condominium (Managed by Gumley-Haft)*…………...…………..1

APPLICABLE STANDARD ON A MOTION TO DISMISS…………………………...3

ARGUMENT…………………………………………………….………………4

    I.      THE PLAINTIFFS' CLAIMS ARE NOT TIME BARRED……………..4

          A.    *The ASA Applies Because Gumley-Haft's Negligence Enabled a Series of Heinous Acts that Meet the Criteria for Article 130 Sex Offenses*...……………………………………………….......4

          B.    *The ASA Applies Because Lawrence Ray's Misdeeds Constitute Sexual Offenses as Defined by New York Penal Law*........................7

          C.    *Plaintiffs' Claims Under the TVPRA are Timely and the ASA Revives any Potentially Time-Barred TVPRA Claims*........................9

    II.     PLAINTIFFS' COMMON LAW NEGLIGENCE CLAIMS WERE PROPERLY PLED.......................................................................................12

          A.    *Gumley-Haft Owed a Duty to the Plaintiffs*.....................................12

               1.    *Plaintiffs Allege Facts that Plausibly Establish a Special Relationship Between the Parties*.........................................12

          B.    *Gumley-Haft Had Actual and Constructive Notice of the Wrongful and Criminal Activities Taking Place at the Building*......13

          C.    *At all Relevant Times, Gumley-Haft Maintained an Ability to Control Foreseeable Criminal Acts*.................................................14

       1.     *Facts Establishing Gumley-Haft's Ability to Control*..........14

       2.     *Facts Establishing the Ray's Criminal Acts Were Foreseeable to Gumley-Haft*................................15

III.    THE PLAINTIFFS' NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS WERE PROPERLY PLED......................................17

   A.    *Gumley-Haft Owed a Special Duty to Plaintiffs and/or Caused Plaintiffs to Suffer Traumatic Events Resulting in Them Fearing for Their Safety*..................................17

   B.    *The Plaintiff's NIED Claims are Separate and Distinct from their Negligence Claims*..................................20

IV.    THE PLAINTIFFS' TVPRA CLAIMS WERE PROPERLY PLED...........21

   A.    *Gumley-Haft Knowingly Benefited*..................................22

   B.    *Gumley-Haft Participated in a Venture*.............................23

       1.     *Gumley-Haft's Pattern of Conduct Supported Ray's Harboring of Plaintiffs*............................................24

   C.    *Gumley-Haft Knew or Should Have Known of TVPRA Violations*...24

V.    LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY...........25

CONCLUSION AND REQUEST FOR A HEARING.........................................25

CERTIFICATE OF SERVICE.................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Westbury Union Free Sch. Dist.*,
  829 F. Supp. 2d 89 (E.D.N.Y. 2011) .................................................... 17, 18

*Allaire Corp. v. Okumus*,
  433 F.3d 248 (2d Cir. 2006) ...................................................................... 4

*Anonymous v Castagnola*,
  210 AD3d 940 (2d Dep't 2022) ................................................................. 5

*Arista Records LLC v. Doe*,
  604 F.3d 110 (2d Cir. 2010) ...................................................................... 3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 3

*Ayeni v. County of Nassau*,
  18 A.D.3d 409 (2d Dep't. 2005) .............................................................. 15

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 3

*Boykin v. KeyCorp*,
  521 F.3d 202 (2d Cir. 2008) ...................................................................... 3

*Brown v. New York Design Ctr., Inc.*,
  215 A.D.3d 1 (1st Dep't 2023) ................................................................ 21

*Brown v. U. of Rochester*,
  216 A.D.3d 1328 (3d Dep't. 2023) ............................................................ 7

*Burroughs v. Mitchell*,
  325 F. Supp. 3d 249 (N.D.N.Y. 2018) ................................................ 17, 18

*Carroll v. Trump*,
  650 F.Supp. 213 (S.D.N.Y. 2023) .......................................................... 5, 7

*City Store Gates Mfg. Corp. v. Empire Rolling Steel Gates Corp.*,
  113 A.D.3d 718 (2nd Dep't. 2014) .......................................................... 10

*Cruz v. Maypa*,
  773 F.3d 138 (4th Cir. 2014) .................................................................... 9

*Cucchi v. N.Y.C. Off–Track Betting Corp.*,
  818 F.Supp. 647 (S.D.N.Y.1993) ............................................................ 17

*Curtis v. Gates Cmty. Chapel of Rochester, Inc.*,
  2023 WL 1070650 (W.D.N.Y. Jan. 27, 2023) ......................................... 20

*Doe v. Abdulaziz Bin Fahd Alsaud*,
  12 F. Supp. 3d 674 (S.D.N.Y. 2014) ....................................................... 14

*Doe v. Baram*,
  2021 WL 4847076 (S.D.N.Y. Oct. 15, 2021) ............................................ 7

*Doe v. Doe*,
  No. 952013/2023, 2024 WL 928103, *1 (Sup.Ct. N.Y. Cty Mar. 1, 2024) .......... 6

*Eiseman v. State of New York*,
  70 N.Y.2d 175 (1987) .............................................................................. 12

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014) .................................................................... 11

*Foman v. Davis*,
   371 U.S. 178 (1962) ................................................................................................ 25
*Friedland v. UBS AG*,
   2019 WL 1232084 (E.D.N.Y. 2019) ...................................................................... 4
*Giuffre v. Dershowitz*,
   2020 WL 2123214 (S.D.N.Y. Apr. 8, 2020) ......................................................... 7
*Harper v. Ercole*,
   648 F.3d 132 (2d Cir. 2011) ................................................................................ 11
*In re Skat Tax Refund Scheme Litig.*,
   365 F. Supp. 3d 300 (S.D.N.Y. 2019) ................................................................. 20
*Jackson v. Lefferts Heights Hous. Dev. Fund Co., Inc.*,
   831 N.Y.S.2d 528 (2d Dep't. 2007) ...................................................................... 6
*Lama v. Malik*,
   192 F.Supp.3d 313 (E.D.N.Y. 2016) ..................................................................... 9
*Luina v. Katherine Gibbs Sch. N.Y., Inc.*,
   37 A.D.3d 555 (2d Dep't 2007) ........................................................................... 16
*M.A. v. Wyndham Hotels & Resorts, Inc.*,
   425 F. Supp. 3d 959 (S.D. Ohio 2019) ............................................................... 22
*Majewski v Broadalbin-Perth Cent. Sch. Dist.*,
   91 NY2d 577, 696 NE2d 978 (N.Y. 1998) ........................................................... 5
*Marrero v. Roman Cath. Archdiocese of N.Y., No. 70329/2021E, 2023 N.Y. Misc. LEXIS*
   *25241 (Sup.Ct. Brox Cty. September 25, 2023)* ............................................. 20, 21
*Maysonet v. KFC, Nat'l Mgmt. Co*.,
   906 F.2d 929 (2d Cir. 1990) ................................................................................ 16
*Nallan v. Helmsley–Spear*, Inc.,
   50 N.Y. 2d 507 (1980) ......................................................................................... 12
*Newman v. Krintzman*,
   723 F.3d 308 (1st Cir.2013) ................................................................................... 4
*Paguirigan v. Prompt Nursing Emp't Agency LLC*,
   286 F. Supp. 3d 430 (E.D.N.Y. 2017) ................................................................. 23
*Persaud v. S. Axelrod Co.*,
   1996 WL 11197 (S.D.N.Y. Jan. 10, 1996) .......................................................... 19
*Reed v. Chisolm*,
   2024 WL 928103 (2d Dep't 2024) ........................................................................ 5
*Reed v. Chisolm* ,
   *711440/2023,  2023 N.Y. Misc. LEXIS 21889, at *3 (Sup.Ct. Queens Cty. Aug. 15, 2023)* ....... 5
*Robinson v. June*,
   637 N.Y.S.2d 1018 (N.Y. Sup. Ct. 1996) ........................................................... 17
*Salahuddin v. Cuomo*,
   861 F.2d 40 (2d Cir. 1988) .................................................................................... 4
*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) ................................................................................ 11
*Starr v. Time Warner, Inc.*,
   2007 WL 4144627 (S.D.N.Y. Nov. 21, 2007) ..................................................... 19
*Strass v. Costco Wholesale Corp.*,
   2016 WL 3448578 (E.D.N.Y. June 17, 2016) ..................................................... 13

*Taft v. Connell*,
  285 A.D.2d 992 (4th Dep't 2001).................................................................... 16, 17
*U.S. ex rel. Hagerty v. Cyberonics, Inc.*,
  95 F. Supp. 3d 240 (D. Mass. 2015) ...................................................................... 4
*Ungruhe v. Blake-Riv Realty LLC*,
  934 N.Y.S.2d 155 (1st Dep't. 2011) ...................................................................... 6
*United States v. Ray*,
  20 Cr. 110 (LJL) .............................................................................................. 8, 9, 19
*Watson v. United States*,
  865 F.3d 123 (2d Cir. 2017) ................................................................................ 10
*Williams v. Weaver*,
  2006 WL 2794417 (N.D.N.Y. 2006) ..................................................................... 4

## Statutes

18 U.S.C. §1594(b) .................................................................................................. 23
18 U.S.C. § 1591(e)(6) ............................................................................................ 23
18 U.S.C. § 1595(a) ................................................................................................. 22
18 U.S.C. §1595 ........................................................................................... 10, 11, 23
42 U.S.C. § 1983 ...................................................................................................... 18
N.Y. C.P.L.R. §214-j.......................................................................................... Passim
N.Y. C.P.L.R. 3211(a)............................................................................................. 21
N.Y. Penal Law §121.12 ........................................................................................... 9
N.Y. Penal Law, §130.52 .......................................................................................... 8
N.Y. Penal Law §130.90 ........................................................................................... 9
N.Y. Penal Law §130.91 ........................................................................................... 8
N.Y. Real Prop. § 339–j .......................................................................................... 15

## Rules

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 3
Fed. R. Civ. P. 8(d)(2) ............................................................................................. 20
Fed. R. Civ. P. 12(b)(6)............................................................................................. 3

## Other Authorities

2022 Reg. Sess. N.Y. Senate Bill S.66A (April 26, 2022)........................................ 7
2022 Reg. Sess. N.Y. Assembly Bill A.66A (May 23, 2022)..................................... 7

## PRELIMINARY STATEMENT

In its Motion to Dismiss, Gumley-Haft makes the following arguments: (1) the Adult Survivor's Act ("ASA"), codified in N.Y. C.P.L.R. §214-j, does not resurrect Plaintiffs' claims that are time-barred; (2) Plaintiffs have not adequately articulated a claim for common law negligence; (3) Plaintiffs' claim of negligent infliction of emotional distress lacks merit; and (4) Plaintiffs have not established a viable claim under the Trafficking Victims Protection Reauthorization Act, as amended. For the following reasons, Gumley-Haft's arguments here fail, and therefore their Motion to Dismiss should be denied (or, in the alternative, leave to Amend the Complaint should be granted by the Court).

## STATEMENT OF FACTS

### *Sarah Lawrence College*

During the fall of 2010, several students from Sarah Lawrence College, including Plaintiffs Daniel Levin and Santos Rosario, were housed together in an on-campus, townhouse style dormitory known as Slonim Woods 9. Dkt. No. 1 at ¶ 19 ("Complaint"). Soon after moving into Slonim Woods 9, Daniel and Santos learned that their roommate's father, Lawrence Ray ("Ray"), had recently been released from prison. *Id.* at ¶ 24. After being released from prison, Lawrence Ray moved into Slonim Woods 9, where he immersed himself into these students' lives for the purpose of exploiting them for human trafficking. *Id.* at ¶ 25.

### *The Manhattan Condominium (Managed by Gumley-Haft)*

At the end of the 2010-2011 school year, Ray moved out of Slonim Woods 9 and into a condominium unit located in the Waterford Building managed by Gumley-Haft in Manhattan. *Id.* at ¶ 53. The condominium unit was owned by Defendant Lee Chen ("Chen"), an acquaintance of Ray. *Id.* at ¶ 54. Shortly thereafter, Daniel Levin and Santos Rosario moved into the condominium

with Ray. Ray used the condominium to further perpetuate the exploitation of the Plaintiffs for human trafficking. Ray, with Chen's consent, continued his abuse and manipulation at the condominium by hosting gatherings, which included Plaintiffs Daniel Levin and Santos Rosario. *Id.* at ¶ 56.  At these gatherings, Ray and Chen would engage in sex acts with the young students. *Id.* at ¶ 62. Shortly after moving into the condominium, Ray started committing acts of physical assault, sexual assault and emotional abuse upon Daniel Levin and Santos Rosario. *Id.* at ¶ 61. On at least one occasion, Daniel Levin was forced to watch Ray and Chen sexually assault a young college student with her arms, wrist, and ankles bound to a table in the condominium. *Id.* at ¶ 63.

In or around 2012, Plaintiff Felicia Rosario, Santos Rosario's sister, moved into the condominium unit. *Id.* at ¶ 76. At the condominium, Ray used coercion and manipulation, emotional and physical abuse, and sexual assault to control the Plaintiffs for the purpose of ultimately exploiting them for human trafficking. *Id.* at ¶¶ 59, 61. After Felicia moved into the condominium, the unscrupulous and suspicious activities coming from the unit increased. *Id.* at ¶ 77. Felicia was regularly seen entering and leaving the building at all hours of the day and night, often dressed inappropriately for the weather. *Id.* at ¶ 78-79.

During this time, Gumley-Haft doormen and/or security personnel, including but not limited to Carlos Pagan, regularly observed groups of students entering and leaving the building at various times of the day and night, including these three Plaintiffs. *Id.* at ¶ 75. Upon information and belief, these Gumley-Haft staff members witnessed Felicia's concerning behavior described above. *Id.* at ¶ 78.

Gumley-Haft received complaints from other residents regarding suspicious activities involving these Plaintiffs. *Id.* at mor¶ 182. Moreover, upon information and belief, the condominium board wrote a complaint letter about disturbances stemming from the subject

condominium. *Id.* at ¶¶ 182, 183. Despite being made aware of these concerning occurrences, Gumley-Haft failed to take any action to intervene or protect these Plaintiffs. *Id.* at ¶ 183.

## <u>APPLICABLE STANDARD ON A MOTION TO DISMISS</u>

A motion under Fed. R. Civ. P. 12(b)(6) tests the formal sufficiency of a claim for relief. If the Complaint provides fair notice of the Plaintiff's claims and the facts alleged sufficiently show a plausible claim for relief, the motion must be denied. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662 (*citing Twombly*, 550 U.S. at 556). Ultimately, a Complaint need only set forth "a short and plain statement . . . showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).

The Second Circuit has rejected the contention that "*Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010). Further, the Second Circuit has held that "[t]he *Twombly* plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged "upon information and belief" where the facts are peculiarly within the possession and control of the defendant ... or where the belief is based on factual information that makes the inference of culpability plausible.'" *Id*. at 120 (citing *Boykin v. KeyCorp.*, 521 F.3d 202, 205 (2d Cir. 2008); *Iqbal*, 566 U.S. at 662.)

In considering a motion to dismiss for failure to state a claim, the court is limited to the

factual allegations in the Complaint and documents attached, as well as documents incorporated in the Complaint by reference and those of which the Plaintiff had knowledge and relied upon in commencing the action. *Friedland v. UBS AG*, No. 16 Civ. 687 (VMS), 2019 WL 1232084 (E.D.N.Y. 2019). It should be noted that it is also permissible for a court in this circuit[1] to consider materials outside a Complaint when reviewing a motion to dismiss for failure to state a claim (for example, the Plaintiffs' opposition papers) to the extent those papers are consistent with the allegations of the Complaint. *Williams v. Weaver*, No. 9:03-CV-0912 (LEK/GHL), 2006 WL 2794417 (N.D.N.Y. 2006). Moreover, facts alleged in Plaintiffs' Complaint must be taken in the light most favorable to Plaintiffs.

Finally, the Court must accept as true all well-pleaded factual allegations, and "draw … all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks omitted). Dismissal is reserved only "for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

## ARGUMENT

## I.    THE PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED

### A.    The ASA Applies Because Gumley-Haft's Negligence Enabled a Series of Heinous Acts that Meet the Criteria for Article 130 Sex Offenses

Gumley-Haft contends that the Adult Survivor's Act ("ASA") does not apply because they

---

[1] This is consistent with case law in other circuit courts, such as the first circuit that has held: in reviewing a motion to dismiss for failure to state a claim it is permissible for the court to go beyond plaintiffs' pleadings to "consider '(a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiffs' response to the motion to dismiss.' *Newman v. Krintzman*, 723 F.3d 308, 309 (1st Cir.2013) (internal quotation marks and alterations omitted)." *U.S. ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 256 (D. Mass. 2015), aff'd sub nom. *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26 (1st Cir. 2016)

did not enable Ray to commit acts of manipulation, grooming, physical and sexual abuse, and human trafficking while living at the Waterford Building. Gumley-Haft's position here is baseless, as the facts demonstrate that Gumley-Haft, as manager and operator of the Waterford Building, had actual and constructive notice of Ray's presence on the premises as well as the harm he was causing the Plaintiffs.

The ASA created a one-year revival period during which adult survivors of sexual assault could sue "any party" for their injuries despite the expiration of the previously applicable statutes of limitation. C.P.L.R. 214-j; *See Carroll v. Trump*, 650 F.Supp. 213, 218 (S.D.N.Y. 2023) . The ASA provides as follows:

> Notwithstanding **any provision of law** which imposes a period of limitation to the contrary […], **every civil claim or cause of action** brought against **any party** alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, which is barred as of the effective date of this section because the applicable period of limitation has expired […] **is hereby revived**, action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

C.P.L.R. § 214-j (emphasis added).

"The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the Legislature." *Reed v. Chisolm*, No. 711440/2023, 2023 N.Y. Misc. LEXIS 21889, at *3 (Sup.Ct. Queens Cty. Aug. 15, 2023) (*citing Anonymous v Castagnola*, 210 AD3d 940 (2d Dep't 2022), inner citations omitted) aff'd *Reed v. Chisolm*, 2024 WL 928103 (2d Dep't 2024). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Id*. at *3-*4 (*quoting Majewski v Broadalbin-Perth Cent. Sch. Dist*., 91 NY2d 577, 696 NE2d 978 (N.Y. 1998)). The ASA, codified in C.P.L.R. §214-j, applies to 'any civil claim' brought

'against any party' arising from conduct defined by Article 130 of New York's Penal Law.

Gumley-Haft attempts to parse out arbitrary limitations on categories of duty which can be argued in the "intentional or negligent acts or omissions" for which the ASA applies, but they provide no basis for this carving. There is no language within the statute suggesting this proposition. Rather, "under C.P.L.R. 214-j's plain language, the term "every" applies to all "civil claims or cause of action" that would have been properly brought in New York in the first instance." *Doe v. Doe*, No. 952013/2023, 2024 WL 928103, *1 (Sup.Ct. N.Y. Cty Mar. 1, 2024) (*citing Samuel W. v. United Synagogue of Conservative Judaism*, 219 AD3d 421, 422 (1st Dep't 2023)).

Gumley-Haft further provides no footing within legislative intent to justify their theory that the ASA applies only in a limited scope to either the abuser or the abuser's enabler. Gumley-Haft instead crudely attempts to hinge their argument on a single dictionary definition of the word "enable." In fact, there is an entire branch of law dedicated to delineating who can be said to "enable" or be held responsible for wrongful conduct which is established in the common law identifying duty. New York Courts have held that landlords have a duty to take minimal precautions to protect tenants and their guests from foreseeable harm, including third-party foreseeable criminal conduct. *Jackson v. Lefferts Heights Hous. Dev. Fund Co., Inc*., 831 N.Y.S.2d 528, 530 (2d Dep't. 2007). This duty is also applicable to managing agents. *Ungruhe v. Blake-Riv Realty LLC*, 934 N.Y.S.2d 155, 156 (1st Dep't. 2011).

The text and legislative history clearly show that the purpose of the ASA is to decrease the ticking clock on how long survivors of sexual abuse have to come forward if they want to seek civil remedies. The New York Legislature passed the ASA to combat a long-recognized problem created by what is characterized as a "culture of silence" and the existence of comparatively short

limitations periods to bring civil actions for sexual assault and other sexual offenses. *Carroll v. Trump*, 650 F.Supp. 213 (S.D.N.Y. 2023). A property management company's passive silence while a dangerous convict resided openly and visibly among innocent young adults for several years, for the purpose of committing sexual abuse and ultimately engaging in sex and labor trafficking, exemplifies the very "culture of silence" the ASA aims to combat.

Moreover, the applicability of the ASA here is exemplified by similar cases proceeding under New York's Child Victims Act ("CVA"), a law that is not only highly analogous to the ASA, but that legislators used as their model when enacting it. *See* 2022 Reg. Sess. N.Y. Assembly Bill A.66A (May 23, 2022) at 35, 46; 2022 Reg. Sess. N.Y. Senate Bill S.66A (April 26, 2022) at 2708. *See Brown v. U. of Rochester*, 216 A.D.3d 1328, 1331-32 (3d Dep't. 2023).

### B.    The ASA Applies Because Lawrence Ray's Misdeeds Constitute Sexual Offenses as Defined by New York Penal Law

The revival of civil causes of action under the ASA is triggered by "conduct which constitutes a sexual offense as defined in article one hundred thirty of the penal law." N.Y. C.P.L.R. §214-j. Gumley-Haft's contention that the Plaintiffs must plead which provision of Article 130 of the New York Penal Code Ray violated in order to benefit from the ASA's revival window is misplaced. *See Doe v. Baram,* 20 Civ. 9522 (ER), 2021 WL 4847076 (S.D.N.Y. Oct. 15, 2021) (denying motion to dismiss even where complaint did not cite specific provisions of Article 130). *See also Giuffre v. Dershowitz,* No. 19 CIV. 3388 (LAP), 2020 WL 2123214 at *2 (S.D.N.Y. Apr. 8, 2020) (the CVA's incorporation of the language from the Penal Code is merely a guidepost for determining which claims may be revived, the CVA creates no cause of action). Accordingly, the Plaintiffs are not required to allege or substantiate any breach of Article 130 to withstand a motion to dismiss.

That being said, while it is not Plaintiffs' burden to allege facts supporting the elements of

an Article 130 sex offense, Plaintiffs have alleged facts demonstrating that Ray and Chen's conduct would indeed constitute such sex offenses. For Plaintiffs' claims to be timely under the ASA, their conduct needs only amount to one such sex offense. Gumley-Haft's negligent acts and omissions perpetrated a series of heinous acts that qualify as Article 130 sex offenses as described below:

While residing at the Waterford Building, both Ray and Chen subjected Plaintiffs to sexual abuse. Dkt. No. 1. at ¶¶ 61-62, 71, 98-99, 150, 161. Chen's actions constitute sexual offenses as defined by Article 130, including but not limited to rape in the first degree (§130.35), rape in the third degree (§130.25), sexual abuse in the first degree (§130.65), sexual abuse in the third degree (§130.55), sexual misconduct (§130.20); and forceable touching (§130.52). *Id.* at ¶ 161.

As a result of Gumley-Haft's intentional and negligent acts and omissions and participation in a trafficking venture, all three Plaintiffs were victims of forcible touching by Ray as defined in PL, §130.52. For example, on one occasion, Ray intentionally and forcibly wrapped aluminum foil and saran wrap around Daniel Levin's testicles and twisted hard for the purpose of degrading and abusing him. *United States of America v. Ray*, 20 Cr. 110 (LJL) at p.264, lines 4-7 (S.D.N.Y. March 11, 2022). On many occasions, Ray choked Santos and Daniel until they lost consciousness, and would sometimes hold a knife to their genitals while threatening to cut them off. *United States of America v. Ray*, 20 Cr. 110 (LJL) at pp. 263, 316, 317 (S.D.N.Y. March 11, 2022). This contact with these Plaintiffs' genitals was for no legitimate purpose other than to degrade and abuse. Felicia Rosario was also subjected to forcibly touching by Ray.

As a result of Gumley-Haft's intentional and negligent acts and omissions and participation in a trafficking venture, all three Plaintiffs were victims of multiple sexually motivated felonies as defined by N.Y. Penal Law §130.91. First, Ray committed promotion of prostitution in the second degree as defined in section 230.30. Ray advanced prostitution by compelling Felicia to engage in

prostitution by intimidation and force. Felicia was forced to engage in sex acts with men for the benefit of Ray's trafficking enterprise as well as his own sexual gratification. Dkt. No. 1 at ¶ 87. Second, Santos Rosario and Daniel Levin were victims of a sexually motivated felony when they were subjected to strangulation in the second degree as defined in N.Y. Penal Law §121.12. *United States of America v. Ray*, 20 Cr. 110 (LJL) at pp. 263, 316, 317 (S.D.N.Y. March 11, 2022). These instances of strangulation were committed to create and promote a prostitution and sex trafficking venture and for Ray's personal sexual gratification.

Moreover, all three Plaintiffs were victims of facilitating a sex offense with a controlled substance as defined in N.Y. Penal Law §130.90. The facts will demonstrate that Ray coerced the Plaintiffs into taking Adderall to ensure they were sleep deprived and could easily be controlled. Ray did this for the purpose of controlling them to promote prostitution, create a sex trafficking venture, and for his own sexual gratification.

### C.   Plaintiffs' Claims Under the TVPRA are Timely and the ASA Revives any Potentially Time-Barred TVPRA Claims

Gumley-Haft argues that the Plaintiffs' TVPRA claims arising prior to November 21, 2013 are untimely because the ten-year limitations period expired prior to Plaintiffs' filing the Complaint on November 21, 2023. However, cases addressing this issue demonstrate that the Plaintiffs' claims under the TVPRA do not accrue until the victims have escaped from their trafficker and are free to seek legal redress. *See Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (taking facts "in light most favorable to [plaintiff], this virtual imprisonment prevented her from seeking legal redress until at least the date of her escape"); *Lama v. Malik*, 192 F.Supp.3d 313, 321 (E.D.N.Y. 2016) ("claim accrued when she left Malik's home in 2008"). Construing the Complaint in the light most favorable to Plaintiffs, they did not escape from Ray's abuse and the cult brainwashing until well after November 2013.

For Plaintiffs meeting the criteria of the ASA, the statute resurrects *all* claims (federal and state) arising from the sexual abuse experienced by Plaintiffs, including the TVPRA claims. The ASA explicitly extends beyond state law claims, revitalizing **'every civil claim or cause of action,'** and does so without regard to any statute of limitations imposed by other laws (**"notwithstanding any provision of law which imposes a period of limitation to the contrary"**). (N.Y.C.P.L.R. § 214-j, emphasis added). There is no stipulation that the claim must be under state law - the sole requirement is that the 'conduct' underlying the 'claim or cause of action' violates article 130 of N.Y. Penal Law. As long as this criterion is met, the statute applies to revive the claim, irrespective of its legal classification or whether it is based on federal or state law.

Moreover, the Plaintiffs' TVPRA claims should be equitably tolled. The ten-year limitations period under the TVPRA begins to run when "the cause of action arose." 18 U.S.C. §1595. For typical tort claims, a cause of action accrues when the wrongful conduct occurs (or when the last element of the cause of actions occurs). *City Store Gates Mfg. Corp. v. Empire Rolling Steel Gates Corp.*, 113 A.D.3d 718, 718 (2nd Dep't. 2014) ("With respect to tort claims, accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in the complaint …." (internal quotation marks and citations omitted)). The limitations period may be tolled or extended under principles of equitable tolling if the party seeking tolling establishes "two elements: (1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Watson v. United States*, 865 F.3d 123, 132 (2d Cir. 2017) (internal quotation marks omitted). To satisfy the diligence requirement, a Plaintiff must "demonstrate that [she] did not discover [her human trafficking] cause of action -- and could not have discovered it with due diligence -- until less than ten years

before bringing suit." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 at 800 (2d Cir. 2014) (affirming dismissal where "plaintiffs were aware of all the necessary elements of a cause of action for human trafficking long before" the event they allege triggered knowledge of their claim). The "extraordinary circumstance" in the second element refers "to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011).

A claim may be dismissed based on the statute of limitations only if it is clear on the face of the Complaint that the claim is untimely as a matter of law. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Given the possibility of equitable tolling, a TVPRA claim is subject to dismissal based on a statute of limitations defense only if the Complaint makes clear that each element of the alleged wrongful conduct arose more than ten years before the claim was filed, the Plaintiff has not been pursuing her rights diligently, and no extraordinary circumstance stood in her way. *See Ellul*, 774 F.3d at 800.

At the pleading stage, however, dismissal of the § 1595 claim is not warranted because it is not clear from the face of the Complaint that equitable tolling does not apply. Gumley-Haft enabled Ray's scheme of exploitation through coercion and manipulation into acts of forced labor and sex trafficking by willfully ignoring, and thereby facilitating, the criminal activities occurring on its premises. Dkt. No. 1 at ¶¶ 58, 59, 61, 71, 74, 75, 77-82. Through their negligence, Gumley-Haft enabled Ray to isolate and mistreat the Plaintiffs. Ray tortured, manipulated, and brainwashed the Plaintiffs so horrifically that they were unable to escape let alone seek help or pursue redress. The Plaintiffs have sufficiently alleged that they were victims of coercion, manipulation, threats, physical and sexual assault, and monitoring for years. It can be inferred that while under Ray's control, the Plaintiffs had no access to legal advice, no significant freedom of movement, and were primarily contained wherever Ray was staying, isolated from others, socially and otherwise. The

circumstances surrounding their years living with Ray were sufficiently "extraordinary" to warrant equitable tolling.

Finally, should the Court find the Plaintiffs TVPRA claims are time barred, the Plaintiffs request leave to amend their complaint to supplement information related to accrual of the Plaintiffs' TVPRA claims.

## II.   PLAINTIFFS' COMMON LAW NEGLIGENCE CLAIMS WERE PROPERLY PLED

### A.   Gumley-Haft Owed a Duty to the Plaintiffs

In their Complaint, the Plaintiffs allege that Gumley-Haft was the manager of the building. Dkt. No. 1 at ¶¶ 55, 178-180. Managers presumptively have a special relationship with tenants and invitees to the building. The Plaintiffs' Complaint includes multiple allegations that plausibly could have made them invitees or even tenants. *Id.* at ¶¶ 74-76. A duty need not be explicitly named and may arise from factual allegations that point to a special relationship that requires the Defendant to protect against the risk of harm to Plaintiff. *Eiseman v. State of New York*, 70 N.Y.2d 175, 187–188 (1987). Landowners, for example, have a duty to protect tenants, patrons and invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises, because the special relationship puts them in the best position to protect against the risk. *Nallan v. Helmsley–Spear*, Inc., 50 N.Y. 2d 507, 518–519 (1980).

#### 1.   Plaintiffs Allege Facts that Plausibly Establish a Special Relationship Between the Parties

The facts alleged by Plaintiffs plausibly demonstrate a special relationship between the Plaintiffs and Gumley-Haft, and said special relationship created a heightened duty of care. Plaintiffs allege facts that point to multiple interactions with Gumley-Haft employees, including naming a specific employee. Dkt. No. 1 at ¶¶ 72-74. Plaintiffs further allege that on multiple nights

and days they were in and out of the condo building, and that they had ongoing and repeated access to the unit through the entryway maintained by Gumley-Haft. Plaintiffs' allegations could plausibly lead to a finding that the access Ray and Plaintiffs had to the condominium was open and obvious, including moving into the building while it was managed by Gumley-Haft. These alleged facts taken together plausibly give rise to a special relationship and a heightened duty of care. *Id.* at ¶ 116.

Gumley-Haft argues that the duty it owed to the Plaintiffs was equivalent to the duty any property owner would have had to the general public. However, the above facts demonstrate that the Plaintiffs' continuous and obvious access supports a claim that they were tenants or invitees to the building. The Plaintiffs were seen by and interacted with Gumley-Haft employees on a regular, repeated and ongoing basis as they occupied, entered and exited the building at various hours.

### B. Gumley-Haft Had Actual and Constructive Notice of the Wrongful and Criminal Activities Taking Place at the Building

Plaintiffs' allegations made "upon information and belief" are sufficient to support an inference that Gumley-Haft was on notice of the wrongful and criminal activities taking place at the building. Rejecting this argument, in their Motion to Dismiss, Gumley-Haft cites *Strass v. Costco Wholesale Corp.*, No. 14CV06924PKCVMS, 2016 WL 3448578 (E.D.N.Y. June 17, 2016). However, that case is distinguishable from our case at bar. In *Strass,* the Plaintiff's claims arose from injuries suffered when a puddle of a liquid substance was left unattended on the floor of a building. In our case, the Plaintiffs allege that Gumley-Haft allowed Ray ongoing access and occupation of the building they manage, while failing to inquire and turning a blind eye to foreseeable dangers. Dkt. No. 1 at ¶ 178. A jury could reasonably conclude that by allowing Ray, Ray's co-conspirators, other victims, and Plaintiffs repeated and ongoing access to the building, actual and constructive notice has been established. Dkt. No. 1 at ¶¶ 62-70.

Plaintiffs' allegations plausibly support that Gumley-Haft had constructive notice of Ray's actions and their injuries. Plaintiffs' pleadings make it plausible to infer that Ray violated occupancy and noise regulations while he tortured Plaintiffs and furthered his criminal enterprise through forced labor and sex trafficking. Plaintiffs' allegations include: 1) Ray gained access to the condo through the building entrance that Gumley-Haft managed and supervised; 2) Ray invited multiple college students to gain access to the condo through the building entrance controlled by Gumley-Haft; 3) Felicia Rosario was seen at times "not wearing clothing appropriate for the weather" which is a known red flag for trafficking; 4) Gumley-Haft doormen and security personnel, including but not limited to Carlos Pagan, were aware of "suspicious activities against Plaintiffs" as Pagan regularly interacted with Ray; and 5) the Condo Board documented the disturbances in the unit and a complaint was made about noise coming from the unit. Dkt. No. 1 at ¶¶ 178, 180-183.

Finally, in their Motion to Dismiss, Gumley-Haft also relies on *Doe v. Abdulaziz Bin Fahd Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y. 2014)*,* a case that is clearly distinguishable from our case at bar. *Doe* centers around a negligent supervision and retention claim against an employer for the sexual assault of Doe, who was lured to a location not managed by the employer, then drugged and raped. In *Doe*, unlike in this case, the claim was against an employer that did not have control over the entry to the hotel where the assault took place. *Id.* at 681.

### C. At all Relevant Times, Gumley-Haft Maintained an Ability to Control Foreseeable Criminal Acts

#### 1. Facts Establishing Gumley-Haft's Ability to Control

Plaintiffs adequately allege facts that can plausibly lead to a finding that Gumley-Haft had the ability to control access to the building and condominium unit where Plaintiffs were injured. Gumley-Haft managed the building where Plaintiffs were injured and assumed a duty to discover

Ray's motives and reasons for accessing the building and occupying a unit which he did not lease or own. As noted above, Ray had a criminal record before the time of the events at the Waterford. Dkt. No. 1 at ¶ 74-75. Wherefore, the criminal acts Ray inflicted upon these three Plaintiffs was foreseeable. These foreseeable acts included using the condo to commit sexual and physical abuses against Plaintiffs, as well as harboring and maintaining Plaintiffs for the purposes of extortion, forced labor and human trafficking.

Moreover, condominium rules, by-laws, and regulations apply to all owners, tenants, invitees, guests and even contract workers (N.Y. REAL PROP. § 339–j). Gumley-Haft, acting as a direct agent of the condominium board, had assumed a duty to enforce the condominium rules, by-laws, and regulations. As property managers, Gumley-Haft further assumed a duty to identify suspicious activity, including known or suspected violations of laws or ordinances.

### 2. Facts Establishing that Ray's Criminal Acts Were Foreseeable to Gumley-Haft

Ray's criminal acts were foreseeable or should have been foreseeable to Gumley-Haft because said acts were ongoing and persistent. In their Motion to Dismiss, Gumley-Haft cites to several cases in an attempt to refute this foreseeability argument. However, all of these cases cited by Gumley-Haft are clearly distinguishable from our case at bar.

The first case cited by Gumley-Haft is *Ayeni v. County of Nassau,* 18 A.D.3d 409 (2d Dep't. 2005) that centered around a violent fight that took place on school property. In *Ayeni*, there was no way for the school to know this incident was linked to a prior incident, and security responded immediately to the incident. *Id.* at 410. Wherefore, it was not unreasonable for the court to find that the criminal act was not foreseeable to the defendant in that case. In our case at bar, however, the facts will establish that Gumley-Haft could have linked these three Plaintiffs' overt injuries to the fact that they were occupying the same premises as a convicted criminal (Ray).

Moreover, Gumley-Haft security personnel failed to respond or check on the condominium unit and/or its occupants, despite alleged violations and complaints concerning noise and occupancy.

The second case cited by Gumley-Haft on this issue is *Luina v. Katherine Gibbs Sch. N.Y., Inc.*, 37 A.D.3d 555 (2d Dep't 2007). The events in *Luina* took place in a campus classroom when a student, suddenly and without warning, punched another student in the face. The court in *Luina* ruled that the college did not have a duty to protect in that case because the underlying act was sudden, and therefore unforeseeable. *Id.* at 556. In our case at bar, it was not a single incident, but repeated abuses and violations and Gumley-Haft was at all times a residential property manager providing for security of the building.

The third case cited by Gumley-Haft on this issue is *Maysonet v. KFC, Nat'l Mgmt. Co*., 906 F.2d 929 (2d Cir. 1990). The *Maysonet* case involved a criminal act which took place inside a fast-food chain restaurant. The Court in *Maysonet* found that, "[u]nder New York law a proprietor is not liable for the intervening criminal acts of another unless such acts were reasonably foreseeable." *Id.* at 930. Our case at bar is distinguishable from *Maysonet*, as our case involves a residential property manager, and not a fast-food restaurant. Patrons of restaurants are not asked or expected to provide their names nor the purpose of their visit, because they do not live in or sleep at the premises. Patrons of restaurants have a specific purpose for being on the premises – and that purpose is to purchase prepared food as a convenience.

The fourth case cited by Gumley-Haft on this issue is *Taft v. Connell*, 285 A.D.2d 992 (4th Dep't 2001). In *Taft*, the Plaintiff was attacked in a parking lot outside of a bar, and the bar owner did not control or regulate the parking lot. The Court in *Taft* held that the duty to protect a Plaintiff from foreseeable harm caused by third persons is limited to conduct the owner "had the opportunity to control,", and of which the owner "was reasonably aware." *Id.* at 992. In our case

at bar, Gumley-Haft controlled and/or regulated the premises where the criminal conduct took place. Therefore, our case is clearly distinguishable from the *Taft* case. Our case at bar should instead be reviewed in light of the more analogous case of *Robinson v. June*, 637 N.Y.S.2d 1018 (N.Y. Sup. Ct. 1996). In *Robinson,* even though the Defendant property management company did not own the property where an attack took place, there was "… evidence [to] support the jury's implicit finding that [the property] was under the effective control of the [defendant], … and that management had assumed an obligation to protect patrons using the [property]." *Id.* at 487.

### III.    THE PLAINTIFFS' NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS WERE PROPERLY PLED

For the reasons articulated *supra* in Section II, the Plaintiffs' claims for negligent infliction of emotional distress ("NIED") are properly pled. In their Motion to Dismiss, Gumley-Haft further argues that the Plaintiffs' NIED claims fail for two reasons, namely (1) Gumley-Haft did not owe a "special duty" to the Plaintiffs; and (2) the Plaintiffs' NIED claims are duplicative of their negligence claims. For the following reasons, both of Gumley-Haft's arguments fail.

#### A.    Gumley-Haft Owed a Special Duty to Plaintiffs and/or Caused Plaintiffs to Suffer Traumatic Events Resulting in Them Fearing for Their Safety

"A cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only to plaintiff ..., or where there is proof of a traumatic event that caused the plaintiff to fear for her own safety." *Cucchi v. N.Y.C. Off–Track Betting Corp.*, 818 F.Supp. 647, 656 (S.D.N.Y.1993) (emphasis added). In their Motion to Dismiss, Gumley-Haft argues that the Plaintiffs' NIED claims must be dismissed because no "special duty" existed between the Plaintiffs and Gumley-Haft. In support of their argument, Gumley-Haft relies on two cases, namely *Burroughs v. Mitchell*, 325 F. Supp. 3d 249 (N.D.N.Y. 2018) and *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011).

However, the facts and circumstances outlined in both *Burroughs* and *Alexander* are clearly distinguishable from our case at bar, and therefore should not be considered as binding upon this court.

In *Burroughs*, the Plaintiff filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 asserting claims arising out of his confinement while in the custody of the New York Department of Corrections and Community Supervision. The court dismissed the NIED claims in that case because the Plaintiff had "failed to allege any special duty owed to him by defendants aside from the general duty owed to all inmates not to use excessive force". *Burroughs* at 285.

In *Alexander*, the Plaintiff was a teacher who sued a school district alleging that she was sexually harassed by a principal at her school. In Alexander, the court dismissed the Plaintiff's NIED claim on the grounds that the Defendant did not owe a "special duty" to the Plaintiff because an employer had an obligation to treat all employees in the same matter.

Neither *Burroughs* nor *Alexander* bear any resemblance to our case at bar. This case involves a property manager's duty to protect its tenants and guests from harm, particularly when said property manager is on direct and constructive notice of said harm. This duty becomes particularly significant when the property manager has direct or constructive notice of the harm occurring on the premises. Direct notice implies that the property manager was made aware of the harm through explicit reports or complaints from tenants or other sources. Dkt. No. 1 at ¶¶ 71, 81, 82, 182, 183. Constructive notice, on the other hand, refers to the notion that the property manager should have been aware of the harm through reasonable diligence or observation, even without explicit reports. Dkt. No. 1 at ¶¶ 71, 74, 75, 78, 79, 176-183.

When a property manager is on notice of harm, whether directly or constructively, it heightens their duty to take reasonable steps to address the situation and ensure the safety of tenants

and guests. Here, Gumley-Haft had either direct or constructive knowledge of the harms which the Plaintiffs were subjected to and owed a duty to take appropriate actions to mitigate the risk of harm and stop the ongoing criminal activity on its premises.

Moreover, there are ample facts within the Complaint to support the conclusion that Ray caused the Plaintiffs to suffer traumatic events that caused them to fear for their safety. "[T]o recover damages for [NIED], such a cause of action must generally be premised upon conduct that unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety." *Starr v. Time Warner, Inc.*, No. 07 CIV. 5871 (DC), 2007 WL 4144627, at *6 (S.D.N.Y. Nov. 21, 2007). The Plaintiffs were in a constant state of apprehension and fear for their safety, while Ray subjected them to emotional abuse and acts of physical and sexual assault. Dkt. No. 1 at ¶¶ 61, 63, 64, 99, 147, 150, 158, 160, 169. In *Persaud v. S. Axelrod Co.*, No. 95 CIV. 7849(RPP), 1996 WL 11197, at *5 (S.D.N.Y. Jan. 10, 1996) the court ruled that although the plaintiff had not specifically alleged a special duty owed to her, the complaint did outline at least one traumatic event that led to her fear for her physical safety. (The plaintiff alleged an encounter outside the ladies' room, which caused her to physically fear for her safety). Consequently, the court denied the defendant's motion to dismiss the claim for negligent infliction of emotional distress. There is ample evidence in this case to illustrate the severe trauma, harm, and fear for their safety that the Plaintiffs endured, which will be disclosed during discovery. This evidence includes instances of physical and sexual assault, such as forcefully throwing Felicia on the ground, choking Santos and Daniel until they lost consciousness, or threatening to mutilate genitals. *Ray*, 20 Cr. 110 (LJL) at 263, 264, 316, 317. Hence it would be premature to dismiss the NIED at this stage.

**B.      Plaintiffs' NIED Claims are Separate and Distinct from their Negligence Claims**

Gumley-Haft argues that the Plaintiffs' NIED claim should be dismissed because the NIED claim is "duplicative" of the negligence claim. The Plaintiffs' allegations of negligence and NIED present distinct legal claims that are not duplicative of each other. A plaintiff "may plead claims that provide alternative bases for relief," and "a claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other." *In re Skat Tax Refund Scheme Litig.*, 365 F. Supp. 3d 300, 325 (S.D.N.Y. 2019); *see also* Fed. R. Civ. P. 8(d)(2).

In support of this argument, Gumley-Haft relies on only one case, *Curtis v. Gates Cmty. Chapel of Rochester, Inc.*, 2023 WL 1070650 (W.D.N.Y. Jan. 27, 2023). It is true that, in *Curtis*, the Court agreed that the Plaintiffs' negligence claims and NIED claims involved identical conduct, sought the same relief, and were duplicative. *Curtis* at 14. It is also true that, in Curtis, the Court dismissed the Plaintiff's NIED claim. However, a careful reading of the Curtis decision reveals that the Court's decision to dismiss the Plaintiff's NIED was the result of a technicality, not substance. More specifically, in *Curtis*, the Plaintiff's counsel failed and/or neglected to oppose the Defendant's argument seeking dismissal of the NIED claim. The *Curtis* court went on to say that dismissal of the NIED claim is warranted because, by not offering an opposing argument, Plaintiff's counsel had abandoned the NIED claim. *Curtis* at 13.

Wherefore, Gumley-Haft's reliance on the Curtis decision as grounds for dismissal of the Plaintiffs' NIED claims in our case is not warranted. In our case, the Plaintiffs vehemently oppose dismissal of their NIED claim. As grounds in support of their opposition, the Defendants rely on *Marrero v. Roman Cath. Archdiocese of N.Y.*, No. 70329/2021E, 2023 N.Y. Misc. LEXIS 25241 (Sup.Ct. Brox Cty. September 25, 2023).

In *Marrero*, the Defendants sought to dismiss the Plaintiffs' NIED claims as being

duplicative to their other negligence-based causes of action. The Marrero court disagreed, finding that a "duplicative claim" is not a viable basis for dismissal within N.Y. C.P.L.R. 3211(a). *Id.* at 7. The Marrero court looked at several other decisions as grounds in support of their ruling, including *Brown v. New York Design Ctr., Inc*., 215 A.D.3d 1, 9 (1st Dep't 2023) (the court allowed both a negligence claim and a NIED claim based on the same underlying facts and circumstances to survive after a summary judgment motion). The *Marrero* court went on to state that there is a risk of prejudicing the due process rights of a litigant by eliminating causes of action that contain separate elements that must be proven when all necessary elements have been adequately pleaded. *Marrero* at 7. The *Marrero* Court also found that such prejudice to the Plaintiff is greater than any prejudice to the civil defendant in defending against them - if their theory holds true it will require no additional effort at all on their part to refute since the underlying conduct in question is the same. *Id.* The *Marrero* court further held that under New York law, a negligence cause of action and a negligent infliction of emotional distress cause of action are not the same. *Id*.

## IV.    THE PLAINTIFFS' TVPRA CLAIMS WERE PROPERLY PLED

Plaintiffs' allegations plausibly support a finding that they were each victims of multiple TVPRA Chapter 77[2] violations, including violations of 18 U.S.C. §§1591, 1594 while residing at Defendant's managed property. Plaintiffs' allegations include Ray obtaining, recruiting, enticing, and grooming each of them by use of force, fraud and coercion for the purpose of furthering his criminal enterprise of human trafficking. Dkt. No. 1 at ¶¶ 58-59. Plaintiffs also include reference to Ray's convictions, including 18 U.S.C. §§1591; §1594. *Id.* at ¶138.

Plaintiffs' third-party liability claims are brought under 18 U.S.C. § 1595(a). Said claims are based on alleged facts that, taken in the light most favorable to the Plaintiffs, plausibly show

---

[2] Chapter 77 is often referred to as the "TVPRA" or Trafficking Victim Protection Reauthorization Act.

that Gumley-Haft, along with its agents and employees, knowingly benefited from a venture while its agents or employees knew or should have known of violations of Chapter 77 with respect to Plaintiffs. *Id.* at ¶¶ 136, 140.

### A.    Gumley-Haft Knowingly Benefited

Plaintiffs adequately alleged facts that plausibly show Gumley-Haft and its employees and agents knowingly benefited[3] (1) as a management company through its management services (*Id.* at ¶ 186); (2) through cash tips to its employees by Ray (*Id.* at ¶ 67); and (3) through improvements to the building. (*Id.* at ¶¶ 165-166, 169, 186)

Upon information and belief, Gumley-Haft managed the building and was responsible for securing the building that was accessed and used by Ray to violate the TVPRA with respect to Plaintiffs. Gumley-Haft presumably charged for its services to the building. Further, Ray's direct excessive tipping to Gumley-Haft employees and agents benefited the company through payment to employees and employee retention. *Id.* at ¶67. (Gumley-Haft employees and agents accepting excessive tips from Ray may arguably extend beyond a third-party beneficiary if the employees had direct knowledge and were paid to look the other way.)[4]

Plaintiffs allege that their forced labor of real property improvements to the condominium benefited Gumley-Haft. *Id.* at ¶ 186. Plaintiffs have plausibly alleged that Gumley-Haft managed the building that provided access to the condominium. Allegations make it plausible to conclude that as part of being a residential building manager, Defendant was contracted to monitor and report unauthorized improvements and construction in order to maintain safety for all residents and protect the value of the property for the owners. Such monitoring would have been

---

[3] Defendant knowingly benefit from fees it collected on room rental at its branded hotels. See *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019)

[4] Plaintiffs allege that Defendant assisted in harboring Plaintiffs. Dkt. 1 at ¶ 186.

compensated and would include monitoring and reporting unauthorized projects that could potentially cause harm to life or property value, such as those performed by Plaintiffs within the building.

### B.      Gumley-Haft Participated in a Venture

Gumley-Haft participated in a venture. Gumley-Haft attempts to equate "participate in a venture" to participating in a "conspiracy" (See 18 U.S. Code §1594(b)). Plaintiffs are not required to allege that Gumley-Haft "entered into a joint enterprise with consciousness of its general nature and extent." Dkt. No. 17-1 at 23. Any such proof that Gumley-Haft was conspiring with Ray would expose Gumley-Haft to not just civil, but criminal liability. (See definition of a conspiracy in *Paguirigan v. Prompt Nursing Emp't Agency LLC,* 286 F. Supp. 3d 430 (E.D.N.Y. 2017) (cited in *United States v. Ray,* 20-cr-110 (LJL), Opinion and Order (S.D.N.Y. Jul. 27, 2021)).

Plaintiffs are not claiming that Gumley-Haft violated a criminal statute and are not claiming that their actions rose to the level of a "conspiracy" in terms of their consciousness of the general nature and extent of Ray's actions at the condominium. Instead, Plaintiffs argue that Gumley-Haft was in its own profitable venture of managing access to a residential building providing housing on its property. Defendant further attempts to define "venture" by citing to a criminal standard in 18 U.S. Code § 1591(e)(6). Reading in this heightened standard for Plaintiffs' §1595 claim would give no meaning to the "should have known" language that gives rise to a civil claim. Furthermore, there is no requirement in 18 U.S.C. § 1595 that there be a formal association between Ray and Gumley-Haft. As the manager of the building, it can be presumed that Gumley-Haft had the authority to remove Ray and yet they continued to allow him to have access to the building and condominium. Dkt. No. 1 at ¶¶55, 178-180.

### 1. Gumley-Haft's Pattern of Conduct Supported Ray's Harboring of Plaintiffs

Gumley-Haft argues that they did not participate in a venture due to there being no appearance that they had an established pattern of conduct. However, Gumley-Haft did, in fact, engage in a pattern of conduct by ignoring repeated violations of regulations and not inquiring about suspicious and dangerous activity. Plaintiffs allege that Gumley-Haft repeatedly allowed Ray and Plaintiffs' unfettered access to the condominium. The court may infer that employees of Defendant were motivated by Ray's excessive tips to ignore other complaints about the presence of unusual activity, loud noises, and other concerning behavior coming from Chen's Condo unit, which Ray and Plaintiffs occupied. When notified of this suspicious activity, Gumley-Haft had the sole authority to investigate what may have been occurring in Apartment 15E, yet they chose to do nothing. Dkt. No. 1 at ¶¶ 81, 182.

### C. Gumley-Haft Knew or Should Have Known of TVPRA Violations

Plaintiffs' factual allegations with respect to Gumley-Hafts actions and inactions (Dkt. No. 1 at ¶¶ 80, 82, 183, 186, 191) plausibly support a finding that Gumley-Haft knew or should have known of Ray's use of the building and the condo for trafficking of Plaintiffs. Gumley-Haft was aware that Ray and Plaintiffs were residing in Apt. 15E and with minimal inquiry would have been made aware that Ray was trafficking Plaintiffs. Plaintiffs' allegations in their totality plausibly support a finding that Gumley-Haft knew or should have known that Ray was preying on vulnerable individuals in the building. Plaintiffs' complaint includes factual allegations of the injuries resulting from trafficking that each Plaintiff sustained while inside the condominium unit. Dkt. No. 1 at ¶¶ 183, 186, 189. These injuries were caused by Ray's trafficking enterprise, which was discoverable by Gumley-Haft.

Gumley-Haft chose convenience and revenue over intervening when it was in a unique position to prevent and put an end to Ray's further terror. Gumley-Haft knew or should have known of Ray's multiple tactics that amounted to violations of the TVPRA through use of force, fraud, and coercion. Plaintiff alleges that signs of Ray's tactics at the condominium building were reported. Gumley-Haft knew or should have known that Ray's tactics were used to compel both labor and sex acts for his benefit. Ray's tactics at the condominium building included force, fraud, coercion, emotional abuse, and physical and sexual assault to entice, obtain, groom, and recruit Plaintiffs for the purpose of his multiple trafficking ventures.

Plaintiffs are not required to plead facts that show Gumley-Haft should have known the exact evil that Ray would exact in his multiple trafficking ventures, which included sex trafficking and forced labor, including domestic servitude. It is foreseeable that Ray, who was presumably violating multiple regulations by residing in Apt. 15E with a number of other "roommates" was building a criminal enterprise that relied on human beings. Plaintiffs allege that Ray, a convicted kidnapper, would perform criminal activities inside the condo, and it is foreseeable that these activities would include the abuse and trafficking of Plaintiffs.

## V.    LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY

If the Court sees fit to dismiss these claims, the Plaintiffs respectfully request that they be dismissed with leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that Fed. R. Civ. P. 15(a) requires that leave to amend a pleading be freely given).

## CONCLUSION AND REQUEST FOR A HEARING

For the foregoing reasons, the Plaintiffs respectfully request that this Honorable Court Gumley-Haft, LLC's, Motion to Dismiss on all grounds. The Plaintiffs further request a hearing.

Dated: April 25, 2024

Respectfully submitted,
The Plaintiffs,
By their attorneys,
*Admitted pro hac vice,*

*/s/ Kelly A. Guagenty, Esq.*
Kelly A. Guagenty, Esq. (MA BBO 658872)
Paula S. Bliss, Esq.  (MA BBO 652361)
Kimberly A. Dougherty, Esq. (MA BBO 658014)
JUSTICE LAW COLLABORATIVE, LLC
210 Washington Street
North Easton, MA 02356
Tel: (508) 230-2700
kelly@justicelc.com
paula@justicelc.com
kim@justicelc.com


And,


*/s/ Nicholas R. Farnolo, Esq.*
Nicholas R. Farnolo, Esq.
Roopal P. Luhana, Esq.
CHAFFIN LUHANA LLP
600 Third Ave., 12th Floor
New York, New York 10016
Tel: (888) 480-1123
Farnolo@chaffinluhana.com
luhana@chaffinluhana.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 25th day of April 2024, a true and correct copy of the foregoing was electronically filed via the Court's CM/ECF system, which will automatically serve notice of this filing via e-mail to all registered counsel of record.

I hereby certify that a copy of the foregoing was served via electronic and first-class mail upon the following:

*Defendant:*
Mr. Scott Muller
34 Knox Street
Mount Pocono, PA 18344
scottm1427@yahoo.com

*/s/ Kelly A. Guagenty* _____

Attachment

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 35 of 105

Curtis v. Gates Community Chapel of Rochester, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 1070650
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Melissa CURTIS, Plaintiff,
v.
GATES COMMUNITY CHAPEL OF
ROCHESTER, INC., d/b/a Freedom
Village USA, and Fletcher A. Brothers
(aka Pastor Brothers), Defendants.

6:20-CV-06208 EAW
|
Signed January 27, 2023

**Attorneys and Law Firms**

David A. Beke, Ralph DeSimone, DeSimone &
Associates, LLC, New York, NY, for Plaintiff.

Joseph W. Carbonaro, Carbonaro Law, PC, New York,
NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, Chief Judge

**INTRODUCTION**

*1 Plaintiff Melissa Curtis ("Plaintiff") commenced this
negligence action, arising under this Court's diversity
jurisdiction, against Defendants Gates Community Chapel
of Rochester, Inc. d/b/a Freedom Village USA ("FVU")
and Fletcher A. Brothers a/k/a Pastor Brothers ("Brothers")
(collectively "Defendants"). (Dkt. 1). Presently before the
Court is Defendants' motion to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6). (Dkt. 36). For the following reasons,
Defendants' motion is granted in part and denied in part.

**BACKGROUND**

The following facts are taken from Plaintiff's complaint.
(Dkt. 1).

Plaintiff, a citizen of the Commonwealth of Pennsylvania,
attended FVU, a private school for troubled teens located
in Lakemont, New York, from the fall of 1996 through the
spring of 2001. (Id. at ¶¶ 1, 5). She alleges that FVU and
Brothers are both citizens of the State of New York. (Id. at
¶¶ 7, 8). Brothers owned, operated, and controlled FVU.
(Id. at ¶ 15). Plaintiff's father served as Head of
Maintenance at FVU. (Id. at ¶ 10).

FVU employed Eli Gonzalez ("Gonzalez") as a member of
its maintenance staff. (Id. at ¶ 16). Beginning in January of
1998, Gonzalez, while employed by FVU, repeatedly
sexually abused Plaintiff on FVU grounds. (Id. at ¶ 21). As
a result of the abuse, Plaintiff stopped attending school and
her grades suffered, and was so afraid that she never told
anyone what Gonzalez did to her. (Id. at ¶¶ 22, 24).
Plaintiff alleges that Defendants owed FVU students a duty
of care and knew or should have known of Gonzalez's
propensity to subject students to acts of sexual abuse, and
that the wrongful acts of Defendants were the proximate
cause of harm to Plaintiff. (See generally id. at ¶¶ 25-61).

Plaintiff asserts claims against FVU and Brothers for
negligent hiring (id. at ¶¶ 25-31); negligent training (id. at
¶¶ 32-37); negligent supervision (id. at ¶¶ 38-43); negligent
retention (id. at ¶¶ 44-50); negligence (id. at ¶¶ 51-56); and
negligent infliction of emotional distress (id. at ¶¶ 57-61).
She seeks compensatory and punitive damages, attorneys'
fees, costs, and interest as damages. (Id. at 10).

**PROCEDURAL HISTORY**

On April 3, 2020, Plaintiff filed the instant action. (Dkt. 1).
On May 21, 2020, Defendants were served with the
summons and complaint, and affidavits of service on
Brothers (Dkt. 5) and FVU (Dkt. 6) were filed on August
6, 2020.

On September 11, 2020, Plaintiff requested that the Clerk
of Court enter default against Defendants pursuant to
Federal Rule of Civil Procedure 55(a). (Dkt. 9). The Clerk
entered default on September 14, 2020. (Dkt. 10).

On November 30, 2020, Plaintiff filed motions for default
judgment. (Dkt. 12; Dkt. 13). On May 27, 2021, the Court
granted Plaintiff's motions for default judgment. (Dkt. 18).
On June 7, 2021, Defendants filed a consent motion to set
aside the default judgment. (Dkt. 25). Plaintiff thereafter
withdrew her consent and the Court directed Defendants to
refile it as a contested motion. (Dkt. 31). On January 18,
2022, Defendants filed a second motion to vacate the
default judgment (Dkt. 32), which was opposed by Plaintiff
(Dkt. 34), and granted by the Court on June 6, 2022 (Dkt.
35).

*2 On June 20, 2022, Defendants filed the instant motion
to dismiss. (Dkt. 36). On July 13, 2022, Plaintiff filed her
opposition to the motion. (Dkt. 39).

## DISCUSSION

### I. Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

### II. Defendants' Motion to Dismiss

Defendants argue that Plaintiff's complaint fails to adequately plead the elements of the claims asserted. In addition, they contend that Plaintiff's claim for negligent infliction of emotional distress is subject to dismissal because it is duplicative of her other claims and premised upon the same factual allegations. The Court will address these arguments below.

#### A. Negligence

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by

the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.' " *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90, 96 (W.D.N.Y. 2017) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006)).

Here, the gravamen of Plaintiff's negligence claim arises from her contention that Defendants owed a duty of care to Plaintiff, a minor student at FVU, to ensure that she and other students were adequately supervised. "In New York, schools owe a special duty ... to students[,] requir[ing] a school to act when a child, while in its charge, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats" and "will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." *Murray v. Nazareth Reg'l High Sch.*, No. 20CV1471(RJD)(RML), 2022 WL 3139116, at *2 (E.D.N.Y. Aug. 5, 2022) (quotations and citations omitted); *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 568 (E.D.N.Y. 2021) ("Starting with the duty element, it is well settled that [i]n New York, schools are under a special duty of *in loco parentis*, which obligates them to exercise such care of [their charges] as a parent of ordinary prudence would observe in comparable circumstances." (citations and quotations omitted)), *appeal dismissed*, No. 21-2669, 2022 WL 14807756 (2d Cir. May 3, 2022).

**\*3** Plaintiff alleges that Defendants breached that duty by not protecting her from Gonzalez's foreseeable sexual abuse and that the breach was the proximate cause of the emotional and physical harm she suffered. *See PC-41 Doe*, 590 F. Supp. 3d at 569 ("[T]he adequacy of supervision and proximate cause ... are generally factual questions for the jury." (quoting *Wood v. Watervliet City Sch. Dist.*, 30 A.D.3d 663, 664 (3d Dep't 2006)); *Zilioli v. City of New York*, No. 17CV9495, 2020 WL 1548763, at *10 n.7 (S.D.N.Y. Apr. 1, 2020) ("[U]nder New York law, proximate cause is normally an issue for the factfinder to resolve in negligence actions."). At this stage of the proceedings, these allegations are sufficient to state a plausible negligence claim and accordingly, Defendants' motion to dismiss this claim is denied.

#### B. Negligent Hiring, Supervision, Training, and Retention Claims

"[T]o state a claim for negligent supervision, hiring, training or retention of employees, a plaintiff must allege, in addition to the usual elements of negligence, that the defendant employer knew of [an] employee's propensity to commit the alleged acts or that defendant should have

known of such propensity had it conducted an adequate hiring procedure." *AA by BB v. Hammondsport Cent. Sch. Dist.*, No. 19-CV-6551L, 2021 WL 1081179, at *3 (W.D.N.Y. Mar. 22, 2021) (quotation and citation omitted).

### 1. Negligent Hiring

Plaintiff's claim for negligent hiring generally alleges that Defendants knew or should have known of Gonzalez's propensity to engage in sexual abuse but contains no factual predicate for those conclusory allegations. (Dkt. 1 at ¶ 28). This is insufficient to support her claim.

As summarized by the court in *Read v. Corning Inc.*, 371 F. Supp. 3d 87 (W.D.N.Y. 2019):

> [W]here a defendant's knowledge of some fact or circumstance is an element of a tort claim, a bare assertion that a defendant knew or should have known of that fact or circumstance is insufficient to state a claim.
>
> Plaintiffs need not plead evidence, but that does not mean they can proceed on the basis of conjecture, based on a few scraps of information, or broad, conclusory allegations about what was generally known in the past. They must allege facts which, if proven, would support a reasonable inference that defendants were culpably negligent. In other words, as stated by the United States Supreme Court, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible...." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955. They have not done so, with respect to the negligence claim.

*Id.* at 92 (internal quotations and citations omitted).

Here, Plaintiff's complaint does not contain any allegations that Gonzalez had ever engaged in or been accused of sexual abuse prior to his employment with Defendants or provide any other basis for a conclusion that Defendants were or should have been aware of his propensity to do so before he was hired, which is fatal to Plaintiff's negligent hiring claim. *See Reinhardt v. City of Buffalo*, No. 1:21-CV-206, 2022 WL 2442300, at *14 (W.D.N.Y. July 5, 2022) (granting motion to dismiss negligent hiring claim where "there are no allegations that the Bail Shop Defendants knew that its employees had engaged in tortious conduct in the past or would do so in this case"); *Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) (negligent hiring claim failed due to lack of factual allegations regarding the existence of a prior act of misconduct and that employer should have known of any such act). Accordingly, Defendants' motion to dismiss

Plaintiff's claim for negligent hiring is granted.

### 2. Negligent Training

**\*4** Much like Plaintiff's claim for negligent hiring, Plaintiff's claim for negligent training alleges that Defendants failed to properly train FVU and knew or should have known that a failure to do so would result in the sexual abuse of the students at FVU, but the claim does not contain any factual allegations beyond those bare conclusions. (Dkt. 1 at ¶ 34). The claim does not even attempt to specify how Defendants allegedly failed to train staff or how this purported failure resulted in Plaintiff's sexual abuse. Indeed, the apparent theory of Plaintiff's case as gleaned from the facts that are alleged in the complaint, is not that Gonzalez was improperly trained or that his sexual abuse was a product of inadequate training, but rather that Gonzalez engaged in criminal acts that Defendants otherwise negligently failed to protect against.

Thus, these allegations are insufficient to state a plausible claim for negligent training. *See Ortiz v. Orleans Cnty.*, No. 120CV01555-JLS-MJR, 2022 WL 1242486, at *6 (W.D.N.Y. Mar. 15, 2022) ("Plaintiff alleges that Sheriff Bower knew or should have known of other defendants' propensities and conduct resulting in disregard for the constitution, as well as rules, regulations, and protocols on the administration of inmate discipline, use of force, and inmate interaction. However, such allegations are conclusory and unsupported." (internal citations omitted)), *report and recommendation adopted*, No. 20CV1555-JLS-MJR, 2022 WL 1241704 (W.D.N.Y. Apr. 26, 2022); *Capak v. St. Execs Mgmt.*, No. 20-CV-11079 (RA), 2021 WL 2666007, at *4 (S.D.N.Y. June 29, 2021) ("Plaintiff's failure to allege any facts that would establish that Street Execs knew or should have known of a propensity for violence on Smith's part is fatal to the complaint."). Accordingly, Defendants' motion to dismiss Plaintiff's claim for negligent training is granted.

### 3. Negligent Retention and Negligent Supervision

Unlike Plaintiff's claims for negligent hiring and training, Plaintiff's claim for negligent retention contains more than threadbare legal conclusions and specifically alleges that upon information and belief, students and others had complained about sexual abuse committed by Gonzalez prior to his abuse of Plaintiff. (Dkt. 1 at ¶ 46). Although the allegations that there were complaints of prior sexual abuse by Gonzalez are alleged upon information and belief, they

nevertheless provide a sufficient factual basis for Plaintiff's contention that Defendants' decision to retain Gonzalez as an employee amounted to negligence. *See A.B. v. Staropoli*, 929 F. Supp. 2d 266, 288 (S.D.N.Y. 2013) ("As has been said in the school setting, 'a negligent retention theory is not viable in a sexual abuse case, unless the school had notice of prior allegations of a teacher's inappropriate contact with a student and failed to investigate the allegations."); *see also United States v. Daugerdas,* No. 09CR581, 2020 WL 364601, at *3 (S.D.N.Y. Jan. 22, 2020) ("The '*Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged upon information and belief' in certain circumstances, including where: (1) 'the facts are peculiarly within the possession and control of the [opposing party]' or (2) 'the belief is based on factual information that makes the inference of culpability plausible.' " (quoting *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010))); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 431 (S.D.N.Y. 2014) ("When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on secondhand information that [he] believes to be true."). Taking the instant facts as true, the allegation upon information and belief that Defendants received complaints about prior sexual abuse by Gonzalez before he sexually abused Plaintiff, support for which is within the possession or control of Defendants, is sufficient to plausibly state a claim for negligent retention.

**\*5** With respect to the negligent supervision claim, those same facts—that Defendants received complaints about prior sexual abuse by Gonzalez before he sexually abused Plaintiff—would sufficiently allege the requisite knowledge to allow such a claim to proceed. However, Plaintiff does not explicitly include that allegation in her negligent supervision claim. In other words, the allegation about complaints concerning prior sexual abuse is set forth in paragraph 46 of the complaint, and that paragraph is not alleged as part of the negligent supervision cause of action. (*See* Dkt. 1 at ¶¶ 38-43). Nonetheless, construing the complaint liberally as it must, *see Brettler Tr. of Zupnick Fam. Tr. 2008 A v. Allianz Life Ins. Co. of N. Am.*, 1 F.4th 57, 61 (2d Cir. 2022), *certified question on other grounds accepted sub nom. Brettler v. Allianz Life Ins. Co. of N. Am.*, 39 N.Y.3d 978 (2023) ("We review *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor."), the Court concludes that—while a close call—the negligent supervision claim has been

sufficiently alleged at this stage of the litigation to proceed.

Accordingly, Defendants' motion to dismiss the negligent supervision and negligent retention claims is denied.

### C. Negligent Infliction of Emotional Distress

Finally, Defendants argue that Plaintiff's claim for negligent infliction of emotional distress is duplicative of her other claims because it is premised upon the same allegations. The Court agrees that the claims involve identical conduct, seek the same relief, and are duplicative. *J.L. v. E. Suffolk Boces*, No. 14-CV-4565 (SIL), 2018 WL 1882847, at *12 (E.D.N.Y. Apr. 19, 2018) (plaintiffs' negligent and intentional infliction of emotional distress causes of action are duplicative of their assault, battery and negligence claims). Moreover, Plaintiff did not address this issue when responding to Defendants' motion to dismiss. "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jones v. Pawar Bros. Corp.,* 434 F. Supp. 3d 14, 20 (E.D.N.Y. 2020) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)); *Felix v. City of New York*, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) (finding that on a motion to dismiss, "[c]ourts 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.' " (quoting *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008))). As a result, Defendants' motion to dismiss Plaintiff's claim for negligent infliction of emotional distress is granted.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to Plaintiff's claims for negligent hiring, negligent training, and negligent infliction of emotional distress, but it is denied as to Plaintiff's claims for negligence, negligent supervision, and negligent retention.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2023 WL 1070650

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Curtis v. Gates Community Chapel of Rochester, Inc., Not Reported in Fed. Supp. (2023)

Doe v. Baram, Not Reported in Fed. Supp. (2021)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 40 of 105

2021 WL 4847076
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jane DOE, Plaintiff,

v.

Jonathan BARAM and Warren &
Baram Management LLC, Defendants.

20 Civ. 9522 (ER)
|
Signed 10/15/2021

**Attorneys and Law Firms**

Lisa D. Haba, The Haba Law Firm, P.A., Longwood, FL, Farzin Franklin Amanat, Greg G. Gutzler, DiCello Levitt Gutzler LLC, New York, NY, for Plaintiff.

#### ORDER

Ramos, D.J.:

 **\*1**  Plaintiff Jane Doe filed this suit on November 12, 2020 against Defendants Jonathan Baram and Warren & Baram Management LLC alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591, *et seq.*, as well as state laws.[1] Doc. 1. Doe alleges Baram knowingly recruited her into the sex trafficking scheme of Peter J. Nygard.[2] *Id.* In a letter dated February 26, 2021 but docketed on March 9, 2021, Baram, appearing pro se, asserts that the federal sex trafficking claim should be dismissed due to the expiration of the statute of limitations. Doc. 22. The Court, as did Doe, construes Baram's letter as a motion to dismiss. On August 27, 2021, Baram submitted another letter alleging that a press release posted on Doe's counsel's website, as well as several statements made by Doe's counsel during court proceedings, were defamatory. Doc. 56. The Court construes this letter as both a motion for leave to file a counterclaim for defamation and a motion to strike portions of the Complaint repeated in the press release. For the following reasons, Baram's motions to dismiss the TVPRA claims, for leave to file a counterclaim, and to strike portions of the Complaint are DENIED.[3]

#### I. Statement of Facts

Doe filed the Complaint on November 12, 2020. Doc. 1. The Complaint has since been sealed, and a redacted version of the Complaint has been filed. Doc. 1. In the Complaint, Doe alleges that in 2007, Baram lured and transported Doe to the apartment of Peter J. Nygard, the alleged leader of an international sex trafficking scheme, knowing that Nygard "was waiting there to rape her." Doc. 1 at 2. Doe also alleges that Baram waited outside while Nygard did rape her and then transported her back to Baram's apartment, where he also sexually battered her. *Id.* In support of these allegations, Doe includes several photographs of Baram, including one photograph Doe states was taken from Baram's social media profile, Doc. 58 at 2, captioned "HEBREW PIMP 'THE CHOSEN PEOPLE,' " which Doe uses to argue that Baram is a "self-proclaimed 'pimp.' " Doc. 1 at 5. On November 18, 2020, counsel for Doe issued a press release and posted it on their website stating, in relevant part:

> Jonathan Baram ... [is] being accused of knowingly and actively recruiting young women for Nygard as part of a sweeping international sex trafficking venture....[4] [**Doc. 1 at ¶ 2.**] [Baram is] accused of enticing another of Nygard's victims, who was a 17-year-old girl at the time, to travel to New York in 2007, on the pretense of offering her acting and modeling representation, with knowledge that she would be sex trafficked to Peter Nygard. [**Doc. 1 at ¶ 7.**] Baram is accused of luring the victim from Canada to his New York apartment, coercing her into posing for nude photos, which he sent to Nygard, and subsequently taking her to Nygard's penthouse apartment, where he knew that she would be raped. [**Doc. 1 at ¶¶ 15–20.**] The lawsuit alleges that Nygard Company employees and Baram plied the victim with alcohol spiked with drugs and encouraged her to drink, even though they knew she was underaged. [**Doc. 1 at ¶ 21.**] The complaint details, how, shortly after Jane Doe was taken into a bedroom to "meet" with Nygard and discuss "modeling," she lost consciousness.

Doe v. Baram, Not Reported in Fed. Supp. (2021)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 41 of 105

[**Doc. 1 at ¶¶ 22–24.**] The lawsuit explains that the victim awoke to find Nygard on top of her, sodomizing her, continuing to attack her even as she resisted. [**Doc. 1 at ¶¶ 26–27.**] After Nygard assaulted the victim, the lawsuit describes how Baram then took the victim back to his apartment, where Baram groped her as she begged him to stop. [**Doc. 1 at ¶¶ 30–32.**] While Baram purports to run a talent agency for models and actresses, the Complaint posts pictures of Baram in which he proclaims himself to be a "pimp." [**Doc. 1 at ¶ 12.**]

\*2  Doc. 70. The press release also contains a link to the Complaint. As noted, each of the allegations in the press release are also included in the Complaint, with no additional allegations about Baram included in the press release that were not also a part of the Complaint. *See* Doc. 1 at 6–7.

## II. Standard of Review

In general, because Baram is appearing pro se, the Court will read his letters liberally, construing them as raising the strongest arguments they suggest. *See* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994).

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 557). However, this "flexible 'plausibility standard' " is not a heightened pleading standard, *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint ... does

not need detailed factual allegations" to survive a motion to dismiss. *Twombly,* 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath,* 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014); *see also* *Twombly,* 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable ...."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

### B. Motion for Leave to File Counterclaim

Because Baram has not yet answered the Complaint and is appearing pro se, the Court will permit his counterclaim only if the counterclaim could withstand a motion to dismiss. Baram's counterclaim for defamation thus must satisfy the same legal standard as outlined above.

### C. Motion to Strike

\*3  Rule 12(f) of the Federal Rules of Civil Procedure allows the court to "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." "To prevail on a motion to strike, a party must demonstrate that 1) no evidence in support of the allegations would be admissible; 2)

Doe v. Baram, Not Reported in Fed. Supp. (2021)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 42 of 105

the allegations have no bearing on the issues in the case; and 3) to permit the allegations to stand would result in prejudice to the movant." *Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15 Civ. 7425 (JSR), 2016 WL 3144053, at *1 (S.D.N.Y. Apr. 11, 2016) (collecting cases). Courts should not tamper with the pleadings unless there is a strong reason for doing so, and motions to strike are generally disfavored. *See Hunley v. Buzzfeed, Inc.*, No. 20 Civ. 8844 (ALC), 2021 WL 4482101, at *5 (S.D.N.Y. Sept. 30, 2021).

### III. <u>Discussion</u>

### A. <u>Motion to Dismiss</u>

An affirmative defense of statute of limitations generally must be pled and proved in an answer to a complaint. 🔲 *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). However, an affirmative defense may be raised in a pre-answer motion to dismiss if the defect appears on the face of the complaint. 🔲 *Id.* at 426. Baram has not yet answered the Complaint, and his letter does not demonstrate how the facts in Doe's Complaint prove that the statute of limitations has passed. Baram does not reference any dates or any applicable statute of limitations. Rather, Baram simply states that the statute of limitations on the TVPRA claim has expired and "nothing [he] did warranted equitable tolling." Doc. 22. However, in light of his pro se representation, the Court will turn to the Complaint to see whether, on its face, a statute of limitations defect exists.

The Complaint discusses events that took place in 2007, approximately 13 years before the filing of the Complaint, when Jane Doe was 17 years old. Doc. 1 at ¶ 13. The Complaint does not state the statute of limitations for the relevant statutes, but does claim that the statute of limitations is equitably tolled for Doe's TVPRA claims. *Id.* at ¶ 62. According to the Complaint, Doe "pursued her rights diligently and was impeded because of a combination of force, threats of force, shame, embarrassment, fear," etc., and thus should be extended equitable tolling. *Id.* at ¶ 64. Additionally, Doe alleges that the statute of limitations is tolled under the continuing violation doctrine for all victims of Nygard's sex trafficking scheme as well as against Defendants because of their continued conspiracy to commit rape, sexually assault, sex traffic, and cover up their crimes. *Id.* at ¶ 83. Further, Doe claims the conspiracy was only discovered upon the filing of *Jane Does Nos. 1-57 v. Nygard*,

*et al*, No. 20 Civ. 01288 (ER) (S.D.N.Y), filed in February of 2020, which has the effect of tolling the conspiracy claims under the discovery rule. *Id.* at ¶ 85.

In light of these arguments in the Complaint, it is not obvious that the statute of limitations was expired. Additionally, and perhaps dispositively, Doe points out in her opposition to Baram's letter that any stale claims would be revived under the New York Child Victims Act ("NYCVA"), 🔲 N.Y. C.P.L.R. § 214-g. The NYCVA states in relevant part:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, ... which is barred as of the effective date of this section because the applicable period of limitation has expired, ... is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than two years and six months after the effective date of this section.

**\*4** 🚩 N.Y. C.P.L.R. § 214-g.

In the Complaint, Doe has clearly alleged intentional actions by Baram causing physical and psychological harm. *See, e.g.*, Doc. 1 at 6–7. Doe has also alleged that she was a minor in 2007 at the time of these allegations. *Id.* at ¶ 13. Doe has also alleged conduct that, if proven, could constitute a sexual offense under N.Y. Penal L. § 130, including §§ 130.20

Doe v. Baram, Not Reported in Fed. Supp. (2021)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 43 of 105

(sexual misconduct), 130.25 (third degree rape), 130.35 (first degree rape), 130.40 (third degree criminal sexual act), 130.50 (first degree criminal sexual act), 130.52 (forcible touching), 130.55 (third degree sexual abuse), 130.60 (second degree sexual abuse), 130.65 (first degree sexual abuse), 130.90 (facilitating a sex offense with a controlled substance), and 130.91 (sexually motivated felony, with sex trafficking of a child as the specified offense). *Id.* at 6–7. Lastly, the NYCVA was signed into law and took effect on February 14, 2019, so Doe's Complaint, filed a little over a year after the window opened, was filed within the revival window. Therefore, even if the statute of limitations had expired on Doe's claims, it would be revived under the NYCVA.

Because "a court must deny a motion to dismiss based on the statute of limitations unless all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that the statute was tolled," *In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009), Baram's motion to dismiss is DENIED.

## B. Motion for Leave to File Counterclaim

Baram alleges that Doe has sent "false press releases" about this case to media outlets and posted a press release before he was served with the lawsuit. Doc. 56 at 1. Specifically, Baram is concerned with the press release's labeling of him as a "major global sex trafficker with Nygard," a "child rapist," and someone who secretly put drugs in Doe's drink. *Id.* Baram also takes issue with the press release for the inclusion of an image of him from about 14 years ago with the caption "Hebrew Pimp," which he alleges was taken "out of context with malicious intent." *Id.* at 1–2. He also states that the press release has interfered with his industry and modeling clients by painting him as a "sleazy Hollywood agent." *Id.* at 2. Baram also takes issue with several claims that counsel for Doe made during conference calls with the Court and Baram, including allegations that he drugged Doe and that he proclaimed himself to be an illegal pimp. *Id.* at 2, 4. The Court interprets these arguments as a motion for leave to file a counterclaim of defamation.

Doe argues that this counterclaim should be denied. Doe cites the litigation privilege under New York law, which provides that "statements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding are absolutely privileged, notwithstanding the motive with which they are made, so long as they are material and pertinent

to the issue to be resolved in the proceeding." *Lipin v. Hunt*, No. 14-CV-1081 (RJS), 2015 WL 1344406, at *8 (S.D.N.Y. Mar. 20, 2015) (internal quotation and citation omitted). The privilege applies not only to pleadings but also to statements made between attorneys and parties as well as in judicial proceedings. *Id.* Thus, "allegedly defamatory statements are protected if they may possibly be pertinent to a proceeding." *Id.* The Court agrees with Doe that the statements at issue made during conferences with the Court are protected by the litigation privilege. The nature of Baram's alleged conduct, including whether he drugged Doe and has called himself a pimp, is directly pertinent to the claims Doe alleges in the Complaint. Therefore, statements made during those conferences are privileged, and any counterclaim alleging defamation based on the statements would be futile. Baram's motion for leave to file a counterclaim regarding the contents of the Complaint or any statements at Court conferences is thus DENIED.

**\*5** As for the press release, Doe argues that a counterclaim regarding the contents of the press release would be futile because the press release is entitled to immunity under Section 74 of the New York Civil Rights Law. Section 74 states:

> A civil action cannot be maintained against any person ... for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civil Rights Law § 74. Doe argues that because the press release accurately conveys the content already pleaded in the Complaint, it is a true and fair report of judicial proceedings immune under Section 74. The Court agrees. The press release discusses how Baram is "accused of" the various claims, and states that the lawsuit "alleges" that Baram spiked Doe's drink, among other allegations. Doc. 70 at 2–3. The press release does no more than restate the allegations in the Complaint, and is a fair report of the pending judicial proceeding. *See Southridge Cap. Mgmt., LLC. v. Lowry*, No. 1 Civ. 4880 (RO), 2003 WL 68041, at

Doe v. Baram, Not Reported in Fed. Supp. (2021)

Case 1:23-cv-10236-LJL   Document 49   Filed 04/25/24   Page 44 of 105

*2 (S.D.N.Y. Jan. 7, 2003) (granting a motion to dismiss a defamation counterclaim related to a press release regarding a pending case). Therefore, the press release and its subsequent transmittal to media outlets as alleged by Baram is immune from defamation claims. Baram's proposed counterclaim for defamation regarding the press release would thus be futile, so his motion for leave to file a counterclaim of defamation based on the press release is DENIED.

### C. Motion to Strike

Baram argues that the press release is "prejudicial" with "complete false representations of the truth." Doc. 56 at 1. He claims that the allegations that he is a sex trafficker and child rapist as well as that he spiked drinks are false and prejudicial and have "tampered with [his] witnesses." *Id.* He also states that the press release has interfered with his industry and modeling clients by painting him as a "sleezy Hollywood agent." *Id.* at 2. Baram also takes issue with the inclusion of the picture captioned "Hebrew Pimp" within the linked Complaint on the press release, which he believes also constitutes witness tampering and is extremely prejudicial. *Id.* He asks that the picture be stricken "everywhere." *Id.* Lastly, Baram takes issue with the Complaint for labelling him as a "pimp as a fact." *Id.* at 4. The Court construes these arguments as a motion to strike the portions of the Complaint Baram references as repeated in the press release.

The allegations Baram references from the Complaint, which are restated in the press release, are material and pertinent to the claims Doe alleges. While the allegations may result in some prejudice to Baram, they have direct bearing on the issues in the case and can possibly be proven through admissible evidence. Baram's alleged behavior towards Doe and representations he made about himself using the word "pimp" are plainly relevant to her sex trafficking claims.

*Contrast Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 512 (S.D.N.Y. 2013) (striking portions of the Complaint that were immaterial and irrelevant to the claims and served no purpose except to inflame the reader). Baram is entitled to dispute the claims and the meaning of the word "pimp" in discovery and subsequent proceedings, but the Court finds no reason to strike them from the Complaint. Baram's motion to strike is thus DENIED.

### IV. Conclusion

*6 For the above reasons, Baram's motions to dismiss, for leave to file a counterclaim, and to strike portions of the Complaint are DENIED.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4847076

---

### Footnotes

1    Defendant Warren and Baram Management LLC has defaulted. Doc. 35.

2    Mr. Nygard has been indicted in this District on counts of racketeering conspiracy and related charges concerning his alleged sex trafficking of children and adult women. *U.S. v. Nygard*, 20 Cr. 624.

3    Baram's recent letter requesting the press release be removed, Doc. 68, is denied as moot.

4    All citations to the Complaint, Doc. 1, within this text have been added by the Court.

---

**End of Document**                               © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 928103
Supreme Court, New York County, New York.

Jane DOE, Plaintiff,
v.
John DOE, Camp Poyntelle, Samuel Field
YM & YWHA, Defendant.

Index No. 952013/2023
|
Decided on March 1, 2024

## Synopsis

**Background:** Summer camp alumna brought action against her alleged assailant, camp, and camp's operator, under the Adult Survivors Act (ASA), for negligence, battery, intentional infliction of emotional distress, intentional violations of five penal statutes, and violation of city's Victims of Gender-Motivated Violence Protection Law (GMVL), alleging that assailant sexually assaulted her while she was intoxicated at a summer camp reunion. Assailant and operator separately moved to dismiss based on statute of limitations and failure to state a cause of action.

**Holdings:** The Supreme Court, Dakota D. Ramseur, J., held that:

alumna's claims for battery, intentional infliction of emotional distress, and intentional violations of five penal statutes were revived under the ASA;

Court was required to treat both alumna and assailant as residents of city, for purposes of assailant's motion to dismiss for failure to state a cause of action;

as matter of first impression, alumna's allegation that she was a resident of city was sufficient for city's Victims of Gender-Motivated Violence Protection Law (GMVL) to apply to her action; and

alumna's allegations were insufficient to establish that camp owed alumna a duty, as required to state negligence claim.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim; Motion to Dismiss.

## Attorneys and Law Firms

Jane Doe: The Law Firm of Andrew M. Stengel, Andrew Stengel, Esq., New York

John Doe: Kaufman Borgeest & Ryan LLP, David Bloom, Esq., Valhalla, Brennan Breeland, Esq., New York

Samuel Field YM & YWHA, Leila Cardo, Esq., Brooklyn

## Opinion

Dakota D. Ramseur, J.

**\*1** In August 2023, plaintiff Jane Doe commenced this action under the Adult Survivors Act, CPLR 214-j, and Victims of Gender-Motivated Violence Protection Law (hereinafter, "GMVL") against John Doe, Camp Poyntelle, Samuel Field YM & YWHA, alleging John Doe sexually assaulted her while she was intoxicated at a summer camp reunion in Pennsylvania. In motion sequence 003, John Doe moves to dismiss (1) plaintiff's causes of action for battery, intentional infliction of emotional distress, and intentional violations of five statutes in Article 130 of the New York State Penal Law pursuant to CPLR 3211 (a) (5) as barred by the statute of limitations, and (2) her causes of action for negligence and statutory violation of the GMVL under CPLR 3211 (a) (7) for failure to state a cause of action. In motion sequence 004, Samuel Field moves to dismiss plaintiff's causes of action for negligence and intentional violation of the GMVL pursuant to the same two CPLR rules. While plaintiff opposes both motions in their entirety, she seeks to serve an amended complaint in response to mot. seq. 004. For the following reasons, motion sequence 003 is denied in its entirety and motion sequence 004 is granted in part.

## BACKGROUND

On or about August 6, 2016, plaintiff and defendant John Doe—both alleged residents of New York—attended an "Alumni Day" reunion for Camp Poyntelle in the Poconos operated by Samuel Field YM & YMHA. (NYSCEF doc. no. 1 at ¶ 17, *original complaint.*) Many of those attending the reunion stayed at a nearby, unnamed Inn, including plaintiff. (*Id.* at ¶ 19.) That evening, plaintiff alleges that the Inn's bar hosted "a continuation" of the reunion festivities, during which she and others became intoxicated. (*Id.* at ¶ 21-22.) After her friends escorted her to her room and put her to bed, plaintiff describes waking sometime later to find defendant having sexual intercourse

with her to which she did not consent. (*Id.* at ¶ 23-25.) Plaintiff's first cause of action against Doe is for battery and intentional violations of New York State Penal Law Article 130 (entitled "Sex Offenses"), in particular sections 130.35 (1) and (2) (Rape in the First Degree), 130.65 (1) and (2) (Sexual Abuse in the First Degree), and 130.52 (Forcible Touching). Her second and third causes of action against Doe are for, respectively, intentional infliction of emotional distress and § 10-1104 of the NYC Administrative Code, or the Gender-Motivated Violence Protection Law.

As to the relationship between Samuel Field and the Inn, in her original complaint, plaintiff alleges that Samuel Field (1) should have known about the Doe's alleged propensity to sexually assault camp attendees (NYSCEF doc. no. 1 at ¶¶ 29, 32, 33), (2) did not have policies or protocols in place to protect attendees and did not properly monitor or otherwise supervise Doe's interactions with attendees (*id.* at ¶¶ 30, 36-37), and (3) failed to take appropriate measures to evaluate Doe's fitness to attend the reunion in the first place (*id.* at ¶ 62). Plaintiff's amended complaint provides more context: she avers that Samuel Field suggested reunion attendees stay at the Inn (NYSCEF doc. no. 58 at ¶ 19, *proposed amended complaint*), that the Inn was the only place where camp employees and attendees could gather and sleep (*id.* at ¶ 21), that camp employees told reunion attendees to gather at the bar at the Inn on August 6 (*id.* at 24), and that camp staff observed underage drinking at the bar yet failed to intervene (*id.* at 25).

**\*2** In contrast, Adam Popper, who was the Assistant Director of Camp Poyntelle during the relevant time, testifies that the activities for the reunion began at 12 noon and ended at 5 p.m., when attendees were asked to depart the camp unless attending a campfire at the lake on the campgrounds. (NYSCEF doc. no. 50 at 2, *Popper affidavit*.) Additionally, Popper explains that Samuel Field did not book or make arrangements for attendees' hotel accommodations in connection with the event, had no affiliation with any of the inns surrounding the camp, nor "make arrangements for, sanction, or host any continuation of Alumni Day at any location off campgrounds." (*Id.*) In his words, "the after-Alumni Day activities at the local inn of which plaintiff complains were not in any way part of the camp alumni reunion, and were not organized, sanctioned, or supervised by Samuel Field." Plaintiff asserts causes of action against Samuel Field for negligence and violation of the GMVP Law.

## DISCUSSION

*Dismissal Under CPLR 3211 (a) (5)—Statute of Limitations*

Plaintiff commenced this action approximately six years after her sexual assault under the Adult Survivors Act ("ASA"), specifically CPLR 214-j. Effective May 24, 2022, this CPLR provision provides:

> "Notwithstanding any provision of law which imposes a period of limitations to the contrary ... every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered *as a result of conduct which would constitute a sexual offense* as defined in Article 130 ... committed against such person who was eighteen years of age or older ... which is barred ... because the period of limitations has expired ... is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section." (CPLR 214-j [emphasis added].)

In motion sequences 003 and 004, defendants Doe and Samuel Field contend that the Adult Survivors Act and CPLR 214-j operate to revive only claims and causes of action premised on sexual offenses committed in New York. This is because (1) New York only has the power to enact and enforce criminal statutes within its territorial borders, (2) to be prosecuted under Article 30 for a "sexual offense," the conduct constituting the crime must have taken place in New York, and (3) by its very terms, CPLR 214-j applies to conduct which constitutes an offense under Article 130. (*See* NYSCEF doc. no. 35 at 10-12, *John Doe memo of law.*) Moreover, defendants argue that certain rules of statutory interpretation support its theory, namely that "unless expressly stated, no legislation is presumed to ... operate outside the territorial jurisdiction of the state ... enacting it." (*See* *S.H. v. Diocese of Brooklyn*, 205 A.D.3d 180, 187-188, 167 N.Y.S.3d 171 [2d Dept. 2022], citing *Goshen v. Mutual Life Ins. Co. of N.Y.*, 286 A.D.2d 229, 230, 730 N.Y.S.2d 46 [1st Dept. 2001]) Being, then, that plaintiff alleges she was sexually assaulted in Pennsylvania, defendants contend CPLR 214-j does not revive plaintiff's otherwise untimely commenced action. The Court is unpersuaded.

In *Samuel W. v. United Synagogue of Conservative Judaism*, the First Department analyzed the territorial scope of the Child Victims Act (CVA) and CPLR 214-g, which revived otherwise time-barred causes of action brought by child victims of sexual abuse and, in doing so, served a model for the ASA. Like the Second Department

in *S.H. v. Diocese of Brooklyn*, the First Department found that the CVA and CPLR 214-g apply to claims of sexual abuse irrespective of where the incidents themselves occurred, whether within or outside New York. (*Samuel W. v. United Synagogue of Conservative Judaism*, 219 A.D.3d 421, 422, 194 N.Y.S.3d 25 [1st Dept. 2023]; *Doe v. Wilhelmina Models, Inc.*, — Misc.3d —, — N.Y.S.3d ——, 2024 WL 789657, 2024 N.Y. App. Div. LEXIS 1052 [1st Dept. 2024]; *Diocese of Brooklyn*, 205 A.D.3d at 187, 167 N.Y.S.3d 171) The First Department explained its rationale as such: "[c]ontrary to defendants' position, it is not a *violation* of one of the enumerated penal statutes that is required to trigger the revival of certain civil causes of action, but '*conduct* which constitutes' a sexual offense. New York's criminal statutes' territorial limitations are, thus, not a basis for excluding claims under the CVA." (*Id.* at 422, 194 N.Y.S.3d 25 [emphasis added; internal citations omitted].) The Court went on to refute the suggestion that the purpose of the CVA was to apply only to those "acts of sexual abuse that occurred in the State of New York" (*see Gumpel v. NY Province of the Society of Jesus*, 2022 WL 14813805 at *2 [Sup. Ct. NY County 2022]), explaining that the purpose of CPLR 214-g was to remedy the injustices to survivors of child sex abuse by extending the "restrictive" statute of limitations that required most survivors to file civil actions or criminal charges long before they reported or came to terms with their abuse. (*Samuel W.*, 219 A.D.3d at 422, 194 N.Y.S.3d 25.) Further, in refuting the proposition that long-established rules of statutory interpretation require a different conclusion, the First Department pointed out that, under CPLR 214-g's plain language, the term "every" applies to all "civil claim or cause of action" that would have been properly brought in New York in the first instance. (*Id.*) Accordingly, even though the alleged sexual abuse in *Samuel W.* occurred outside New York, the plaintiff's cause of action was properly revived since she was a resident of New York. (*Id.* at 422, 194 N.Y.S.3d 25; *see also Diocese of Brooklyn*, 205 A.D.3d at 190-191, 167 N.Y.S.3d 171 ["CPLR 214-g does not apply extraterritorially, where the plaintiff is a nonresident and the alleged acts of sexual abuse were perpetrated by a nonresident outside of New York"].)

**\*3** In attempting to cast doubt on *Samuel W.*'s persuasive authority, John Doe selectively cites *Monahan v. Toback* to argue that at least one court has already determined that the ASA—not the CVA—"applied only to conduct that occurred within the State of New York." (2023 WL 2895178 at *4 [Sup. Ct. NY County 2023].) The relevant quote, however, is "the history, purpose, and text of the statute, along with relevant caselaw demonstrate that the ASA applies to acts of sexual abuse that occurred in the state of New York regardless of where the plaintiff lives at the time of filing." (*Id.*) Of course, armed with the full quote, *Monahan* neither limits CPLR 214-j's applicability

to only those cases involving sexual assaults within New York nor addresses factual circumstances where, like here, both plaintiff and defendant Doe are residents and the crime itself that takes place outside New York.

Given that the ASA is, in defendant Doe's words, "a functionally identical revival statute" to the CVA, the Court sees no reason why the First Department's holding in *Samuel W.* should not be applied to the ASA. Accordingly, since plaintiff alleges that both she and defendant are residents of New York State at the time the alleged sexual assault occurred, CPLR 214-j revives her claims. The branches of motion sequence 003 and 004 that seek dismissal based on the statute of limitations are denied.[1]

*Dismissal Under CPLR 3211 (a) (7)—Failure to State a Cause of Action*

Motion Sequence 003—John Doe

On a motion to dismiss for failure to state a cause of action under CPLR 3211 (a) (7), courts afford the pleadings a liberal construction, accept the facts as alleged in the complaint as true, and give the plaintiff the benefit of every possible favorable inference. (*Leon v. Martinez*, 84 N.Y.2d 83, 87, 614 N.Y.S.2d 972, 638 N.E.2d 511 [1994]; *JF Capital Advisors, LLC v. Lightstone Group, LLC*, 25 N.Y.3d 759, 764, 16 N.Y.S.3d 222, 37 N.E.3d 725 [2015].) A court's inquiry is limited to assessing the legal sufficiency of the plaintiff's pleadings; accordingly, its only function is to determine whether, from facts alleged and inferences drawn therefrom, plaintiff has stated the elements of a cognizable cause of action. (*JF Capital Advisors*, 25 N.Y.3d at 764, 16 N.Y.S.3d 222, 37 N.E.3d 725; *Skillgames, LLC v. Brody*, 1 A.D.3d 247, 250, 767 N.Y.S.2d 418 [1st Dept. 2003].)

GMVL provides, "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." (NYC Admin. Code § 10-1104.) Moreover, "crime of violence" is defined by the statute to mean "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law." (NYC Admin. Code § 10-1103.) As with CPLR 214-g and 214-j, the GMVL's plain language demonstrates that a plaintiff has a cause of action based on whether the individual engages in

conduct that constitutes a crime of violence—not on whether the offender may or may not (given the location of the crime) be prosecuted for such crime. Accordingly, for the GMVL to exceed the territorial limitations of New York City or even New York State, it is insufficient, in and of itself, for the alleged sexual assault to have taken place outside New York City.

To this point, while defendant John Doe contends "the GMVL has no applicability to acts allegedly committed by a non-resident and outside the City and State of New York" (NYSCEF doc. no. 35 at 15), his only evidence that he was not/is not a resident of New York City is his affidavit. Per paragraph three, John Doe alleges "On August 6, 2016, I was not resident of the City of New York, but of Nassau County, New York." (NYSCEF doc. no. 34 at ¶ 3, *John Doe affidavit*.) Yet he does not attach documentary evidence establishing this fact, meaning the Court cannot take them to be true, since to do so would require it to reject facts plaintiff has alleged in her complaint. Accordingly, for purposes of this motion, the Court must treat both parties as residents of New York City.

**\*4** But even if John Doe is considered a resident of Nassau County, as he asserts in his affidavit, it is not clear this would have any effect on the outcome on this motion. Based on the Court's reading of *Samuel W.*, the only residency that is relevant to whether CPLR 214-g, 214-j, or GMVL can be applied "territorially" to sexual assaults occurring outside New York is the plaintiff's. (*See Samuel W.*, 219 A.D.3d at 422, 194 N.Y.S.3d 25 ["plaintiff's claims were properly revived under CPLR 214-g. Even though the alleged sexual abuse occurred outside New York, *plaintiff was a New York resident at the time the action accrued*"].)[2] As this quote makes clear, there is simply no reference to the defendant's residency as bearing any weight in this consideration. And yet, defendant Doe suggests, "upon information and belief" only, that plaintiff was not a resident of New York City on August 6, 2016. (*See* NYSCEF doc. no. 34 at ¶ 4.) Since the Court must also accept plaintiff's residency to be in New York City, defendants have not demonstrated the GMVL to be inapplicable to plaintiff's claims.

Motion Sequence 004—Samuel Field

To properly plead a claim for negligence, plaintiff must show that Samuel Field owed her a duty, breached that duty, and that breach proximately caused harm to the plaintiff. (*Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459, 23 N.Y.S.3d 183 [1st Dept. 2016].) Whether a duty exists between the parties depends

on circumstance and is an issue of law for the Court. In analyzing whether a duty exists, it must consider a broad range of societal and policy factors like "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels." (*Id.*; citing *Hayes v. Riverbend Hous. Co., Inc.*, 40 A.D.3d 500, 500, 836 N.Y.S.2d 589 [1st Dept. 2007]; *On v. BKO Express LLC*, 148 A.D.3d 50, 54-55, 45 N.Y.S.3d 68 [1st Dept. 2017].) Furthermore, while it is true generally that a defendant has no duty to control the conduct of third persons to prevent them from harming others (*see Moskowitz v. Masliansky*, 198 A.D.3d 637, 639, 155 N.Y.S.3d 414 [2d Dept. 2021]; *Duncan v. Black Veterans for Social Justice*, 218 A.D.3d 442, 443, 193 N.Y.S.3d 60 [2d Dept. 2023]), certain special relationships—like employers and employees, parents and children, and common carries—give rise to a duty that requires defendant to protect plaintiff from the conduct of others. (*Moskowitz*, 198 A.D.3d at 639, 155 N.Y.S.3d 414)

Here, plaintiff has neither pled nor argued that a special relationship of the kind cited above exists between her and Samuel Field.[3] Instead, she asks the Court to find a duty based on the fact that defendant knew or should have known Doe posed a danger to plaintiff. (*See* NYSCEF doc. no. 59 at 16-17.) However, plaintiff merely alleges that Doe "violated some rules and regulations" when working as a former camp counselor. There are no other allegations from which to conclude that Samuel Field should have known of Doe's alleged dangerous propensities. (*See N.X. v. Cabrini Med. Ctr.*, 280 A.D.2d 34, 41, 719 N.Y.S.2d 60 [1st Dept. 2001] ["An act of sexual deviance committed by a doctor with no history of sexual misconduct is no doubt possible .... In assessing the scope of duty owed by [defendant's] nurses, however, a mere possibility of improper conduct is insufficient to impose liability since, historically, liability for negligence has been determined by what is probable, not merely by what is possible"].) Without anything more substantive, plaintiff's allegation of a duty based what Samuel Field should have known is, essentially, little more than a bare conclusory allegation. (*See Godfrey v. Spano*, 13 N.Y.3d 358, 373, 892 N.Y.S.2d 272, 920 N.E.2d 328 [2009] ["Conclusory allegations— claims consisting of bare legal conclusions with no factual specificity—are insufficient to survive a motion to dismiss"]; *Barnes v. Hodge*, 118 A.D.3d 633, 633-634, 989 N.Y.S.2d 467 [1st Dept. 2014].) Accordingly, since plaintiff has failed to establish Samuel Field owed her a duty on this basis, plaintiff's negligence claim is dismissed pursuant to CPLR 3211 (a) (7).

**\*5** Accordingly, for the foregoing reasons, it is hereby

ORDERED that defendant John Doe's motion to dismiss (mot. seq. 003) is denied in its entirety, and it is further

ORDERED that the branch of defendant Samuel Field YM & YWHA's motion to dismiss (mot. seq. 004) pursuant to CPLR 3211 (a) (5) is denied; and it is further

ORDERED that the branch of defendant Samuel Field's motion to dismiss pursuant to CPLR 3211 (a) (7) is granted to the extent that plaintiff's cause of action for negligence against it is dismissed; and it is further

ORDERED that counsel for the parties shall appear at 60 Centre Street, Courtroom 341, New York, New York at 9:30 a.m. on March 19, 2024, for a status conference with the Court; and it is further

ORDERED that counsel for plaintiffs shall serve a copy of this order, along with notice of entry, on all parties within ten (10) days of entry.

This constitutes the Decision and Order of the Court.

**All Citations**

--- N.Y.S.3d ----, 2024 WL 928103, 2024 N.Y. Slip Op. 24065

Footnotes

1    In its motion to dismiss based on CPLR (a) (5), Samuel Field adopted and repeated defendant John Doe's arguments in mot. seq. 003.

2    That the Court analogizes the GMVL to the First Department's holding concerning CPLR 214-g demonstrates the dearth of cases that confront the narrow issue on this motion. Neither party has cited, nor has the Court's own research uncovered, a case that answers whether a crime committed outside New York City may entitle a plaintiff to relief under GMVL.

3    Plaintiff acknowledges that Defendant John Doe previously worked as a camp counselor at Poyntelle and was not a current employee at the alumni reunion.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2019 Employee Benefits Cas. 87,965

2019 WL 1232084
United States District Court, E.D. New York.

Barry FRIEDLAND, Plaintiff,
v.
UBS AG, Defendant.

16 Civ. 687 (VMS)
|
Signed 03/14/2019

**Attorneys and Law Firms**

Barry Friedland, Ardsley, NY, pro se.

Margaret L. Watson, Littler Mendelson, P.C., New York, NY, for Defendant.

**MEMORANDUM & ORDER**

VERA M. SCANLON, United States Magistrate Judge

**\*1** Presently before the Court is Defendant UBS AG's motion to dismiss Plaintiff Barry Friedland's Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court treats Defendant's motion as one for summary judgment and grants summary judgment for Defendant. The Clerk of Court is directed to enter judgment in favor of Defendant and close the case.

**I. BACKGROUND**

**A. Facts**

In support of its motion, Defendant submitted a declaration from counsel, ECF No. 26-3, annexing copies of the following documents referenced below: (1) UBS AG's Pension Plan (the "UBS Plan" or "Plan"), ECF No. 26-4 at 18-188;[1] (2) the Revised Retirement Income Plan for Employees of Dillon, Read & Co., Inc. (the "Dillon Read

Plan"), ECF No. 26-4 at 190-296; (3) the Pension Plan Pension Election Authorization Form signed by Plaintiff on July 23, 2007 (the "Election Form"), ECF No. 26-4 at 298; (4) the Pension Plan Pension Informational Notice to Plaintiff, dated September 23, 2009 (the "September 2009 Letter"), ECF No. 26-4 at 300; (5) the General Release, Covenant Not To Sue And Confidentiality Agreement signed by Plaintiff on August 2, 2010 (hereinafter, the "August 2010 Agreement"), ECF No. 26-4 at 302-08; (6) the General Release, Covenant Not To Sue And Confidentiality Agreement signed by Plaintiff on November 22, 2010 (hereinafter, the "November 2010 Agreement"), ECF No. 26-4 at 310-16; and (7) the September 28, 2015 administrative appeal decision by the UBS Retirement Board (the "Plan Administrator Decision"), ECF No. 26-4 at 318-22. The following facts are drawn from the Amended Complaint and the foregoing documents, the authenticity of which Plaintiff does not dispute.

Plaintiff Barry Friedland ("Plaintiff" or "Mr. Friedland") is a former employee of Dillon, Read & Co., Inc. ("Dillon Read") who participated in a pension plan maintained by Dillon Read (the "Dillon Read Plan"). See Amended Complaint ¶¶ 6-7, ECF No. 42. Defendant UBS AG ("Defendant" or "UBS") later acquired the successor to Dillon Read and the Dillon Read Plan merged into UBS AG's pension plan (the "UBS Plan" or "Plan"). Id. ¶¶ 8, 12; see UBS Plan § 1.1. Under the Plan, a participant's accrued pension benefit is determined as a "single life annuity," meaning an annuity providing equal monthly payments for the lifetime of the participant with no survivor benefits, commencing at the participant's "normal retirement age," defined as age 65. See Dillon Read Plan §§ 1.4, 1.28, 4.1, 6.1; UBS Plan §§ 2.1(a), 2.1(cc), 2.1(ll), 4.1(a). Plaintiff's accrued pension benefit, stated as a single life annuity beginning at his normal retirement age, was calculated to be $7,830.47 annually. See September 2009 Letter, ECF No. 26-4 at 300. Had Plaintiff elected to receive his accrued pension benefit under this form of payment, he would have received $652.54 per month ($7,830.47 / 12) beginning in October 2017, upon reaching age 65.

**\*2** The Plan also offers an alternative, optional form of accrued benefit payment, the "Level Income Age 62 Option," that a participant could elect in lieu of payment as a single life annuity beginning at age 65. Dillon Read Plan §§ 3.2, 6.4; UBS Plan § 6.3. Under the Level Income Age 62 Option, a participant receives a larger monthly payment starting as early as age 55, and continuing until age 62, the age of Social Security benefit eligibility, at which point the monthly pension benefit payments are reduced, potentially to zero, and are offset by Social Security payments. Dillon Read Plan § 6.4; UBS Plan § 6.3. Under the Plan, and as

Friedland v. UBS AG, Not Reported in Fed. Supp. (2019)

2019 Employee Benefits Cas. 87,965

required by ERISA, the amount payable to a Plan participant under the Level Income Age 62 Option must be of "actuarially equivalent" value to the amount that would be paid as a single life annuity commencing at age 65. See Dillon Read Plan §§ 1.6, 6.5; UBS Plan § 6.3(a). The Level Income Age 62 Option seeks to help ensure Plan participants a retirement income floor.

On July 23, 2007, Plaintiff signed the Election Form by which he elected to begin receiving his pension benefit on October 1, 2007, upon reaching the age of 55, under the Level Income Age 62 Option. See Election Form, ECF No. 26-4 at 298. Plaintiff's pension calculation was reviewed in 2009, resulting in the September 2009 Letter to Plaintiff, which stated:

> We calculated your accrued benefit correctly (i.e., your total annual pension paid as a single life annuity as of 9/30/1997, $7830.47/year). However, we converted your annual single life annuity to the Level Income Option form of payment incorrectly. Your monthly annuity under this optional form of payment was quoted as $721.60 as of October 1, 2007; it should be $750.51. This resulted in you receiving $28.91 less than you should have, for 25 months. This error was caused by a data entry error. We certainly apologize for this.

> Starting on November 1, 2009, you will begin receiving the correct monthly annuity, $750.51. In addition, you will also receive a one-time payment of $722.75 to make up for the under-payment from October 1, 2007 through October 31, 2009. This one-time payment has been determined as follows: ($750.51 - $721.60 × 25 months). Again we apologize for any inconvenience this may have caused.

> Note that since you elected the Level Income form of payment, your pension payment from the plan will change when you reach age 62. Your pension benefit will decrease by the Social Security offset used in calculating your Level Income option. Since your Social Security offset is greater than your Single Life Annuity, your payment at age 62 will be $0.00.

September 2009 Letter, ECF No. 26-4 at 300.

The following year, Plaintiff and UBS entered into the August 2010 Agreement, which, as explained in the Plan Administrator's Decision discussed below, resolved claims raised by Plaintiff regarding whether he received proper notice of the merger of the Dillon Read Plan into the UBS Plan. See August 2010 Agreement, ECF No. 26-4 at 302-08; Plan Administrator Decision, ECF No. 26-4 at 318-22. Section one of the August 2010 Agreement provided that Plaintiff and UBS "agree as follows":

1. Under the UBS Pension Plan, into which the Revised Retirement Income Plan for Employees of Dillon, Read & Co., Inc. (the "Dillon Read Pension Plan") was merged, Friedland is entitled to receive the following benefits, which Friedland agrees and represents, in the aggregate, equal the entire amount of his benefit entitlement under the UBS Pension Plan:

(i) Dillon Read Benefit. An annual pension benefit of $7,830.47, payable as a life annuity (the "Dillon Read Benefit"), which commenced on October 1, 2007. Friedland acknowledges and agrees that the Dillon Read Benefit reflects all benefits accrued by Friedland under the Dillon Read Pension Plan from Friedland's date of hire through the date benefit accruals were frozen under the Dillon Read Pension Plan on September 30, 1997. Friedland further acknowledges and agrees that, for purposes of calculating the Dillon Read Benefit, the amount of Friedland's Compensation (as such term is defined in the UBS Pension Plan) for the 1992 Plan year (the "1992 Compensation") has been determined correctly, unless he produces proof satisfactory to the Retirement Board (as such term is defined in the UBS Pension Plan) by September 30, 2010 that his 1992 Compensation was a different amount (the "Revised Amount"). The Dillon Read Benefit has been calculated as a single life annuity form of payment and;

**\*3** (ii) Lump Sum Payment. A single lump-sum payment of $10,000.00 (the "Lump Sum Payment"), payable on the Effective Date (as defined herein).

August 2010 Agreement § 1. Subsection (i), the August 2010 Agreement preserved Plaintiff's right to seek a recalculation of his pensionable compensation for the "1992 Plan year" (hereinafter, the "Compensation Calculation Claim") by submitting documents to the Retirement Board, which is designated under the Plan to function as the Plan Administrator. Id. § 1(i); see id. § 4(a) (setting forth that if Plaintiff provided the Retirement Board satisfactory proof of his entitlement to an upward revision of his compensable income by September 30, 2010, the Dillon Read Benefit would be revised accordingly, and Plaintiff's release and discharge with respect to the Compensation Calculation Claim would become effective only after that issue was resolved).

Plaintiff pursued the Compensation Calculation Claim preserved in the August 2010 Agreement, and entered into the November 2010 Agreement with UBS. See November 2010 Agreement, ECF No. 26-4 at 310-16. Section one of the November 2010 Agreement provided that Mr. Friedland and UBS "agree as follows":

1. Under the UBS Pension Plan, into which the Revised Retirement Income Plan for Employees of Dillon, Read

& Co., Inc. (the "Dillon Read Pension Plan") was merged, Friedland is entitled to receive the following benefits, which Friedland agrees and represents, in the aggregate, equal the entire amount of his benefit entitlement under the UBS Pension Plan:

(i) <u>Dillon Read Benefit</u>. An annual pension benefit of $7,830.47, payable as the Age 62 Level Income Option (the "Dillon Read Benefit"), which commenced on October 1, 2007, providing a monthly benefit of $750.51 until Mr. Friedland attains age 62, at which point his benefit will be offset entirely by Social Securities benefits and thus be reduced to zero. Friedland acknowledges and agrees that the Dillon Read Benefit reflects all benefits accrued by Friedland under the Dillon Read Pension Plan from Friedland's date of hire through the date benefit accruals were frozen under the Dillon Read Pension Plan on September 30, 1997. Friedland further acknowledges and accepts the amount of Friedland's Compensation (as such term is defined in the UBS Pension Plan) for the 1992 Plan year (the "1992 Compensation") that UBS used for purposes of calculating the Dillon Read Benefit. The Dillon Read Benefit has been calculated as a single life annuity form of payment and;

(ii) <u>Lump Sum Payment</u>. A single lump-sum payment of $4,000.00 (the "Lump Sum Payment"), payable on or about thirty (30) days, or as soon thereafter as administratively practicable, after the Effective Date (as defined herein) of this Agreement....

<u>Id.</u> § 1.

Of particular relevance to this case are the descriptions of the "Dillon Read Benefit" in the August 2010 Agreement and November 2010 Agreement. In the August 2010 Agreement, the "Dillon Read Benefit" is described as: "[a]n annual pension benefit of $7,830.47, payable as a life annuity, ... which commenced on October 1, 2007." August 2010 Agreement § 1(i). The November 2010 Agreement describes the "Dillon Read Benefit" as: "[a]n annual pension benefit of $7,830.47, payable as the Age 62 Level Income Option ... which commenced on October 1, 2007, providing a monthly benefit of $750.51 until Mr. Friedland attains age 62, at which point his benefit will be offset entirely by Social Securities benefits and thus be reduced to zero." November 2010 Agreement § 1(i).

**\*4** According to Plaintiff's own allegations, the August 2010 Agreement's purpose was not to change his election or provide him a second payment of his pension. Plaintiff refers to the August 2010 Agreement as "memorializing the terms of the[ ] agreement concerning the miscalculated benefits" addressed in the September 2009 Letter, Amended Complaint ¶ 12, or, alternatively, as

"memorializ[ing]" his "right to benefits under the pension plan," <u>id.</u> ¶ 20.

In 2015, Plaintiff filed an administrative claim and appeal under the Plan, arguing: (1) that the November 2010 Agreement was void and unenforceable due to the absence of a signature by Plaintiff's counsel on the agreement and the alleged lack of Plaintiff's initials on each page of the agreement; and (2) that Plaintiff was entitled under the August 2010 Agreement to "a life annuity rather than an age 62 level income form of payment." <u>See</u> Plan Administrator Decision, ECF No. 26-4 at 318. By decision dated September 18, 2015, the Plan Administrator denied Plaintiff's appeal, concluding that Plaintiff's accrued pension benefit correctly was paid under the Level Income Age 62 Option he had elected in 2007. <u>See id.</u>

The Plan Administrator first addressed and rejected Plaintiff's contention that the November 2010 Agreement was void and unenforceable, noting the following facts:

• The November [2010] Agreement bears a signature indicating that it was signed by Mr. Friedland and a notary public qualified in New York signed the agreement indicating that the notary witnessed Mr. Friedland sign the agreement.

• Contrary to Mr. Friedland's assertion, the November [2010] Agreement has initials signed on each page of the agreement.

• The November [2010] Agreement provides for a single lump sum payment of $4,000.[00] to Mr. Friedland. Our records show that the $4,000[.00] was paid to Mr. Friedland on December 8, 2010 via check and that the check was deposited on December 15, 2010.

• The Plan's records include an email from [Plaintiff's attorney at the time] to UBS dated October 14, 2010 in which [the attorney] indicates that Mr. Friedland would settle his dispute for $4,000[.00]. [The attorney] points out [in the email] that Mr. Friedland is receiving a monthly pension payable through Sept[ember] 30, 2014 and the $4,000 would be on top of the monthly payment.

<u>Id.</u> at 320-21. The Plan Administrator noted that under New York law, which governs the August 2010 Agreement and November 2010 Agreement, <u>see</u> August 2010 Agreement § 15; November 2010 Agreement § 15, a party to an agreement need not sign the agreement for it to be valid, there is no requirement that counsel for a party must sign the agreement, and there is no requirement that each page of an agreement must be initialized. <u>Id.</u> at 320. Based on the foregoing facts and law, the Plan Administrator

concluded that the November 2010 Agreement is a valid agreement. Id. at 320-21.

Further, the Plan Administrator found that neither the August 2010 Agreement nor the November 2010 Agreement changed Plaintiff's form of benefit payment. Id. at 321. In this respect, the Plan Administrator noted (1) that Plaintiff had elected to receive his Plan benefit in the form of a Level Income Age 62 option commencing on October 1, 2007, (2) that the September 2009 Letter made clear to Plaintiff that payments under his elected option would be reduced to $0.00 when Plaintiff reached age 62 due to Social Security offsets, and (3) that the November 2010 Agreement "simply reinforced and made clear that the benefit to [Plaintiff] was payable as an Age 62 Level Income Benefit which would end in September 2014." Id. The Plan Administrator noted that Plaintiff "continuously was paid a monthly benefit of $750.51 both immediately before and after those agreements." Id. The Plan Administrator did not address the purpose, if any, of Section 1(i) of the August 2010 Agreement.

### B. Procedural History

**\*5** This action was originally brought by Plaintiff in the New York State Supreme Court, Kings County, asserting state-law claims for fraud, breach of contract and unjust enrichment, and it was subsequently removed by Defendant pursuant to 28 U.S.C. §§ 1441 and 1446. See Complaint, ECF No. 1-1. Plaintiff had legal representation when he commenced this action, but he discharged his counsel following the initial conference. See ECF No. 13 (motion to withdraw as attorney); ECF No. 17 (Order granting motion to withdraw as attorney). By Memorandum and Order dated December 4, 2017, ECF No. 39, the Court granted Defendant's motion to dismiss the original Complaint on the grounds of preemption by the Employment Retirement Income Act ("ERISA"), 29 U.S.C. §§ 1001-1461. See Friedland v. UBS AG, No. 16 Civ. 687 (VMS), 2017 WL 6001769 (E.D.N.Y. Dec. 4, 2017). Although Plaintiff had previously been afforded an opportunity to amend his complaint, the Court granted Plaintiff leave to replead his claims under ERISA in light of his pro se status. Id.

Plaintiff subsequently filed his Amended Complaint asserting a single cause of action, under ERISA § 502(a)(1)(B), "to recover benefits under an employee benefit plan." See Amended Complaint ¶ 1, ECF No. 42. Specifically, Plaintiff alleges in the Amended Complaint that he "understood, by executing the August [2010] Agreement, that his annual pension benefit would continue

for the remainder of his life, regardless of his qualification for Social Security when he turned 62." Id. ¶ 16.

Defendant has moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(6) or, in the alternative, for summary judgment pursuant to FRCP 56. See ECF No. 47. In support of Defendant's motion, as stated in its notice of motion, Defendant relies on its Statement of Undisputed Material Facts Pursuant to FRCP 56 and Local Rule 56.1 ("56.1 Statement"), and the documents filed in 26-4, discussed above, which were previously filed by Defendant in connection with its motion to dismiss the original Complaint. See Notice of Motion, ECF No. 47. Defendant served the foregoing documents on Plaintiff at the time of its motion against the original Complaint, and again in connection with the motion currently before the Court. Defendant also served on Plaintiff the statement that Local Civil Rule 56.2 requires be served on pro se litigants against whom summary judgment is sought. Plaintiff filed a one-page opposition, in which he states: "I have a signed, legal contract with the Defendant. Based on my contention, nothing can override that contract. The lawyers for both sides signed it. I want to make sure that the Court looks at the contract, which is the final word on the matter." See ECF No. 46. Although not specified by Plaintiff, the Court construes the contract referenced in Plaintiff's opposition to be the August 2010 Agreement. Defendant submitted a reply in further support of its motion. See ECF No. 47-2.

The Parties have consented for this Court to conduct all proceedings and enter final judgment in this case. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, ECF No. 20. The District Judge approved the consent. Id.

## II. DISCUSSION

### A. Conversion To Summary Judgment

On a motion to dismiss pursuant to FRCP 12(b)(6), a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, Montero v. City of Yonkers, 890 F.3d 386, 391 (2d Cir. 2018), but it gives "no effect to legal conclusions couched as factual allegations," Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 35 (2d Cir. 2017). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662,

Friedland v. UBS AG, Not Reported in Fed. Supp. (2019)

2019 Employee Benefits Cas. 87,965

678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). In considering a motion to dismiss under FRCP 12(b)(6), the court is limited to the factual allegations in the complaint and documents attached thereto, as well as documents incorporated in the complaint by reference and those of which the plaintiff had knowledge and relied upon in commencing the action. See Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

**\*6** Defendant has submitted certain documents that Plaintiff incorporated into the Amended Complaint by reference, such as the Dillon Read Plan, UBS Plan, September 2009 Letter, August 2010 Agreement and November 2010 Agreement, as well as other documents that Plaintiff can fairly be said to have relied on in bringing suit, such as the Plan Administrator Decision. Defendant has also submitted documents that fall outside those categories, such as a document showing the conversion of Plaintiff's single life annuity into a Level Income Age 62 payment option, ECF No. 26-4 at 324, and a document showing the history of the pension payments made to Plaintiff under the Plan, ECF No. 26-4 at 326.

When presented with materials outside the pleadings on a motion to dismiss pursuant to FRCP 12(b)(6), the Court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under [FRCP] 56 and afford all parties the opportunity to present supporting material." Friedl v. City of N.Y., 210 F. 3d 79, 83 (2d Cir. 2000); see FRCP 12(d). In determining whether conversion is appropriate, "[t]he essential inquiry is whether the [nonmovant] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985).

Here, Defendant's notice of motion expressly states that Defendant is moving for summary judgment as an alternative to dismissal, see Nat'l Assoc. of Pharm. Mfrs., Inc. v. Ayerst Labs., 850 F.2d 904, 911 (2d Cir. 1988) (pro se non-movant on notice of conversion where motion was styled as a "motion to dismiss or, in the alternative, for summary judgment"), and states that, in support of its motion, Defendant would rely on the above-referenced documents and Rule 56.1 Statement. Defendant served Plaintiff copies of the documents and 56.1 Statement with its prior motion and again in connection with the current motion. Defendant also served on Plaintiff the statement that Local Civil Rule 12.1 requires be served to a pro se litigant when a represented party moving to dismiss or for judgment on the pleadings has submitted evidence outside

the pleadings, and the statement that Local Civil Rule 56.2 requires be served on pro se litigants against whom summary judgment is sought. As Plaintiff had sufficient notice of the possibility that Defendant's motion might be treated by the Court as a motion for summary judgment, and he had a reasonable opportunity to present supporting material, the Court will consider Defendant's motion as one brought for summary judgment under FRCP 56.

On a motion for summary judgment, the moving party has the burden of establishing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); Anderson v. Libery Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court resolves "all ambiguities and draw[s] all factual inferences in favor of the party opposing the motion[,]" reading "pleadings of a pro se plaintiff liberally and interpret[ing] them to raise the strongest arguments they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks omitted).

### B. Standard Of Review Applicable To Denial Of ERISA Benefits

Pursuant to ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary of a retirement plan governed by ERISA may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "Essentially, plaintiffs assert under this section a 'contractual right under a benefit plan.' " Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 82 (2d Cir. 2001) (quoting Strom v. Goldman, Sachs & Co., 202 F.3d 138, 142 (2d Cir. 1999) ).

**\*7** Judicial review of a denial of ERISA benefits must be reviewed de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the administrator does have such discretion under the plan, a court may reverse the administrator's decision only if it is arbitrary and capricious. See id.; Roganti v. Metro. Life Ins. Co., 786 F.3d 201, 210 (2d Cir. 2015). A plan administrator's decision is arbitrary and capricious only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995). The standard is "highly deferential," and "the scope of judicial review is narrow."

Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance." Tansey v. Anthem Health Plans, Inc., 619 F. App'x 24, 25 (2d Cir. 2015).

Here the Plan grants the Plan Administrator "the primary responsibility and discretionary authority ... to interpret [the Plan's] provisions, ... to determine the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan ... [and] to consider and decide conclusively appeals by any claimant...." Plan § 11.3. All "interpretations, determinations and decisions" with respect to any claim shall be made by the Plan Administrator "in its sole discretion based on the Plan and documents presented to it and shall be final, conclusive and binding." Id. § 11.9. Such language is sufficient to entitle Defendant to the deferential arbitrary and capricious standard of review. See Elizabeth W. v. Empire HealthChoice Assurance, Inc., 709 F. App'x 724, 726 (2d Cir. 2017) (finding sufficient that the plan granted the administrator the power to construe the plan's terms and decide all questions arising under the plan); Wegmann v. Young Adult Inst., Inc., No. 15 Civ. 3815 (KPF), 2018 WL 3910820, at *8 (S.D.N.Y. Aug. 14, 2018) (finding sufficient that the plan granted the power "to interpret the [p]lan, and to resolve ambiguities, inconsistencies and omissions" and to "determine the amount of benefits which shall be payable to any person in accordance with the provisions of the [p]lan").

Under either the arbitrary and capricious standard or the de novo standard, the Court would come to the same substantive decision.

### C. Application

The Court finds that the decision of the Plan Administrator was not arbitrary and capricious, and that it is correct as a matter of law. Plaintiff has received the full value of his accrued pension benefit under the Level Income Age 62 payment option he elected, ECF No. 26-4 at 326, and he does not argue otherwise. Under his chosen early-retirement option, Plaintiff receiving accelerated monthly pension payments beginning in October 2007, after he turned 55, and those payments continued until October 2014, when he turned 62, at which time his pension payments were reduced to $0.00 as his Social Security benefits became available to Plaintiff.[2] Id. Plaintiff now seeks to be paid his accrued pension benefit a second time

in the form of a life annuity. In addition to finding no support from the August 2010 Agreement or November 2010 Agreement for the relief he seeks, such a double payout would impermissibly conflict with the controlling terms of the Plan. See Dillon Read Plan §§ 3.2, 6.4; UBS Plan § 6.3

**\*8** A review of the August 2010 Agreement and November 2010 Agreement confirms the Plan Administrator's conclusion that neither agreement was intended to change Plaintiff's elected form of pension payment. The purpose of the August 2010 Agreement, as explained by the Plan Administrator, was to settle a claim raised by Plaintiff regarding notice of the merger of the Dillon Read Plan into the UBS Plan, and it provided for a lump sum settlement amount of $10,000.00 to be paid to Plaintiff. See August 2010 Agreement § 1(ii). Section (1)(i) of the August 2010 Agreement sets forth the "Dillon Read Benefit" to which Plaintiff is entitled under the Plan, describing it as: "[a]n annual pension benefit of $7,830.47, payable as a life annuity ... which commenced on October 1, 2007." Id. § (1)(i). The "Dillon Read Benefit", according to the August 2010 Agreement, "represents ... [Plaintiff's] benefit entitlement under the UBS Pension Plan," and "reflects all benefits accrued by [Plaintiff] under the Dillon Read Pension Plan from [Plaintiff's] date of hire through the date benefit accruals were frozen under the Dillon Read Pension Plan on September 30, 1997." Id. Viewed in the context of the entire agreement, the textual purpose of defining Plaintiff's Dillon Read Benefit in Section (1)(i) was to set up Plaintiff's Compensation Calculation Claim in Section 4(a). See August 2010 Agreement § 1(i), 4(a); see also id., second "Whereas" clause (referring to "claims concerning the calculation and amount of [Plaintiff's] entire pension benefit"). Plaintiff pursued and resolved the Compensation Calculation Claim via the November 2010 Agreement.

Plaintiff's proffered interpretation of the August 2010 Agreement as vesting him with a new entitlement to a second pension benefit, to be paid for the remainder of his life, is not supported by the plain language of the agreement. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.... When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.... The language of a contract is not made ambiguous simply because the parties urge different interpretations.").

Indeed, the August 2010 Agreement accurately states Plaintiff's accrued benefit of $7,830.47, and it specifically notes the date on which Plaintiff began receiving payments

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 56 of 105

Friedland v. UBS AG, Not Reported in Fed. Supp. (2019)

2019 Employee Benefits Cas. 87,965

under the Level Income Age 62 option (October 1, 2007).[3] To the extent the August 2010 Agreement contained a misstatement in referring to payment "as a life annuity," this does this not support Plaintiff's claim for a new entitlement, and the superseding November 2010 Agreement confirmed there was no change in his benefit payment option. Compare August 2010 Agreement § 1(i) with November 2010 Agreement § 1(i). The November 2010 Agreement, about which there is no dispute as to its accuracy, is controlling as the last settlement agreement. See November 2010 Agreement § 16 ("This Agreement constitutes the whole agreement between the parties. Neither party has relied on any representations, promises, or agreements other than those contained in this document."). The November 2010 Agreement is enforceable for the same reasons the Plan Administrator found it enforceable; it was properly signed and initialed, and it stated the benefit and lump sum correctly. See Plan Administrator Decision at 320-21.

The relief requested by Plaintiff in this action would impermissibly conflict with the plain terms of the Plan, which is not permissible under ERISA. As set forth in this Court's prior decision dismissing Plaintiff's original complaint on the basis of ERISA pre-emption, the relief sought by Plaintiff, whether framed as a change to Plaintiff's election or a second payment of his pension, can only be derived directly from rights created by the Plan.[4] Friedland v. UBS AG, No. 16 Civ. 687 (VMS), 2017 WL 6001769, at *3-5 (E.D.N.Y. Dec. 4, 2017); see Kelly v. Deutsche Bank Sec. Corp., No. 09 Civ. 5378 (JS) (ART), 2010 WL 2292388, at *1-2 (E.D.N.Y. June 3, 2010) ("[T]he great weight of authority holds that ERISA preempts common law claims to enforce a settlement agreement relating to an ERISA-covered benefit plan."); Morlino v. Staten Island Univ. Hosp., No. 95 Civ. 3891 (NG) (SMG), 1998 WL 160937, at *9 (E.D.N.Y. Apr. 1, 1998) (finding claim for breach of separation agreement preempted where merits of the claim were contingent on the rights created by the ERISA plan); Cefalu v. B.F. Goodrich Co., 871 F.2d 1293, 1293 (5th Cir. 1989) (holding that ERISA pre-empted the plaintiff's state-law claim because "the damages would consist of the pension benefits [the plaintiff] would have received" had the contract not been breached). Under ERISA, a participant in a pension plan can "recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). "The

statutory language [of ERISA] speaks of 'enforc[ing]' the 'terms of the plan,' not of changing them." CIGNA Corp. v. Amara, 563 U.S. 421, 436 (2011) (explaining that while ERISA § 502(a)(1)(B) "allows a court to look outside the plan's written language in deciding what [a] term[ ] [is], i.e., what the language means," it does not "authorize[ ] a court to alter [that] term[ ]"); Cefalu, 872 F.2d at 1296 (holding that oral modifications and informal written agreements to ERISA-governed plans are not enforceable; explaining that the purposes behind ERISA's formal writing requirement are to protect employees from having their benefits diluted by informal modifications and to protect the plan's actuarial soundness).

**\*9** Under the Plan here, a participant can receive his or her accrued benefits in the form of a single life annuity commencing at normal retirement age, or, "in lieu" of that form of payment, can elect the alternative Level Income Age 62 Option form of payment. See Dillon Read Plan §§ 3.2, 6.4; UBS Plan § 6.3. The Plan does not permit the payment of a participant's accrued pension benefits under both options, and the private settlement agreements between Plaintiff and Defendant do not profess to be formal Plan amendments.

Plaintiff's arguments must be rejected, and the Plan Administrator's decision must be confirmed as not being arbitrary and capricious, and as proper as a matter of law.

### III. CONCLUSION

For the reasons set forth above, summary judgment is granted in favor of Defendant UBS AG. The Clerk of Court is directed to enter judgment in Defendant's favor and close the case. A copy of this Memorandum & Order will be mailed to pro se Plaintiff Barry Friedland at the address listed for him on the docket.

### All Citations

Not Reported in Fed. Supp., 2019 WL 1232084, 2019 Employee Benefits Cas. 87,965

Footnotes

1    Because the documents were filed together under the same docket entry, ECF No. 26-4, the Court notes the page range where each
     document appears within that docket entry, using the pagination generated by the ECF system. For consistency, the Court will use
     ECF pagination throughout this Memorandum & Order when citing the page of any of these documents.

2019 Employee Benefits Cas. 87,965

2   The Plan terms clearly explained the nature and mechanics of the Level Income Age 62 Option, including the reduction of pension payments at age 62, potentially to zero, see Dillon Read Plan §§ 3.2, 6.4; UBS Plan § 6.3, and the September 2009 Letter explicitly informed Plaintiff that the payments would be reduced to $0.00 upon Plaintiff reaching the age of 62, see September 2009 Letter.

3   The commencement date for payments under the single life annuity form of payment would have been September 9, 2017, when Plaintiff turned 65.

4   That what Plaintiff seeks is an amended plan is confirmed by his submission of his initial claim and appeal to the Plan Administrator, as he construed his request as one for a payment under the Plan. See generally Plan Administrator Decision.

Giuffre v. Dershowitz, Not Reported in Fed. Supp. (2020)

Case 1:23-cv-10236-LJL   Document 49   Filed 04/25/24   Page 58 of 105

2020 WL 2123214
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Virginia L. GIUFFRE, Plaintiff,

v.

Alan DERSHOWITZ, Defendant.

No. 19 Civ. 3377 (LAP)
|
Signed 04/08/2020

**Attorneys and Law Firms**

Charles J. Cooper, Haley N. Proctor, Nicole J. Moss, Michael W. Kirk, Cooper & Kirk, PLLC, Washington, DC, Joshua Schiller, Boies Schiller Flexner LLP, New York, NY, Sigrid S. McCawley, Boies, Schiller & Flexner LLP, Fort Lauderdale, FL, for Plaintiff.

Arthur Louis Aidala, Law Offices of Aidala & Bertuna, P.C., Brooklyn, NY, Christian Kiely, Howard M. Cooper, Kristine Chappen Oren, Todd & Weld LLP, Boston, MA, Imran H. Ansari, Aidala Bertuna & Kamins PC, New York, NY, for Defendant.

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

 **\*1** Before the Court is a motion to amend the operative complaint filed by Plaintiff Virginia Giuffre ("Giuffre"). (See Plaintiff's Memorandum of Law in Support of Motion to Amend Complaint ("Pl. Mem."), dated December 20, 2019 [dkt. no. 100]; see also Defendant's Memorandum of Law in Opposition to Motion to Amend ("Opp."), dated January 24, 2020 [dkt. no. 112]; see also Plaintiff's Reply Memorandum of Law in Further Support of Motion to Amend ("Reply"), dated February 7, 2020 [dkt. no. 114].) For the following reasons, that motion to amend is GRANTED.

The parties are more than familiar with the facts underlying this litigation, so the Court will not endeavor to recite them here.[1] Of essential note, counsel for Giuffre and Defendant Alan Dershowitz ("Dershowitz") appeared at a conference before the Court on December 2, 2019, to discuss next steps in the litigation following the Court's October 16, 2019 denial of Dershowitz's motion to dismiss the original

complaint. At that conference, counsel for Giuffre indicated that she was planning to seek to amend her complaint to add (1) expired New York state battery claims that have been revived by the claim-revival provision of the New York Child Victims Act ("CVA") and (2) claims under the Electronic Communications Privacy Act, i.e., the Wiretap Act, relating to Dershowitz's purported recording of certain conversations with David Boies, Giuffre's former attorney. (See Transcript of December 2, 2019 Conference ("Transcript"), dated December 10, 2019 [dkt. no. 96] at 19:2-3, 20:1-3, 21:11-24.) Dershowitz indicated that he would oppose any such motion to amend the complaint on the grounds that amendment would be futile, though the Court cautioned him that doing so would be an uphill battle prior to summary judgment. (Id. at 20:17-21:9.) Giuffre filed her motion to amend on December 20, 2019, Dershowitz dutifully opposed the motion on grounds of futility, and now here we are.

Rule 15 of the Federal Rules of Civil Procedure emphasizes that leave to file an amended complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A litigant seeking to amend her complaint accordingly "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001); see also Agerbrink v. Model Serv. LLC, 155 F. Supp.3d 448, 452 (S.D.N.Y. 2016) (describing "liberal" Rule 15 standard). An amendment to a pleading "is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Federal Rule of Civil Procedure] 12(b)(6)." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002).

Dershowitz has argued that both of Giuffre's proposed New York State battery and Wiretap Act claims are futile. (See Opp. at 4-24.) He has failed on both scores. With respect to the battery claim, Dershowitz has first suggested that Giuffre has failed plausibly to plead a lack of consent to any alleged sexual encounter with Dershowitz. (Id. at 5.) However, as Giuffre points out, the absence of consent is not a formal element of the tort of battery under New York law. (Reply at 2.) Instead, a lack of consent is but one mechanism through which a plaintiff may establish the element of harmful or offensive contact. Rivera v. Puerto Rican Home Attendants Serv., Inc., 930 F. Supp. 124, 133 (S.D.N. Y 1996). Alternatively, where a Defendant can demonstrate that a Plaintiff consented to the relevant contact, consent may function as a defense to the tort of battery. O'Connor v. Western Freight Ass'n, 202 F. Supp. 561, 565 (S.D.N.Y. 1962). Thus, even assuming arguendo that Giuffre did not

adequately plead a lack of consent to her alleged sexual encounters with Dershowitz, that defect would not be legally fatal to her proposed claim.

**\*2** Dershowitz's other gambits with respect to the proposed battery claim are more consequential, but equally unsuccessful. First, he contends that the CVA's claim-revival provision, which gives victims of alleged sexual assaults an additional year to pursue claims for which the statute of limitations has run, see N.Y. C.P.L.R. § 214-6, violates Dershowitz's right to due process under the New York Constitution. (See Opp. at 9.) That argument proceeds something like this: the New York Constitution's due process clause is broader than its sister provision in the federal Constitution; given the breadth of New York's due process protections, New York courts have looked upon claim-revival provisions skeptically, only upholding them in circumstances where a given plaintiff could not have brought an action in a timely manner; the CVA is thus unconstitutional as applied to Giuffre's sexual battery claim against Dershowitz because nothing prevented her from commencing an action against Dershowitz within the original statute of limitations. (Id. at 11-13 (citations omitted).)

Unfortunately for Dershowitz, the New York Courts' historical skepticism of claim-revival provisions appears to be just that: historical. While Justice Cardozo may have opined that claim revival is an "extreme exercise of legislative power" nearly a century ago, Hopkins v. Lincoln Trust Co., 233 N.Y. 213, 215 (1922), that does not appear to be the prevailing view of such provisions in the here and now. Indeed, the New York Court of Appeals has recently enunciated the permissive stance that a given revival statute will not run afoul of New York's due process clause if it merely "was a reasonable measure to address an injustice." Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 N.Y.3d 377, 400 (2017). In doing so, the Court of Appeals specifically rejected the kind of heightened standard for claim-revival statutes that Dershowitz presses the Court to apply here, noting such limitations are "too strict" in part because "there is no principled way for a court to test ... whether a particular class of plaintiffs is blameless [for failing to bring suit]." Id. Applying that reasoning, the CVA's claim-revival provision obviously reflects the New York State Legislature's desire to correct a perceived injustice, i.e., that the statute of limitations for certain claims expired before child victims of sexual abuse recovered from past traumas to a degree sufficient to assert their rights. (See Reply at 6.) And, as applied here, the claim revival provision ostensibly

works as the legislature intended by redressing Giuffre's purported inability to pursue claims of sexual battery against Dershowitz and others due to her continued victimization at the hands of Jeffrey Epstein. For purposes of the instant motion, then, the Court is unable to see how the CVA's claim-revival provision fails to meet the manageable bar set forth in the World Trade Center litigation.

Dershowitz additionally contends that the CVA is unconstitutional because it is void for vagueness in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution. Specifically, Dershowitz notes that the CVA revives claims for injuries to a minor "suffered as a result of conduct which would constitute a sexual offense as defined in [Article 130 of the New York Penal Law]." See N.Y. C.P.L.R. § 214-g. The New York Penal Law, in turn, makes lack of a consent "an element of every offense defined in [the] article." N.Y.P.L. § 130.05. The Penal Law states that lack of consent may result from "any circumstances ... in which the victim does not expressly or impliedly acquiesce in the actor's conduct." Id. § 130.05(2)(c). Dershowitz takes issue with this definition of "lack of consent," arguing that it does not provide sufficient notice as to what kind of "circumstances" indicate a lack of consent and encourages arbitrary enforcement. (Opp. at 14.)

This is too clever by half. First, Giuffre is not "seek[ing] to sue under a statute that allows consent to be proven by surrounding circumstances," as Dershowitz contends. (Id.) She cannot sue under the CVA because it creates no cause of action, and the CVA itself does not provide for "proof" of anything because it in no way regulates conduct. Instead, the CVA is a means to an end. As discussed above, its claim-revival mechanism allows Giuffre to raise a claim for civil sexual battery--which itself does not require any proof of lack of consent, see supra at 3—-in the face of a potential limitations defense because the conduct alleged by Giuffre would amount to a sexual offense under the New York Penal Code. Thus, the definition of lack of consent that Dershowitz finds problematic cannot be wielded against him at all, at least not in any substantive sense. Instead, the CVA's incorporation of the language from the Penal Code is merely a guidepost for determining which claims may be revived. It is not, as Dershowitz suggests, a guidepost for how to prove those claims once they have been resurrected from the dead. Thus, the Court sees no constitutional issue with the type of notice that the CVA provides.

**\*3** Second, even if the CVA itself regulated conduct it would not run afoul of the Due Process Clause. As Giuffre points out, the CVA is a civil statute that is "not impermissible under [the Due Process Clause] unless its commands are so vague as really to be no rule or standard at all." Ass'n of Int'l Auto Mfrs. V. Abrams, 84 F.3d 6022, 614 (2d Cir. 1996)(quoting Boutilier v. INS, 387 U.S. 118, 123 (1967)). And here, the Court agrees that the concept of implied consent is "a concept ubiquitous in the law," (Reply at 8), that does not provide any ground whatsoever for declaring a civil claim-revival statute void for vagueness.

Finally, Dershowitz opposes Giuffre's proposed Wiretap Act claim on the grounds that she does not have statutory standing to bring the claim, that she has failed to plead a criminal tortious purpose as required by the statute, and that the claim, in any case, is time-barred. (See Opp. at 18-24.)

The standing issue is dicey, which itself counsels against a finding that the proposed claim is futile. Of course, prior to granting the present motion, this Court must examine the claims "to ascertain whether they are futile on their face." Town of New Windsor v. Tesa Tuck, Inc., 919 F. Supp. 662, 678 (S.D.N.Y. 1996)(emphasis added). Dershowitz has argued that the Wiretap Act's language, which provides a cause of action to persons "whose" communications are intercepted, does not cover the present situation, i.e., a scenario where an individual's attorney is surreptitiously recorded, because Giuffre herself was not party to the recorded conversation. (Opp. at 15-17.) The Court acknowledges that this argument is, on its face, persuasive. However, that is not enough for the Court to find Giuffre's proposed Wiretap Act claim futile. Here, it appears that the question of whether Giuffre has a possessory interest in the communications of her (now former) attorney under the Wiretap Act is a disputed, unsettled question of law. Cf. Travelers Ins. Co. v. Buffalo Reins. Co., 1990 WL 116741, at \*2 (S.D.N.Y. Aug. 7, 1990)(finding proposed claim was not legally insufficient on its face because it involved an unsettled question of law); see also At the Airport v. ISATA, LLC, 438 F. Supp.2d 55, 66 (E.D.N.Y. 2006)(rejecting futility argument in favor of "allowing the parties an opportunity to be fully heard" where relevant question of law was "unsettled"); see also In re Bernard L. Madoff Inv. Securities LLC, 468 B.R. 620, 624-25 (S.D.N.Y. Bankr. 2012). Accordingly, the Court will wait to decide the Wiretap Act standing question until the parties have had an opportunity to be fully heard on the issue in the context of a motion for summary judgment.

Dershowitz's suggestion that Giuffre's proposed Wiretap Act claim fails to allege that he acted with a "criminal or tortious purpose" in recording the conversation with David Boies, (Opp. at 18-23) is also unavailing for purposes of defeating a motion to amend. The Wiretap Act provides that:

> "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication ... unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or any State."

See 18 U.S.C. § 2511(2)(d). The Court of Appeals has explicitly held that "to survive a motion to dismiss, a [Wiretap Act] plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording." Caro v. Weintraub, 618 F.3d 94, 100 (2d Cir. 2010).[2] Dershowitz is correct that courts in this circuit construe the tortious purpose exception "narrowly," United States v. Jiau, 734 F.3d 147, 152 (2d Cir. 2013), and thus require that committing a tort was the "primary motivation" behind a defendant's conduct, In re DoubleClick Inc. Privacy Litig., 154 F. Supp.2d 497, 514-15 (S.D.N.Y. 2001). The exception is accordingly "confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party." Jiau, 734 F.3d at 152.

**\*4** That is precisely what Giuffre's proposed Wiretap Act claim contends. Her proposed amended complaint alleges that Dershowitz has "played selective portions of his recordings to the press in an effort to persuade the public" that Giuffre's own lawyers "disbelieve her." (See Proposed Amended Complaint ("PAC"), dated December 20, 2019 [dkt. no. 101-1], ¶ 88.) Giuffre also alleges that Dershowitz utilized the recording to buttress public claims that Giuffre had committed perjury. (Id. ¶ 17(w).) The Court thus agrees that the proposed pleading creates a plausible inference that Dershowitz recorded his conversations with Giuffre "for the purpose of creating a false impression about [Giuffre's] credibility" in further support of his "defamation campaign against her." (Reply at 13.) Giuffre does not specifically say that Dershowitz was "primarily motivated" by these objectives, but the Court does not find those words to be talismanic. The Court accordingly concludes that Dershowitz has failed to demonstrate that the

**Giuffre v. Dershowitz, Not Reported in Fed. Supp. (2020)**

Case 1:23-cv-10236-LJL   Document 49   Filed 04/25/24   Page 61 of 105

Wiretap Act claim is futile due to Giuffre's failure to plead a tortious purpose.

With further respect to Dershowitz's arguments regarding the Wiretap Act claim being inadequately pleaded and his separate argument that the claim is time-barred, the Court finds that Dershowitz has primarily shown questions of fact that will need to be adjudicated at a later point, not that the claims in question are futile as a legal matter. See McGarty v. Town of Carmel, 997 F. Supp. 435, 437-38 (S.D.N.Y. 1998). For example, whether the Wiretap Act claim is time-barred appears to depend in part on the accuracy of an article cited by Dershowitz that suggests that David Boies had suspicions that Dershowitz was taping him in 2015. (Opp. at 24.) Similarly, Dershowitz has contended that the low-quality of the relevant records and the amount of time that he waited to disclose them evidence a lack of tortious intent. (Id. at 21-22.) These are

factual issues that lay beyond the four corners of the proposed amended complaint and thus are not suitable for resolution on a motion to amend.

For the reasons detailed above, Giuffre's motion to amend [dkt. no. 99] is GRANTED. To the extent not addressed in this opinion, the Court considered Dershowitz's remaining arguments and found them unavailing. Giuffre is directed to file her First Amended Complaint by no later than April 15, 2020.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2123214

---

## Footnotes

1    A rigorous recounting of the relevant facts can be found in this Court's October 16, 2019 opinion denying Defendant Dershowitz's motion to dismiss Giuffre's original complaint. (See Opinion & Order, dated October 16, 2019 [dkt. no. 67].)

2    For this reason, the Court rejects Giuffre's argument that she need not plead facts giving rise to an inference of tortious intent because 18 U.S.C. § 2511(2)(d) only defines a statutory exception and not an element of a Wiretap Act claim. (See Reply at 12.) To be sure, courts in this circuit have made similar findings regarding different statutes. See, e.g., Mountain Candy & Cigar Co., Inc. v. Plainfield Tobacco and Candy Co., Inc., No., 2019 WL 5895973, at *5 (E.D.N.Y. Nov. 12, 2019) ("The [New York Cigarette Marketing Standards Act's] exception for meeting competition in good faith need not be pleaded in the negative to survive a motion to dismiss. Instead, the CMSA's statutory structure makes clear the exception is an affirmative defense ... rather than an element to be pleaded.") The Court of Appeals' clear language in Caro, however, compels a different result here. See 618 F.3d at 100.

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## *Marrero v. Roman Cath. Archdiocese of N.Y.*

Supreme Court of New York, Bronx County

September 25, 2023, Decided; September 25, 2023, Filed

INDEX NO. 70329/2021E

**Reporter**

2023 N.Y. Misc. LEXIS 25241 *

MARRERO, Plaintiff(s), v. ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK, et al., Defendant(s),

**Judges:** [*1] Hon. MARISSA SOTO, J.S.C.

**Opinion by:** MARISSA SOTO

## Opinion

The following papers NYSCEF Doc No. __. Read on this motion. (Seq. No. 1) Noticed on__ and duly submitted as NYSCEF Doc. No.__.

NYSCEF Doc. No.

Notice of Motion - Order to Show Cause - Exhibits and Affidavits Annexed 12-18

Answering Affidavit and Exhibits

Replying Affidavit and Exhibits

Other: Stipulation

Upon the foregoing papers, it is ordered that this motion is decided in accordance to the annexed decision and order.

This constitutes the order of the Court.

**Dated**: 9/25/2023

Hon.

/s/ MARISSA SOTO

**MARISSA SOTO, J.S.C.**

SUPREME COURT OF THE STATE OF NEW

YORK COUNTY OF BRONX: I.A.S. PART 22

LUIS MARRERO, Plaintiff(s), v. ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK, SACRED HEART PARISH, and PETER C. O'DONNELL Defendant(s).

DECISION AND ORDER

Index No.: 70329/2021E

MOT SEQ. 1

Honorable Marissa Soto, J.S.C.

The following e-filed NYSCEF papers read herein:

Papers NYSCEF Doc. #'s/No.

Notice of Motion and Affidavits/Affirmations Annexed: 12-18

Opposition Affirmation/ Cross Motions: 19-24, 27-34

Reply Affirmation: 35

Defendant The Roman Catholic Archdiocese of New York (hereinafter the "Archdiocese") moves pursuant to *CPLR § 3211(a)(7)* for dismissal of Plaintiff's Luis Marrero (hereinafter the "Plaintiff") [*2] Plaintiff's fifth cause of action for negligent infliction of emotional distress against the Archdiocese and granting the Archdiocese such other and further relief as this Court deems just and proper.

Co-Defendant, Sacred Heart Paris (hereinafter "Sacred Heart"), cross moves for the same relief seeking to strike the sixth cause of action

for negligent infliction of emotional distress pursuant to *CPLR § 3211(a)(7)*. Plaintiff opposes both motions.

This action was commenced by summons and complaint, dated August 6, 2021, at NYSCEF Doc. No. 1 (hereinafter the "Complaint"). The Complaint alleges that in or around 1982 through in or around 1983, when Plaintiff was approximately fourteen (14) years old, he was attending baptism classes at the Defendant Sacred Heart, he was sexually abused by Father Peter C. O'Donnell (hereinafter "Father Peter C. O'Donnell") and Father Roy Gomey (hereinafter "Father Roy Gomey") "on numerous occasions, as frequently as weekly, over the course of approximately one year." Plaintiff's Complaint ¶¶ 36-48.

The Plaintiffs allege that they sustained emotional and physical injuries caused by the Defendants and brought this action under the *CPLR § 214-g*, also known as the Child Victims Act (hereinafter, [*3] the "CVA") against all the Defendants with the following six causes of action: (1) negligence against the Archdiocese; (2) negligence against Sacred Heart Parish; (3) negligent hiring, retention, and supervision against the Archdiocese; (4) negligent hiring, retention, and supervision against Archdiocese; (5) negligent infliction of emotional distress against the Sacred Archdiocese; (6) negligent infliction of emotional distress against Sacred Heart Parish; (7) assault against Father Peter C, O'Donnell; (8) battery against Father Peter C. O'Donnell; and (9) intentional infliction of emotional distress against Fr. Peter C. O'Donnell.

## DISCUSSION

It is well settled law that complaints are to be liberally construed. *CPLR §3026*. "On a motion to dismiss pursuant to *CPLR 3211*, the pleading is to be afforded a liberal construction. "We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." *34-06 73, LLC v. Seneca Ins. Co., 39 N.Y.3d 44, 51 (2022)* citing *Sassi v. Mobile Life Support Servs., Inc., 37 N.Y.3d 236, 239 (2021)*; accord *Chanko v. American Broadcasting Cos. Inc., 27 N.Y.3d 46, 52 (2016)*; *Goshen v. Mutual Life Ins. Co. of N.Y., 98 N.Y.2d 314, 326 (2002)*; *Campaign for Fiscal Equity v. State of New York, 86 N.Y.2d 307, 318, (1995)*; *Leon v Martinez, 84 N.Y.2d 83, 87-88, (1994)*.

Pursuant to *CPLR §3211(a)(7)* a party may move for judgment dismissing one or more causes of action asserted against him on the ground that the pleading fails to [*4] state a cause of action. *Maroutian v. Fuchs, 124 A.D.3d 541, 541 (1st Dept 2015)*. When considering a motion to dismiss for failure to state a cause of action, the pleadings must be liberally construed. *CPLR §3026*; *Siegmund Strauss, Inc., 104 A.D.3d 401, 403 (1st Dept 2013)*. In deciding such a motion, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs 'the benefit of every possible favorable inference,' [and] determine only whether the facts as alleged fit into any cognizable legal theory." *Siegmund Strauss, Inc., 104 A.D.3d at 403*; citing *Leon v Martinez, 84 NY2d 83, 87-88 [1994]*). "In deciding such a pre-answer motion, the court is not authorized to assess the relative merits of the complaint's allegations against the defendant's contrary assertions or to determine whether or not plaintiff has produced evidence to support his claims." *Salles v. Chase Manhattan Bank, 300 A.D.2d 226, 228 (1st Dept 2002)*. However, "allegations consisting of bare legal conclusions as well as factual claims flatly contradicted by documentary evidence are not" presumed to be true or accorded every favorable inference. *David v. Hack, 97 A.D.3d*

437 (1st Dept 2012) citing *Mass v. Cornell Univ., 94 N.Y.2d 87, 91 (1999)*; *Biondi v Beekman Hill House Apt. Corp., 257 A.D.2d 76, 81 (1st Dept 1999)*, affd *94 N.Y.2d 659 (2000)*; *Kliebert v. McKoan, 228 A.D.2d 232 (1st Dept)*, lv denied *89 N.Y.2d 802 (1996)*.

### Claims Subject to Revival

Numerous state and federal courts have found that the claim revival provision of New York's Child Victims Act does not violate the due process clauses of the New York and United States Constitution. *See* *Farrell v. United States Olympic & Paralympic Comm., No. 1:20-CV-1178 FJS/ CFH, 567 F.Supp.3d 378, 391 (N.D.N.Y., Oct. 15, 2021)* ("a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in [*5] order to remedy an injustice"); *see* *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 N.Y.3d 377, 400 (2017)*. "The CVA, which afforded victims of childhood sexual abuse a limited period of time within which to pursue their claims of sexual abuse through the judicial system, was a reasonable, non-arbitrary response to remedy an injustice and therefore satisfies the New York Due Process Clause." *PC-41 Doe v. Poly Prep Country Day Sch., No. 20-CV-03628 (DG) (SJB), 590 F.Supp.3d 551, 558 (E.D.N.Y., Sept. 22, 2021)*.

Multiple New York courts and two federal district courts in the Second Circuit have held that the CVA does not run afoul of due process because it remedies an injustice. *Id., see* e.g., *Giuffre v. Dershowitz, No. 19 Civ. 3377 (LAP), 2020 WL 2123214, *2, 2020 U.S. Dist. LEXIS 78596, *5-*6 (S.D.N.Y., Apr. 8, 2020)*; *PB-36 Doe v. Niagara Falls City Sch. Dist., No. E172556/2020, 72 Misc.3d 1052, 1058-1059, 2021 NY Slip. Op. 21188, *4-6, (Sup. Ct., Niagara County, July 19, 2021)*; *Torrey v. Portville Cent. Sch., 66 Misc.3d 1225 [A], *4,*

*125 N.Y.S.3d 531, *4 (Sup Ct, Cattaraugus County, Feb. 21, 2020)*. As *CPLR §214-g* has been found repeatedly to be constitutional.

As a housekeeping matter, the Court will only address the Plaintiff's fifth and sixth causes of action as both are for Negligent Infliction of Emotional Distress claim (hereinafter "NIED") against each Defendant, the Archdiocese and Sacred Heart.

### Negligent Infliction of Emotional Distress

The Defendants seek to dismiss Plaintiffs' Negligent Infliction of Emotional Distress claims ("NIED"), as being duplicative to the other negligence-based causes of action. The Archdiocese argues Plaintiff's fifth cause of action for NIED should be dismissed as duplicative of the Plaintiff's negligence claims, specifically the Plaintiff's first cause of action for negligence [*6] and the third cause of action for negligent hiring, retention, and supervision. Sacred Heart argues that the sixth cause of action for NIED is based on common law negligence and negligent hiring, retention and supervision, and the facts relied upon to support the negligence causes of action are identical to those pleaded in support for NIED, therefore it should be dismissed as duplicative.

The Court does not find duplicative claim as a viable basis for dismissal within *CPLR 3211(a)*. *CPLR 3211(a)* Motion to Dismiss Cause of Action states in relevant part A party may move for judgment dismissing one or more causes of action asserted against him on the ground that:

1. a defense is founded upon documentary evidence; or

2. the court has not jurisdiction of the subject matter of the cause of action; or

3. the party asserting the cause of action has not legal capacity to sue; or

4. there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground but may make such order as justice requires; or

5. the cause of action may not be maintained because of arbitration and award, collateral estoppel, discharge in bankruptcy, [*7] infancy or other disability of the moving party, payment, release, res judicata, statute of limitations, or statute of frauds; or

6. with respect to a counterclaim, it may not properly be interposed in the action; or

7. the pleading fails to state a cause of action; or

8. the court has not jurisdiction of the person of the defendant; or

9. the court has not jurisdiction in an action where service was made under section 314 or 315; or

10. the court should not proceed in the absence of a person who should be a party.

11. the party is immune from liability pursuant to section seven hundred twenty-a of the not-for-profit corporation law. Presumptive evidence of the status of the corporation, association, organization or trust under section 501 (c) (3) of the internal revenue code may consist of production of a letter from the United States internal revenue service reciting such determination on a preliminary or final basis or production of an official publication of the internal revenue service listing the corporation, association, organization or trust as an organization described in such section, and presumptive evidence of uncompensated status of the defendant may consist of an affidavit of the chief financial officer of the corporation, association, [*8] organization or trust. On a motion by a defendant based upon this paragraph the court shall determine whether such defendant is entitled to the benefit of section seven hundred twenty-a of the not-for-profit corporation law or subdivision six of section 20.09 of the arts and cultural affairs law and, if it so finds, whether there is a reasonable probability that the specific conduct of such defendant alleged constitutes gross negligence or was intended to cause the resulting harm. If the court finds that the defendant is entitled to the benefits of that section and does not find reasonable probability of gross negligence or intentional harm, it shall dismiss the cause of action as to such defendant.

NY CLS CPLR R 3211. As a result, the Court will look to the case law referenced and the general landscape of the law in this area.

The First Department has allowed both a negligence and negligent infliction of emotional distress claims based on the same underlying facts and circumstances to survive after a summary judgment motion. *Brown v. New York City Design Ctr., Inc., 215 A.D.3d 1, 9 (1st Dept 2023)*. (. . . motion for summary judgment dismissing the negligent infliction of emotional distress claim and denied the motion as to the negligence claim, should be modified, on the law, to [*9] reinstate the negligent infliction of emotional distress claim . . .). In *Brown,* the bathroom of a building owned by the defendant had a grapefruit sized hole in the wall between the men's and women's bathroom through which video was being taken of the women using the bathroom. *Id.* The plaintiff's alleged negligence and negligent infliction of emotional distress claims based on the defendant's failure to fix the hole. *Id.* Both were allowed to proceed after defendant's summary judgment motion was denied on appeal. *Id.* This Court understands that *Brown* is distinguishable in that it was a motion pursuant to *CPLR 3212* rather than 3211 and that the Court may not have addressed the explicit duplicative argument. However, the

Court still finds the First Department's treatment of these two causes of action informative in how to address them in this context.1

Further, the authority relied on for the proposition that civil causes of action can be dismissed on a *CPLR §3211* motion based on the fact that there are multiple causes of action that stem from the same set of operative facts and circumstances is unclear. Defendants argue that a NIED claim cannot remain if it is essentially duplicative of tort or contract causes [*10] of action. Defendant cites to *Wolkstein v. Morgenstem,* a First Department case addressing the dismissal of a negligent infliction of emotional distress in connection with professional malpractice. *275 A.D.2d 635, 637 (1st Dept 2000)* ("Generally, a cause of action for infliction of emotional distress is not allowed if essentially duplicative of tort or contract causes of action.") citing *Murphy v. American Home Prods. Corp., 58 NY2d 293, 303 (1983)* citing *Fischer v. Maloney, 43 NY2d 553, 557 (1978)*. In *Wolkstein,* the court expressly states that the first step for the court to determine in this posture is whether the conduct alleged can be is outrageous and immediately finds that it does not. *Id.* The next sentence states that "generally" the negligent infliction of emotional distress should be dismissed if duplicative of a tort or contract claim. *Id.* This Court interprets the use of the word "generally" as the qualifier of the remainder of the sentence, which precludes the application of the premise as a bright line rule.

Further, distinguishing *Wolkenstein* from the current case is the authority relied on by the court therein, the Court of Appeals decision in *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293 (1983)*. The Court of Appeals in the *Murphy* decision dismissed the IIED claim because it stemmed from a termination of employment and stated that "there is now no cause of [*11] action in tort in New York for abusive or wrongful discharge of an at-will employee, plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress. *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d at 303*. This reasoning could be interpreted to mean that an IIED claim will be subject to additional hurdles unless there is an already existing and recognized tort for the conduct underlying the IIED claim. *Murphy v. Am. Home Prods. Corp., 58 N.Y.2d at 303* ("The facts alleged by plaintiff regarding the manner of his termination fall far short of this strict standard."). The Court of Appeals in *Murphy* contrasts its reasoning to that of the court in *Fischer v. Moloney, 43 NY2d 553, 557 (1978)*. In *Fischer,* like in *Wolkenstein* and *Murphy,* the court first stated that the conduct alleged did not meet the outrageous element. *Id.* It then went on to question whether it could exist if the conduct complained of fit well within an established tort action. *Id. at 558*. The questioning in *Fisher* was dicta and not the holding of the Court of Appeals. Further, all three of the cases in that line of authority deal with intentional infliction of emotion distress and not negligent infliction of emotion distress and therefore, [*12] are also distinguishable on those grounds.

The protections against double jeopardy afforded to criminal defendants are set forth in the Constitution of the United States, the New York State Constitution, and codified in the *New York State NY CLS CPL § 40.20*, yet even those protections do not shield a criminal defendant from answering to all charges applicable to the underlying criminal conduct alleged if they require different elements be proven. *See generally* Lexis+ Commentary to *NY CLS CPL § 40.20*; PRACTICE INSIGHTS: *How to Tell When Previous Prosecution Constitutes Double Jeopardy,* By John M.

Castellano, Esq., Member of New York Bar, General Editor, John M. Castellano, Esq., Member of New York Bar. The Court finds that there are greater protections to a criminal defendant than a civil defendant as demonstrated by the lower burden of proof and the lack of unanimity required of juries. As a result, it is incongruous to this Court's logic that a civil defendant would be shielded from the need to have to defend multiple causes of action that stem from the same conduct but not the criminal defendant, whose protections are woven through the foundational principles of our legal system.

This Court finds that there is the risk of prejudicing [*13] the due process rights of a litigant by eliminating causes of action that contain separate elements that must be proven when all necessary elements have been adequately pleaded. The Court also finds that such prejudice to the Plaintiff is greater than any prejudice to the civil defendant in defending against them - if their theory holds true it will require no additional effort at all on their part to refute since the underlying conduct in question is the same. To dismiss the cause of action as duplicative may eliminate a litigant's ability to recover on a cause of action that it might otherwise be entitled to. It is completely conceivable that a reasonable jury could find all the elements that support one cause of action and not the other if the causes of action require non identical elements be proven. In addition, the Court is not certain why it or the defendant should be in the position to dictate which of the two allegedly duplicative causes of action survive.

Under New York law, a cause of action alleging intentional infliction of emotional distress "has four elements; (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, [*14] severe emotional distress; (iii) a causal connection between the conduct and

injury; and (iv) severe emotional distress." *Brown, 215 A.D.3d at 9* (internal citations omitted). A cause of action for negligent infliction of emotional distress does not require extreme or outrageous conduct, or physical injury. *Id.* However, the mental injury must be "a direct, rather than a consequential, result of the breach", meaning the negligent breach of the duty of care, (*Kennedy v. McKesson Co., 58 N.Y.2d at 506*), and the claim must possess "some guarantee of genuineness." *Id.* Therefore, a negligent infliction of emotional distress cause of action requires an accompanying negligence finding. Further, negligent infliction of emotional distress contains a separate element that is not necessary for a negligence claim, i.e. severe emotional distress. Based on the above, the Court does not find that dismissal for being duplicative is warranted as a matter of law.

Sacred Heart argues in its motion to dismiss that the negligent infliction of emotional distress cause of action is duplicative of the negligence and negligent hiring, retention and supervision. Here, the Court would like to make clear that the misclassification of the motion as a cross motion will be disregarded [*15] for purposes of reaching the merits. The elements to each are different and it is therefore conceivable that one or all of them could be found to have been proven by a jury. Accordingly, the Court does not find that the nature of the causes of action require a dismissal of any one as a matter of law.

The Court notes that neither motion to dismiss alleged that the causes of action were insufficiently pleaded and therefore does not reach that issue.

The Court has considered the remaining arguments and they do not warrant a contrary result and finds them unavailing.

## CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

**ORDERED** that the Defendant Archdiocese motion to dismiss the fifth cause of action of the Plaintiff's complaint of negligent infliction of emotional distress is denied; it is further

**ORDERED** that the Defendant Sacred Heart motion to dismiss the sixth cause of action of the complaint for negligent infliction of emotional distress is denied; it is further

**ORDERED** that the parties shall proceed with discovery; and it is further

**ORDERED** that counsel for Defendants shall serve a copy of this order, along with notice of entry, on all parties within 30 days.

This constitutes [*16] the decision and order of the Court.

Dated: September 25, 2023

/s/ MARISSA SOTO

HON. MARISSA SOTO, J.S.C.

1 The Court recognizes that the duplicative claim may not have been argued on appeal but the record below is sealed so the exact arguments presented below and preserved for appeal are unknown.

_____

**End of Document**

Persaud v. S. Axelrod Co., Not Reported in F.Supp. (1996)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 69 of 105

69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

🚩 KeyCite Yellow Flag - Negative Treatment

Criticized in   Dryden v. Tiffany & Co.,   S.D.N.Y.,   March 25, 1996

1996 WL 11197

United States District Court, S.D. New York.

Debbie PERSAUD, Plaintiff,

v.

S. AXELROD COMPANY,

and Douglas Parks, Defendants.

No. 95 CIV. 7849(RPP).

|

Jan. 10, 1996.

**Attorneys and Law Firms**

Law Office of Allegra L. Fishel, by Allegra L. Fishel, New York City, for Plaintiff.

Davis & Gilbert, by Howard J. Rubin, Jeffrey D. Pollack, New York City, for Defendant S. Axelrod Company.

Newman Tannenbaum Helpern Syracuse & Hirschtritt, by Yolanda Kanes, New York City, for Douglas Parks.

OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Defendants, Douglas Parks ("Parks") and S. Axelrod Company ("Axelrod") move to dismiss certain causes of action in a complaint filed by plaintiff, Debbie Persaud ("Persaud") on September 13, 1995. The complaint consists of eight claims: (1) hostile work environment; (2) retaliatory discharge; (3) retaliation; (4) sex discrimination; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) negligent retention; and (8) negligent supervision.

Defendant Parks moves to dismiss plaintiff's complaint pursuant to Rules 12(b)(1), 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure. Defendant Axelrod moves pursuant to Rules 12(b)(1), 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure to dismiss plaintiff's fifth, sixth, seventh, and eighth causes of action against it. [1]

For the following reasons, Parks' motion is granted in part and denied in part and Axelrod's motion is granted.

*BACKGROUND*

From August 8, 1989 to September 15, 1992, Debbie Persaud was employed as an administrative assistant by Axelrod, a family-run company doing business in New York. (Complaint filed September 13, 1995 ("Complaint") ¶¶ 9-13.) Throughout Persaud's employment, Harvey Axelrod was president of the company, Ida Axelrod was vice-president, and Michael Axelrod was treasurer. (*Id.* ¶¶ 11-13.)

During Persaud's employment, Parks worked in Axelrod's shipping department, which consisted of approximately fifteen to twenty male employees. Parks' work station was located on the same hallway as the sales and administrative office in which Persaud worked. [2] (*Id.* ¶¶ 15, 17.) In order to use the ladies room or the water cooler, Persaud had to pass Parks' work station. (*Id.* ¶ 20.)

Persaud alleges that from the summer of 1990 until September 1992 Parks continually asked her out on dates and made comments about her physical appearance. On numerous occasions Parks touched her hair and clothes, and grabbed her waist. (*Id.* ¶¶ 22-24.) Persaud consistently discouraged Parks' advances by refusing to date him, ignoring his comments or asking him not to make them, pulling away from him, and telling him not to touch her. (*Id.*) Plaintiff contends that other employees in the shipping department made comments about her appearance and implied that Parks and Persaud were involved in a sexual relationship. (*Id.* ¶ 26.)

Persaud alleges that her direct supervisor, Stephen Taylor ("Taylor"), and the director of the shipping department, Tyrone Gaynor ("Gaynor"), knew about Parks' actions toward her (*Id.* ¶ 28) and about the comments of the men in the shipping department (*Id.* ¶ 26), but did not make an effort to stop this behavior. Plaintiff further asserts that Harvey, Ida, and Michael Axelrod were aware of Parks' actions (*Id.* ¶ 29), but made no attempt to curtail his behavior (*Id.* ¶ 46).

Persaud alleges that after a time Parks became angry with her and acted in a "hostile and aggressive manner" when she refused to date him or to submit to his sexual overtures. (*Id.* §31.) Plaintiff's complaint describes two specific incidents in which Parks' actions became "violent and threatening." (*Id.* ¶ 32.) First, Persaud alleges that in or about October 1991, as

Persaud v. S. Axelrod Co., Not Reported in F.Supp. (1996)

Case 1:23-cv-10236-LJL    Document 49    Filed 04/25/24    Page 70 of 105

69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

she was leaving the ladies room, Parks confronted her with a knife in his hand. (*Id.* ¶ 33.) Parks waved his knife back and forth close to Persaud's face and neck while trying to push Persaud into the ladies room. He screamed at her for refusing to go out with him and accused her of sleeping with other men in the office. (*Id.*) During this encounter Persaud was afraid that Parks would push her into the bathroom and either sexually assault her or kill her. (*Id.* ¶ 34.)

**\*2** On the same day, Persaud complained to Michael Axelrod and discussed the incident with Ida Axelrod. (*Id.* ¶¶ 36-38.) The next day, Michael and Harvey Axelrod allegedly told Persaud that Parks was a "good worker and had a problem with alcohol" and said that they felt "sorry for him." (*Id.* ¶ 40.) Parks was not dismissed from Axelrod following this incident. (*Id.* ¶ 41.) After this incident, Persaud was "frightened and distraught" at work every day. [3] (*Id.* ¶ 42.)

The second incident allegedly took place in approximately February 1992. According to the complaint, Parks pushed Persaud against the wall near the water cooler and yelled obscenities at her. (*Id.* ¶ 49.) Persaud maintains that Harvey Axelrod knew about the incident and suggested that she avoid Parks (*Id.* ¶ 52); Michael Axelrod told her that Parks was "harmless" and that "it was probably just love" (*Id.* ¶ 54); and Ida Axelrod called her a "troublemaker" (*Id.* ¶ 55). After this incident, "Persaud dreaded going to work and felt degraded, fearful, anxious and helpless on a daily basis." (*Id.* ¶ 60.)

At a September 10, 1992 staff meeting Persaud learned that two Axelrod employees were fired because of their alleged involvement in the theft of company property. (*Id.* ¶ 61.) On September 11, 1992, Parks approached Persaud, asked her if she knew "what was going on in the back," and then asked her to go out with him. (*Id.* ¶ 62.) When Persaud demanded that Parks leave her alone, Parks yelled an obscenity at her and told her that she would "regret this." (*Id.* ¶¶ 63-64.)

On September 15, 1992, plaintiff was terminated by Axelrod. (*Id.* ¶ 68.) Harvey Axelrod told Persaud that she was terminated because someone had told him that Persaud had failed to report information about the alleged theft. (*Id.* ¶¶ 66, 68.)

*DISCUSSION*

*I. Plaintiffs' First, Second, Third, and Fourth Cause of Action*

Plaintiff's first four causes of action allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.* (Title VII), the New York State Human Rights Law, N.Y. Exec. Law, Art. 15, §290 *et seq.* (NYHRL), and the NYCHRL. Plaintiff claims: 1) both defendants discriminated against her "through the creation and perpetuation of a sexually charged hostile work environment" (*Id.* ¶ 75); 2) Axelrod terminated plaintiff in retaliation for complaining about sexual harassment perpetrated by Parks (*Id.* ¶ 79); 3) Axelrod terminated her on the basis of unsubstantiated representations in retaliation for plaintiff's complaints about ongoing sexual harassment (*Id.* ¶ 82); and 4) Axelrod terminated Persaud on the basis of sex (*Id.* ¶ 87). [4] [5]

Defendant Parks moves to dismiss plaintiff's first four causes of action which allege violations of the NYHRL on the grounds that there is no individual liability under the NYHRL. [6] Section 296 of the NYHRL states in pertinent part:

> **\*3** It shall be an unlawful discriminatory practice: for an employer... because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual...to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law §296(1)(a).

This language does not provide that employees are individually liable for acts of discrimination. Indeed an employer is defined under §292(5) of the NYHRL as having four or more employees in his employ. N.Y. Exec. Law §292(5).

In a per curiam opinion the New York Court of Appeals has held that an employee is "not individually subject to suit with respect to discrimination based on...sex under New York's Human Rights Law...if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank,*

Case 1:23-cv-10236-LJL  Document 49  Filed 04/25/24  Page 71 of 105

Persaud v. S. Axelrod Co., Not Reported in F.Supp. (1996)

69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

63 N.Y.2d 541, 543, 473 N.E.2d 11, 12, 483 N.Y.S.2d 659, 660 (N.Y. 1984). Parks did not have any ownership interest in Axelrod and did not exercise any supervisory power over Persaud. (Affidavit of Douglas Parks dated November 7, 1995 ("Parks Aff.") ¶¶ 3-4.)

Plaintiff's claims against Parks, however, are based on his actual participation in the conduct giving rise to the discrimination claims under the NYHRL, and therefore it is not necessary to show that he had any supervisory control over her or that he had any ownership interest in Axelrod.

Section 296(6) of the NYHRL states "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL], or attempt to do so." [7]

In Tomka v. Seiler Corporation, 66 F.3d 1295 (2d Cir. 1995), the Second Circuit held that §296(6) of the NYHRL permitted the plaintiff to maintain claims against an individual defendant for violations of the NYHRL if the individual defendant participated in the conduct giving rise to the discrimination claim. Tomka, 66 F.3d at 1317. See also Poulsen v. City of North Tonawanda, N.Y., 811 F.Supp. 884, 900 (W.D.N.Y. 1993) (defendant who held a "quasi-supervisory" position within Police Department, had higher rank than plaintiff, and was actual perpetrator of the hostile work environment could be held liable under NYHRL); Bridges v. Eastman Kodak Company, 800 F.Supp. 1172, 1181 (S.D.N.Y. 1992) (motion to dismiss NYHRL claims against individual employee denied since the relationship between defendants and plaintiff was unclear); Wanamker v. Columbian Rope Co., 740 F.Supp. 127 (N.D.N.Y. 1990) (summary judgment on NYHRL claims denied to defendants who allegedly had power and authority to terminate plaintiff). Accordingly, Parks' motion to dismiss the first cause of action in so far as it claims violations of the NYHRL is denied.

*II. Plaintiff's Fifth Cause of Action*

 **\*4**  Plaintiff's fifth cause of action alleges that Parks and Axelrod intentionally caused Persaud extreme emotional distress (Complaint, ¶¶ 90, 96). The tort of intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and

(iv) severe emotional distress." Howell v. New York Post Company, Inc., 81 N.Y.2d 115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353 (N.Y. 1993).

In order to survive a motion to dismiss, plaintiff's allegations against both Axelrod and Parks must satisfy the rule set out in the Restatement (Second) of Torts and adopted by the New York Court of Appeals which states that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Murphy v. American Home Products Corporation, 58 N.Y.2d 293, 303, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 236 (N.Y. 1983) quoting Fisher v. Maloney, 43 N.Y.2d 553, 557, 373 N.E.2d 1215, 1217, 402 N.Y.S.2d 991, 992-993 (N.Y. 1978). This standard is strict, and liability will result only from conduct which is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Murphy, 461 N.Y.S.2d at 236.

Persaud's allegations against Axelrod do not show that Axelrod engaged in conduct so outrageous in character and extreme in degree as to go beyond all possible bounds of decency to intentionally inflict severe emotional distress on plaintiff. Therefore, her claim against Axelrod for the intentional infliction of emotional distress is dismissed.

With regards to Parks, Persaud's complaint does allege each of the four elements of the tort. Persaud's allegations describe conduct which is both outrageous and extreme. (See e.g. Complaint ¶¶ 33, 49.) Although the complaint does not allege directly that Parks' conduct was motivated by an intent to cause Persaud emotional distress, the actions alleged, particularly the assaults, give rise to a clear inference the they were intended to cause severe emotional distress. Allegations of facts giving rise to a strong inference of bad intent are sufficient to survive a motion to dismiss. Ouaknine v. MacFarlane, 897 F.2d 75, 79-80 (2nd Cir. 1990) (citations omitted). [8] Therefore, Parks' motion to dismiss plaintiff's fifth cause of action is denied.

*III. Plaintiff's Sixth Cause of Action*

Plaintiff's sixth cause of action alleges that Axelrod's failure to take any action to prevent Parks' ongoing sexual harassment constituted negligent infliction of emotional

Persaud v. S. Axelrod Co., Not Reported in F.Supp. (1996)

69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

distress. (Complaint ¶¶ 98-100.) "A cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only to plaintiff...or where there is proof of a traumatic event that caused the plaintiff to fear for her own safety." *Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 656 (S.D.N.Y. 1993) (citations omitted).

**\*5** Although it is not alleged that Parks owed a special duty only to plaintiff, the complaint does allege at least one traumatic event, the encounter with Parks outside the ladies room in October 1991 (Complaint ¶ 33), which caused her to fear for her physical safety (*Id.* ¶ 34). *See* *Ford v. Village Imports, Ltd.,* 461 N.Y.S.2d 108 (App. Div. 4th Dept. 1983). For this reason, Parks' motion to dismiss plaintiff's sixth cause of action is denied.

Axelrod asserts that Persaud's claim for negligent infliction of emotional distress against it must take into account that "[i]n New York recovery for accidental injuries arising out of and in the course of employment, including injuries caused by an employer's negligence, is governed by the Workers' Compensation Law." *O'Brien v. King World Productions, Inc.,* 669 F.Supp. 639, 641 (S.D.N.Y. 1987).[9] If recovery is available under the Workers' Compensation Law, this recovery will be plaintiff's exclusive remedy against her employer and she will not be able to bring other common law tort claims against employer. N.Y. Work. Comp. Law §11. The bar against other remedies does not apply however, if the tort alleged was committed by the employer intentionally or "perpetrated at the employer's direction or instigation." *Thompson v. Maimonides Medical Center,* 86 A.D.2d 867, 868, 447 N.Y.S.2d 308, 310 (App. Div. 2d Dept. 1982).

Although Persaud alleges that her direct supervisor, along with Michael, Harvey, and Ida Axelrod, failed to stop Parks' conduct (Complaint ¶ 59), she does not allege that Axelrod directed or instigated Parks' actions. Accordingly, the emotional distress allegedly caused by her employer's negligence is covered by the Workers' Compensation Law which provides her exclusive remedy. Axelrod's motion to dismiss Persaud's sixth cause of action is granted.

### *IV. Plaintiff's Seventh and Eighth Cause of Action*
Plaintiff's seventh cause of action alleges that Axelrod's continued retention of Parks after it was on notice of Parks' "pervasive pattern of sexual harassment" constituted the tort of negligent retention. (Complaint ¶ 104.) Her eighth cause of action alleges that Axelrod's "failure to reasonably supervise Parks" constitutes the tort of negligent supervision (*Id.* ¶¶ 109-110).[10]

For the reasons articulated in the discussion of Persaud's sixth cause of action against Axelrod, plaintiff's exclusive remedy for her claims of negligence is provided by New York's Workers' Compensation Law. Accordingly, her sixth and seventh causes of action against Axelrod are dismissed.

### *CONCLUSION*

Defendant Axelrod's motion to dismiss plaintiff's fifth, sixth, seventh and eighth causes of action is granted. Defendant Parks' motion to dismiss is granted as to plaintiff's first four causes of action in so far as they are based on violations of Title VII and as to plaintiff's seventh and eighth causes of action. Parks' motion to dismiss plaintiff's first, fifth, and sixth causes of action is denied.

**\*6** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 11197, 69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

## Footnotes

1    In defendants' reply papers and at oral argument Axelrod and Parks argued that plaintiff's first, second, third and fourth causes of action should be dismissed to the extent that they claim violations of the New York City Human Rights Law, N.Y.C. Admin. Code §8-101 *et seq.* (NYCHRL) on the ground that plaintiff violated §8-502(c) of the New York City Administrative Code by failing to serve both the City Commission on Human

69 Fair Empl.Prac.Cas. (BNA) 1371, 67 Empl. Prac. Dec. P 43,856

Rights ("City Commission") and the New York City Corporation Counsel ("Corporation Counsel") with a copy of the complaint prior to initiating this action. At the oral argument, the Court denied defendants' motion to dismiss plaintiff's NYCHRL claims. *See Bernstein, M.D. v. 1995 Associates,* 630 N.Y.S.2d 68, 72 (App. Div. 1st Dept. 1995) (the language of §8-502(c) was designed not to create a condition precedent, but to serve as a device by which the [City Commission] and the [Corporation Counsel] would be apprised of any actions commenced under Title 8).

2    Ida Axelrod, and Michael Axelrod also worked in the sales and administrative office located on the second floor at 7 West 30th Street in New York City. Harvey Axelrod's office was entered through the sales and administrative office. (Complaint ¶ 15.)

3    Persaud alleges that after this incident, she was "terrified to leave work on any occasion when Parks might be leaving the office at the same time she did" and that on several occasion Parks followed her on the street and into department stores. (*Id.* ¶ 44.)

4    Defendant Axelrod has not moved to dismiss plaintiff's claims under Title VII or the NYHRL.

     Plaintiff does not oppose the dismissal of her Title VII claims against Parks individually in recognition of the lack of individual liability under Title VII. *See Tomka v. Seiler Corporation,* 66 F.3d 1295, 1313 (2d Cir. 1995). (Plaintiff's Memorandum of Law in Opposition to Parks' Motion to Dismiss ("Pl.'s Mem. Oppn. Parks") p.4.)

5    Plaintiff alleges that she complied with the administrative prerequisites of Title VII by filing a charge of discrimination on the basis of sex with the Equal Employment Opportunity Commission ("EEOC") in a timely manner. (Complaint ¶ 8.) On August 8, 1995, she received a Determination/Right to Sue Letter with respect to the sexual harassment claim, and on August 9, 1995 she received a Determination/Right to Sue Letter with respect to her termination/retaliation claim. (*Id.*)

6    The second, third, and fourth causes of action do not seek relief against Parks.

7    Section 292(1) of the NYHRL defines "person" as "one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." N.Y. Exec. Law §292(1).

8    Of course whether Parks in fact intended to cause plaintiff severe emotional distress is a question of fact for the jury.

9    Under New York's Worker's Compensation scheme, "psychological or nervous injury precipitated by psychic trauma is compensable to the same extent as physical injury." *Wolfe v. Sibley, Lindsay & Curr Co.,* 36 N.Y.2d 505, 510, 330 N.E.2d 603, 606, 369 N.Y.S.2d 637, 641 (N.Y. 1975). Plaintiff's allegations include psychological injuries. *See e.g.* Complaint ¶¶ 27, 42, 44, 48, 60.

10   Plaintiff's claims for negligent retention and negligent supervision pertain only to defendant Axelrod. Plaintiff does not object to the dismissal of the seventh and eighth causes of action against defendant Parks. (Pl.'s Mem. Oppn. Parks p. 8.)

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 833888 (N.Y.A.D. 2
Dept.), 2024 N.Y. Slip Op. 63198(U)

**This motion is uncorrected and is not subject
to publication in the Official Reports.**

Yolanda Reed, appellant,

v.

Douglas Chisolm, etc., respondent, et al., defendant.

**MOTION DECISION**

Supreme Court, Appellate Division,
Second Department, New York

2023-12275, 711440/2023

February 28, 2024

AFA/, COLLEEN D. DUFFY, J.P., LINDA CHRISTOPHER,
LARA J. GENOVESI, LOURDES M. VENTURA, JJ.
DECISION & ORDER ON MOTION

2023-12276

Yolanda Reed, appellant,

v Douglas Chisolm, etc., respondent,

et al., defendant.

(Index No. 711440/2023)

Appeals from two orders of the Supreme Court, Queens
County, dated August 14, 2023, and September 29, 2023,
respectively. Motion by the respondent to dismiss the appeal
from the order dated August 14, 2023, on the ground that the
appeal was untimely taken, and for an award of attorneys'
fees. Motion by Curtis Law, PLLC for leave to withdraw as
counsel for the appellant and to file certain material under
seal.

Upon the papers filed in support of the motion by the
respondent and no papers having been filed in opposition
or in relation thereto, and upon the papers filed in support
of the motion by Curtis Law, PLLC and the papers filed in
opposition thereto, it is

ORDERED that the branch of the motion by the respondent
which is to dismiss the appeal from the order dated August 14,
2023, is granted, and the appeal from the order dated August
14, 2023, is dismissed, without costs or disbursements; and
it is further,

ORDERED that the branch of the motion by the respondent
which is for an award of attorneys' fees is denied; and it is
further,

ORDERED that the branch of the motion by Curtis Law,
PLLC which is for leave to withdraw as counsel for the
appellant on the appeal from the order dated August 14, 2023,
is denied as academic; and it is further,

ORDERED that the branch of the motion by Curtis Law,
PLLC which is for leave to withdraw as counsel for the
appellant on the appeal from the order dated September
29, 2023, is granted and on or before March 20, 2024,
Curtis Law, PLLC, shall serve its client by one of the
methods specified in CPLR 2103(c), with a copy of this
decision and order on motion and shall file proof of such
service with the Acting Clerk of this Court, via NYSCEF, if
applicable, or, if NYSCEF is not mandated, via email at AD2-
Motions@nycourts.gov; and it is further,

ORDERED that no further proceedings shall be taken against
the appellant, without leave of the Court, until the expiration
of 30 days after service upon her of a copy of this decision
and order on motion; and it is further,

ORDERED that the branch of the motion which is to file
certain material under seal is granted to the extent that the
retainer agreement filed in support of the motion shall remain
sealed.

DUFFY, J.P., CHRISTOPHER, GENOVESI and
VENTURA, JJ., concur.

ENTER:

Darrell M. Joseph

Acting Clerk of the Court

Copr. (C) 2024, Secretary of State, State of New York

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# *Reed v. Chisolm*

Supreme Court of New York, Queens County

September 29, 2023, Decided; October 2, 2023, Filed

Index No.: 711440/2023

**Reporter**
2023 N.Y. Misc. LEXIS 21200 *

YOLANDA REED, Plaintiff, v. DOUGLAS CHISOLM, C.R.N.A. and ST. JOHN'S EPISCOPAL HOSPITAL, Defendants.

**Judges:** [*1] HONORABLE KARINA E. ALOMAR.

**Opinion by:** KARINA E. ALOMAR

## Opinion

The following numbered papers numbered 10 to 49 read on this motion by defendant St. John's Episcopal Hosptial. ("St. John's") for an order pursuant to *CPLR §3211(a)(1)* and *CPLR §3211(a)(7)* dismissing the action.

⊞ *Go to table1*

Upon the foregoing cited papers, defendant St. John's motion for an order pursuant to *CPLR §3211(a)(5)* is decided as follows:

By way of background, plaintiff commenced a virtually identical action based on the same alleged events seeking the same relief against the same defendants on or about February 11, 1991, under index number 22551/1991 (the "prior action").

On or about November 15, 1999, defendant, St. John's, filed a voluntary petition for bankruptcy under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Easter District of New York (Case Nos. 199-23816-

353 through 199-23828-353). Pursuant to *Section 362(a) of the Bankruptcy Code*, the filing of the voluntary petition operated as an automatic stay of the prior action as against St. John's.

On December 28, 2000, St. John's emerged from bankruptcy after the Easter District [*2] Bankruptcy Court confirmed a Reorganization Plan and issued a Confirmation Order. The Confirmation Order clarified it was "enforceable as a matter of contract against any holder of a Claim timely notified of the provisions of the plan" and that "any new or amended Claim filed after the Confirmation Date shall be void unless the Claim holder has obtained prior Court authorization for the filing." Plaintiff and her attorney received notice of St. John's Chapter 11 proceeding yet failed to file a claim with the Bankruptcy Court.

Defendant St. John's now moves to dismiss the complaint based upon its discharge in bankruptcy.

On March 21, 2023, Plaintiff commenced an action against Douglas Chisolm C.R.N.A. and St. John's Episcopal Hospital seeking the same relief based on the same facts alleged in the prior action pursuant to *CPLR § 214-j* (the "Adult Survivors Act").

Pursuant to *CPLR §214-j*:

Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of

intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought [*3] against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, or incest as defined in section 255.26 or *255.27 of the penal law* committed against such person who was eighteen years of age or older, which **is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim**, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

Special laws that revive causes of action are extreme examples of legislative power which must be narrowly construed. (*S.H. v Diocese of Brooklyn, 205 AD3d 180, 167 NYS3d 171 [2d Dept 2022]*; *Anonymous v Castagnola, 210 AD3d 940, 178 NYS3d 587 [2d Dept 2022]*). The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the Legislature. (*Anonymous v Castagnola, 210 AD3d 940, 178 NYS3d 587 [2d Dept 2022]*, inner citations omitted). "As the clearest indicator of legislative intent is the statutory text, the starting [*4] point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." (*Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 696 NE2d 978 [1998]*). "In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add or take away from that meaning." (*Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 696 NE2d 978 [1998]*, quoting *Tompkins v Hunter, 149 NY117, 43 NE 532 [1896]*).

Here, *CPLR §214-j* is an example of a "special law" which revives causes of action and as such must be narrowly construed. A plain reading of *CPLR §214-j* provides that an action may be revived under three circumstances: (1) where the previous action was dismissed as time-barred; 2) where the previous action was dismissed for failure to file a notice of claim; and 3) where the previous action was dismissed for failure to file a notice of intention to file a claim. Here, plaintiff argues that their causes of actions may be revived pursuant to CPLR §241-j's statute of limitations provision.

It should be noted however that the legislative intent behind *CPLR §214-j* was to provide "those who have had justice denied [to] them as a result of New York's formerly insufficient statutes of limitations…the [*5] opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law." (2022 Sess. Law News of N.Y. Legis. Memo Ch. 203 [McKinney's]). As such, the Adult Survivor's Act was a response to those injustices in which a plaintiff's causes of action were originally barred by the statute of limitations, for failure to file a notice of claim, and/or for failure to file a notice of intention to file a claim. The Adult Survivor's Act gave plaintiff's the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law.

Here, plaintiff has had their opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law when she timely filed the prior action on February 11, 1991. Upon defendant filing for chapter 11

protection under the United States Bankruptcy code, plaintiff could have filed a claim with the Bankruptcy Court but failed to do so, and as a result was discharged. As such, plaintiff may not now revive what is essentially her prior action.

Accordingly, it is hereby

**ORDERED**, that defendant St. John's motion for an order pursuant to *CPLR §3211(a)(1)* and *(7)* dismissing plaintiff's complaint as against St. John's. [*6] is granted, it is further

**ORDERED**, that plaintiff shall serve a copy of this order, with notice of entry, upon defendants within thirty (30) days of the date of entry.

This constitutes the decision and order of the Court.

Dated: September 29, 2023

**/s/    Karina    E.    Alomar,    J.S.C.**

2023 N.Y. Misc. LEXIS 21200, *6

**Table1 (** *Return to related document text* **)**

| PAPERS | NUMBERED |
|---|---|
| Notice of Motion, Affidavit, Exhibits | 25-36 |
| Affirmation in Opposition, Affidavit, Exhibits | 41-44 |
| Affirmation in Reply, Exhibits | 51 |

**Table1 (** *Return to related document text* **)**

2007 WL 4144627
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Zohreh STARR a/k/a Zoe Starr, Plaintiff,

v.

TIME WARNER, INC. and Time
Warner Cable, Inc., Defendants.

No. 07 Civ. 5871(DC).
|
Nov. 21, 2007.

**Attorneys and Law Firms**

Sylvor & Richman, LLP, by: Boris Sorin, Esq., New York,
NY, for Plaintiff.

Seyfarth Shaw LLP, by: Richard Reice, Esq., Anjanette
Cabrera, Esq., New York, NY, for Defendants.

***MEMORANDUM DECISION***

CHIN, District Judge.

**\*1** In this employment discrimination case, plaintiff Zohreh
"Zoe" Starr alleges that her former employer, Time Warner
Cable ("TWC"), discriminated against her and terminated
her employment because of her disability and Iranian origin.
Starr brings claims against TWC and its parent company
Time Warner ("TW") under Title VII of the Civil Rights Act
of 1964 ("Title VII"), the Americans With Disabilities Act
(the "ADA"), the Family Medical Leave Act (the "FMLA"),
New York State Human Rights Law ("State Human Rights
Law" or "NYSHRL"), New York City Human Rights Law
("City Human Rights Law" or "NYCHRL"), and Connecticut
Fair Employment Practices Act ("CFEPA"). She also claims
damages for negligent and intentional infliction of emotional
distress ("NIED" and "IIED," respectively).

Defendants move to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6). Specifically, they argue that the Title VII,
ADA, FMLA, and CFEPA claims are time-barred; that New
York State and City laws are inapplicable because all alleged
acts occurred in Connecticut; and that Starr has failed to state
a claim on which relief can be granted under state tort laws.
TW also moves to dismiss all claims against it on the ground

that the complaint "fails to allege any relationship between
Time Warner Cable and Time Warner, Inc. or between Time
Warner, Inc. and Plaintiff." (Def.Mem.2). For the reasons that
follow, defendants' motion to dismiss is denied in part and
granted in part.

***BACKGROUND***

For purposes of this motion, the facts as alleged in Starr's
complaint are assumed to be true. Although the parties have
submitted affidavits and exhibits with their briefs, on a motion
to dismiss, a court's consideration is "limited to facts stated
on the face of the complaint, in documents appended to
the complaint or incorporated in the complaint by reference,
and to matters of which judicial notice may be taken."
*Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991). Accordingly, I do not rely on the parties' affidavits
and exhibits for purposes of this motion, except for certain
documents incorporated in the complaint by reference.

**A. *Facts***

On September 8, 2003, Starr, then a resident of New
York State, began working at TWC's offices in Stamford,
Connecticut. (Compl.¶ 10). Plaintiff alleges that during her
employment, TWC created a hostile work environment
and discriminated against her because of her Iranian
origin. Specifically, she alleges that TWC took away her
projects and responsibilities, cut her off from work-related
communications, excluded her from meetings and company
activities, advised other employees not to speak to her,
attempted to damage her reputation at TWC, and prevented
her from transferring to another department. (Compl.¶¶
11-18).

As a result of the treatment she endured at TWC, Starr
became mentally and physically ill, thus requiring leave
of absence for psychotherapy beginning in August 2004.
(Compl.¶ 19). TWC's insurance provider, UNUM Provident,
paid for Starr's medical care, which involved weekly therapy
sessions with Dr. Joerg Bose. (Compl.¶ 22). Nearly two years
later, in March 2006, Dr. Bose approved Starr's return to work.
(Compl.¶ 25).

**\*2** Starr, however, never returned to TWC as an employee.
Starr alleges that on April 7, 2006, "TWC advised Plaintiff
that neither her job, nor any employment position with the
company, was available to her." (Compl.¶ 28).

**B.** *Procedural History*

Plaintiff's complaint states that on October 4, 2006, she filed a claim with the United States Equal Employment Opportunity Commission (the "EEOC"). (Compl. ¶ 29). The EEOC's letter accompanying its Notice of Dismissal and Right to Sue, however, indicates that Starr's claim was received and filed with the EEOC in November 2006. (Pl.Ex. R). On March 27, 2007, the EEOC found that "[a]fter being out on long-term disability for several months, [TWC] notified you by letter, on January 11, 2005, that the company could no longer hold your position open any longer." (*Id.*). Consequently, the EEOC determined that it lacked jurisdiction to investigate Starr's charge of discrimination because the charge was not filed within 300 days from the date of the last alleged violation as required by law. (*Id.; see also* Compl. ¶ 30).

Plaintiff appealed the EEOC's decision on April 3, 2007 (Pl.Ex. S), and filed the instant action on June 21, 2007.

## DISCUSSION

**A.** *Pleading Standards*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *see Erickson v. Pardus,* 127 S.Ct. 2197, 2199 (2007) (per curiam); *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007).

On a motion to dismiss for failure to state a claim, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Bell Atl. Corp.,* 127 S.Ct. at 1965 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). In its recent holding in *Bell Atlantic Corp.,* the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 47 (1957), adopting in its place a "plausibility" requirement. *Bell Atl. Corp.,* 127 S.Ct. at 1969. As interpreted by the Second Circuit, *Bell Atlantic Corp.* did not announce a "universal standard of heightened fact pleading,

but ... instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007).

In any event, "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and will not defeat a motion to dismiss. *Gavish v. Revlon, Inc.,* No. 00-7291, 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting *Citibank, N.A. v. Itochu Int'l, Inc.,* No. 01-6007, 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

**B.** *Title VII*

**1.** *Statute of Limitations*

**\*3** Under Title VII, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days in states such as New York and Connecticut that have an agency with the authority to address charges of discriminatory employment practices. 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge of discrimination with the EEOC renders that claim time-barred, thereby preventing a claimant from bringing the claim in federal court. *Williams v. Bd. of Educ.,* 972 F.Supp. 248, 249 (S.D.N.Y.1997).

Defendants argue that Starr's Title VII claim is time-barred by disputing April 7, 2006 as the date on which Starr was terminated as an employee of TWC, as she alleges in her complaint. Defendants claim that "the 300-day window for Starr to file her charge began on January 11, 2005, when Time Warner Cable first notified her of the decision to terminate her employment." (Def.Mem.8). Because the court must accept the factual allegations of the complaint as true on a motion to dismiss, I use the date of termination as alleged in plaintiff's complaint for purposes of this motion. (*See* Compl. ¶ 28).

Plaintiff's complaint also states that she filed a discrimination charge with the EEOC on October 4, 2006, which is contradicted by the EEOC's letter dismissing her case. But it is not necessary to decide here whether Starr filed her charge on October 4, 2006, as she claims, or on November 24, 2006, as the EEOC's letter indicates, to determine whether her claim was timely filed, for both dates fall within 300 days of April 7, 2007, the date alleged by plaintiff as her date of termination. Accordingly, based on the allegations of the

complaint, Starr filed a timely charge of discrimination with the EEOC. Defendants' motion to dismiss the Title VII claim as time-barred is denied, without prejudice to the filing of a summary judgment motion if discovery shows that plaintiff's employment was actually terminated on January 11, 2005.

### 2. *Elements of a Title VII Claim*

Turning to the merits, a prima facie case of discrimination under Title VII requires a plaintiff to show that "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Garcia v. New York City Admin. of Children's Servs.,* 2007 WL 2822153, at *4 (S.D.N.Y.2007). In *Swierkiewicz v. Sorema N. A.,* the Supreme Court held that a complaint in an employment discrimination action need not contain specific facts establishing a prima facie case of discrimination to survive a motion to dismiss. 534 U.S. 506, 511 (2002). The Supreme Court held that because "the prima facie case operates as a flexible evidentiary standard," a complaint need only comply with the pleading standard articulated in Federal Rule of Civil Procedure 8(a) to assert an employment discrimination claim. *Id.* at 512. Thus, the "complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Id.* (quoting Fed.R.Civ.P. 8(a)(2)). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Hence, a plaintiff in a Title VII case need only allege that she was discriminated against in the terms and conditions of her employment on account of national origin or other unlawful factor.

**\*4** Applying the pleading standard articulated in Rule 8(a), I conclude that Starr's complaint satisfies the Rule's requirements because it gives defendants fair notice of the basis for petitioner's claims. Although plaintiff's complaint does not provide specific facts attributing TWC's treatment of her to a discriminatory motive, she does allege that she was dismissed on account of her national origin in violation of Title VII. (Compl.¶ 63-66). The complaint states the events leading to her dismissal (*id.*), and these allegations give defendants fair notice of what her claims are and the grounds upon which they rest. Because Starr states claims upon which relief could be granted under Title VII, defendants' motion to dismiss the Title VII claim is denied.

### C. *The ADA*

#### 1. *Statute of Limitations*

The statute of limitations for filing a claim under the ADA and Title VII are identical. 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2005e-5(e)). Accordingly, for the reasons set forth above, defendants' motion to dismiss the ADA claim as time-barred is denied.

#### 2. *Elements of an ADA Claim*

To establish a prima facie ADA case, a plaintiff must show that "(1) plaintiff's employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered [an] adverse employment action because of her disability." *Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir.2004). Although "a plaintiff need not plead 'specific facts establishing a prima facie case of discrimination' " in violation of the ADA to survive a motion to dismiss, *Ridgway v. Metropolitan Museum of Art,* No. 06-5055, 2007 WL 1098737, at *3 (S.D.N.Y. Apr. 10, 2007) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002)), as discussed below, Starr has failed to plead that she was qualified to perform the essential functions of her job with or without reasonable accommodation or that she suffered adverse employment action because of her disability.

#### a. *Starr Is Not Qualified To Perform Essential Functions of Job, With Or Without Reasonable Accommodation*

Starr alleges that "she was discharged due to her disability" and "during and/or following her medical leave of absence." (Compl.¶¶ 45, 50). But these allegations do not state an ADA claim because a nearly two-year leave of absence is not a reasonable accommodation under the ADA.

In general, a leave of absence is a reasonable accommodation. *Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 201 (S.D.N.Y.1999). The ADA, however, "does not require an employer to grant an employee an indefinite leave of absence." *Stamey v. NYP Holdings, Inc.,* 358 F.Supp.2d 317, 324 (S.D.N.Y.2005) (citing *Mitchell v. Washingtonville*

*Cent. Sch. Dist.,* 190 F.3d 1, 9 (2d Cir.1999)). An employer cannot be expected to hold a job open for an extended period of time. A medical leave would be unreasonable if, for example, "the request is for a very long leave of absence, such as one year." *Powers,* 40 F.Supp.2d at 201. Although the *Powers* Court did not "hold that any exact number is the 'red line' that demarcates the reasonable from the unreasonable," a nineteen-month leave is substantially more than the year that the Court found to be "very long." *Id.* As a matter of law, a two-year leave is too long an absence from work to be reasonable. Plaintiff, therefore, has not sufficiently pled that she was qualified to perform her job with or without reasonable accommodations.

**b. Starr Did Not Suffer Adverse Employment Action Because of Her Disability**

**\*5** In support of her ADA claim, Starr makes numerous allegations that TWC discriminated against her because of her Iranian origin, but not because of her disability. (*See, e.g.,* Compl. ¶¶ 49, 51, 52, 53). The ADA protects employees only from discrimination on the basis of a disability, and so these allegations do not support a claim under the ADA.

Because Starr has failed to plead that she could perform the essential functions of her job with or without reasonable accommodations or that she suffered adverse employment action because of her disability, her ADA claim is dismissed.

**D. The FMLA**

Plaintiff does not state a claim under the FMLA for at least two reasons. First, she does not qualify for benefits under the Act. Section 2611 defines an "eligible employee" as one "who has been employed for at least 12 months by the employer with respect to whom leave is requested." 29 U.S.C. § 2611. As alleged in the complaint, Starr had only worked eleven months, from September 2003 to August 2004, before going on medical leave. (*See* Compl. ¶¶ 10, 19). Thus, plaintiff is not an eligible employee qualified for FMLA benefits.

Second, the FMLA provides eligible employees with the right to "a total of 12 workweeks of leave during any 12-month period" for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). Starr was on uninterrupted medical leave from August 27, 2004 to April 7, 2006-a total of nineteen months. The FMLA does not protect employees from adverse employment action as a result of a medical

leave that lasts for a period longer than twelve weeks per year. Consequently, Starr was not denied any benefits under the FMLA. Because plaintiff was not an eligible employee and, furthermore, did not suffer a violation of a right that is protected under the FMLA, defendants' motion to dismiss the FMLA claim is granted.

**E. City Human Rights Law**

Starr brings a claim under New York City Code § 8-107, which prohibits discharge from employment on the basis of national origin and disability. To state a claim under the City Human Rights Law, however, "a plaintiff must allege that he was discriminated against by the defendant within New York City." *Duffy v. Drake Beam Morin,* No. 96-5606, 1998 WL 252063, at \*11 (S.D.N.Y. May 19, 1998) (finding that "both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City") (citing N.Y. Gen. Mun. Law § 239-s and N.Y.C. Admin. Code § 2-201). Because Starr does not allege any discriminatory conduct occurring in New York City, her City Human Rights Law claim is dismissed.

**F. State Human Rights Law**

The State Human Rights Law, unlike the City Human Rights Law, may apply to discriminatory acts committed outside New York State if they are "committed outside this state against a resident of this state ... [and] such act would constitute an unlawful discriminatory practice if committed within this state." N.Y. Exec. Law § 298-a. Because Starr is a New York State resident, she may bring a claim against a non-resident employer for acts committed outside New York State.

**\*6** The elements of a prima facie case for discrimination prohibited by the NYSHRL are the same as a claim under the ADA: "plaintiff must show that (1) her employer was subject to the NYSHRL; (2) she was disabled within the meaning of the NYSHRL; (3) she was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability." *Roberts v. Ground Handling, Inc.,* 499 F.Supp.2d 340, 357 (S.D.N.Y.2007). For the reasons given above for dismissing Starr's ADA claim, Starr's claim under the State Human Rights Law is likewise dismissed.

## G. *The CFEPA*

Starr brings a claim under section 46a-60 of the CFEPA, which prohibits discriminatory employment practices on the basis of national origin and disability. To bring an action under the CFEPA, a plaintiff must first file a complaint with Connecticut's Commission on Human Rights and Opportunities ("Commission") within 180 days after the alleged act of discrimination. Conn. Gen.Stat. §§ 46a-82, 46a-100.

Starr has not met the two requirements to state a claim under Connecticut's anti-discrimination law. First, she did not file a complaint with the Commission prior to bringing this action before the EEOC and this Court. Second, more than 180 days had passed before Starr filed a charge with the EEOC. Starr's claim under Connecticut law is time-barred and, therefore, dismissed.

## H. *State Tort Claims*

Starr brings state tort claims for negligent and intentional infliction of emotional distress, but the complaint does not specify which state law-New York or Connecticut-applies to this case. In any event, Starr does not state a claim for either negligent or intentional infliction of emotional distress under both New York and Connecticut laws, so these claims are dismissed.

### 1. *NIED*

#### a. *New York Law*

In New York, "[a] cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only to plaintiff" or "where there is proof of a traumatic event that caused the plaintiff to fear for her own safety." *Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 656 (S.D.N.Y.1993). Starr alleges that TWC's treatment towards her during her employment as well as the termination of her employment were negligent acts, which "inflicted shock, trauma, mental anguish and emotional distress." (Compl.¶ 171). The discharge of an employee, however, does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees. *Kelly v. Chase Manhattan Bank,* 717 F.Supp. 227, 235 (S.D.N.Y.1989).

Although Starr also alleges that TWC's conduct towards her during her employment was negligent and caused her emotional distress, the reduction of work responsibilities and exclusion from meetings and work-related activities do not amount to conduct that would unreasonably endanger one's physical safety or cause one to fear for her safety, as required for an NIED claim. *See Perry v. Valley Cottage Animal Hosp.,* 690 N.Y.S.2d 617, 522-23 (2d Dep't 1999) ("to recover damages for negligent infliction of emotional distress, such a cause of action must generally be premised upon conduct that unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety"). Because TWC neither owed plaintiff a special duty nor caused her to fear for her safety, Starr fails to state a claim for negligence under New York law.

#### b. *Connecticut Law*

**\*7** In Connecticut, claims for negligent infliction of emotional distress are restricted to conduct occurring during the process of the termination of employment. *Perodeau v. City of Hartford,* 259 Conn. 729, 757-63 (2002). Accordingly, Starr's allegations of tortious conduct during her employment at TWC do not support a claim for NIED under Connecticut law.

For conduct occurring in the context of termination to amount to a negligent infliction of emotional distress, Connecticut courts generally require that termination be done in a way that is "unreasonable, humiliating, or embarrassing." *Almeida v. Athena Health Care Associates, Inc.,* 2007 WL 2221164, at \*3 (D.Conn.2007). The "mere act of terminating the plaintiff's employment is insufficient to establish [an NIED] claim." *Contois v. Carmen Anthony Restaurant Group,* No. 160287, 2001 WL 195396, at \*6 (Conn.Super.Feb. 2, 2001).

Here, Starr alleges only that her discharge was wrongful, and does not allege any other conduct on the part of TWC that humiliated or embarrassed her. Accordingly, plaintiff's allegations do not state a claim for NIED.

### 2. *IIED*

To state a claim for IIED under both Connecticut and New York laws, a plaintiff must plead the following four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."

*Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (1993)); *see also Petyan v. Ellis,* 200 Conn. 243, 253 (1986).

Both Connecticut and New York courts treat the first element as a threshold issue when analyzing an IIED claim because the "requirement of extreme and outrageous conduct is rigorous, and has been met only 'where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency.' " *Tadros v. Public Employees Federation,* No. 94-6893, 1996 WL 631705, at *5 (S.D.N.Y.1996) (citing *Fischer v. Maloney,* 402 N.Y.S.2d 991, 993 (1978)); *see also Rodican v. Heartcare Assocs. of Conn.,* No. 75008889S, 2007 WL 2363878, at *4 (Conn.Super.Aug. 2, 2007) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Starr alleges only that she was isolated and excluded in the workplace; this alleged behavior does not rise to that level of outrageous conduct required to state an IIED claim. Accordingly, Starr's intentional tort claims are dismissed under both Connecticut and New York laws.

### J. *TW as a Party*

TW argues that plaintiff's claims against it must be dismissed because "Starr has failed to plead any facts that Time Warner was ever involved in any aspect of her employment or termination." (Def.Mem.6). The Second Circuit has held that "parent companies may be considered employers of a subsidiary's employees" for the purposes of Title VII when evidence shows that the two companies have "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240-1 (2d Cir.1995).

**\*8** Plaintiff has not alleged any such facts in her complaint. Accordingly, the Title VII claim against TW is dismissed. Because there are no remaining claims against TW, it is dismissed as a party in this case.

### *CONCLUSION*

For the reasons set forth above, the motion to dismiss is denied in part and granted in part. It is denied as to Starr's claim of employment discrimination under Title VII against TWC. All other claims in the complaint are dismissed, and all claims against TW are dismissed.

A pretrial conference will be held on December 7, 2007, at 11:30 a.m. at 500 Pearl Street, New York, New York 10007, Courtroom 11A.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4144627

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-10236-LJL   Document 49   Filed 04/25/24   Page 85 of 105

Strass v. Costco Wholesale Corporation, Not Reported in Fed. Supp. (2016)

2016 WL 3448578
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Nina STRASS and Allan Gold, Plaintiffs,
v.
COSTCO WHOLESALE CORPORATION,
Defendant.

14-CV-06924 (PKC) (VMS)
|
Signed 06/17/2016

### Attorneys and Law Firms

Michael Byk, Dino Mastropietro, Lozner & Mastropietro, Brooklyn, NY, for Plaintiffs.

Gregory J. Dell, Rachel Ann Rubin, Wilson Elser Moskowitz Edelman & Dicker LLP, New York, NY, for Defendant.

### MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge

**\*1** Plaintiffs Nina Strass and Allan Gold bring this action against Defendant Costco Wholesale Corporation ("Defendant" or "Costco") seeking damages for injuries suffered as a result of Strass's slip-and-fall inside one of Costco's stores. Costco now moves for summary judgment, contending that Plaintiffs have failed to put forward sufficient evidence to make out a *prima facie* case of negligence. More narrowly, the issue is whether the record contains evidence that Costco created the condition that allegedly caused Strass's fall or, in the alternative, had actual or constructive notice of the condition. Because the record is devoid of any evidence that Costco created, or had actual or constructive notice of, the condition, and for the additional reasons stated below, Costco's motion for summary judgment is granted.

### BACKGROUND

## I. THE AUGUST 23, 2014 INCIDENT

On August 23, 2014, Plaintiffs Nina Strass and her husband Allan Gold visited a Costco store in North Brunswick, New Jersey, (Dkt. 27 ("Def.'s 56.1") ¶ 2-3),[1] arriving "between 4:00 p.m. and 4:30 p.m." (*Id.* ¶ 4.) According to Gold, during their visit, Plaintiffs walked "through every aisle except for the meat aisle." (Dkt. 25-5 ("Gold. Dep.") at 11:9-11.) After walking through the store, Plaintiffs walked towards the cash registers to check out. (Def.'s 56.1 ¶ 8.) Gold testified that as Plaintiffs approached the registers, his wife left him and went to get something to drink. (Gold. Dep. at 13:2-10.)[2]

**\*2** Approximately 20 to 30 minutes after arriving at Costco, "[o]n her way to select [a] beverage product," Strass slipped and fell by Aisle 319. (*See* Def.'s 56.1 ¶¶ 8-9.) Prior to her fall, she did not see the substance that allegedly caused her to slip on the floor. (*Id.* ¶ 15.) Although Strass stated that the substance was "wet," but not "sticky," (Strass Dep. at 29:9-12), she did not know its color, origin, or how long it had been on the floor prior to her fall. (Def.'s 56.1 ¶¶ 13-14, 16.) After she fell, Strass stood up unassisted and walked towards the front of the store where her husband waited. (*Id.* ¶ 17.) While in line to check out, Gold recalls that he saw his wife walk towards him looking "pale" with "blood ... coming off of her arm" and "bones sticking out from her fingers." (Gold Dep. at 15:5-15.) Plaintiffs then walked to Costco's food court and reported the incident to a Costco employee. (Def.'s 56.1 ¶ 21.) Around this time, Robert Chiavaroli, a Costco maintenance employee saw Strass and rendered medical assistance to her in the food court. (*Id.* ¶ 28.)[3] While receiving aid, Strass did not tell Chiavaroli the cause of her injury. (*Id.*) To further assist, Chiavaroli bandaged Strass's wrist and helped transport her by wheelchair into a back-office space. (Dkt. 30 ("Pls.' 56.1") ¶ 39.) Sometime later, Gold took his wife to the Hospital for Special Surgery in Manhattan, where she underwent surgery the following Monday. (*Id.* ¶ 40.)

## II. COSTCO'S SPILL POLICY

Costco maintains certain policies and procedures to address potential accidents from spills and other hazards. Specifically, the store's employees conduct hourly floor-walk inspections, "which consist of an employee walking through the store, starting from the entrance and working their way throughout the building to inspect for conditions within the warehouse." (Def.'s 56.1 ¶ 23.) Costco employees are required to report "anything of danger" that is discovered during the inspection on the store's daily

walk sheet. (*Id.*) On the daily walk sheet ("Walk Sheet"), there is a section to record any "spills or other hazards." (*Id.*)

On August 23, 2014, the Walk Sheet indicated that Robert Coombs, a member services[4] employee at Costco, performed a floor walk that "began at 4:10 p.m. and was completed around 4:40 p.m." (*Id.* ¶ 25.) The Walk Sheet is devoid of any indication from either before or after Strass's fall that there was a beverage spill near the area where beverages are sold in bulk, which includes Aisle 319. (*Id.* ¶¶ 26-27.)

### III. THE INSTANT LITIGATION

On November 25, 2014, Plaintiffs commenced this action to recover damages for Strass's injuries and Gold's loss of consortium. (Dkt. 1.) After discovery, on February 26, 2016, Defendant moved for summary judgment seeking dismissal of Plaintiffs' claims in their entirety. (Dkt. 25.)

### DISCUSSION

### I. LEGAL STANDARD

Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173–74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material within the meaning of *Rule* 56 where it "might affect the outcome of the suit under the governing law." *Id.* at 248. In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003) (citations and quotations omitted).

This standard imposes the initial burden on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324; *see also Anderson,* 477 U.S. at 256–57. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.' " *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7,* 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Summary judgment is also proper where "after adequate time for discovery and upon motion ... a party ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322-23.

### II. PLAINTIFF'S NEGLIGENCE CLAIM

#### A. Negligence Under New York Law

**\*3** "To establish a prima facie case of negligence under New York law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 286 (2d Cir. 2006) (citations and quotations omitted).[5] In a slip-and-fall case, "the *plaintiff* must demonstrate a genuine issue of material fact that the defendant either created the dangerous condition or had actual or constructive notice of the condition." *Lionel v. Target Corp.,* 44 F. Supp. 3d 315, 318 (E.D.N.Y. 2014) (emphasis added); *Lacey v. Target Corp.,* 13-CV-4098, 2015 WL 2254968, at \*2 (E.D.N.Y. May 13, 2015); *see Kraemer v. K-Mart Corp.,* 641 N.Y.S.2d 130 (N.Y. App. Div. 1996).

Defendant argues that there is no evidence in the record indicating that Costco created the wet condition or had actual or constructive notice that the liquid was present on the floor prior to Strass's fall. Plaintiffs respond that there is "a question of fact as to [ ] whether the Defendant caused and created the hazardous condition that caused [Strass's] fall or had [ ] actual or constructive notice of the same." (Dkt. 29 "Pls.' Opp.") at 11.)[6]

### B. Applicable Summary Judgment Standard

As an initial matter, the parties dispute the applicable summary judgment standard. Specifically, Plaintiffs contend that the moving party, *i.e.* Defendant, must "make out a prima facie case establishing that it did not have notice of or create the condition that caused Plaintiff's fall." (Pls.' Opp. at 5.)[7] But Plaintiffs' argument erroneously relies on the State court summary judgment standard, which differs from the standard applied in federal court. *See Shimunov v. Home Depot U.S.A*, Inc., 11-CV-5136, 2014 WL 1311561, at *3 (E.D.N.Y. Mar. 28, 2014); *Painchault v. Target Corp.*, 09-CV-1831, 2011 WL 4344150, at *3 (E.D.N.Y. Sept. 14, 2011) (citations and quotations omitted); *DeAngelis v. Am. Airlines, Inc.*, 06-CV-1967, 2010 WL 1292349, at *3 n.2 (E.D.N.Y. Mar. 31, 2010). Whereas the State court summary judgment standard in New York requires the moving party to put forth evidence in support of its motion for summary judgment, the federal standard does not. *Casierra*, 2010 WL 2793778, at *1 n.1 (citing N.Y.C.P.L.R. 3212(b)); *see Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 Fed.Appx. 11, 12 (2d Cir. 2008) (noting how New York summary judgment standard differs from federal standard); *Simoes v. Target Corp.*, 11-CV-2032, 2013 WL 2948083, at *9 (E.D.N.Y. June 14, 2013). Under the federal summary judgment standard, Defendant is not required to put forth evidence affirmatively demonstrating its lack of knowledge or its constructive knowledge; rather, it need only show that Plaintiffs will not be able to prove at trial that Defendant had such knowledge. It is this standard that controls here "because what burdens each party bears on summary judgment is a procedural rather than substantive matter." *DeAngelis*, 2010 WL 1292349, at *3 n.2 (citations and quotations omitted); *see Chong v. Target Corp.*, 14-CV-547, 2015 WL 2250250, at *4 (E.D.N.Y. May 12, 2015) (plaintiff "misconttrue[d] the burden" where she "argue[d] that [d]efendant ... failed to prove a lack of constructive notice"). Thus, Defendant can meet its burden on summary judgment in federal court by pointing to *Plaintiffs'* inability to prove at trial that Defendant created or had actual or constructive notice of the allegedly hazardous condition.[8]

### C. Creation of the Condition

**\*4** Defendant avers that "[P]laintiffs offer no evidence as to the creation of the spill that is alleged to have caused her fall." (Dkt. 26 ("Def.'s Br.")). In the context of a summary judgment motion, Plaintiffs' "burden ... is not merely to proffer a plausible theory, but to present evidence from which a reasonable jury could draw the inference that Defendant created the hazardous condition." *Lionel*, 44 F.

Supp. 3d at 319 (citing *Tenay*, 281 Fed.Appx. at 13).

Here, Plaintiffs fail to point to any evidence establishing that Costco and/or its employees created the spill that allegedly caused Strass's fall. Indeed, it is undisputed that Strass "did not know the origin of the condition on which she fell," (Def.'s 56.1 ¶ 14), and Plaintiffs do not proffer any additional evidence to establish that Defendant created the spill. Absent such evidence, Plaintiffs cannot prove that Defendant created the spill, and summary judgment on that issue is warranted. *See, e.g., Painchault*, 2011 WL 4344150, at *3 (granting summary judgment where plaintiff did not know the source of the spill and failed to present any other evidence regarding its source); *Doona v. OneSource Holdings, Inc.*, 680 F. Supp. 2d 394, 404 (E.D.N.Y. 2010) ("The evidence ... does not support a reasonable inference that [defendant's] employee created the puddle, even if [it] does not foreclose such a possibility."); *Quarles v. Columbia Sussex Corp.*, 997 F. Supp. 327, 331 (E.D.N.Y. 1998) ("There is no proof, only mere speculation, as to how the substance got on the floor, or whether the defendants or their employees created the condition, and absent evidentiary proof in admissible form to prove otherwise, the plaintiff has not raised a triable issue of fact.").

### D. Actual Notice

Defendant also argues that Plaintiffs present no evidence to support their allegation that Costco and/or its employees had actual notice of the spill. (Def.'s Br. at 15.) To show actual notice, the plaintiff must "prove that the defendants were, in fact, aware of the dangerous condition." *Quarles*, 997 F. Supp. at 332; *Nussbaum v. Metro-N. Commuter R.R.*, 603 Fed.Appx. 10, 12 (2d Cir. 2015) ("Actual notice requires that a defendant receive complaints or similarly be alerted to the existence of the dangerous condition."). Aside from conclusory references to "actual notice," Plaintiffs do not identify any evidence that would support a finding that Costco was, in fact, aware of the condition that allegedly caused Strass's fall, and the Court's review of the record reveals none.

### E. Constructive Notice

Because Plaintiffs have failed to show that Costco created or had actual notice of the condition that allegedly caused Strass's fall, the sole dispositive issue at this stage is whether the record contains evidence that Costco had

constructive notice of the condition. It does not.

"To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Lacey*, 2015 WL 2254968, at *3 (citations and quotations omitted); *Quarles*, 997 F. Supp. at 332; *Hammond-Warner v. United States*, 797 F. Supp. 207, 211 (E.D.N.Y. 1992). "[P]laintiff must provide some basis for an inference that the [spill was] there long enough to blame [D]efendant for the accident." *Lacey*, 2015 WL 2254968, at *4 (citations and quotations omitted). A "general awareness" of the allegedly hazardous condition is insufficient. *DeAngelis*, 2010 WL 1292349, at *6 (citation and quotation omitted). "[A] jury should not be allowed to conclude, based on mere speculation, that a condition was visible and apparent for a sufficient length of time to be discovered and remedied." *Painchault*, 2011 WL 4344150, at *4 (citation and quotation omitted).

### 1. Direct Evidence

**\*5** Summary judgment is warranted where a plaintiff "fails to submit evidence that the dangerous condition was present for some time before the accident occurred." *DeAngelis*, 2010 WL 1292349, at *6; *Tenay*, 281 Fed.Appx.at 14 (affirming grant of summary judgment where plaintiff "offered neither any evidence that the wet area was visible or apparent, nor any evidence suggesting how long the condition had existed prior to his fall"); *Lacey*, 2015 WL 2254968, at *4-5 (plaintiff failed to "identif[y] any evidence that raise[d] a triable issue of fact as to constructive notice" where "debris that purportedly caused plaintiff's slip could have been on the floor for a long period of time, or it could have landed there only moments before plaintiff slipped on it"); *Casierra*, 2010 WL 2793778, at *3 ("To get to a jury, [the plaintiff] is required to provide some basis for an inference that the spill was there long enough to blame [the defendant] for the accident."); *Hammond-Warner*, 797 F. Supp. at 211 ("[I]n order to show constructive notice, plaintiff must present evidence of the length of time the condition existed prior to the alleged fall. In the absence of such evidence, the complaint must be dismissed.").

Here, the record is devoid of any evidence establishing the amount of time the liquid was on the floor prior to Strass's fall and, therefore, there are no genuine issues of material fact for trial. Indeed, the parties agree that Strass herself, at the time of accident, "did not know how long the condition [had] existed on the floor prior to the time that she fell. (Def.'s 56.1 ¶ 16.) And now, after discovery, Plaintiffs still

do not offer any evidence as to when the spill occurred. Accordingly, summary judgment is warranted because Plaintiffs fail to offer evidence as to an element which they bear the burden at trial, *i.e.*, that the substance was on the floor long enough for one of Defendant's employees to have discovered it, so as to support a finding of constructive notice. *See Shimunov*, 2014 WL 1311561, at *6 (finding that defendant established an absence of constructive notice where plaintiff could not present evidence as to how long the condition existed prior to plaintiff's fall); *Quarles*, 997 F. Supp. at 332 ("[T]here is no evidence as to when the coffee was spilled on the floor, and plaintiff's failure to offer such evidence is fatal to her claim of constructive notice."); *Hammond-Warner*, 797 F. Supp. at 211 (granting summary judgment where plaintiff did not know the length of time the substance had been on the ground) (collecting cases).

Moreover, the record supports the conclusion the contrary conclusion, *i.e.*, that Defendant did *not* have constructive notice of the spill before Strass's fall. Strass feel between 4:20 p.m. and 5:00 p.m. (*See* Def.'s 56.1 ¶¶ 4, 8-9.) According to Costco's Walk Sheet, Costco's employee Coombs conducted a full store inspection between 4:10 p.m. and 4:40 p.m. (Dkt. 25-10 ("Walk Sheet") at 1.) He also specifically indicated that he checked the Sales Floor, which includes Aisle 319, where the fall occurred, for "[t]rash, spills & trip hazards." (*Id.*) Based on Coombs's recollection and review of the Walk Sheet, he testified that he did not find any hazards during his walk between 4:10 p.m. and 4:40 p.m. (Dkt. 25-8 ("Coombs Dep.") at 30:15-18 ("Q. On your daily walk/safety inspection walk at four o'clock on August 3, 2014, did you find anything that needed to be reported? A. No.").)

Where a defendant conducts regular inspections and fails to discover any hazards prior to a plaintiff's slip and fall, there can be no showing of constructive knowledge and summary judgment in favor of the defendant is appropriate. *See, e.g., Shimunov*, 2014 WL 1311561, at *2-3 (granting defendant's summary judgment motion where spill area was inspected "at most, one hour before plaintiff's accident" and plaintiff failed to produce evidence establishing that spill existed for a period of time prior to accident); *Stephanides v. BJ's Wholesale Club, Inc.*, 12-CV-0083, 2013 WL 1694901, at *6-9 (E.D.N.Y. Apr. 18, 2013) (granting defendant's summary judgment motion where inspection of area occurred within an hour of accident and plaintiff failed to produce evidence indicating defendant's knew of spill); *Gonzalez v. K-Mart Corp.*, 585 F. Supp. 2d 501, 505 (S.D.N.Y. 2008) (finding as a matter of law that defendant did not act unreasonably where "inspections occurred every ten to fifteen minutes during store hours"); *Mantzoutsos v. 150 St. Produce Corp.*, 76 A.D.3d 549, 549-50 (N.Y. App. Div. 2010) (finding under

State court summary judgment standard that defendant proved lack of constructive notice where store manager inspected the aisle where the spill occurred "sometime within the hour immediately before the injured plaintiff fell"). Here, absent any evidence to the contrary, the Walk Sheet establishes that Defendants could not have had constructive notice of the spill that allegedly caused Strass's slip and fall.

**\*6** Plaintiffs respond that there are issues of fact precluding summary judgment because (1) "Mr. Coombs in fact never said that he specifically inspected aisle 319," (2) the record is allegedly unclear as to the exact time he inspected Aisle 319, and (3) the time of Strass's fall is in dispute. (Pls.' Opp. at 4-5.) These arguments all fail.[9]

First, Plaintiffs' argument that Coombs did not inspect Aisle 319 is based entirely on deposition testimony at which Coombs testified that he did not have "independent recollection" of which areas he inspected on the day of the incident and had to rely on his Walk Sheet for that the day. (*Id.* at 4.) But, as previously discussed, the Walk Sheet makes clear that Coombs inspected the Sales Floor, which includes Aisle 319, on the day in question. (Walk Sheet at 1.) Contrary to Plaintiffs' argument, Coombs's lack of independent recollection does not create a genuine issue of material fact.

Second, the exact time of Aisle 319's inspection and Strass's fall are not material for purposes of summary judgment. The record shows that Aisle 319 was inspected between 3:07-3:55 p.m. and again between 4:10-4:40 p.m. (Walk Sheet at 1),[10] and that Strass fell between 4:20 p.m. and 5:00 p.m. (Dkt 25-5 ("Gold Dep.") at 9:11-18; Dkt. 25-9 ("Incident Report") at 1; Def.'s 56.1 ¶¶ 4, 8-9.) Thus, the exact time at which Strass fell is immaterial because no matter when she fell, Costco had conducted at least one inspection of Aisle 319 shortly before the spill and had determined that there were no hazardous conditions.[11]

2. Circumstantial Evidence

**\*7** Given the absence of direct evidence to establish constructive notice, Plaintiffs argue that a reasonable jury could find constructive notice based on certain circumstantial evidence, namely: (1) an earlier spill in an aisle "not far" from Strass's fall, and (2) the size of the puddle that allegedly caused Strass to slip. (Pls.' Opp. at 6-9.) Neither of these facts, however, viewed in the light most favorable to Plaintiffs, is sufficient to defeat summary judgment.

First, Plaintiffs argue that constructive notice can be inferred because there is evidence that Costco's employees were aware of another spill on the same day "not far" from the site of Strass's slip and fall. (Pls.' Opp. at 7-8.) Even if true, such evidence fails to show that Costco had constructive notice of the spill that allegedly caused Strass's fall.[12] Generally, a "plaintiff may ... establish constructive notice by submitting evidence that an *ongoing and recurring* dangerous condition existed in the area of the accident which was *routinely left unaddressed* by the [defendant]." *Gonzalez*, 299 F. Supp. 2d at 193 (citation and quotation omitted) (emphasis added). This evidence must show Defendant's "constructive notice of the *particular* dangerous condition that caused the accident." *Id.* (Citations and quotations omitted) (emphasis added).

Here, according to the Walk Sheet, an earlier inspection on the day of Strass's slip and fall revealed a wet floor around Aisle 300. (Walk Sheet at 1.) Maintenance later mopped the floor and cured the potentially hazardous condition. (*Id.*) This evidence regarding Costco's knowledge of another spill in a different aisle is not relevant to establishing either how long prior to Strass's fall the spill in Aisle 319 existed or that Costco had constructive notice of that spill. *Ortiz v. Pathmark Stores, Inc.*, 03 CIV.0040, 2004 WL 2361674, at \*4 (S.D.N.Y. Oct. 20, 2004), *aff'd*, 04-6146-CV, 2005 WL 2899864 (2d Cir. Nov. 3, 2005) (finding that evidence of grapes on the floor in one part of the store fifteen minutes prior to a slip and fall in another location did not establish constructive notice as to how long grapes were present in location where spill occurred); *Anderson v. Cent. Valley Realty Co.*, 751 N.Y.S.2d 586, 587-88 (N.Y. App. Div. 2002) (defendant entitled to summary judgment where plaintiff observed puddle of water in another part of the store prior to her fall, but could not show that the puddle plaintiff slipped on was present for enough time to infer constructive notice).

Second, Plaintiffs' circumstantial evidence that Strass slipped on a large puddle, without more, does not support an inference that the puddle had existed for enough time to allow a Costco employee to discover the spill and clean it up. Obviously, a large amount of liquid can be spilled as quickly as a small amount of water. To infer a longer period of time based on the size of the puddle, Plaintiffs would have to offer evidence that the original puddle was small and grew over time, such as might occur if the spill resulted from a slow leak.[13] Plaintiffs fail to offer any such evidence and thus do not create a genuine issue of material fact in order to survive summary judgment. *See Lacey*, 2015 WL 2254968, at \*4-5 (finding that plaintiff failed to raise a triable issue of fact as to constructive notice, based on plaintiff's testimony that apple pieces were brown, since the apple pieces "could have been brown and oxidized before [they] fell on the floor"). This is not a case where

the "telltale signs supporting an inference of a long-standing condition" are present. *See, e.g., Quarles*, 997 F. Supp. at 333 (rejecting plaintiff's argument about inferring a longstanding puddle where there was no evidence that the puddle had previously been stepped in). Accordingly, absent evidence regarding the increase in size of the puddle, any inference of constructive notice based on Plaintiffs' description of the size of the puddle is pure speculation. *See Nolasco v. Target Corp.*, 10-CV-3351, at 5 (E.D.N.Y. Nov. 14, 2012) (rejecting plaintiff's argument where "detergent may well have been inherently thick and cloudy"); *Casierra*, 2010 WL 2793778, at \*3 ("For all we know, the lotion may have been on the floor for a long time, or it may have spilled moments before [the plaintiff] slipped on it."); *Casiano v. Target Stores*, 06-CV-6286, 2009 WL 3246836, at \*4 (E.D.N.Y. Sept. 24, 2009) (finding that laundry detergent's condition as "dried, pasty, and sticky" did not permit the inference that it was "present on the floor for a sufficient amount of time to constitute constructive notice."). *Cf. Figueroa v. Pathmark Stores, Inc.*, No. 02 CIV. 4992, 2004 WL 74261, at \*4 (S.D.N.Y. Jan. 15, 2004) (inferring constructive notice where there was a trail of pink liquid with "shopping cart tracks and footprints through it" *combined* with plaintiff's observation that the liquid had changed colors and become sticky).

**\*8** Accordingly, drawing all inferences in favor of Plaintiffs as the non-moving parties, a reasonable jury could not conclude that Defendant had constructive notice of the particular spill that allegedly caused Strass's injury. This deficiency is fatal to Plaintiffs' negligence claim, which is the sole cause of action in this case.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to enter judgment for Defendant and close the case.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 3448578

Footnotes

1    The facts in this section are drawn from the statements contained in the parties' 56.1 statements. Unless otherwise noted, a standalone citation to a 56.1 Statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a party's 56.1 Statement incorporates by reference the documents cited therein. Where relevant, however, the Court may cite directly to underlying documents.

Local Rule 56.1 "requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact.... If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003); *see also Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (A party's "failure to respond or contest the facts set forth [in the moving party's] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed.") (quotation marks omitted). In its reply, Defendant did not respond to Plaintiffs' 56.1 counterstatement. Therefore, the Court deems the facts asserted in Paragraphs 30 through 40 of Plaintiffs' 56.1 counterstatement to be undisputed and admitted. *Giannullo*, 322 F.3d at 140; *see also Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Rule 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."). The Court is not aware of any authority that dictates a different rule where the moving party is responding to a non-moving party's 56.1 counter-statement.

2    Plaintiffs disagree as to whether or not Gold was in the checkout line when his wife went to find something to drink. (*Compare* Gold. Dep. at 12:15-18 ("Q. At that point, your wife left you to go look for water? A. My wife went to look for water and I stayed on the checkout line.") *with* Dkt. 25-4 ("Strass Dep.") at 23:20-24:2 ("Q.... At the time that you split from your husband when you went to retrieve the water, is it true, yes or no, that he was not yet at the cash registers? A. Yeah, we didn't stay in the line yet.").)

3    As a maintenance employee, Chiavaroli is responsible for responding to calls from other employees, remediating spills, and performing any necessary maintenance in the Costco. (Def.'s 56.1 ¶ 29.)

4    "Member services" is Costco's term for "customer services," presumably based on the fact all of its customers have to become "members" to shop at its stores. *See* http://www.costco.com/membership.html.

5    Defendant argues, and Plaintiffs do not contest, that New York law applies to this action. "A federal court sitting in diversity applies the choice of law principles of the forum state, in this case New York, to decide which state's substantive law controls." *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 53 (E.D.N.Y. 2000) (citations omitted). "[T]he first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Here, the Court agrees with Defendant that there is no relevant conflict between New York's and New Jersey's negligence laws. *See, e.g., Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. App. Div. 1985); *Febesh v. Elcejay Inn Corp.*, 157 A.D.2d 102, 104 (N.Y. App. Div. 1990). Accordingly, the Court applies New York substantive law to the elements of Plaintiffs' claims, but federal procedural law to determine whether Defendant is entitled to summary judgment. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Khalil-Mirhom v. Kmart Corp.*, 12-CV-5512, 2014 WL 173415, at *3 (E.D.N.Y. Jan. 13, 2014); *Casierra v. Target Corp.*, 09-CV-1301, 2010 WL 2793778, at *1 (E.D.N.Y. July 12, 2010).

6    All page references correspond to page numbers generated by the Electronic Court Filing ("ECF") system, and not the document's internal pagination.

7    The Court notes that despite correctly identifying the federal court summary judgment standard, Plaintiffs simultaneously and erroneously rely on the State court summary judgment. (*Compare* Pls.' Opp. at 5 ("It follows that defendant has failed to make a prima facie case establishing that it did not have notice of or create the condition that caused Plaintiff's fall.") *with id.* at 3 ("No genuinely triable factual issue exists when the moving party demonstrates, after drawing all inferences and resolving all ambiguities in favor of the non-moving party[,] that no rational jury could find in the non-movant's favor.").

8    Plaintiffs correctly identify "preponderance of the evidence" as the ultimate burden they will bear at trial. (Pls.' Opp. at 3.) But to survive summary judgment, Plaintiffs still must present sufficient evidence to create a triable issue of fact as to all elements of their claim, *i.e.*, that a jury could find, by a preponderance of the evidence, that Plaintiffs had proved their claim.

9    Plaintiffs' reliance on *Birnbaum v. New York Racing Association*, 869 N.Y.S.2d 222 (N.Y. App. Div. 2012) is misplaced. First, *Birnbaum* is factually distinguishable from this case. In *Birnbaum*, there was "no evidence regarding any particularized or specific inspection or stair-cleaning procedure in the area of the plaintiff's fall on the date of the accident." *Id.* at 224. Here, by contrast, the evidence shows that Costco conducted hourly inspections and that such inspections occurred on the day of Strass's accident. Second and more fundamentally, *Birnbaum* is a State court case in which the decision was based on the State court summary judgment standard, which requires the defendant to prove lack of constructive notice. Here, as previously discussed, Plaintiffs, and not Defendant, bear the burden of putting forth sufficient evidence to establish a triable issue of fact regarding constructive notice.

10   Though the end time for the last inspection is missing a digit, the inspection appears to have concluded at or around 6:30 p.m. (Walk Sheet at 1.)

11   Plaintiffs argue that the ambiguity surrounding the time Strass fell is material because it shows that there was "ample time for the dangerous condition to have happened." (Pls.' Opp. at 5.) But that is not the test. Plaintiffs need not adduce evidence that there was sufficient time for the condition to have occurred; rather, Plaintiffs must show that the condition existed for a sufficient amount of time for Costco reasonably to have discovered it. *See Shimunov*, 2014 WL 1311561, at *6. Indeed, the very fact that Plaintiffs cannot establish when the spill occurred weighs decidedly in favor of granting summary judgment to Defendant because Plaintiffs cannot establish an essential element of their claim.

12      For purposes of this Memorandum and Order, the Court assumes that Aisle 319, where the accident occurred, is "not far" from Aisle 300, where another spill occurred earlier in the day. However, neither party has identified any evidence regarding the relative locations of these aisles.

13      Plaintiffs refer to *Giuffrida v. Metro N. Commute R. Co.* as a case that is "similar to the case at bar." (Pls.' Opp. at 7.) However, the court in *Giuffrida* applied the State court summary judgment standard, and is therefore distinguishable. *See* 720 N.Y.S.2d 41 (N.Y. App. Div. 2001) ("Contrary to defendants' suggestion, it is not plaintiff's burden in opposing the motions for summary judgment to establish that defendants had actual or constructive notice of the hazardous condition. Rather, it is defendants' burden to establish the lack of notice as a matter of law."). *Negri v. Stop & Shop, Inc.* is also distinguishable. In *Negri*, unlike here, the record contained circumstantial evidence "that a slippery condition was created by jars of baby food which had fallen and broken a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy the condition." 65 N.Y.2d 625, 626, 491 N.Y.S.2d 151, 480 N.E.2d 740 (1985).

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2794417
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jamal WILLIAMS, Plaintiff,
v.
W. WEAVER, Defendant.

No. 9:03-CV-0912 (LEK/GHL).
|
Sept. 26, 2006.

## Attorneys and Law Firms

Jamal Williams, Naponoch, NY, Pro Se.

Hon. Eliot L. Spitzer, Attorney General of the State of New York, Maria Moran, Esq., Assistant Attorney General, Syracuse, NY, for Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on September 5, 2006, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 29). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Jamal Williams, which were filed on September 20, 2006. Objections (Dkt. No. 31).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.[1]

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 29) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's motion for judgment on the pleadings (Dkt. No. 26) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff is permitted **THIRTY (30) DAYS** from the date of this Order to file an Amended Complaint that complies with Rules 8 and 12 of the Federal Rules of Civil Procedure and the September 5, 2006 Report-Recommendation; and it is further

**ORDERED,** that if Plaintiff fails to file an Amended Complaint within **THIRTY (30) DAYS** from the date of this Order, the Clerk shall enter judgment dismissing this action without further order of this Court due to Plaintiff's failure to comply with the requirements of this Order; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

GEORGE H. LOWE, United States Magistrate Judge.

## *REPORT-RECOMMENDATION*

This action has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to Local Rule 72.3(c) and 28 U.S.C. § 636(b). Jamal Williams ("Plaintiff") commenced this *pro se* civil rights action against W. Weaver ("Defendant"), pursuant to 42 U.S.C. § 1983. (Dkt. No. 1.) Currently before the Court is Defendant's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 26.) For the reasons that follow, I recommend that Defendant's motion be conditionally granted.

## I. BACKGROUND

### A. Allegations of Plaintiff's Complaint

A liberal reading of Plaintiff's *pro se* Complaint reveals the following allegations.

On June 20, 2003, while Plaintiff was incarcerated at Auburn Correctional Facility, "a weapon ... was found on the outside upper part of [the] door" to his cell, number D-4-32. (Dkt. No. 1, "Attached Statement.") For the rest of that day, Plaintiff was confined to his cell. *(Id.)* On June 21, 2003, he was issued a misbehavior report by the officer in charge of D-Block, Randy Russer, charging plaintiff with violating Auburn Correctional Facility Rule 113.10.[1] *(Id.)*

**\*2** On June 25, 2003, Plaintiff appeared at a disciplinary hearing, over which Defendant presided. *(Id.)* Plaintiff pled not guilty. *(Id.)* After committing several procedural errors (described below), Defendant found Plaintiff guilty and sentenced him to four (4) months in the Special Housing Unit ("SHU") with a corresponding loss of privileges and good-time credit. *(Id.)* On June 25, 2003, Plaintiff filed an appeal of the disciplinary conviction. *(Id.)* The appeal was still pending when Plaintiff filed the current federal court action, on July 1, 2003. *(Id.)*

Generally, Plaintiff alleges that two procedural errors occurred with respect to his disciplinary hearing and conviction. First, he alleges that, during the hearing, Defendant, (1) denied Plaintiff's request to call Officer Russer as a witness to establish his innocence, (2) denied Plaintiff's request for a written statement as to why his request to call Officer Russer was being denied, and (3) "condoned" the action of the Plaintiff's assigned legal assistant who, while Plaintiff was in pre-hearing confinement, had denied Plaintiff (a) "documentary evidence for his defenses, i.e.[,] log book entries for the date of his placement in D-4-32 and a copy of D-4-32 search cell slip and incident report" and (b) an opportunity to interview Officer Russer. *(Id.)* Second, Plaintiff alleges that Defendant reached a determination of guilt despite the fact that the disciplinary charge against Plaintiff lacked substantial evidence, given the location of the weapon found, which was "accessible to over 47 prisoners, including the prisoner who was in D-4-32 cell before [plaintiff]." *(Id.)*

Finally, Plaintiff alleges that, while he was confined for 23 hours per day in the SHU, he was denied the right to attend Islamic religious services and religious classes. *(Id.)*

### B. Relevant Procedural History

On October 30, 2003, Defendant moved to dismiss Plaintiff's Complaint on the ground that Plaintiff failed to exhaust his administrative remedies and that Plaintiff fails to state a claim upon which relief can be granted. (Dkt. No. 7.) Generally, that motion was based on two grounds: (1) Plaintiff failed to exhaust his available administrative remedies before filing suit; and (2) in any event, Plaintiff failed to state a claim upon which relief can be granted because he has not specified what constitutional right has allegedly been violated. (Dkt. No. 8.) On January 18, 2005, I issued a Report-Recommendation to District Judge Kahn, recommending that Defendant's motion be denied. (Dkt. No. 15.) On February 18, 2005, Judge Kahn issued an Order approving and adopting my Report-Recommendation. (Dkt. No. 17.) On February 23, 2005, Defendant filed an Answer to Plaintiff's Complaint. (Dkt. No. 18.) On January 18, 2006, Defendant filed the current motion for judgment on the pleadings. (Dkt. No. 26.) On April 12, 2006, Plaintiff filed a response in opposition to Defendant's motion. (Dkt. No. 28.)

**\*3** Generally, Defendant's current motion is based on two grounds. First, Defendant argues that Plaintiff's Complaint should be dismissed because the sole claim asserted in that Complaint is a procedural due process claim under the Fourteenth Amendment, and Plaintiff has not sufficiently alleged that Defendant violated a due process liberty interest that was in fact protected by the Fourteenth Amendment because the duration of his confinement in SHU was too brief. (Dkt. No. 26, Part 2, at 3-10.) In particular, Defendant argues that Plaintiff was released from SHU confinement after only thirteen (13) days. *(Id.)* Second, Defendant argues that, even if Plaintiff had sufficiently alleged the existence of a protected liberty interest, his Complaint should be dismissed because, as a matter of law, Defendant is protected by qualified immunity because the boundaries of an inmate's liberty interest, as articulated by *Sandlin v. Conner*, 515 U.S. 472 (1995), were not "clearly established" at the time in question, on June 25, 2003 (nor are those boundaries clearly established now, argues Defendant). *(Id.* at 10-11.)

Liberally construed, Plaintiff's response asserts three arguments .[2] First, Plaintiff argues that Defendant is incorrect that the *sole* claim asserted in Plaintiff's Complaint is a procedural due process claim under the Fourteenth Amendment-Plaintiff argues that he *also* asserts a First Amendment claim with respect to his practicing of the Islamic religion. (Dkt. No. 28 at 1-2.) Second, Plaintiff argues that he did possess a due process liberty interest that was protected by the Fourteenth Amendment because, despite the brevity of his period of confinement, the conditions of that confinement were unusually harsh (e.g., in that those conditions prevented him from practicing his religion, etc.). *(Id.)* Third, Plaintiff argues that Defendant

is not entitled to qualified immunity because, at the time he conducted Plaintiff's disciplinary hearing, Defendant was acting outside of the scope of his employment (as defined in the DOCS' employee manual). (*Id.* at 2.)

## II. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)."[3]

A defendant may move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To prevail on a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," a defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief,"[4] or the defendant must show that the plaintiff's claim "fails as a matter of law."[5] Thus, a defendant may base a Rule 12(b)(6) motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2);[6] or (2) a challenge to the legal cognizability of the claim.[7]

**\*4** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[8] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[9] The purpose of this rule is to "facilitate a proper decision on the merits."[10] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[11]

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See Swierkiewicz v. Sorema N.A.,* 534 U .S. 506, 513-514 (2002) (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits."[12]

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ."[13] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[14] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[15]

Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[16] However, "all normal rules of pleading are not absolutely suspended."[17] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[18]

Finally, as with a Rule 12(b)(6) motion, Rule 12(c) motions are limited to the facts alleged in the complaint and must be converted into a motion for summary judgment if the court considers materials outside the pleadings.[19]

## III. ANALYSIS

Taken together, Defendant's motion papers, and Plaintiff's response, raise the following three issues: (1) whether Plaintiff has stated a claim under the First Amendment with respect to his practicing of the Islamic religion; (2) whether Plaintiff has sufficiently alleged the existence of a due process liberty interest protected by the Fourteenth Amendment; (3) whether Defendant is protected by qualified immunity as a matter of law.

### A. Whether Plaintiff Has Stated a Claim Under the First Amendment with Respect to His Practicing of the Islamic Religion

**\*5** Generally, First Amendment claims by inmates regarding the practice of their religion may be broken down into two types of claims-a claim that a defendant's conduct infringed on the inmate's religious beliefs (called a "free exercise claim"), and/or a claim that a defendant retaliated against a plaintiff for practicing his religion (called a "retaliation claim").

**1. Free-Exercise Claim**

"Prisoners retain their right to religious freedom [under the First Amendment] even when incarcerated ... [and are] therefore entitled to a reasonable accommodation of [their] religious beliefs."[20] Generally, "[t]o assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the [prisoner's] scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged conduct of prison officials infringes upon the religious belief; and (3) whether the challenged conduct of the prison officials furthers some legitimate penological objective."[21] The reason for the third consideration is the fact that the right of a prisoner to exercise his religion is balanced against "the interest of prison officials charged with the complex duties arising from administration of the penal system."[22]

Here, the challenged conduct consisted of (1) confining Plaintiff to SHU for 23 hours per day between June 25, 2003 (when Plaintiff started serving the disciplinary sentence imposed on him by Defendant), and July 9, 2003 (when Plaintiff was released from the Auburn C.F. SHU and transferred to Cayuga C.F.),[23] which allegedly prevented Plaintiff from being able to "attend Muslim religious services and Muslim religious classes,"[24] and (2) subjecting Plaintiff to harsh conditions in SHU (consisting of "90 degree [heat]" and "Plex's glass [sic] [walls]"), which allegedly prevented him from being able to practice Islam.[25]

I find that, as alleged, this conduct did not *infringe* on Plaintiff's religious beliefs, as a matter of law. Most notably, Plaintiff does not assert any factual allegations indicating what "Muslim religious services and Muslim religious classes" he was not able to attend during the time period in question.[26] Because Plaintiff alleges that the conduct in question occurred between June 25, 2003, and July 23, 2003, I cannot imagine any circumstances, consistent with the factual allegations of Plaintiff's Complaint, in which Defendant could have prevented Plaintiff from attending either of (what the Second Circuit has characterized as) the two "major religious observances" in Islam in 2003-the "Eid ul Fitr" feast (which occurred in November of 2003), or the "Eid ul Adha" feast (which occurred in February of 2003).[27] Nor can I imagine how Defendant could have prevented Plaintiff from attending any other Islamic "observance" in 2003.[28] Rather, the only thing I can imagine Plaintiff having missed between June 25, 2003 (a Wednesday), and July 9, 2003 (also a Wednesday) are two weekly religious services. Courts within this Circuit have repeatedly held that, as a matter of law, similar deprivations do not

substantially burden an inmate's right to practice his religion.[29]

**\*6** Moreover, I can imagine no circumstances, consistent with the factual allegations of Plaintiff's Complaint, in which being denied "religious classes" or being subjected to 90-degree heat behind Plexiglass walls could have inhibited Plaintiff from practicing the Islamic religion. For example, Plaintiff's Complaint is conspicuously absent of details indicating that the heat in his cell actually prevented him from doing things such as praying five times a day or reading the Koran. I have difficulty imagining circumstances in which these events occurred, and Plaintiff simply chose to omit mentioning them in his Complaint. Indeed, Plaintiff has not had just one opportunity to provide such details to the Court, but *three* opportunities to do so-the latter two opportunities consisting of his opportunities to respond to Defendant's two motions to dismiss (which responses I have construed as essentially amending Plaintiff's bare-bones and rather prematurely filed Complaint).

My frustration with Plaintiff's Complaint is tempered somewhat by my continued consideration of the fact that he is a civil rights plaintiff who is proceeding *pro se*. For this reason, and the fact that a very liberal reading of the Complaint gives the slightest of indications that Plaintiff *might* be able to state a First Amendment claim if given a final opportunity to do so, I believe that he should be granted leave to amend his Complaint before his attempted free-exercise claim is dismissed.[30]

As a result, I recommend that Plaintiff's free-exercise claim should be *conditionally* dismissed (as described at the end of this Report-Recommendation) for failure to state a claim.

One final point bears mentioning before I move on to my analysis of any retaliation claim asserted in Plaintiff's Complaint. Plaintiff's attempted free-exercise claim emerged from obscurity only through his response to Defendant's motion for judgment as a matter of law. Because Defendant did not file a reply to Plaintiff's response, Defendant has not briefed the Court on whether any *legitimate penological objective* was furthered by the (alleged) deprivation to Plaintiff of attending religious services and/or classes.[31] As a result, I am unable to reach the issue of whether the challenged conduct did, as a matter of law, further a legitimate penological objective, except to make the following observation. Auburn C.F. is a maximum security prison, and Plaintiff was confined in its SHU due to a disciplinary conviction arising from the discovery of a weapon in his possession. Permitting Plaintiff to attend "congregate" or communal religious services during his stay in SHU would, by definition,

involve permitting Plaintiff to co-mingle with other inmates. I can easily imagine that such a co-mingling would pose an increased security risk, making any prohibition of his attending the service a "legitimate penological objective."[32]

### 2. Retaliation Claim

Claims of retaliation find their roots in the First Amendment.[33] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[34] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care.[35] As the Second Circuit has noted,

> *7 [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.[36]

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech or conduct and the adverse action-in other words, that the protected speech or conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[37] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[38]

Here, Plaintiff has asserted no factual allegations indicating that he was retaliated against for practicing his religion.[39] Indeed, Plaintiff does not even allege that Defendant knew Plaintiff was a follower of Islam when he issued his disciplinary hearing determination and sentence.[40]

As a result, I do not even liberally construe Plaintiff's

Complaint as asserting a First Amendment retaliation claim.

### B. Whether Plaintiff Has Sufficiently Alleged the Existence of a Due Process Liberty Interest Protected by the Fourteenth Amendment

In my Report-Recommendation addressing Defendant's motion to dismiss (which Report-Recommendation was approved and adopted by the Court), I stated, *inter alia,* that Plaintiff "has sufficiently stated a [Fourteenth Amendment] claim under Section 1983."[41] That statement requires some qualification.

Specifically, that statement was made in response to Defendant's argument that Plaintiff had failed to state a Fourteenth Amendment claim because he had not alleged that his disciplinary conviction had been reversed, expunged, or invalidated by another tribunal.[42] Because Plaintiff alleged (in his response to Defendant's motion to dismiss) that his disciplinary conviction had been reversed, I rejected Defendant's argument and concluded that Plaintiff had sufficiently stated a claim.[43] In so doing, I should have clarified that Plaintiff had sufficiently stated a Fourteenth Amendment claim under Section 1983 only *insofar as he has alleged that his disciplinary conviction had been reversed.* I did not mean to *sua sponte* address the issue (which had not been raised or briefed by the parties) of whether Plaintiff had failed to state a Fourteenth Amendment claim by failing to allege the existence of a liberty interest protected by the Fourteenth Amendment. That latter issue has been raised and briefed by the parties in the current motion. As a result, I shall address it now, without regard to my finding in my prior Report-Recommendation that Plaintiff has sufficiently stated a claim insofar as he has alleged that his disciplinary conviction had been reversed.

*8 Defendant argues that Plaintiff has not sufficiently alleged that Defendant violated a due process liberty interest that was in fact protected by the Fourteenth Amendment because Plaintiff has not alleged facts indicating that he possessed a protected liberty interest in not being confined to SHU for thirteen (13) days under the conditions he describes.[44] Specifically, Defendant argues that (1) New York State did not create a liberty interest in remaining free from such confinement, under the standards articulated in *Meachum v. Fano,* 427 U.S. 215 (1976) and *Wolff v. McDonnell,* 418 U.S. 539 (1974), and (2) in any event, such confinement did not impose on Plaintiff an "atypical and significant hardship in relation to the ordinary incidents of prison life," under *Sandlin v. Conner,*

Williams v. Weaver, Not Reported in F.Supp.2d (2006)

515 U.S. 472, 484 (1995).[45]

Liberally construed, Plaintiff's response papers argue that Plaintiff possessed a due process liberty interest that was protected by the Fourteenth Amendment because the conditions of his confinement did impose on him an atypical and significant hardship in relation to the ordinary incidents of prison life.[46] Specifically, Plaintiff argues that the atypical and significant hardship resulted from the fact that his confinement was unusually harsh in that (1) he was subjected to 90-degree heat behind Plexiglass walls, and (2) he was denied the opportunity to attend religious services and religious classes.[47]

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989). Because I construe Defendant's argument as addressing only the first step (i.e., whether there exists a liberty or property interest which has been interfered with by the State), I will address only that first step.

With regard to that first step, "in *Sandlin v. Conner,* 515 U .S. 472 ... (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *11 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., adopting Report-Recommendation of Peebles, M.J.) [citations omitted].

Here, as the defendants did in *Ciaprazi,* Defendant argues that New York State has not, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons.[48] *See Ciaprazi,* 2005 WL 3531464, at *11. However, here, as the defendant did in *Ciaprazi,* Defendant supports that argument with citations to federal court cases that are inapposite.[49] *See Ciaprazi,* 2005 WL 3531464, at *11 (distinguishing several of the same cases as those cited by Defendant in this action).

**\*9** After carefully reviewing the law on this issue, I agree with Magistrate Judge David E. Peebles who concluded, in *Ciaprazi,* that "it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandlin* factor." *See*

*Ciaprazi,* 2005 WL 3531464, at *11 [citations omitted]. In addition to the four cases cited by Magistrate Judge Peebles in support of that conclusion (one of which was issued by District Judge Lawrence E. Kahn, *see id.*), I respectfully draw defense counsel's attention to a half dozen other cases supporting that conclusion.[50]

Thus, the only issue remaining before the Court, with respect to Defendant's due process argument, is whether the SHU confinement of Plaintiff, as alleged, imposed an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life." *Sandlin,* 515 U.S. at 483-484. On this issue I agree with Defendant that, as alleged, the confinement did not constitute such a hardship on Plaintiff, as a matter of law. I reach this conclusion for the same reasons as those asserted by Defendant in his motion papers.[51]

I would add only one point. As described above, the conditions of Plaintiff's confinement in the Auburn C.F. SHU, as alleged, consisted of his being confined to SHU for 23 hours per day between June 25, 2003, and July 9, 2003, under conditions in which he was prevented from being able to "attend Muslim religious services and Muslim religious classes," and in which he was subjected to harsh conditions (consisting of "90 degree [heat]" and "Plex's glass [sic] [walls]"), which allegedly prevented him from being able to practice Islam.[52] I calculate this duration of SHU confinement at Auburn C.F. as consisting of fourteen (14) days, not thirteen (13) days as asserted by Defendant.[53] Moreover, as I stated above, I do not even liberally construe Plaintiff's Complaint (and his papers in response to Defendant's two dispositive motions) as alleging that Defendant somehow *caused* Plaintiff to be confined to the Cayuga C.F. SHU from July 9, 2003, to July 23, 2003.[54] (Such a construction would enlarge the duration of Plaintiff's allegedly unconstitutional confinement to a period of twenty-eight days.) In any event, regardless of whether I construe the period of Plaintiff's allegedly unconstitutional confinement as thirteen (13) days, fourteen (14) days, or twenty-eight (28) days, I would reach the same conclusion with regard to that confinement-i.e., that the confinement, as alleged, did not impose an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," as a matter of law.

In reaching this conclusion, in addition to relying on the four factually analogous cases cited by Defendant,[55] I rely on two seminal cases. In those two cases, the Supreme Court and Second Circuit made clear that a "short" period of disciplinary confinement (i.e., under 101 days) under generally "normal" conditions (i.e., even if some of those conditions are harsher than those in disciplinary confinement or the general population) usually does not

rise to the level of an "atypical and significant hardship ." *See Sandlin v. Conner,* 515 U.S. 472, 475-476, 486 (1995) (30 days of disciplinary confinement in SHU under conditions that mirrored those of normal administrative segregation "with insignificant exceptions" did not rise to the level of atypicality); *Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and somewhat more severe than those of general population" did not rise to the level of atypicality).

**\*10** As a result, I recommend that Plaintiff's due process claim should be *conditionally* dismissed (as described at the end of this Report-Recommendation) for failure to state a claim.

### C. Whether Defendant Is Protected by Qualified Immunity

Because I have concluded that adequate grounds exist for an order conditionally dismissing Plaintiff's Complaint, I need not, and do not, reach Defendant's alternative argument that Plaintiff's Complaint should be dismissed because Defendant is protected by qualified immunity. I would only add the following two observations (should the Court find it necessary to reach this alternative argument in deciding Defendant's motion).

First, Defendant correctly recites the law of qualified immunity. (Dkt. No. 26, Part 2 at 10.) However, it should be remembered that, "usually, the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted." *McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (citation omitted). Rather, the qualified immunity defense may "be asserted on a Rule 12(b)(6) motion [only] as long as the defense is based on facts appearing on the face of the complaint." *McKenna,* 386 F.2d at 435. Accordingly,

> a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint ... but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' ... Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense. *Id.*

Second, although Defendant would have a rather heavy burden in succeeding on a motion to dismiss based on the ground of qualified immunity, he has made a credible argument in support of such a dismissal. In addition to the Fourteenth Amendment cases cited by Defendant, I have come across a recent First Amendment case that would weigh in Defendant's favor. *See Persad v. Savage,* 02-CV-0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (report-recommendation by magistrate judge, observing that there was "no clear statement of law" from the Supreme Court or the Second Circuit that an inmate's First Amendment right to practice the Islamic religion would be substantially burdened by his inability to attend two weekly religious services), *adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004).

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for judgment on the pleadings (Dkt. No. 26) be **CONDITIONALLY GRANTED** in that Plaintiff's Complaint should be **DISMISSED UNLESS,** within **THIRTY (30) DAYS** of the issuance of the Court's Order on Defendant's motion, Plaintiff files an **AMENDED COMPLAINT** that complies with Rules 8 and 12 of the Federal Rules of Civil Procedure.

**\*11** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 2794417

### Footnotes

1    The Court notes several errors, which do not, however, impact materially upon the content of the Report-Recommendation. First, the correct citation for the case of *Straker v. Metropolitan Transportation Authority* is 333 F.Supp.2d 91 (E.D.N.Y.2004). Report-Rec. (Dkt. No. 29) at 6 n. 7. Second, the correct citation for *Shakur v. Selsky* is 391 F.3d 106 (2d Cir.2004). *Id.* at 10 n. 21. Third,

the correct citation for *Ford v. McGinnis* is 352 **F.3d** 582 (2d Cir.2003). *Id.* at 12 n. 27.

1    Rule 113.10 provides: "Inmates shall not make, possess, sell or exchange any item of contraband that may be classified as a weapon by description, use or appearance." 7 NYCRR § 270.2[B][14][i]. It is either a Tier II or Tier III offense. *Id.*

2    I note that Plaintiff's response is deficient in that it is not accompanied by a memorandum of law, as required by Local Rule 7.1(a) of the Local Rules of Practice for this Court. (*See* Dkt. No. 28 at 2 [Plf.'s Response, acknowledging lack of presentation of legal authority supporting arguments contained therein].)

3    *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir .2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

4    *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (citations omitted); *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotations and citation omitted).

5    *Phelps v. Kapnolis,* 308 F.3d 180, 187 (2d Cir.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 108, n. 16 [1976].)

6    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

7    *See Swierkiewicz* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig .,* 2005 U.S. Dist. LEXIS 6686 (S.D.N.Y. Apr. 20, 2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim.") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01 Civ. 4430, 2002 U.S. Dist. LEXIS 1658, *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

8    *See Swierkiewicz* 534 U.S. at 511-512, 515.

9    *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 .U.S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

10   *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) (quoting *Conley,* 355 U.S. at 48).

11   *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

12   2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir .2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N. Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

13   *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

14   *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

15   *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

16   *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.

17   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) (citations omitted), *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

18   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

19    *See* Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

20    *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999).

21    *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988); *see also, Ford v. McGinnis,* 352 F.3d 582, 588-596 (2d Cir.2003) (not deciding question of whether "substantial burden" requirement is contained among elements of First Amendment free-exercise claim); *accord, McEachin v. McGinnis,* 357 F.3d 197, 203 (2d Cir.2004); *Shakur v. Selsky,* 319 F.3d 106, 120 (2d Cir.2004).

22    *Ford,* 352 F.3d at 588; *Burgess v. Friedmann,* 05-CV-0379, 2005 U.S. Dist. LEXIS 38423, at *7-8 (N.D.N.Y. Dec. 22, 2005) (Mordue, J.); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989); *Farid,* 850 F.2d at 925.

23    (*See* Dkt. No. 12, ¶ 4 [Plf.'s Response to Def.'s Motion to Dismiss, alleging that Plf. was transferred from Auburn C.F. to Cayuga C.F. on July 9, 2003].) As I pointed out in my previous Report-Recommendation, it is permissible for a court to consider materials outside a plaintiff's complaint when reviewing a motion to dismiss for failure to state a claim, to the extent those papers are consistent with the allegations of the plaintiff's complaint. (Dkt. No. 15 at 4, n. 6 [Report-Recommendation filed 1/18/05].) As a result, I consider Plaintiff's opposition papers in reaching the aforementioned liberal interpretation of Plaintiff's Complaint. I note, however, that Plaintiff also appears to suggest, in his opposition papers, that-after the Superintendent reversed Defendant's disciplinary conviction of Plaintiff on July 8, 2003, and after Plaintiff was transferred from Auburn C.F. to Cayuga C.F. on July 9, 2003-Plaintiff continued to be confined under conditions that prevented him from being able to practice his religion until July 23, 2003. (*See* Dkt. No. 12, ¶ 4 [Plf.'s Response to Def.'s Motion to Dismiss; Dkt. No. 28 at 1 [Plf.'s Response to Def.'s Motion for Judgment on Pleadings, alleging that, after the Superintendent reversed Plf.'s disciplinary conviction, Plf. spent "a continuous [period] of time" in SHU before being released].) Because these assertions are factually bare and inconsistent with the allegations of Plaintiff's Complaint, I do not even liberally construe them as alleging that Defendant, by issuing a disciplinary sentence that was admittedly reversed on appeal, somehow *caused* Plaintiff to be deprived of a First Amendment right to practice his religion at Cayuga C.F. from July 9, 2003, to July 23, 2003. Among other deficiencies, such an assertion fails to even suggest that Defendant was *personally involved* in any such deprivation at Cayuga C.F. Even if I were to construe Plaintiff's Complaint as alleging that Defendant caused Plaintiff to be confined in SHU between June 25, 2003, and July *23,* 2003 (as opposed to July *9,* 2003), I would reach the same conclusions as I reach later in this Report-Recommendation regarding his failure to state a First Amendment claim.

24    (Dkt. No. 1, "Attached Statement" at 2.)

25    (Dkt. No. 28 at 1 [Plf.'s Response to Def.'s Motion for Judgment on Pleadings].)

26    (*See generally* Dkt. Nos. 1 [Plf.'s Compl.], 23 [Plf.'s Response to Def.'s Motion to Dismiss], 28 [Plf.'s Response to Def.'s Motion for Judgment on Pleadings].)

27    *See Ford v. McGinnis,* 352 F.2d 582, 584-585 & n. 4 (2d Cir .2003) (recognizing Islam's "two major religious observances" as the "Eid ul Fitr feast," which occurs after the conclusion of the holy month of Ramadan, and the "Eid ul Adha" feast). I take judicial notice of the dates of these two Islamic holidays in 2003. *See, e.g., Commadari v. Long Island Univ.,* 89 F.Supp.2d 353, 379 (E.D.N.Y.2000) (taking judicial notice of the date of the Thanksgiving holiday in 1998); *Platts v. U.S.,* 658 F.Supp. 850, 854, n. 5 (D. Maine 1987) (taking judicial notice of the date of the Labor Day holiday in 1984); *Allen v. Allen,* 518 F.Supp. 1234, 1235, n. 2

(E.D.Pa.1981) (taking judicial notice of the date of Father's Day in 1979); *Lloyd v. Cessna Aircraft Co.,* 430 F.Supp. 25, 26 (D.Tenn.1976) (taking judicial notice of the date of the Memorial Day holiday in 1976).

28    I take judicial notice of the fact that, in 2003, no Islamic holidays occurred between June 25, 2003, and July 23, 2003 (or, in other words, that all Islamic holidays in 2003 occurred on dates other than the dates of June 25, 2003, to July 23, 2003). *See, supra,* note 27 of this Report-Recommendation.

29    *See, e.g., Persad v. Savage,* 02-CV-0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (report-recommendation by magistrate judge, observing that there was "no clear statement of law" from the Supreme Court or the Second Circuit that an inmate's right to practice the Islamic religion would be substantially burdened by his inability to attend two weekly religious services), *adopted,* 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004); *Cancel v. Mazzuca,* 205 F.Supp.2d 128, 142 (S.D.N.Y. March 22, 2002) (granting defendant's motion to dismiss in part because inmate's right to practice Islamic religion was not substantially burdened by his inability to attend one weekly religious service); *Gill v. DeFrank,* 98-CV-7851, 2000 WL 897152, at *1-2 (S.D.N.Y. July 6, 2000) (inmate's right to practice Jehovah's Witness religion was not substantially burdened by his inability to attend one weekly religious service), *aff'd,* 8 Fed. Appx. 35 (2d Cir.2001) (unpublished decision); *Troy v. Kuhlmann,* 96-CV-7190, 1999 WL 825622, at *14-15 (S.D.N.Y. Oct. 15, 1999) (inmate's right to practice Islamic religion was not substantially burdened by his inability to attend one weekly religious service; *Boomer v. Irvin,* 963 F.Supp. 227, 230-231 (W.D.N.Y.1997) (inmate's right to practice Islamic religion was not substantially burdened by his inability to attend one weekly religious service).

30    *See, supra,* Part II & n. 16 of this Report-Recommendation.

31    Had Defendants in fact briefed the issue, I would have been interested to see whether their argument would have required the support of evidence that would have transformed their motion to dismiss into a motion for summary judgment.

32    *See Matiyn v. Henderson,* 841 F.2d 31, 33, 37 (2d Cir.1988) (inmate, who was prevented from attending communal Islamic services due to his incarceration in Auburn C.F. SHU following discovery of weapon in his possession, was so prevented for reasons related to "legitimate penological objectives") [citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) ].

33    *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

34    *See Gill,* 389 F.3d at 381-383.

35    *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

36    *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

37    *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U .S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

38      *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

39      (*See generally* Dkt. Nos. 1 [Plf.'s Compl.], 23 [Plf.'s Response to Def.'s Motion to Dismiss], 28 [Plf.'s Response to Def.'s Motion for Judgment on Pleadings].)

40      (*Id.*)

41      (Dkt. No. 15 at 9.)

42      (Dkt. No. 15 at 7, 9; Dkt. No. 8 at 3-4.)

43      (Dkt. No. 15 at 9.)

44      (Dkt. No. 26, Part 2, at 3-10.)

45      (Dkt. No. 26, Part 2, at 3-10.)

46      (Dkt. No. 28 at 1-2.)

47      (*Id.; see also* Dkt. No. 1, "Attached Statement" at 2.)

48      (Dkt. No. 26, Part 2, at 5-7.)

49      (Dkt. No. 26, Part 2 at 5 [citing *Hall v. Unknown Agents,* 825 F.2d 642 (2d Cir.1987), *Klos v. Haskell,* 48 F.3d 81 (2d Cir.1995), and *Frazier v. Coughlin,* 81 F.3d 313 (2d Cir.1996) ].)

50      *See Tellier v. Fields,* 280 F.3d 69, 79-83 (2d Cir.2000) (state regulation concerning administrative detention orders creates a liberty interest that is protected by procedural due process); *accord, Smart v. Goord,* 04-CV-8850, 2006 WL 2089889, at *7 (S.D.N.Y. July 27, 2006); *Homes v. Grant,* 03-CV-3426, 2006 WL 851753, at *18-20 (S.D.N.Y. March 31, 2006); *Freeman v. Goord,* 02-CV-9033, 2005 WL 3333465, at *8 (S.D.N.Y. Dec. 7, 2005); *Torres v. Selsky,* 02-CV-0527, 2005 WL 948816, at *5 (N.D.N.Y. Apr. 25, 2005) (Peebles, M.J.), *adopted,* Decision and Order, 02-CV-0527 (N.D.N.Y. Nov. 8, 2005) (Hurd, J.), *Gulley v. Roach,* 02-CV-0908, 2004 WL 2331922, at *5 (W.D.N.Y. Oct. 15, 2004).

51      (Dkt. No. 26, Part 2, at 3-10.)

52   *See, supra,* Part III.A.1. of this Report-Recommendation.

53   (Dkt. No. 26, Part 2, at 7, 9.)

54   *See, supra,* Part III.A.1. & note 23 of this Report-Recommendation.

55   (Dkt. No. 26, Part 2, at 9-10 [citing *Colon v. Howard,* 215 F.3d 227, 231-232 (2d Cir.2000), *Arce v. Walker,* 139 F.3d 329, 336-337 (2d Cir.1998), *Durran v. Selsky,* 251 F.Supp.2d 1208, 1213-1215 (W.D.N.Y.2003), *Alvarado v. Kerrington,* 152 F.Supp.2d 350, 354-355 (S.D.N.Y.2001) ].)

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.