UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                         :

DANIEL B. LEVIN, SANTOS J. ROSARIO, and   :
FELICIA ROSARIO,                          :

           Plaintiffs,             :

       -v-                           :

SARAH LAWRENCE COLLEGE, LEE CHEN,    :
GUMLEY-HAFT LLC, and SCOTT MULLER,    :
                          :

           Defendants.          :

------------------------------------------------------------------- X

23-cv-10236 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiffs Daniel Levin ("Levin"), Santos Rosario, and Felicia Rosario (collectively, "Plaintiffs") assert several claims against Sarah Lawrence College ("SLC"), Lee Chen ("Chen"), Gumley-Haft LLC ("Gumley-Haft"), and Scott Muller ("Muller").

Defendants SLC and Gumley-Haft ("Moving Defendants") move to dismiss the complaint, Dkt. No. 1 ("Compl." or "Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. Nos. 17, 37. For the following reasons, Moving Defendants' motions to dismiss are granted.

## BACKGROUND

In evaluating the motions to dismiss, the Court accepts the well-pleaded allegations of the Complaint as true. *See N. Fork Partners Inv. Holdings, LLC v. Bracken*, 2020 WL 2521448, at *1 (S.D.N.Y. May 18, 2020).

This case grows out of the well-documented criminal conduct of Lawrence Ray ("Ray"). In February 2020, Ray was arrested on charges of extortion conspiracy (18 U.S.C. § 1951), extortion (18 U.S.C. §§ 1951–1952), sex trafficking (18 U.S.C. §§ 1591–1592), forced labor

(18 U.S.C. §§ 1582, 1589), forced labor trafficking (18 U.S.C. §§ 1590, 1592), forced labor conspiracy (18 U.S.C. § 1594), two counts of use of interstate commerce to promote unlawful activity (18 U.S.C. § 1252(a)), and money laundering (18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)). *See* Indictment, *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Feb. 6, 2020), Dkt. No. 2. On April 6, 2022, Ray was convicted by a jury on charges of sex trafficking by force, fraud, or coercion (18 U.S.C. § 1591), conspiracy to commit sex trafficking by force, fraud, or coercion (18 U.S.C. § 1594), forced labor (18 U.S.C. § 1589), trafficking with respect to peonage, slavery, involuntary servitude, or forced labor (18 U.S.C. § 1590), and forced labor conspiracy (18 U.S.C. § 1594), Dkt. No. 1 ¶ 138, as well as racketeering conspiracy (18 U.S.C. § 1962(d)), money laundering (18 U.S.C. §§ 1952, 1956(a)(1)(B)(i)), four counts of tax evasion (26 U.S.C. § 7201), and assault with a dangerous weapon in aid of racketeering (18 U.S.C § 1959(a)(3)), *see* Jury Verdict, *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Apr. 6, 2022). The charges grew out of Ray's labor trafficking and sex trafficking of a group of persons he met when several of them were college students. On January 20, 2023, Ray was sentenced to 60 years in prison. Compl. ¶ 99. His appeal remains pending. *See United States v. Ray*, No. 23-6114 (2d Cir. Feb. 3, 2023).[1]

### A.    Ray Meets Plaintiffs at Sarah Lawrence College

Levin and Santos Rosario are two of Ray's alleged victims. They were students at SLC in 2010. *Id.* ¶ 21. They met Ray when he moved into Slonim Woods 9, a dormitory at SLC that was occupied by Levin, Santos Rosario, and Ray's daughter, Talia Ray. *Id.* ¶¶ 21, 25. Felicia Rosario is another alleged victim, but she is not alleged to have been a student at SLC. Ray had served

---

[1] The Court may take judicial notice of court records where their authenticity is unchallenged. *See Sanders v. Johnson*, 2021 WL 4776357, at *1 (S.D.N.Y. Oct. 11, 2021); *Elite Union Installations, LLC v. Nat'l Fire Ins. Co. of Hartford*, 559 F. Supp. 3d 211, 218 (S.D.N.Y. 2021).

time for kidnapping Talia Ray in the past, and had recently been released from prison. *Id.* ¶¶ 22, 24.

Ray did not conceal his presence at SLC. *Id.* ¶¶ 32–50. The SLC dormitory was located on Kimball Avenue, a busy, main road on the SLC campus. *Id.* ¶¶ 20, 28. Several SLC campus buildings were located on or around Kimball Avenue, including the Kober building, the Campus Operatives building, and numerous parking lots for staff and students. *Id.* ¶ 30. At all relevant times, signage on campus indicated that Kimball Avenue was under "24 Hour Video Recording." *Id.* ¶ 29. Ray often drove to and from the grocery store, where he would pass SLC cameras, security personnel, and staff. *Id.* ¶ 34. He openly searched for the students' escaped cat on numerous occasions by walking around the SLC campus, where he was easily visible to staff and security. *Id.* ¶¶ 36–38. On one occasion while Ray was cooking a meal in Slonim Woods, the fire alarm was set off and when staff and fire department personnel arrived, Ray was the only individual in the dorm room. *Id.* ¶¶ 39–40. SLC did not question Ray as to why he was alone in the dorm room cooking, remove him from the premises, or monitor to ensure he was not residing at the dormitory. *Id.* ¶¶ 40–41. While Ray was residing at the dormitory at SLC, several students, community members, and parents contacted SLC administrators and authorities to address concerns related to SLC students' health and well-being as a result of Ray's abusive behavior. *Id.* ¶ 50. SLC did not investigate these complaints or do anything to prevent Ray from causing harm to the Plaintiffs. *Id.*

Plaintiffs allege that during the time Ray resided at the SLC dormitory, "he committed acts of manipulation, grooming, sexual abuse, food deprivation and sleep deprivation upon [Levin and Santos Rosario]." *Id.* ¶ 45. Plaintiffs further allege that during this "same time period, Ray began

to groom and manipulate Felicia Rosario." *Id.* ¶ 46. No further allegations are made about Ray's treatment of any of the three Plaintiffs while he and they were at SLC.

### B.    Ray Moves Plaintiffs to the Waterford Building in Manhattan

Ray resided at SLC until the summer of 2011. *Id.* ¶ 53. That summer, Ray moved from SLC into a condominium unit located in the Waterford Building at 300 East 93rd Street, Apt. 15E in Manhattan. *Id.* ¶ 53. The unit was owned by Defendant Chen and managed by Defendant Gumley-Haft. *Id.* ¶¶ 54–55. Gumley-Haft is a domestic limited liability company created and licensed in the State of New York. *Id.* ¶ 17.

Shortly after moving in, Ray started to commit acts of physical assault, sexual assault, and emotional abuse upon Levin and Santos Rosario as well as other SLC students. *Id.* ¶ 61. On one occasion, Levin "was forced to watch while Lawrence Ray clamped the arms, wrists and ankles of a young college student ['I.P.'] to a table, while Lawrence Ray and [Chen] sexually assaulted her." *Id.* ¶¶ 62–63.

Felicia Rosario was moved into the condominium unit in approximately 2012. *Id.* ¶ 76. Levin and Santos Rosario also moved into the unit at some point, but the Complaint does not state precisely when. *Id.* at 8. Plaintiffs were forced to work to renovate the apartment and perform sex acts. *Id.* ¶ 186.

Ray hosted gatherings of SLC students in the condominium, including Levin and Santos Rosario. *Id.* ¶ 56. Plaintiffs allege that Chen would engage in sex acts with the college students inside the condominium unit, *id.* ¶ 62, and that on more than one occasion he witnessed these young SLC students being trafficked for sex, *id.* ¶ 65.

Chen ultimately moved out of the condominium. *Id.* ¶ 68. Before he did so, Plaintiffs witnessed Ray hand Chen "wads of cash" on numerous occasions and, upon information and

belief, allege that Chen benefitted financially from the criminal acts taking place in his condominium unit. *Id.* ¶¶ 66–67.

Gumley-Haft employees including doormen and security personnel witnessed SLC students including Felicia Rosario entering and exiting the apartment "at various hours of the day and night." *Id.* ¶¶ 74–75, 180. On numerous occasions, Felicia Rosario "exited and entered [t]he Waterford [B]uilding not wearing clothing appropriate for the weather." *Id.* ¶¶ 79, 180.

Gumley-Haft did not take any action to protect Plaintiffs from harm or to intervene in the criminal activity that was ongoing on its premises. *Id.* ¶ 80. Other residents of the building made complaints regarding "suspicious wrongdoings" taking place in the condominium unit. *Id.* ¶¶ 81, 182–183. Gumley-Haft took no action to investigate those complaints or to intervene to protect the occupants. *Id.* ¶ 82.

Also in 2012, Allen Green, the Dean of Students at SLC, met with Felicia Rosario and Ray to discuss the mental health of "C.D.," a student at SLC. *Id.* ¶ 47. During this encounter, Felicia Rosario was manipulated and groomed by Ray to assist him in providing Dean Green information regarding C.D. "to further [Ray's] efforts to groom and assault C.D." *Id.* ¶ 48. Dean Green did not intervene or investigate why Ray was interfering with C.D.'s mental health and did not take action to protect Felicia Rosario, "who was clearly participating with Ray in the meeting under duress." *Id.* ¶ 49.

## C.    Ray Moves Santos and Felicia Rosario to North Carolina

During the summer of 2013, Ray moved Santos and Felicia Rosario to Pinehurst, North Carolina. *Id.* ¶ 83.[2] There, Ray forced them to "perform painful, hard manual labor while using

---

[2] Plaintiffs' brief in opposition to SLC's motion to dismiss contains the contrary representation that in the summer of 2013, "Santos Rosario remained in the Manhattan condominium." Dkt. No. 38 at 4. On a motion to dismiss, consideration is limited "to facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." *Nechis v. Oxford*

dangerous equipment, and without being paid." *Compl.* ¶ 84. Santos and Felicia Rosario were deprived of sleep and proper nutrition. *Id.* ¶¶ 85–86. Felicia Rosario was additionally "forced to engage in sex acts with men for the benefit of Lawrence Ray's trafficking enterprise." *Id.* ¶ 87.

No allegations are made about Levin during this time period.

### D.    Ray Moves Felicia Rosario to New Jersey

Eventually Ray moved Felicia Rosario into Muller's home in Piscataway, New Jersey. *Id.* ¶ 88. While there, Ray committed "numerous acts of violence" upon Felicia Rosario and she "was forced to perform painful, hard labor at the property for free . . . until the time of Lawrence Ray's arrest in February 2020." *Id.* ¶¶ 92–94; *see also id.* ¶ 209 (Felicia Rosario performed "landscaping, yard work, and renovations" without compensation.). During this time, and upon information and belief, Muller received sexual favors from women at Ray's direction. *Id.* ¶ 90. Also, upon information and belief, Muller witnessed numerous acts of violence committed by Ray upon Felicia Rosario but failed to intervene and took no action to protect her from harm. *Id.* ¶¶ 94, 96.

No allegations are made about Santos Rosario or Levin during this time period.

### E.    Ray is Arrested.

In approximately February 2020, the New York Police Department and Federal Bureau of Investigations raided Muller's New Jersey property. *Id.* ¶ 97. During the raid, Ray was arrested in connection with his financial, sexual, and physical crimes against Plaintiffs and others. *Id.* ¶¶ 97–98. A jury found Ray guilty on all counts and on January 19, 2023, this Court sentenced Ray to 60 years in prison. *Id.* ¶ 99; *see* Judgment, *United States v. Ray*, 2022 WL 17175799 (S.D.N.Y. Jan. 31, 2023), Dkt. No. 615. Ray was additionally ordered to pay victims restitution in the total amount of $5,594,862.83 pursuant to 18 U.S.C. § 3663, 18 U.S.C. § 3663A, and 18

---

*Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The Court therefore accepts the Complaint's version of events for the purposes of the motions to dismiss.

U.S.C. § 2259.  Order of Restitution as to Lawrence Ray at 1, *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Mar. 7, 2023), Dkt. No. 640.[3]

## PROCEDURAL HISTORY

Plaintiffs filed the Complaint on November 21, 2023.  Compl.  SLC moved to dismiss the Complaint on January 29, 2024 and filed a memorandum of law in support of the motion. Dkt. No. 17.  On March 11, 2024, Plaintiffs filed a memorandum of law in opposition to SLC's motion to dismiss.  Dkt. No. 38.  On April 3, 2024, SLC filed a reply memorandum of law in support of its motion to dismiss.  Dkt. No. 46.  Gumley-Haft moved to dismiss the Complaint on March 11, 2024.  Dkt. No. 37.  Plaintiffs filed a memorandum of law in opposition to Gumley-Haft's motion to dismiss on April 25, 2024.  Dkt. No. 49.  On May 29, 2024, Gumley-Haft filed a reply memorandum of law in support of its motion to dismiss.  Dkt. No. 53.

On February 6, 2024, Plaintiffs stated that they intended to abandon their claims against Chen.  Dkt. No. 31 at 1 n.1.  On February 7, 2024, the parties filed a joint letter motion seeking a stay of discovery pending determination of the motions to dismiss the Complaint and completion of service on Muller.  Dkt. No. 31.  The Court granted the stay of discovery on February 8, 2024. Dkt. No. 32.  On February 9, 2024, Plaintiffs moved for an extension of time to serve the summons and Complaint upon Muller.  Dkt. No. 34.  The Court granted the extension of time for service of process on February 10, 2024.  Dkt. No. 35.  Muller was served on March 25, 2024.  Dkt. No. 50. On August 21, 2024, the Court granted Muller's request for an extension of time to respond to the Complaint until September 23, 2024.  Dkt. Nos. 59–61.

---

[3] To protect the victims' privacy interests, the Schedule of Victims setting forth the pro rata restitution payable to each victim was filed under seal.  *Id.* at 4.

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. A complaint therefore must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In sum, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

A defendant moving to dismiss the complaint can rely upon documents incorporated by reference into the complaint or information of which the Court may take judicial notice without converting the motion into one for summary judgment. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp.3d 366, 382-83 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021); *see also Jeffery v. City of New York*, 2024 WL 3836581, at *5–6 (2d Cir. Aug. 16, 2024) (discussing judicial notice). "[T]he reciprocal does not apply." *Wade Park Land Holdings, LLC v. Kalikow*, 2023 WL 2614243, at *10 (S.D.N.Y. Mar. 23, 2023), *aff'd sub nom. In re Wade Park Land Holdings, LLC*, 2024 WL 3024648 (2d Cir. June 17, 2024). With limited exceptions, under the Federal Rules of Civil Procedure, "the plaintiff must plead by stating its claims or defenses in numbered

paragraphs." *Id.* A "[d]efendant is entitled to know the allegations against it, and to have those allegations framed in separate paragraphs, 'with sufficient clarity to allow the defendant to frame a responsive pleading.'" *Ahmad v. Experian Info. Sols., Inc.*, 2023 WL 8650192, at *5 (S.D.N.Y. Dec. 14, 2023) (quoting *Jackson v. Warning*, 2016 WL 7228866, at *4 (D. Md. Dec. 13, 2016)).[4]

It follows necessarily that "Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendant['s] motion to dismiss." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013); *see Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (plaintiff did not state a cause of action where the supporting allegation "did not enter the case until [plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss").[5] Such a practice defeats the purpose of notice pleading—informing the defendant of the allegations against it before it is forced to answer those allegations. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 460, 461 (S.D.N.Y. 2007) (Sullivan, J.) ("The purpose of notice pleading is to provide the defendant with 'fair notice of what

---

[4] Plaintiffs argue that it is permissible for the Court to consider materials outside the Complaint in considering the motion to dismiss. Dkt. No. 49 at 4 (citing *Friedland v. UBS AG*, 2019 WL 1232084, at *6 (E.D.N.Y. Mar. 14, 2019)). Tellingly, in the only counseled case cited by Plaintiffs, the documents outside the complaint were proffered to the court by the defendant in support of the motion to dismiss rather than by the plaintiff as a late attempt to supplement the pleadings. *See Friedland*, 2019 WL 1232084, at *6.

[5] This general rule is subject to an important exception, but one that is not applicable here. On a motion to dismiss a complaint filed by a pro se plaintiff, where the court is required to consider the pleadings liberally and generously to state the strongest claim they suggest, *see Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 434 (S.D.N.Y. 2023), the court can consider statements in a memorandum of law in opposition to the motion to dismiss, *see Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *1 n.1 (S.D.N.Y. Mar. 15, 2023); *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("The solicitude afforded to pro se litigants" includes "liberal construction of pleadings, motion papers, and appellate briefs.").

the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002))).

In response to the motions to dismiss, Plaintiffs proffer facts purportedly stemming from testimony offered at Ray's criminal trial. *See, e.g.*, Dkt. No. 38 at 9–10 (citing Transcript at 263–64, 316–17, *United States of America v. Ray*, 20 Cr. 110 (LJL) (S.D.N.Y. March 11, 2022), Dkt. No. 512; Dkt. No. 49 at 8 (same). Not only would the Court be limited to considering that testimony "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings," but even that limited consideration would be improper in opposition to a motion to dismiss. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). The Court therefore disregards such alleged facts on the motions to dismiss except to the extent they inform the determination as to whether Plaintiffs should be permitted to replead. *See U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 445 (S.D.N.Y. 2004).

## DISCUSSION

Asserting that the SLC and Gumley-Haft bear liability for Ray's misdeeds, Plaintiffs bring federal claims for violations of the Trafficking Victims Protection Act ("TVPRA") [6] against SLC on behalf of Levin and Santos Rosario only and against Gumley-Haft on behalf of all Plaintiffs. Compl. ¶¶ 134–140, 184–186. Plaintiffs also bring claims under New York State law against SLC for negligence and negligent failure to maintain safe programs & activities on behalf of all

---

[6] The Complaint states that the cause of action is brought pursuant to the Trafficking Victims Protection Act ("TVPA"). Compl. at 19. Congress enacted the TVPA in 2000 to create criminal penalties for traffickers, and only later added a civil cause of action when it enacted the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA"). *See Anora v. Oasis Pro. Mgmt. Grp., Ltd.*, 2023 WL 2307180, at *6 (S.D.N.Y. Mar. 1, 2023) (citing *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 638 (2021)). Because Plaintiffs sue pursuant to that civil cause of action, the Court will refer to the TVPRA rather than the TVPA.

Plaintiffs and negligent supervision and negligent security and negligent infliction of emotional distress on behalf of Levin and Santos Rosario only.  *Id*. ¶¶ 100–133, 141–145.  Plaintiffs additionally bring state law claims against Gumley-Haft on behalf of all Plaintiffs for negligence and negligent infliction of emotional distress. *Id.* ¶¶ 175–183, 187–191.

Moving Defendants do not dispute that Plaintiffs "suffered terribly at the hands of [Ray]." Dkt. No. 17-1 at 1; Dkt. No. 37-1 at 1. They argue, however, that they should not bear liability for Ray's criminal conduct.  Both SLC and Gumley-Haft argue that Plaintiffs' TVPRA and state common law claims are time-barred, and that the New York State Adult Survivors Act ("ASA") does not revive them because (a) Moving Defendants have no relationship with Ray, (b) Plaintiffs do not plausibly allege a predicate sex offense, and/or (c) the ASA does not revive time-barred federal claims.  Moving Defendants additionally argue that Plaintiffs fail to state a claim for common law negligence, negligent infliction of emotional distress, or violation of the TVPRA. The Court first turns to Moving Defendants' arguments based on the statute of limitations.  It then turns to the questions whether, in the alternative and even if the claims were timely, Plaintiffs have stated a claim under New York common law or the TVPRA.

## I.    Statute of Limitations

"[T]he statute of limitations is ordinarily an affirmative defense that must be raised in the answer." *Ellul v. Congregation of Christian Brothers.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). However, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Id.*; *see Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss."). If it appears from a complaint that the claims are prima facie time-barred, the burden is on the plaintiff to "plausibly alleg[e] that they fall within an exception to the applicable statute of

limitations." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y. 2014) (citing cases), *aff'd*, 579 F. App'x 7 (2d Cir. 2014); *see Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 611 (S.D.N.Y. 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022).

Plaintiffs filed the Complaint on November 21, 2023.  SLC argues that "Plaintiffs' claims against the College accrued—at the *latest*—at the end of the 2010–11 academic year (*i.e.*, May 2011), when Ray and [P]laintiffs assert that they moved to the private apartment in Manhattan." Dkt. No. 17-1 at 6.  Gumley-Haft argues that "Plaintiffs' claims against Gumley-Haft accrued, at the latest, in or around the summer of 2013, the time that Plaintiffs allege that they moved out of Chen's [c]ondo [u]nit to North Carolina."  Dkt. No. 37-1 at 7.  SLC and Gumley-Haft argue that because the Complaint was filed more than twelve years and more than ten years, respectively, after Plaintiffs' claims accrued, each of Plaintiffs' claims was filed years too late.

### A.    Plaintiffs' State-Law Claims

Under New York law, there is a three-year limitations period for claims sounding in negligence, including negligent infliction of emotional distress.  *See Abdulaziz v. McKinsey & Co.*, 2021 WL 4340405, at *3 (S.D.N.Y. Sept. 22, 2021), *aff'd sub nom. Abdulaziz v. McKinsey & Co., Inc.*, 2022 WL 2444925 (2d Cir. July 5, 2022); N.Y. C.P.L.R. § 214.  Generally, "the limitations period begins to run at the time and place of injury, even though the injured party may be ignorant of the existence of the wrong or injury."  *Universitas Educ., LLC v. Bank*, 2015 WL 9304551, at *3 (S.D.N.Y. Dec. 21, 2015) (citation omitted).

Plaintiffs do not dispute that their state-law claims against SLC and Gumley-Haft were filed more than three years after those claims accrued and thus that Plaintiffs' state-law claims are time-barred unless a tolling doctrine or saving statute applies.[7]  Plaintiffs argue that their

---

[7] Plaintiffs' memorandum of law in opposition to Gumley-Haft's motion to dismiss states a later potential accrual date for at least some of Plaintiffs' negligence claims against Gumley-Haft. *See*

negligence claims are revived by the Adult Survivors Act ("ASA"), N.Y. C.P.L.R. § 214-j.  Dkt.

No. 38 at 7–11; Dkt. No. 49 at 4–9.

> The ASA provides that:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary[,] . . . every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older . . . which is barred as of the effective date of this section because the applicable period of limitation has expired[,] . . . is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section.

N.Y. C.P.L.R. § 214-j.

Article 130 of the New York Penal Law proscribes sex offenses, including forcible

touching, criminal sexual acts, sexual abuse, and rape.  N.Y. Penal Law art. 130.  The lowest grade

of sexual offense under Article 130 is forcible touching, which is a misdemeanor and is committed

when a person "intentionally, and for no legitimate purpose . . . forcibly touches the sexual or other

intimate parts of another person for the purpose of degrading or abusing such person, or for the

purpose of gratifying the actor's sexual desire . . . ."  N.Y. Penal Law § 130.52(1); *see Johnson v.*

*NYU Langone Health*, 2023 WL 6393466, at *2–3 (S.D.N.Y. Sept. 30, 2023); *J.S.M. v. City of*

*Albany Dep't of Gen'l Servs.*, 211 N.Y.S.3d 859, 868–69 (N.Y. Sup, Ct., 2024); *see also People*

*v. Guaman*, 8 N.E.3d 324, 328 (N.Y. 2014) ("when done with the relevant mens rea, any bodily

---

Dkt. No. 38 at 4 ("In or around the summer of 2013, Ray brought Felicia Rosario, and several other students to a home in Pinehurst, North Carolina . . . [while] Santos Rosario remained in the Manhattan condominium.  Ray brought Felicia Rosario and the others back to the Manhattan condominium towards the end of 2013.  Santos Rosario was still in the condominium.").  As discussed, the Court credits the allegations in the Complaint rather than those in Plaintiffs' briefs. *Nechis*, 421 F.3d at 100.  Regardless, the allegations in both the Complaint and Plaintiffs' briefs ultimately indicate that the negligence claims accrued more than three years prior to the filing of this suit.  *See* Compl. ¶¶ 97–98 (Ray was arrested in approximately February 2020); Dkt. No. 38 at 4–5 (same).

contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touching within the meaning of Penal Law § 130.52").[8]

The ASA was enacted by the New York State legislature in 2022 to accord to persons "who allegedly were abused sexually as adults a new one-year period within which to sue their alleged abusers." *Carroll v. Trump*, 650 F. Supp. 3d 213, 215 (S.D.N.Y. 2023). The ASA's enactment followed New York's adoption in 2019 of the Child Victims Act ("CVA") which recognized "the injustice inflicted on child victims of sexual abuse as a result of the interactions between their difficulties in coming to grips with and seeking remedies against their abusers and the relevant preexisting limitations period" and created a one-year window for the revival of otherwise time-barred child sexual abuse-related lawsuits. *Id.* at 222; N.Y. C.P.L.R. § 214-g. "Just three years later—using almost precisely the same statutory language—[the New York legislature] came to the same view and the same result as to adult survivors, the ASA." *Carroll*, 650 F. Supp. 3d at 215. Accordingly, courts have interpreted the ASA by reference to the CVA. *See Wilkie v. Vill. of Hempstead*, 2023 WL 5952056, at *8 (E.D.N.Y. June 20, 2023) ("Given that the relevant statutory language in the CVA is identical to that of the ASA, how the CVA has been interpreted by New York courts is helpful guidance."); *Beter v. Baughman*, 2024 WL 1333570, at *11 (S.D.N.Y. Mar. 13, 2024), *report and recommendation adopted*, 2024 WL 1329066 (S.D.N.Y. Mar. 28, 2024).

---

[8] Forcible touching is also committed when a person intentionally and for no legitimate purpose "subjects another person to sexual contact for the purpose of gratifying the actor's sexual desire and with intent to degrade or abuse such other person while such other person is a passenger on a bus, train or subway car operated by any transit agency, authority or company, public or private, whose operation is authorized by New York state or any of its political subdivisions." N.Y. Penal Law § 130.52(2). That provision is not relevant here.

The one-year revival period created by the ASA starts on November 24, 2022. N.Y. C.P.L.R. § 214-j (actions under the ASA "may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section," which was May 24, 2022); *see K.W. v. Cnty. of Rockland*, 2024 WL 1868970, at *1 (N.Y. Sup. Ct. Apr. 3, 2024) ("In effect, the ASA provided a revival of potential claims which could be initiated within a fairly narrow window from November 24, 2022, through November 24, 2023.").

There is no dispute that Plaintiffs' state-law claims against SLC and Gumley-Haft would be timely if covered by the ASA. Dkt. Nos. 17-1, 37-1. Moving Defendants make two arguments against the application of the ASA. First, they contend that the ASA contains a defendant-specific limitation which restricts the claims that are revived to those against the actual abusers and their "enablers," and that the Complaint contains no well-pleaded allegations that either SLC or Gumley-Haft are enablers. Dkt. No. 17-1 at 7–9; Dkt. No. 37-1 at 8–10. Second, they argue that the Complaint does not allege that the claims against either SLC or Gumley-Haft arose from an injury caused by a sexual offense under Article 130. Dkt. No. 17-1 at 10–13; Dkt. No. 37-1 at 10–14.

### 1.    Defendant-Specific Limitation to Enablers and Abusers

Moving Defendants first argue that the ASA only authorizes the revival of claims against a plaintiff's abusers and enablers. They argue that Plaintiffs' claims against Moving Defendants are therefore not revived because SLC and Gumley-Haft are not alleged to be enablers.

Moving Defendants' argument is based on the legislative committee report that accompanied the New York State senate bill that ultimately became the ASA. In describing the purpose and function of the ASA, the report stated: "Those who have had justice denied them as a result of New York's formerly insufficient statute of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law." Dkt. No. 17-

1 at 8 (citing N.Y. Spons. Memo., 2021 S.B. 66); Dkt. No. 37-1 at 9 (same); *see also S.H. v. Diocese of Brooklyn*, 167 N.Y.S.3d 171, 177 (2d Dept. 2022) ("the legislature [that adopted the CVA] also recognized that 'certain abusers—sometimes aided by institutional enablers and facilitators—have been successful in covering up their heinous acts'") (quoting N.Y. Assembly Memo., 2015 A.B. A10600)).  As Moving Defendants note, the dictionary definition of "enabler" is one "that enables another to achieve an end, *especially*: one who enables another to persist in self-destructive behavior (such as substance abuse) by providing excuses or by making it possible to avoid the consequences of such behavior."  Dkt. No. 17-1 at 8–9 (citing *Enabler*, Merriam-Webster Dictionary); Dkt. No. 37-1 at 9 (same).  Moving Defendants reason that the ASA authorizes claims only "against the actual sexual abuser, and institutional defendants which were alleged to have been responsible for encouraging, obfuscating, or promoting (i.e., enabling) the abuser's sexual misdeeds, or to have been negligent in their response to such misdeeds."  Dkt. No. 17-1 at 9; Dkt. No. 37-1 at 9.  Therefore, Moving Defendants argue that—because SLC's "relationship with Ray, at most, was one of landowner and guest," Dkt. No. 17-1 at 9, and "Gumley-Haft's relationship to Ray was one of building manager and the guest/trespasser/subtenant of a unit owner," Dkt. No. 37-1 at 10—the ASA cannot revive Plaintiffs' claims against either of them.

The goal of a court interpreting a New York statute is "'to ascertain and give effect to the intention of the Legislature.'"  *People v. Andujar*, 88 N.E.3d 309, 313 (N.Y. 2017) (quoting *Matter of DaimlerChrysler Corp. v. Spitzer*, 860 N.E.2d 705, 708 (N.Y. 2006)).  "'In construing statutes, courts [applying New York law] are permitted to consider extrinsic sources—legislative reports, for example, and petitions to the legislature requesting that some piece of legislation be passed to aid in statutory interpretation.'"  *Carroll*, 650 F. Supp. 3d at 222 (quoting 97 N.Y. Jur.2d, Statutes

§ 164 (2d ed. 2022)).  However, "[a]s the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof."  *Majewski v. Broadalbin-Perth Central School Dist.*, 91 N.Y.2d 577, 583 (N.Y. 1998).  "Moreover, '[s]pecial laws . . . that revive causes of action are "extreme example[s] of legislative power" and are narrowly construed.'"  *S.H.*, 167 N.Y.S.3d at 178 (quoting *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 815 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987)).

The ASA revives broadly "*every* civil claim or cause of action brought against *any party* alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition" suffered as a result of the specified conduct.  N.Y. C.P.L.R. § 214-j (emphases added).  The term "every," modifies the statutory phrase "civil claim or cause of action" and means all without limitation.  *Zion v. Kurtz*, 405 N.E.2d 681, 686 (N.Y. 1980) (citing *Shilbury v. Bd. of Sup'rs of Sullivan Cnty.*, 284 N.Y.S.2d 124, 129 (N.Y. Sup. Ct. 1967)); *Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 356 (1st Dep't 1999).  The term "any," which modifies "party," is synonymous.  *See Zion*, 405 N.E.2d at 686 ("[T]he word 'any' means 'all' or 'every' and imports no limitation." (citing *Randall v. Bailey*, 43 N.E.2d 43, 46 (N.Y. 1942) ("Any is an all-exclusive word."))); *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023) (in statutory interpretation context "'[a]ny' means 'every'; its meaning is 'expansive' rather than restrictive" (citation omitted)).

The ASA is thus best understood to revive every civil claim or cause of action, regardless of defendant, that is brought by any person who has suffered an "injury or condition" as a result of conduct which would constitute a violation of Article 130 of the Penal Law and which seeks recovery for damages suffered as a result of that injury or condition.  The ASA is claim- and injury-

specific but not party-specific.  *See Beter*, 2024 WL 1333570, at *10; *Dixon v. Reid*, 2024 WL 3794452, at *3 (S.D.N.Y. Aug. 13, 2024) (citing *Shapiro v. Syracuse Univ.*, 173 N.Y.S.3d 769, 772–74 (4th Dep't 2022)).

Courts have held that the ASA and its sister, the CVA, revive claims brought by victims of sexual abuse or assault against third parties seeking recovery for the injuries they suffered as a result of sexual abuse on theories of negligence, negligent supervision, negligent hiring and retention, negligent training, and negligent infliction of emotional distress.  *See, e.g.*, *Beter*, 2024 WL 1333570, at *10 (the ASA revived claims for negligent infliction of emotional distress, aiding and abetting sex discrimination and sexual harassment, retaliation, and aiding and abetting the alleged sexual assault); *Doe v. Doe*, 213 N.Y.S.3d 875, 877 (N.Y. Sup. Ct. 2024) (the ASA revived Plaintiff's causes of action for battery, intentional infliction of emotional distress, other intentional torts, negligence, and violation of the New York City Victims of Gender-Motivated Violence Protection Law); *Wilkie*, 2023 WL 5952056, at *7–9 (recommending that the ASA be held to revive claims for negligence/gross negligent hiring, retention, training, and supervision); *Brown v. Univ. of Rochester*, 189 N.Y.S.3d 801, 801 (3d Dep't 2023) (the CVA revived claims for negligence against university based on assault by fellow student because the CVA "speaks to 'every civil claim or cause of action' arising out of 'a sexual offense as defined in [Penal Law Article 130] . . .'"); *Kaul v. Brooklyn Friends Sch.*, 199 N.Y.S.3d 117, 119 (2d Dep't 2023) (the CVA revived claims for negligent supervision, negligent hiring and retention, negligent training, and intentional infliction of emotional distress); *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 568 (E.D.N.Y. 2021) (the CVA revived claims for "negligence, gross negligence, and willful misconduct" and for "negligently hiring, retaining, supervising, and directing" physical education teacher and coach who sexually abused student).  In effect, any defendant who is liable

18

under state law for an injury caused by conduct that would violate Article 130 is deemed to be an "enabler" subject to the revived statute of limitations.

This case is indistinguishable from those cases. Plaintiffs bring claims for negligence and negligent failure to maintain safe programs and activities (Count I), negligent supervision and negligent security (Count II), negligent infliction of emotional distress (Counts IV and XI), and negligence (Count IX). Although, as discussed *infra*, it may be that neither SLC nor Gumley-Haft is liable for these torts (and in that sense might not be considered an enabler or facilitator), that will be as a function of the substantive elements of those tort claims, and not as a result of a separate limitation contained within the ASA. *See Beter*, 2024 WL 1333570, at *11.

SLC argues that the Court's interpretation will "open[] the door to virtually limitless liability of not only of abusers and enablers, but parties which neither enable nor have ability to control abusers." Dkt. No. 46 at 2. There is some force to SLC's argument that the ASA must contain limitations beyond those that its literal language, construed broadly, would suggest. The statute does not literally revive every claim brought by a victim of sexual abuse that contains an allegation of a violation of Article 130. A plaintiff cannot revive an expired claim by the artifice of including in a complaint an allegation regarding a violation of Article 130, no matter how remote it is from the basis of liability it seeks to impose on the defendant. But SLC draws the wrong conclusion from that observation. Contrary to Moving Defendants' argument, the ASA does not require a court asked to review whether a claim has been revived to determine at the get-go whether a defendant is best characterized as an "enabler." The Court is not required to measure Moving Defendants' alleged conduct against a dictionary definition of a term that the legislature did not use in the statute. Whether a defendant is deemed to have "enabled" conduct requires a value judgment—i.e., whether conduct that was the "but-for" cause of sexual misconduct should be

considered to have permitted that sexual misconduct. Importing such an interpretation would introduce instability and indetermination into the statute that the legislature tellingly intended to eschew. Rather, the ASA's limitations are injury-specific. The ASA revives only those claims that seek relief from an injury caused by conduct that constitutes a predicate sexual offense under Article 130 of the Penal Law.

### 2.    Predicate Sexual Offense

The ASA applies "to a broader set of causes of action than the assault itself, including negligent supervision and hostile work environment, provided the ultimate injury was the result of a sexual offense." *J.S.M.*, 211 N.Y.S.3d at 868; *accord Doe v. N.Y.C. Dep't of Educ.*, 669 F. Supp. 3d 160, 166 (E.D.N.Y. 2023) ("[W]hile conduct that gives rise to injury must be a sexual offense, the civil claim itself need not be synonymous with § 130."); *Wilkie*, 2023 WL 5952056, at *9 (The ASA "extends to claims that arise out of conduct that constitutes a sexual offense under the penal law and not just conduct that constitutes such offenses.").

For a claim to be revived pursuant to the ASA, the conduct giving rise to the complained-of injury must "constitute a sexual offense as defined in article one hundred thirty of the penal law" and have been "committed against such person who was eighteen years of age or older." N.Y. C.P.L.R. § 214-j; *see Johnson*, 2023 WL 6393466, at *2.[9] The plaintiff must allege that conduct that would violate Article 130 "is the conduct that caused" the plaintiff's injury. *J.S.M.*, 211 N.Y.S.3d at 868; *see also id.* ("The focus is . . . on the conduct which caused injury, not on the nature of the legal theory under which the cause of action [is] brought."). "[T]he appropriate CVA revival test is whether the civil claim *arises from* sexual misconduct criminalized under

---

[9] Article 130 of the New York State Penal Law "includes rape, statutory rape, forcible touching, female genital mutilation, and other types of sexual misconduct that involve physical contact." *Doe v. N.Y.C. Dep't of Educ.*, 2023 WL 2574741, at *4 (E.D.N.Y. Mar. 20, 2023); *see* N.Y. Penal Law art. 130.

[Article] 130." *NYC Dep't of Educ.*, 669 F. Supp. 3d at 166 (emphasis added). The same test applies to ASA claims. *See, e.g.*, *Wilkie*, 2023 WL 5952056, at *8 ("There is . . . no reason that an intentional tort like false imprisonment, which . . . arises from the conduct that constitutes an offense under [Article] 130, would not be revived by the ASA.").

In sum, Plaintiffs must allege injury from at least one predicate sex offense as the basis of each claim Plaintiffs attempt to revive pursuant to the ASA. *See Johnson*, 2023 WL 6393466, at *3 ("Because Plaintiff has not alleged that Golden's conduct constituted a 'sexual offense' under Article 130 of the Penal Law, Plaintiff's civil assault and civil battery claims were not revived by the ASA."); *Druger v. Syracuse Univ.*, 172 N.Y.S.3d 304, 304 (4th Dep't 2022) ("plaintiff was required to plead factual allegations related to his lack of consent in order to allege 'conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law' . . . for the claims in the amended complaint to thereby be 'revived' for statute of limitations purposes"). Plaintiffs have not done so here.

### a.    SLC

The Complaint's state-law claims against SLC do not rest on allegations of fact that any Plaintiff was the victim of a violation of Article 130. Plaintiffs allege in Count I that SLC is liable for negligence and negligent failure to maintain safe programs and activities. Compl. ¶¶ 100–113. Count I rests on allegations that SLC "had a non-delegable duty to protect [its]—students including [Levin and Santos Rosario] from threats occurring in [its] programs and activities," *id.* ¶ 102, and "a duty to maintain safe programs and activities—such as dormitory life to students and visitors, including all Plaintiffs," *id.* ¶ 103. Plaintiffs allege in Count I that "[h]aving set up dormitory life as a program at the school," SLC "had an obligation to keep the Plaintiffs [Levin and Santos Rosario], safe in the dormitory program, along with invited visitors, including Felicia Rosario." *Id.* ¶ 106. Plaintiffs allege in Count II that SLC is liable to Levin and Santos Rosario for negligent

supervision and negligent security. *Id.* ¶¶ 114–133. Count II is based on the assertion that "[l]andlords have a 'common-law duty to take minimal precautions to protect tenants from foreseeable harm,' including a third party's foreseeable criminal conduct by a third party." *Id.* ¶ 116. Levin and Santos Rosario allege that SLC "had a duty to take minimal precautions to protect their tenants . . . from intruders," *id.* ¶ 127, and "as a landowner has a duty to protect persons against foreseeable risk of harm from criminal activities of third persons on the premises including Plaintiffs," *id.* ¶ 128. Finally, Count IV alleges that Levin and Santos Rosario suffered the negligent infliction of emotional distress when SLC violated its "duty to act reasonably" toward them. *Id.* ¶ 142. Those claims are not revived because, taking the Complaint's allegations as true, the Complaint does not allege that any Plaintiff suffered injury from a sex offense under Article 130 as a result of SLC's negligence, negligent failure to maintain safe programs and activities, or negligent supervision or security.

Plaintiffs allege a series of wrongs perpetrated both while Ray was present at SLC, and after Ray and Plaintiffs left SLC.

Plaintiffs allege at most that while Ray resided at SLC, he "committed acts of manipulation, grooming, sexual abuse, food deprivation and sleep deprivation upon" Levin and Santos Rosario, Compl. ¶ 44, that Levin and Santos Rosario "suffered emotional, physical and sexual abuse by Lawrence Ray," *id.* ¶ 45, and that Ray "began to groom and manipulate Felicia Rosario," *id.* ¶¶ 46, 48. None of those allegations suffice to plead any injury or condition suffered as a result of conduct which would constitute a sexual offense under Article 130.

Although "grooming" does not have a precise statutory or judicially recognized definition, *see United States v. Daskal*, 2023 WL 9424080, at *10 n.13 (E.D.N.Y. July 12, 2023), the word is often used to describe a strategic pattern including "manipulation or coercion short of physical

force" used to make the target vulnerable to abuse, *United States v. Maxwell*, 2021 WL 5283951, at *2 (S.D.N.Y. Nov. 11, 2021).  *See Feitosa v. Keem*, 2023 WL 2267055, at *1 n.2 (W.D.N.Y. Feb. 28, 2023) ("In common parlance, 'grooming' is understood to be a tactic where someone methodically builds a trusting relationship with a child or young adult, their family, and community to manipulate, coerce, or force the child or young adult to engage in sexual activities." (citation omitted)).  Plaintiffs do not allege that the acts of grooming, manipulation, and food and sleep deprivation to which Ray subjected Plaintiffs were accompanied by physical touch such as might give rise to, for example, a claim for sexual misconduct, *see* N.Y. Penal Law § 130.20, forcible touching, *see* N.Y. Penal Law § 130.52, or sexual abuse, *see* N.Y. Penal Law §§ 130.55–130.70.[10]  Neither the Complaint nor Plaintiffs' memorandum of law in opposition to SLC's motion to dismiss identify any sexual offense codified within Article 130 that Ray's grooming or manipulation allegedly violated.  *See generally* Compl.; Dkt. No. 38.

Furthermore, Plaintiffs' vague references to "sexual abuse" are mere conclusory statements unsupported by factual allegations and insufficient to make out any violation of Article 130.  *See Iqbal*, 556 U.S. at 664; *Johnson*, 2023 WL 6393466, at *3.

The remainder of the harms to which Santos Rosario and Levin were subjected occurred off-campus after Ray moved out of the Slonim Woods dormitory.  After leaving SLC and moving to the Waterford Building, Plaintiffs allege that they were subjected to acts of physical assault, sexual assault, and emotional abuse by Ray.  Compl. ¶ 61.  During that time, they were forced to

---

[10] The New York Penal Law defines "sexual contact" as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party."  N.Y. Penal § 130.00(3).  "It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed."  *Id.*  No factual allegation in the Complaint claims Plaintiffs were subjected to sexual contact.

work to renovate the Manhattan apartment and perform sex acts. *Id.* ¶ 169. Levin was additionally forced to witness other SLC students being sexually assaulted. *Id.* ¶¶ 62–63. Later, after Ray moved Santos and Felicia Rosario to Pinehurst, North Carolina, Ray forced them to "perform painful, hard manual labor while using dangerous equipment, and without being paid." *Id.* ¶¶ 83–84. Santos and Felicia Rosario were additionally deprived of sleep and proper nutrition. *Id.* ¶¶ 85–86. The Complaint further alleges that while Felicia Rosario was residing in North Carolina during the summer of 2013, she was forced to engage in sex acts for the benefit of Ray's trafficking enterprise, *id.* ¶¶ 83, 87, and that thereafter, Felicia Rosario was moved to Muller's home in Piscataway, New Jersey where Muller "allowed his home to be used for sex trafficking and forced labor" of Felicia Rosario, *id.* ¶ 95.[11]

Plaintiffs argue that SLC is liable for these claims on a but-for theory of liability: "[A] multitude of horrific acts constituting Article 130 sex offenses were perpetrated due to [SLC's] negligent conduct, giving rise to the application of the ASA," Dkt. No. 38 at 1, and "[i]t was during [the 2010–2011] school year when Ray set the foundation (through coercion, brainwashing) for the years of physical abuse, sexual abuse, emotional abuse, and human trafficking later suffered by these plaintiffs," Dkt. No. 38 at 18; *see also* Compl. ¶ 133 ("As a result of [SLC's] failure to

---

[11] Plaintiffs point to additional incidents not alleged in the Complaint in which they claim Ray forcibly touched them as defined in N.Y. Penal Law § 130.52, facilitated a sex offense with a controlled substance as defined in N.Y. Penal Law § 130.90 by coercing Plaintiffs "into taking Adderall to ensure they were sleep deprived and could easily be controlled," and committed sexually motivated felonies as defined in N.Y. Penal Law § 130.91 by promoting prostitution by intimidation and force and engaging in strangulation in the second degree for his own sexual gratification. Dkt. No. 38 at 9–10. (Although Plaintiffs' memorandum does not specify when or where these incidents occurred, the trial transcript to which they cite states that they transpired "[a]fter [Santos Rosario] left school" and "in the defendant's apartment." Transcript at 262–64, *United States of America v. Ray*, 20 Cr. 110 (LJL) (S.D.N.Y. March 11, 2022), Dkt. No. 512.). However, because these allegations do not appear in the Complaint and are alleged for the first time in Plaintiffs' opposition to SLC's motion to dismiss, the Court may not consider them at this juncture. *Wright*, 152 F.3d at 178.

protect the Plaintiffs and students within their residential program, Lawrence Ray was able to coerce [Levin and Santos Rosario], to move off-campus, where they continued to be trapped in a violent and abusive situation."). Plaintiffs' apparent theory is that if Ray had never met the students at SLC, they would never have suffered the abuse to which they were later subject. Plaintiffs additionally argue that "but-for [SLC's] negligence, Felicia Rosario never would have been introduced to Ray." Dkt. No. 38 at 18.

The alleged injuries that occurred after Plaintiffs and Ray left SLC are not predicate sexual offenses for the purposes of the ASA for three reasons.

First, many of the allegations themselves do not make out a violation of Article 130. Plaintiffs do not identify any sex offense within Article 130 that is violated when a person is forced to witness another person's sexual assault, forced to engage in manual labor, or deprived of sleep or proper nutrition. *See generally* Dkt. No. 38; N.Y. Penal Law art 130. Plaintiffs argue that Ray's actions forcing Felicia Rosario to engage in sex acts can be construed as a sexually motivated felony pursuant to N.Y. Penal Law § 130.91 because "Ray committed promotion of prostitution in the second degree as defined in section 230.[3]0." Dkt. No. 38 at 10.[12] "A person commits a sexually motivated felony when he or she commits a specified offense for the purpose, in whole or substantial part, of his or her own direct sexual gratification." N.Y. Penal Law § 130.91; *see People v. Seignious*, 237 N.E.3d 778, 781 (N.Y. 2024) ("To establish a defendant's guilt of a sexually motivated felony, the People must prove each element of the underlying specified crime . . . and the additional element that the motivation for committing that crime was in whole or

---

[12] Promoting prostitution in the second degree is one of the specified offenses for the purposes of sexually motivated felony. N.Y. Penal Law § 130.91(2). It is violated when a person "knowingly: (1) [a]dvances prostitution by compelling a person by force or intimidation to engage in prostitution, or profits from such coercive conduct by another; or (2) [a]dvances or profits from prostitution of a person less than eighteen years old." N.Y. Penal Law § 230.30.

substantial part for the defendant's own sexual gratification." (citation omitted)).  Here, even if

Plaintiffs had adequately pled that Ray engaged in promoting prostitution in the second degree,

the Complaint does not affirmatively allege, or plead any facts showing, that he did so for the

purpose of his own direct sexual gratification.  The Complaint states instead that Felicia Rosario

was forced to engage in sex acts "for the benefit of Lawrence Ray's trafficking enterprise."  Compl.

¶ 87.  This too therefore fails to state an injury caused by conduct within the ambit of Article 130.

Absent allegations in the Complaint giving rise to an inference that Plaintiffs were injured as a

result of conduct which would constitute a sexual offense under Article 130, the ASA does not

apply to revive their state-law claims against SLC.  *See Leib-Podry v. Tobias*, 2024 WL 1421152,

at *8 (S.D.N.Y. Feb. 13, 2024), *report and recommendation adopted*, 2024 WL 1134597

(S.D.N.Y. Mar. 15, 2024)

Second, Plaintiffs' allegations that they were subjected to sexual assault and forced to

perform sex acts, Compl. ¶¶ 61, 169, are insufficient to make out any violation of Article 130

because they are mere conclusory statements unsupported by factual allegations.  *See Iqbal*, 556

U.S. at 664; *Johnson*, 2023 WL 6393466, at *3.

Third, even if Plaintiffs did adequately plead injuries suffered as a result of conduct that

would constitute a sexual offense as defined in Article 130, Plaintiffs nonetheless do not allege

that SLC proximately caused Plaintiffs' injuries and therefore fail to allege that their state-law

claims against SLC "arise from" those injuries, N.Y. C.P.L.R. § 214-j; *see NYC Dep't of Educ.*,

669 F. Supp. 3d at 166; *Wilkie*, 2023 WL 5952056, at *8.  That is, the off-campus injuries Plaintiffs

allege do not give rise to Plaintiffs' negligence claims against SLC and therefore cannot support

application of the ASA.

It is black letter law that "[i]n order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm."  Restatement (Second) of Torts § 430 (1965).  Thus, to establish a claim for negligence, it is not sufficient that but for the defendant's conduct plaintiff would never have been injured; a plaintiff must plead that the defendant's conduct was the proximate or legal cause of the plaintiff's injury.  *See Ventricelli v. Kinney Sys. Rent A Car, Inc.*, 383 N.E.2d 1149, 1149 (N.Y. 1978).  But-for causation, or causation in fact—which Plaintiffs plead here—is "[t]he cause without which the event could not have occurred." *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quoting Black's Law Dictionary (10th ed. 2014)).  "The term refers to a link in the chain leading to an outcome, and in the abstract does no more than state the obvious, that any given event, including an injury, is always the result of many causes."  *Id.* (citation omitted).  As Judge Friendly noted, "[t]his does not mean that the careless actor will always be held for all damages for which the forces that he risked were a cause in fact [because] . . . [s]omewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity."  *Petition of Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir. 1964) (Friendly, J.), *cert. denied sub nom. Cont'l Grain Co. v. City of Buffalo*, 380 U.S. 944 (1965); *see Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980) ("The concept of proximate cause stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct.").

Although the determination of proximate cause is often best left for the factfinder, courts may find there is no proximate cause in "cases in which it can be determined, as a matter of law, that a defendant's negligence merely created the opportunity for, but did not cause, the event that

resulted in harm." *Hain v. Jamison*, 68 N.E.3d 1233, 1238–39 (N.Y. 2016).  Such is the case here where, according to the Complaint, SLC's alleged negligence is both temporally removed from the subsequent injury, *see Williams v. State*, 969 N.E.2d 197, 199 (N.Y. 2012), and superseded by Ray's intervening criminal conduct, *Kush by Marszalek v. City of Buffalo*, 449 N.E.2d 725, 729 (N.Y. 1983) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant.").  Where "the intervening allegedly criminal acts were not foreseeable," they "sever[] any causal connection between the acts of [the defendant] and the plaintiff's injuries."  *Camp v. Loughran*, 727 N.Y.S.2d 471, 471 (2nd Dep't 2001); *see also Ingrassia v. Lividikos*, 864 N.Y.S.2d 449, 449 (2d Dep't 2008) (collecting cases).  As discussed, *infra*, Ray's intervening criminal conduct was not foreseeable during Ray's residence on the SLC campus.  Absent proximate cause, Plaintiffs' negligence claims against SLC cannot be said to arise from injuries caused by Ray's conduct after leaving the SLC campus.

Because Plaintiffs do not plead a predicate sexual offense and the ASA therefore does not revive Plaintiffs' state-law claims against SLC, those claims are dismissed.

### b.    Gumley-Haft

The claims against Gumley-Haft similarly fail for lack of a predicate sexual offence committed against Plaintiffs.  Plaintiffs make two state-law claims against Gumley-Haft: negligence and negligent infliction of emotional distress.  Compl. ¶¶ 175–183, 187–191.  In Count IX, Plaintiffs allege that Gumley-Haft was "on actual and/or constructive notice of the sex trafficking and other wrongful activities" to which Plaintiffs were subjected while within the condominium that Gumley-Haft managed, *id.* ¶ 176, and that it was aware "of Plaintiff[s'] abuses on the premises, yet . . . did nothing to intervene or protect Plaintiffs," *id.* ¶ 183.  Count XI

incorporates the prior allegations and also claims that Gumley-Haft's conduct constituted negligent infliction of emotional distress, *id.* ¶¶ 187–191.

But there are no allegations that the abuses that Plaintiffs suffered while within the condominium included sex offenses under Article 130. Plaintiffs allege that while they resided in the condominium managed by Gumley-Haft, Ray subjected them to acts of physical assault, sexual assault, and emotional abuse, *id.* ¶ 61, that they were forced to renovate the condominium unit, *id.* ¶ 169, and that they were forced to perform sex acts, *id.* Plaintiffs additionally allege that Levin was forced to witness other SLC students being sexually assaulted in the unit. *Id.* ¶¶ 62–63.

Plaintiffs do not identify any sex offense within Article 130 that is violated when a person is emotionally abused, forced to witness another person's sexual assault, or forced to engage in manual labor. *See generally* Dkt. No. 38; N.Y. Penal Law art 130. And for the same reasons discussed *supra*, Plaintiffs' conclusory allegations of sexual assault that occurred at the Manhattan condominium and in the years after Ray and Plaintiffs left the condominium do not suffice to make out a predicate sexual offense for the purpose of the ASA. *See Iqbal*, 556 U.S. at 664; *Johnson*, 2023 WL 6393466, at *3. Furthermore, as discussed, *infra*, Ray's intervening criminal conduct was not foreseeable and thus the Complaint does not allege a claim for injury proximately caused by Gumley-Haft. *See Camp*, 727 N.Y.S.2d at 471; *Ingrassia*, 864 N.Y.S.2d at 449. Plaintiffs' negligence claims against Gumley-Haft therefore cannot be said to arise from injuries caused by Ray's conduct.

Plaintiffs thus fail to allege a predicate sexual offense to revive their state-law claims against Gumley-Haft under the ASA and those claims are dismissed as untimely.

## B.    Plaintiffs' TVPRA Claims

The statute of limitations for civil claims under the TVPRA is ten years from the date "the cause of action [arises]" or when "the victim reaches 18 years of age, if the victim was a minor at

the time of the alleged offense," whichever is later.  18 U.S.C. § 1595(c); *see Lama v. Malik*, 192 F. Supp. 3d 313, 320 (E.D.N.Y. June 21, 2016).[13]

"[A] claim accrues 'when the plaintiff has a complete and present cause of action.'" *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)) (collecting cases); *see also Hongxia Wang v. Enlander*, 2018 WL 1276854, at *3 (S.D.N.Y. Mar. 6, 2018) ("A cause of action accrues when the wrongful conduct occurs (or when the last element of the cause of action occurs)."); *Sahebdin v. Khelawan*, 2022 WL 4451005, at *4 (E.D.N.Y. Sept. 24, 2022) (same).  The TVPRA "involves a continuing tort, and . . . [so] a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern." *Schneider v. OSG, LLC*, 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024) (collecting cases).[14]  Thus, TVPRA claims accrue on the last date the wrongful conduct occurs.  *E.g.*, *Sahebdin*, 2022 WL 4451005, at *5 (TVPRA claim filed in May of 2021 was timely because plaintiff alleged he was subjected to TVPRA violations during his employment "at A&N Fish Market between 2003–2013" and "[t]he last incident of alleged forced labor, trafficking, and involuntary servitude occurred in 2013"); *Oluoch v. Orina*, 101 F. Supp. 3d 325, 329 (S.D.N.Y. 2015) ("Plaintiff claims to have been held by defendant in involuntary servitude from 2006 until September 4, 2007 when she escaped from defendant's home . . . [t]hus, her claims accrued in 2007.").

---

[13] In passing the TVPRA, Congress lengthened the time to file from four to ten years.  *See* 18 U.S.C. § 1595(c); *Lama*, 192 F. Supp. 3d at 320.

[14] The continuing tort doctrine provides that "in certain tort cases involving continuous or repeated injuries, the statute of limitations accrues upon the date of the last injury and that the plaintiff may recover for the entire period of the [defendants' tortious conduct], provided that an act contributing to the claim occurs within the filing period."  *Mix v. Del. & Hudson Ry. Co.*, 345 F.3d 82, 88 (2d Cir. 2003); *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

The Complaint was filed November 21, 2023.  Compl.  Accordingly, Plaintiffs' TVPRA claims against SLC and Gumley-Haft must have accrued no earlier than November 21, 2013 for them to be timely.  SLC argues that the claims against it accrued at the latest in May 2011 when the 2010–2011 school year came to an end and Ray moved out from the Slonim Woods dormitory. Dkt. No. 17-1 at 13; Compl. ¶ 53.  Gumley-Haft argues that Plaintiffs' TVPRA claims accrued at the latest when Ray moved Santos and Felicia Rosario to North Carolina in the summer of 2013 (and thus that the claims became time barred at the latest in September 2023).  Dkt. No. 37-1 at 14; Compl. ¶ 83.

Plaintiffs argue that the TVPRA claims against SLC and Gumley-Haft are nonetheless timely because (1) the ASA revives any potentially time-barred claims, Dkt. No. 49 at 9; Dkt. No. 38 at 11; (2) TVPRA claims "do not accrue until the victims have escaped from his or her traffickers and are free to seek legal redress," Dkt. No. 38 at 11, Dkt. No. 49 at 9; and (3) the TVPRA claim should be equitably tolled, Dkt. No. 38 at 11–13, Dkt. No. 49 at 10–12.  Plaintiffs' arguments are unavailing.

First, Plaintiffs' argument that the TVPRA claim is revived under the ASA is without merit. The ASA—as a state statute—cannot revive claims that are time-barred under a federal statute. "If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter."  *Holmberg v. Ambrecht*, 327 U.S. 392, 395 (1946); *see Herget v. Cent. Nat. Bank & Tr. Co. of Peoria*, 324 U.S. 4, 9 (1945) ("Inasmuch as the federal Bankruptcy Act has created the liability and has also fixed the limitation of time for commencing actions to enforce it, we have no occasion to consider the trustee's arguments concerning the applicability and construction of the Illinois statutes of limitation.").  "The Congressional statute of limitations is definitive."  *Holmberg*, 327 U.S. at 395; *accord Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir.

2016); *Ruhl v. Ohio Health Dep't*, 725 F. App'x 324, 335 (6th Cir. 2018); *Beck v Caterpillar, Inc.*, 50 F.3d 405, 407 (7th Cir. 1995); *Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles Cty, Inc.*, 977 F.2d 1224, 1227 (8th Cir. 1991); *Edwards v. Solomon and Solomon, P.C.*, 829 F. App'x 425, 427 (11th Cir. 2020). To accept Plaintiffs' argument "would produce nonuniform periods of limitation in the several States" and "would defeat the aim of a federal limitation provision designed to produce national uniformity." *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 433 (1965); *see Goel*, 820 F.3d at 558. Furthermore, as discussed *supra*, Plaintiffs do not identify any sexual offence under Article 130 of the New York Penal Law that would warrant application of the ASA.

Second, Plaintiffs' argument that the statute of limitations for a TVPRA does not begin to run until the victim escapes from the grasp of their traffickers, Dkt. No. 38 at 11; Dkt. No. 49 at 9, is similarly without merit. Plaintiffs' approach would have extraordinary reach. A hotel that profited at one early time from a TVPRA violation occurring within its walls would continue to be subject to suit until ten years after the victim ceased being trafficked through other unrelated locales—even if the hotel long ago ceased to provide any support to the trafficking or ceased to receive any benefit. Neither of the two cases cited by Plaintiffs for their broad proposition supports the claim. *See* Dkt. No. 38 at 11 (citing *Lama*, 192 F Supp. at 321; *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014)); Dkt. No. 49 at 9 (same). In *Lama*, the court found that the plaintiff's TVPRA claims "accrued when she left the [defendants'] home in 2008." 192 F Supp. at 322. This outcome is more convincingly explained by the continuing tort principle that the plaintiff's claims accrued on the date of the last injury. *See Mix*, 345 F.3d at 88; *Schneider*, 2024 WL 1308690, at *5. Plaintiffs do not explain why the Court should conclude that the victim's escape from the primary trafficker controls accrual of claims against defendants who did not continue to traffic the plaintiff

or benefit from the plaintiff's continued trafficking.  In *Cruz*, the Fourth Circuit held that the TVPRA's statute of limitations was equitably tolled because the plaintiff's "virtual imprisonment prevented her from seeking legal redress until at least the date of her escape."  773 F.3d at 146. *Cruz* too, therefore does not speak to the *accrual* date for TVPRA claims, as opposed to a subsequent date to which otherwise untimely claims may be tolled.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 80–84 (2d Cir. 2002) (discussing the difference between accrual and tolling). Absent any legislative or precedential basis for Plaintiffs' urged accrual method, the Court rejects it.

Finally, Plaintiffs argue that their claims should be equitably tolled during the period of time when they allegedly were trafficked by Ray.  The burden is on Plaintiffs to "plausibly alleg[e] that they fall within an exception to the applicable statute of limitations."  *Twersky*, 993 F. Supp. 2d at 436 (citing cases); *see Roeder*, 523 F. Supp. 3d at 611.

To invoke equitable tolling of the statute of limitations for a federal claim, a plaintiff must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)); *Watson v. United States*, 865 F3d 123, 132 (2d Cir. 2017); *Roeder*, 523 F. Supp. 3d at 617.

The Second Circuit has cautioned that equitable tolling "often raises fact-specific issues premature for resolution on a Rule 12(b)(6) motion, before a plaintiff can develop the factual record."  *Clark v. Hanley*, 89 F.4th 78, 94 (2d Cir. 2023).  Accordingly, to withstand a motion to dismiss based on a statute-of-limitations defense, a plaintiff need only plead facts that plausibly suggest equitable tolling should apply.  *See Franck v. N.Y. Health Care, Inc.*, 2022 WL 4363855, at *10–12 (S.D.N.Y. Sept. 21, 2022), *report and recommendation adopted*, 2023 WL 2474559

(S.D.N.Y. Mar. 11, 2023). Nonetheless, where a plaintiff provides no factual allegations that reflect that the plaintiff pursued their rights diligently and was frustrated by extraordinary circumstances, the court may reject a claim of equitable tolling made in a memorandum of law in opposition to a motion to dismiss. *See id.* at \*11 (citing *Contrera v. Langer*, 278 F. Supp. 3d 702, 723 (S.D.N.Y. 2017)); *Lomako v. N.Y. Inst. of Tech.*, 440 F. App'x 1, 3 (2d Cir. 2011) (summary order) (rejecting equitable tolling argument on appeal of motion to dismiss because the complaint "lacked any factual allegations" other than "vague and conclusory" assertions that did not suggest a plausible basis for equitable tolling).

Plaintiffs identify the total control Ray asserted over Plaintiffs as the extraordinary circumstance giving rise to tolling: "Ray tortured, manipulated, and brainwashed the plaintiffs so horrifically that they were unable to escape let alone seek help or pursue redress." Dkt. No. 38 at 13; Dkt. No. 39 at 11–12. They argue that "[w]hile under the control of Ray, the plaintiffs had no access to legal advice, no significant freedom of movement, and they were primarily contained wherever Ray was staying, isolated from others, socially and otherwise." Dkt. No. 38 at 13; Dkt. No. 39 at 11–12.

However, even if Plaintiffs are correct that their claims may be tolled for the duration of their ordeal with Ray, Santos Rosario and Levin's TVPRA claims would still be time-barred. There are no allegations that, at any point after the summer of 2013, Ray forced Santos Rosario to engage in labor or that Santos Rosario was otherwise under Ray's control. Compl. ¶ 84. For Levin, the time would begin to run before the summer of 2013; he is not among the Plaintiffs who were moved by Ray to North Carolina that summer. *Id.* ¶ 83. Because the Complaint was filed in November 2023—more than ten years after the summer of 2013—equitably tolling Santos Rosario and Levin's TVPRA claims through the end of their captivity still would not make their claims

timely.  On the other hand, Felicia Rosario remained under Ray's control, performing unpaid manual labor at the Piscataway property until Ray's arrest in 2020.  *Id.* ¶ 93.  The question then is whether Felicia Rosario's TVPRA claim against Gumley-Haft may be equitably tolled on account of Ray's conduct.

Answering that question requires a brief review of the distinction between equitable tolling and equitable estoppel.  The Second Circuit has used the term "equitable tolling" to refer to multiple doctrines including both accrual and tolling doctrines.  *See Pearl*, 296 F.3d at 81–82 (discussing the many terms surrounding equitable tolling and estoppel and noting that "the reported decisions of the federal and state courts do not always mean the same thing by their use of these phrases, and phrases to which some judges ascribe different meanings are used interchangeably by other judges"); *Koral v. Saunders*, 36 F.4th 400, 409 (2d Cir. 2022) ("New York courts and the courts of this Circuit variously use the terms 'fraudulent concealment,' 'equitable tolling,' and 'equitable estoppel,' not always with clear delineation.").

"The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).  A defendant may be equitably estopped from asserting a statute of limitations defense where its conduct caused plaintiff to delay in bringing suit. *See Ellul*, 774 F.3d at 802 ("Equitable estoppel applies in cases where, for example, the defendant lulls the plaintiff into not filing suit with assurances that she will settle the case.").

Equitable tolling is a doctrine that "allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996).  Equitable tolling is distinct from equitable estoppel in that it does

not require that the defendant against whom it is asserted have engaged in any form of bad act to delay suit. *See Heins v. Potter*, 271 F. Supp. 2d 545, 554 (S.D.N.Y. 2003); *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir. 1999) (equitable tolling "has been allowed even where the unfairness that would otherwise result was not the fault of the defendant" (citing *Burnett*, 380 U.S. 424)).[15] Plaintiffs therefore need not plead that Gumley-Haft itself engaged in conduct that prevented suit from being filed at an earlier date.

Even so, equitable tolling does not revive Felicia Rosario's claims because the Complaint does not sufficiently plead that extraordinary circumstances stood in her way and prevented timely filing. *See Menominee Indian Tribe*, 577 U.S. at 255. "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). The

---

[15] "There is some debate within the Second Circuit as to whether misleading conduct must have been at the hands of the defendant or whether misconduct by a third-party could make equitable tolling appropriate." *Hannah v. Wal-Mart Stores, Inc.*, 969 F. Supp. 2d 229, 233 (D. Conn. 2013). Much of this confusion may be traced to a frequently-cited Second Circuit case that tends to blur the doctrines of equitable tolling, equitable estoppel, and fraudulent concealment. *See Cerbone v. Int'l Ladies' Garment Workers Union*, 768 F.2d 45, 49–50 (2d Cir. 1985) ("Unlike equitable tolling, which is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit."). However, this blurred approach contradicts controlling Supreme Court precedent. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990) (Posner, J.) (discussing *Cerbone* and noting that "[p]lainly, . . . this proposition is incorrect. *Holmberg* makes clear that equitable tolling does not require any conduct by the defendant." (citing *Holmberg*, 327 U.S. 392 ("[T]he bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." (citation omitted)))); *see also Majid v. Fielitz*, 700 F. Supp. 704, 707 (S.D.N.Y. 1988) ("[D]efendant's steps are not always necessary to invoke the doctrine [of equitable tolling]."), *aff'd*, 891 F.2d 277 (2d Cir. 1989). Several Second Circuit cases decided since *Cerbone* have found equitable tolling may apply even in the absence of allegations that the defendants' misconduct caused the dilatory filing. *See, e.g., Haekal*, 198 F.3d at 43; *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002); *Rios v. Mazzuca*, 78 F. App'x 742, 744 (2d Cir. 2003) (summary order); *Simmons v. Moodt*, 36 F. App'x 676, 678 (2d Cir. 2002) (summary order).

Complaint alleges that Felicia Rosario was "being controlled, manipulated and brainwashed by Lawrence Ray" while at the Manhattan and New Jersey residences. *Id.* ¶¶ 147, 194.[16]

The Second Circuit has recognized on numerous occasions that psychiatric conditions "can manifest extraordinary circumstances, depending on the facts presented." *Harper*, 648 F.3d at 137 (collecting cases); *see Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010) (collecting cases). Brainwashing and extreme control or manipulation may constitute analogous forms of reduced capacity for rational decision-making. *See United States v. Macklin*, 671 F.2d 60, 64 n.5 (2d Cir. 1982) (recognizing that where a kidnapped person is subjected to "brainwashing or some other mind-control technique," courts may find such person unable to consent to a continuance of the kidnapping).

However, because the "burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff, . . . [a] conclusory and vague claim, without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights, is manifestly insufficient to justify any further inquiry into tolling." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000); *accord Bolarinwa*, 593 F.3d at 232. Plaintiffs have not

---

[16] Plaintiffs' memoranda state that in addition to these mental constraints, Ray imposed extraordinary physical barriers to the legal process: "While under the control of Ray, the plaintiffs had no access to legal advice, no significant freedom of movement, and they were primarily contained wherever Ray was staying, isolated from others, socially and otherwise. They were not able to freely communicate with family and not able to leave if they wanted to." Dkt. No. 38 at 13; Dkt. No. 49 at 11–12. These claims do not appear in the Complaint and lack any supporting factual allegations that reasonably permit an inference Ray physically prevented Plaintiffs from accessing legal processes. *See Sikhs for Just. v. Gandhi*, 2014 WL 2573487, at *5 (E.D.N.Y. June 9, 2014), *aff'd sub nom. Sikhs for Just. Inc. v. Gandhi*, 614 F. App'x 29 (2d Cir. 2015). These claims are also at odds with the allegation that Felicia Rosario "often left [t]he Waterford [B]uilding." Compl. ¶ 78. In addition, lack of access to counsel does not constitute extraordinary circumstances. *See Stevenson v. City of N.Y. Dep't of Correction*, 2011 WL 13175927, at *4 (E.D.N.Y. July 11, 2011) (collecting cases), *aff'd sub nom. Stevenson v. N.Y.C Dep't of Correction*, 489 F. App'x 517 (2d Cir. 2012).

carried that burden as the Complaint fails to allege any specifics of Felicia Rosario's mental state. Nor does the Complaint allege a "causal connection between her mental state and the lateness of her complaint." *Guinyard v. Apfel*, 2000 WL 297165, at *4 (S.D.N.Y. Mar. 22, 2000). There are no allegations concerning what steps Ray took to control, manipulate, or brainwash Felicia Rosario, how she responded to such techniques, or how such psychological impact prevented her from filing suit at an earlier date.[17] Because her "assertions fail to describe her impairment with particularity and also fail to demonstrate a causal connection between how she felt and her ability to pursue her rights," equitable tolling is inadequately invoked. *Dos Santos v. Assurant, Inc.*, 2022 WL 1537188, at *9 (S.D.N.Y. May 13, 2022), *report and recommendation adopted*, 625 F. Supp. 3d 121 (S.D.N.Y. 2022).

Plaintiffs' TVPRA claims are thus time-barred and are not revived by the ASA or made timely by the application of equitable tolling.

## II.    State-Law Claims

Even if Plaintiffs' claims were timely, Plaintiffs' state-law claims against SLC and Gumley-Haft fail to state a claim.

Santos Rosario and Levin assert three state-law causes of action against SLC: (1) negligence and negligent failure to maintain safe programs and activities, (Count I); (2) negligent supervision and negligent security, (Count II); and (3) negligent infliction of emotional distress, (Count IV). All three Plaintiffs assert state-law causes of action against Gumley-Haft for negligence (Count IX) and negligent infliction of emotional distress (Count XI). All of Plaintiffs' state-law claims sound in negligence.

---

[17] The Complaint similarly contains none of these allegations with respect to Santos Rosario and Levin and equitable tolling is thus unavailable to them on this additional ground.

"Under New York law, a tort plaintiff seeking to prove a defendant's negligence must show: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023) (quoting *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021)); *see also McCollum v. Baldwin*, 688 F. Supp. 3d 117, 131 (S.D.N.Y. 2023) ("Under New York law, negligence requires a breach of a duty owed to the plaintiff, proximate cause between the conduct and the injury, damages, and, in the case of negligent infliction of emotional distress, severe emotional distress. (citation omitted)); *Santana v. Leith*, 985 N.Y.S.2d 147, 149 (2d Dep't 2014) (claim for negligent infliction of emotional distress must fail where complaint fails to state a claim for common law negligence).

### A.    SLC

The state-law claims against SLC falter at the first element:  Plaintiffs fail to plead that SLC owed them a duty.

The doctrine of in loco parentis states that "[a] teacher owes it to his or her charges to exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances."  *Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y. 1994) (punctuation omitted) (citing *Hoose v. Drumm*, 22 N.E.2d 233, 234 (N.Y. 1939)).  "The duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians."  *Id.*  However, "New York has affirmatively rejected the doctrine of in loco parentis at the college level."  *Luina v. Katharine Gibbs Sch. N.Y., Inc.*, 830 N.Y.S.2d 263, 264 (2d Dep't 2007) (citing *Eiseman v. State of New York*, 511 N.E.2d 1128, 1128 (N.Y. 1987)).  That rejection "derives from the notion that adult students are capable of caring for themselves and making independent decisions."  *Rydzynski v. N. Shore Univ. Hosp.*, 692 N.Y.S.2d 694, 695 (2d Dep't 1999); *see Ellis v. Mildred Elley Sch. Inc.*, 667 N.Y.S.2d 86, 87 (3d Dep't

1997) ("Implicit in this rejection is recognition of the many factors which distinguish the relationship between a college and its students from that of lower-level learning institutions and their students. One such factor is the age and maturity of the students and the concomitant need for closer supervision of younger children.").

New York courts have therefore held that a college does not owe enrolled students a generalized duty of care to protect them from harm caused by others in the absence of allegations that it encouraged the students to participate in the activity and controlled the activity. *See Pasquaretto v. Long Island Univ.*, 964 N.Y.S.2d 599, 601 (2d Dep't 2013) ("A duty, however, may be imposed upon a college where it has encouraged its students to participate in an activity and taken affirmative steps to supervise and control the activity.").

Although Plaintiffs identify "dorm life" as an activity encouraged and controlled SLC, Compl. ¶¶ 106–106; Dkt. No. 38 at 14–15, there is no general duty "to supervise . . . students' conduct in their dormitory rooms." *Talbot v. N.Y. Inst. of Tech.*, 639 N.Y.S.2d 135, 136 (2d Dep't 1996) (citing *Eiseman*, 511 N.E.2d at 1128); *see also Lloyd v. Alpha Phi Alpha Fraternity*, 1999 WL 47153, at *2 (N.D.N.Y. Jan. 26, 1999) (no duty to supervise students' actions in fraternity house, which was owned by Cornell University and leased to the fraternity). Given the proliferation of on-campus housing, imposing such a duty would essentially work to apply the in loco parentis doctrine that New York courts have expressly repudiated in this context. Instead, for the "school-controlled activity" exception to apply, a plaintiff must allege that the college's "involvement in the [activity] was of a degree that gave rise to a duty." *Pasquaretto*, 964 N.Y.S.2d 601; *e.g.*, *Hores v. Sargent*, 646 N.Y.S.2d 165, 166 (2d Dep't 1996) (college had duty to adequately supervise bike trip and take reasonable precautions for the safety of the participants where college personnel "among other things, examined and selected the subject bike route, prepared the bike

map, operated three vans to assist bicyclists during the trip, and instructed the participants on safety issues"). Plaintiffs have not pleaded such involvement on the part of SLC.

Alternatively, "under appropriate circumstances, a college or university may be held liable, under a theory of premises liability, for injuries sustained by a student while on campus." *Ayeni v. Cnty. of Nassau*, 794 N.Y.S.2d 412, 413 (2d Dep't 2005). Such a theory of premises liability provides that "[a]s property owners/occupiers, the defendant[] had a duty to exercise reasonable care to protect the plaintiff from reasonably foreseeable criminal or dangerous acts committed by third persons on campus." *Id.*; *accord Luina*, 830 N.Y.S.2d at 265; *Ellis*, 667 N.Y.S.2d at 87; *Adams v. State*, 620 N.Y.S.2d 80, 82 (2d Dep't 1994). *See also* Dkt. No. 38 at 14.

Here, Plaintiffs do not state such a duty because they do not allege that it was reasonably foreseeable that Ray would commit criminal or dangerous acts. At most, Plaintiffs plead that (1) Ray was "a convicted criminal, who served time behind bars," Compl. ¶¶ 22–23, and (2) SLC should have been aware that Ray was on campus, *id.* ¶¶ 27, 29–43, 50. Neither justifies imposition of a duty.

At the outset, it may not be presumed that, because Ray had a prior conviction, he presented a risk to others and therefore should have been excluded from campus. In *Eiseman*, the New York Court of Appeals held that the State University College at Buffalo was not liable for violent acts perpetrated against students and a nonstudent by a student ("Campbell") with an extensive criminal and carceral record. 511 N.E.2d 1128. The *Eiseman* Court found that the perpetrator's criminal and dangerous acts were unforeseeable and that the fact of his prior convictions did not impose a heightened duty of inquiry on the college. *Id.* at 1128. Indeed, the *Eiseman* Court noted that New York's strong public policy proscribing discrimination against individuals with prior criminal to

promote rehabilitation and reintegration absolutely forbade imposition of a special duty on that ground:

> [F]undamentally, the underlying premise that, once released, Campbell by reason of his past presumptively posed a continuing, foreseeable risk of harm to the community is at odds with the laws and public policy regarding the release of prisoners. Consistent with conditions of parole, an individual returned to freedom can frequent places of public accommodation, secure employment, and if qualified become a student. On any other theory, former inmates cannot be returned to society without imposing on those who open doors to them the risk of absolute liability for their acts.

*Id.*; *see also Robinson v. MSG Entertainment Group, LLC*, 2024 WL 3938361, at *5–7 (S.D.N.Y. Aug. 26, 2024) (reviewing protections for individuals with prior criminal convictions in New York). The mere fact of Ray's prior conviction, prison sentence, and recent release therefore do not work to impose a duty on SLC to exclude him from campus.

Absent an adverse inference from his prior criminal history—of which Plaintiffs do not plead SLC was even aware—SLC is alleged simply to have been aware that Ray was residing on campus. Compl. ¶¶ 27, 29–43, 50. The criminal act of a third person may be reasonably foreseeable "if the third person acts in such a manner that an ordinarily prudent person would believe he poses a risk of harm." *Maysonet v. KFC, Nat. Mgmt. Co.*, 906 F.2d 929, 931 (2d Cir. 1990). Here, Plaintiffs do not plead that the fact of Ray's presence on campus should have alerted SLC that he presented a foreseeable danger. Ray was the father of a student at SLC. Compl. ¶ 22. Plaintiffs do not plead that his conduct violated any law or school policy or was otherwise alarming. The behaviors SLC is alleged to have been aware of are innocuous: searching for a cat, *id.* ¶ 38, cooking in a dorm room, *id.* ¶¶ 39–41, and driving to the grocery store, *id.* ¶ 34.[18] None

---

[18] Plaintiffs also allege that Ray demonstrated worrisome behavior at a meeting between Ray and Dean Green regarding a nonparty SLC student's mental health. *Id.* ¶¶ 47–49. However, that meeting occurred in 2012 after Ray moved to the Waterford Building and thus no longer presented a danger on SLC's premises. *Id.* ¶¶ 47, 53. Furthermore, the Complaint does not allege that Felicia Rosario was ever a student or tenant of SLC such that SLC owed her a duty at any time.

of these activities would have made it foreseeable to SLC that Ray would commit criminal or dangerous acts in the future. *See Fontaine v. Ryan*, 849 F. Supp. 190, 203 (S.D.N.Y. 1993) (defendant "cannot have been negligent for failing to take additional security precautions in the absence of some indication that criminal activity rendered such measures necessary"). Plaintiffs additionally allege that while Ray was residing in the dormitory, "several students, community members and parents contacted [SLC] administrators and authorities to address concerns related to . . . students' health and well-being as a result of Ray's abusive behavior." Compl. ¶ 50. However, Plaintiffs do not state what the concerns were, how Ray's behavior while on campus was abusive, or how the students, community members and parents' contact with SLC might have made Ray's later conduct more foreseeable. "Without notice of prior criminal activity, the owner's duty reasonably to protect those using the premises from such activity never arises." *Williams v. Citibank, N.A.*, 677 N.Y.S.2d 318, 320 (1st Dep't 1998); *see Beato v. Cosmopolitan Assocs., LLC*, 893 N.Y.S.2d 578, 580 (2d Dep't 2010) (same).

Plaintiffs' state-law claims against SLC therefore fail because Plaintiffs do not allege that SLC owed them a relevant duty.

## B.    Gumley-Haft

The state-law claims against Gumley-Haft similarly fail because Plaintiffs do not plead that Gumley-Haft owed them a duty.

Plaintiffs assert that Gumley-Haft owed a duty pursuant to a theory of premises liability. Dkt. No. 49 at 12–14 ("Landowners . . . have a duty to protect tenants, patrons and invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises."); *see Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451, 451 (N.Y. 1980) (As a "natural corollary to the landowner's common-law duty to make the public areas of his property reasonably safe for those who might enter," building's owner and manager must "take reasonable steps to minimize the

foreseeable danger to those unwary souls who might venture onto the premises.") However, Plaintiffs do not allege—as required—that Ray's criminal conduct either while residing in the condominium unit or thereafter was foreseeable to Gumley-Haft. *See id.* (citing Restatement (Second) of Torts § 344); *Maheshwari v. City of New York*, 810 N.E.2d 894, 897 (N.Y. 2004) ("In cases arising out of injuries sustained on another's property, the scope of the possessor's duty is defined by past experience and the likelihood of conduct on the part of third persons . . . which is likely to endanger the safety of the visitor" (citation omitted)).

The Complaint alleges that Gumley-Haft employees "witnessed groups of [SLC] students entering and exiting [the] condominium unit . . . at all hours of the day and night," Compl. ¶¶ 74–75, 178, received complaints from other residents and the condominium board regarding "the noises that were emanating from the condominium unit as a result of Plaintiff[s'] abuse on the premises," *id.* ¶¶ 81, 182–183, and witnessed Felicia Rosario leaving the building "at all hours, often not wearing clothing appropriate for the weather," *id.* ¶¶ 79, 180. These allegations are insufficient to plead that Gumley-Haft should have foreseen Ray's dangerous criminal acts. It is not unusual for college students to leave their housing at night, nor is it necessarily suspect for a young person to wear clothes inappropriate for the weather. Such conduct does not denote that the student is being abused. Nor does it impose a duty on the landlord or building manager to investigate whether the student is being trafficked or require the building owner or manager to subject individuals dressing and moving freely to otherwise unwarranted (and unwanted) inquiry. Thus, Plaintiffs do not allege why student ingress and egress should have raised a red flag. And the Complaint does not allege what the residents and condominium board communicated to Gumley-Haft such that their complaints were anything other than a standard noise complaint which

would not signal impending violence.  *See Goris v. N.Y.C.H.A.*, 211 N.Y.S.3d 324, 325 (1st Dep't 2024).

Plaintiffs' state-law claims against Gumley-Haft therefore fail because Plaintiffs do not allege that Gumley-Haft owed them a relevant duty.

## III.    TVPRA Claims

Moving Defendants argue that even if Plaintiffs' TVPRA claims were timely, the Complaint fails to state a claim for relief.  Dkt. No. 17-1 at 22–25; Dkt. No. 37-1 at 21–25.

Section 1595 of the TVPRA establishes a civil remedy for victims of crimes under Chapter 77.  *See Cho v. Chu*, 2022 WL 2532446, at *1 n.3 (S.D.N.Y. May 12, 2022), *report and recommendation adopted*, 2022 WL 4463823 (S.D.N.Y. Sept. 26, 2022).  It "creates two kinds of civil liability: perpetrator liability and participant liability."  *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 565 (7th Cir. 2023).  The statute provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

To establish participant liability—also called beneficiary liability—the victim of a TVPRA violation "must allege and ultimately prove that: (1) a venture has engaged in an act in violation of Chapter 77, (2) the defendant knew or should have known that the venture had violated Chapter 77, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation."  *G.G.*, 76 F.4th at 565; *see also S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 152 (E.D.N.Y. 2020) ("[L]iability under TVPRA requires that '(1) the person or entity must 'knowingly benefit, financially or by receiving anything of value,' (2) from

participating in a venture, (3) that the 'person knew or should have known has engaged in an act in violation of this chapter.'" (quoting *A.C. v. Red Roof Inns, Inc.*, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020))).

The crimes that violate Chapter 77 of Title 28 include peonage, 18 U.S.C. § 1581, slavery, 18 U.S.C. §§ 1582–1588, forced labor, 18 U.S.C. § 1589, and sex trafficking by force, fraud, or coercion, 18 U.S.C. § 1591.

### A.    SLC

SLC argues that Plaintiffs have failed to allege that it knowingly benefitted from a TVPRA violation, that SLC did not participate in a venture under the TVPRA, and that SLC did not have knowledge of sex or labor trafficking.  Dkt. No. 17-1 at 20–25.

It is axiomatic that to state a claim for beneficiary liability under the TVPRA, the defendant must have received some benefit.  *See* 18 U.S.C. § 1595(a) (liability may attach to "whoever knowingly benefits, financially or by receiving anything of value"); *S.J.*, 473 F. Supp. 3d at 152; *Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.*, 2021 WL 2457107, at *7 (S.D.N.Y. June 16, 2021).  Plaintiffs allege that "the school benefitted from payment of tuition, including housing, for what it knew and should have known was a sex and labor trafficking venture."  Compl. ¶ 136.  But the Complaint does not allege that the tuition payments and housing fees SLC charged bore any relationship to the alleged sex and labor trafficking venture.  There is no allegation that Ray paid any tuition or housing fees to SLC, or that SLC would not have received those payments in the absence of the alleged sex or labor trafficking.  Plaintiffs do not allege that SLC received any other financial benefit or thing of value in connection with any TVPRA violation.  Because the Complaint does not give rise to the plausible inference that SLC benefitted financially or by receiving anything of value the TVPRA claim against SLC must be dismissed.  *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175–76 (9th Cir. 2022) (affirming grant of summary

judgment where defendant did not benefit from forced labor during relevant time), *cert. denied sub nom. Ratha v. Phatthana Seafood Co.*, 143 S. Ct. 491 (2022)

### B.    Gumley-Haft

Gumley-Haft argues that Plaintiffs have failed to allege that it knowingly benefitted from a TVPRA violation, that Gumley-Haft did not participate in a venture under the TVPRA, and that Gumley-Haft did not have knowledge of sex or labor trafficking.    Dkt. No. 37-1 at 21–25. Although the Complaint alleges Gumley-Haft is liable under a perpetrator theory of liability, *see* Compl. ¶ 185, both Gumley-Haft's and Plaintiffs' memoranda of law exclusively discuss participant liability, Dkt. No. 37-1 at 21–25; Dkt. No. 49 at 21–25; Dkt. No. 53 at 17–22.    The Court addresses both theories.    *See* Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); *Lindner v. Int'l Bus. Machs. Corp.*, 2008 WL 2461934, at *11 (S.D.N.Y. June 18, 2008) (Sullivan, J).

Plaintiffs do not plead that Gumley-Haft received any benefit from the alleged sex or labor trafficking.    The Complaint states that "Plaintiffs were forced to work to renovate the apartment and perform sex acts, for the financial benefit of [Gumley-Haft]."    Compl. ¶ 186.    However, it is not clear from the Complaint how Plaintiffs' labor or sex acts could have benefitted Gumley-Haft. Plaintiffs allege that the condominium unit was owned by Chen.    *Id.* ¶ 54.    Any benefit the renovations imparted therefore presumably would have gone to Chen, not Gumley-Haft.    In their memorandum of law in opposition to the motion to dismiss, Plaintiffs claim that "Ray's direct excessive tipping to Gumley-Haft employees and agents benefited the company through payment to employees and employee retention."    Dkt. No. 49 at 22 (citing Compl. ¶ 67).    But this tipping allegation does not appear in the Complaint.    The paragraph to which Plaintiffs cite states only that "[o]n numerous occasions, the Plaintiffs witnessed Lawrence Ray hand wads of cash to the

Defendant, Lee Chen." Compl. ¶ 67 (capitalization normalized). Plaintiffs do not allege that Chen was an employee or agent of Gumley-Haft or that any payment to Chen otherwise benefitted Gumley-Haft. Absent any alleged benefit to Gumley-Haft, Plaintiffs' beneficiary claim against Gumley-Haft must be dismissed. *See S.J.*, 473 F. Supp. 3d at 152; *Starr Indem.*, 2021 WL 2457107, at *7.

Plaintiffs additionally assert a claim for perpetrator liability that alleges Gumley-Haft "through its agents, servants and/or employees harbored and/or assisted Lawrence Ray in harboring [Plaintiffs] in the condominium unit located at the Waterford Building at 300 East 93rd Street, Apt. 15E in Manhattan." Compl. ¶¶ 185–186. Section 1590(a) of the TVPRA states: "Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. 1590(a). The prohibition against "harboring" in Section 1590 refers to "harboring" for the known purpose of obtaining forced labor. *See Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030, at *9 (E.D.N.Y. Apr. 30, 2021); *United States v. Maka*, 237 F. App'x 225, 227 (9th Cir. 2007) (Section 1590 "requires knowledge that the laborer will be used by someone for such purposes."). As stated, *supra*, the Complaint does not plead that Gumley-Haft had knowledge of the alleged sex or labor trafficking occurring in the condominium unit. Absent the required element of knowledge, Plaintiffs' perpetrator claim against Gumley-Haft must be dismissed.

## IV.    Leave To Amend

Plaintiffs state that "if the [C]ourt sees fit to dismiss any or all of the plaintiffs' claims, the [P]laintiffs request that they be dismissed with leave to amend." Dkt. No. 38 at 2, 23; Dkt. 49 at 1, 25. Moving Defendants oppose that request, arguing that Plaintiffs "provide the Court with neither a proposed amendment, nor declarations or other evidentiary material setting forth facts

they would propose to add to their deficient pleading," that the request is procedurally deficient because Plaintiffs did not make a separate motion, and that amendment would be futile. Dkt. No. 46 at 16–17; Dkt. No. 53 at 22–23.

Federal Rule of Civil Procedure 15(a) provides that "a party may amend the party's pleading . . . by leave of the court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006). No separate motion, proposed amendment, nor evidentiary showing is required for a Court to grant leave to amend upon dismissal of a complaint. *See Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 166 (2d Cir. 2013) ("[W]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." (citation omitted)).

Although the Complaint as currently pled fails to state claims for relief, the Court cannot determine that Plaintiffs are unable to allege any facts that would entitle them to pursue their claims and that any amendment would therefore be futile. *See id.*; *Cagle v. Weill Cornell Med.*, 680 F. Supp. 3d 428, 440 (S.D.N.Y. 2023). The Court therefore grants Plaintiffs leave to file an amended complaint.

**CONCLUSION**

Moving Defendants' motions to dismiss are GRANTED.    The Clerk of Court is respectfully directed to close Dkt. Nos. 17 and 37.

Plaintiffs must file any amended complaint within sixty days of the date of this Opinion and Order.


SO ORDERED.

Dated: September 3, 2024
      New York, New York

                                         LEWIS J. LIMAN
                              United States District Judge